S. LANE TUCKER
United States Attorney

ALANA B. WEBER
CARLY S. VOSACEK
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Email: alana.weber@usdoj.gov
Email: carly.vosacek@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>  vs.<br><br>JUNIOR GAFATASI TULALI,<br><br>        Defendant. | No. 4:23-cr-00003-SLG-KFR |

## SENTENCING MEMORANDUM

The United States recommends imposition of the following sentence:

**INCARCERATION** ...........................................................................................**LIFE**
**SUPERVISED RELEASE** ................................................**NOT RECOMMENDED**
**SPECIAL ASSESSMENT**..............................................................................**$100**
**RESTITUTION** ................................................... **AMOUNT TO BE DETERMINED**
**FINE**..........................................................................................**NOT RECOMMENDED**

//

//

**FACTS**

    a. **Case History**

Around October 13, 2020, the defendant, Junior Gafatasi Tulali, agreed to sell 500 Oxycodone M30 pills to A.B. in exchange for $5,000. On October 15, 2020, Tulali shipped a parcel to A.B. in Fairbanks, Alaska. Inside the parcel was at least 480 counterfeit 30 milligram Oxycodone Hydrochloride pills containing a mixture of fentanyl and acetaminophen. A.B. distributed those pills to other users and dealers throughout Fairbanks, resulting in multiple overdoses and one fatal overdose.

On October 26, 2020, A.B. fronted six of the pills supplied by Tulali to W.C.. Prior to the sale, W.C. exchanged separate but nearly simultaneous messages with A.B. and an individual named J.L. via Facebook Messenger setting up the purchase and sale of the pills:

- **A.B to W.C.** (19:54:23 UTC): What up playboy
- **W.C. to A.B.** (21:33:39 UTC): What's good fam
- **A.B to W.C.** (21:34:38 UTC): Just touched the soil out here with sum 30's and remembered u be in that lane ["30's" are drug slang for 30 milligram Oxycodone Hydrochloride pills]
- **W.C. to A.B.** (21:45:49 UTC): Yes sir
- **W.C. to A.B.** (21:46:04 UTC): What u asking fam
- **W.C. to A.B.** (21:46:35 UTC): I have buyers
- **A.B to W.C.** (21:46:38 UTC): 30
- **W.C. to A.B.** (21:46:49 UTC): We're [sic] u at now
- **A.B to W.C.** (21:46:56 UTC): For you you set a price for them
- **A.B to W.C.** (21:47:01 UTC): On the side

- **A.B to W.C.** (21:47:29 UTC): Can you meet me at my spot should we can talk in person that on the phone I'm right there on 17th and Turner my mom's needs the van so I got to take it back to her real quick

- **A.B to W.C.** (21:47:56 UTC): Bet right there by Anderson right

- **W.C. to A.B.** (21:48:08 UTC): Body Imma shoot a word to my one of my buyers and let them know[.] yes sir right by Anderson to little grey apartment complex right on the corner

- **W.C. to A.B.** (21:48:15 UTC): I'll be there in like 10 minutes

- **A.B to W.C.** (21:48:21 UTC): Bet me too

- **W.C. to A.B.** (21:48:24 UTC): *Thumbs Up* Emoji

- **W.C. to J.L.** (21:49:08 UTC): What's good brother I got some 30s they're 60 a piece

- **J.L. to W.C.** (21:49:25 UTC): I'll take 2

- **W.C. to J.L.** (21:52:24 UTC): Ok give me like 15 minutes cuz my phone is shut off cuz I'm using the Wi-Fi over at the library after run to my house text me right now where you want me to meet you at in 15 minutes and then I swear I'll meet you at meet me on the back side of the Pioneer Park you know where we used to meet at I'll be there in 15 minutes

- **J.L. to W.C.** (21:52:56 UTC): Cool

- **W.C. to A.B.** (21:53:14 UTC): I have a buyer for two of them 72 get to from you largest just start but I'm leaving Wi-Fi now so I'm on my way to the house be there in a few minutes

- **A.B. to W.C.** (21:53:57 UTC): *Thumbs Up* Emoji

- **W.C. to J.L.** (22:13:15 UTC): 4 minutes away

- **J.L. to W.C.** (22:13:43 UTC): Ok On my way!

- **J.L. to W.C.** (22:14:14 UTC): In a blue Subaru

Shortly after acquiring the pills from A.B., W.C. met J.L. near Pioneer Park and sold him two of the pills for a total of $120, per the above messages. Although W.C. believed the pills were 30 milligram Oxycodone Hydrochloride pills, in reality and unbeknownst to W.C. at the time of the sale, the pills were counterfeit and actually

contained an unknown amount of fentanyl.

Sometime between the evening of October 26, 2020 and October 28, 2020, J.L. used the pills he obtained from W.C.. On or about October 28, 2020, J.L.'s father discovered J.L. deceased in the bedroom of their shared home as a result of a drug overdose. Medical examination confirmed that the cause of J.L.'s death was the use of fentanyl, which was contained in the pills (which originated from Tulali) that W.C. distributed to J.L. the evening of October 26, 2020.

On October 26, 2020, W.C. also ingested one of the pills he obtained from A.B.. The pill caused an adverse reaction, which concerned W.C. that the pills may be counterfeit and contain fentanyl. Based on these concerns, W.C. contacted A.B. and asked if the pills were "the real thing," because there's "just some crazy shit going around." W.C., concerned about J.L.'s well-being, also sent J.L. a message and asked "[h]ow you doing." J.L. did not respond.

On November 6, 2020, A.B. sold a quantity of the pills that Tulali supplied to Clifford Andrews. Andrews sold one pill to A.L.. A.L. believed the pill was Percocet and overdosed after ingesting it. Medics revived A.L. with Naloxone and transported her to the hospital where she was treated for a fentanyl overdose.

That same day, after investigating two more non-fatal overdoses linked to pills sold by Ladarius Edwards and Christopher Kearney, law enforcement responded to 310 Tipperary Ct., the location of one of those drug sales. Law enforcement observed A.B. and Kearney departing the residence in a stolen Hummer H3. During a search of the

Hummer, law enforcement seized 59 small blue counterfeit oxycodone pills containing fentanyl in the pocket of A.B.'s jacket, along with $2,170 cash.

### b. Procedural History

On November 16, 2020, a criminal complaint was filed charging A.B., Kearney, and Edwards with distributing counterfeit fentanyl pills resulting in death or serious bodily injury. W.C. was later added to an indictment charging Kearney and Edwards. On January 21, 2021, the United States filed a felony information charging A.B. with distribution of fentanyl resulting in death. On January 19, 2023, the United States filed an indictment charging the defendant with one count of distribution of fentanyl resulting in death. Following a five-day trial, on April 19, 2024 a jury returned a guilty verdict as to Count 1 of the Indictment and the enhanced statutory penalty.

## SENTENCING GUIDELINES CALCULATION

### a. Statutory Sentence

The statutory sentence that may be imposed for distribution of controlled substances resulting in death after a prior conviction for a felony drug offense has become final, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), is mandatory life imprisonment; a fine of $2,000,000; and not less than six-years' supervised release up to life.

### b. Sentencing Guidelines Calculation

The United States agrees with the PSR's calculations finding the defendant's total offense level to be 43, with a Criminal History Category of II. This results in a Guidelines range of life imprisonment. *See* PSR ¶¶ 22, 28, 29.

## STATUTORY CRITERIA AND RECOMMENDED SENTENCE

### 1. Nature and circumstances of the offense

In October 2020, just one month after his 22nd birthday, J.L. was working two full-time jobs and dedicated to getting sober for his newborn son. Relapse is often part of recovery and at some point J.L. reverted to abusing prescription pills. However, J.L.'s battle with addiction to prescription pills is not what killed him-- the substance that caused his untimely death was fentanyl disguised in a pill indistinguishable from a legitimate pharmaceutical drug which he purchased from a trusted friend.

As the Court is aware, fentanyl is extremely dangerous. It is approximately 100 times more potent than morphine, and 50 times more potent than heroin as a painkiller.[1] District courts nationwide have recognized the peril of this dangerously potent and destructive narcotic. *See United States v. Kye*, No. 20-MR-88-A, 2020 WL 1815759, at *3-*5 (W.D.N.Y. Apr. 10, 2020) (noting that "the potency of fentanyl makes it extremely dangerous, as it can be deadly even to touch, and its use results in frequent overdoses resulting in respiratory depression and death."); *see also United States v. Taylor*, No. 5:19-CR-192-KKC-MAS, 2020 WL 1501997, at *3 (E.D. Ky. Mar. 26, 2020) (fentanyl is an "exceptionally dangerous drug. It is beyond dispute that distributing narcotics is a serious offense that poses dire health risks to the community—and the risks associated with fentanyl specifically are even greater."); *United States v. Simms*, No. 1:19-CR-423, 2019 WL 7049930, at *6 (N.D. Ohio Dec. 23, 2019) ("The distribution of fentanyl, one of the

---

[1] https://www.dea.gov/sites/default/files/2021-05/Counterfeit%20Pills%20fact%20SHEET-5-13-21-FINAL.pdf

*U.S. v. Gafatasi Tulali*
4:23-cr-00003-SLG-KFR

most deadly illegal drugs on the black market, poses an incredible threat to community members.").

The defendant deliberately recruited A.B. to distribute the counterfeit pills in Fairbanks where they could be sold at a high profit margin. Tulali bears responsibility for that decision, which in this case resulted in a death and multiple non-fatal overdoses. Accordingly, the requested sentence would reflect the seriousness of this offense and of the defendant's conduct, and is both appropriate and warranted.

## 2. History and characteristics of the defendant

The defendant has spent the majority of his adult life in prison. In 1995 he was federally charged and convicted for his role in a conspiracy to distribute cocaine base, for which he was sentenced to 292-months imprisonment, later reduced to 235-months based on new sentencing guidelines for crack cocaine offenses.

In that case, Tulali and codefendant Fannie Ordonez, who travelled under a fake name, flew together from Los Angeles, California, to Honolulu, Hawaii. Authorities stopped Ordonez at the airport and found 1,038 grams of cocaine base strapped to her body. Ordonez stated that Tulali offered to pay her $300 to transport drugs to Honolulu because he could make more profit in Hawaii than in Los Angeles.

Tulali served a sentence of 19.5 years in prison for his greed and reckless disregard for the life and safety of others. He committed the instant offense only two years after completing a term of supervised release on the previous sentence. The loss of liberty for more than two decades was insufficient to deter the defendant from engaging in drug

trafficking. Conversely, Tulali significantly escalated the danger of his criminal activities by transitioning from cocaine to fentanyl—again targeting a remote community, this time in Alaska, for increased profit.

At the time of the instant offense the defendant was not an addict in need of money to fuel his habit. He had been gainfully employed as a sales representative at the same company since his release from prison in 2012 through the time of his arrest in 2023.[2] He also did work for his apartment complex in exchange for rent.[3] He has a rare and strong support system and reported having a great relationship with his loving wife, teenage son, mother, and three siblings.[4] Tulali did not distribute fentanyl out of desperation. Instead, the reason J.L. was killed is because Tulali wanted an extra $5,000 to supplement his legitimate income. The defendant was acutely aware that his conduct could result in another lengthy sentence and chose to take that risk. This venal calculation resulted in J.L.'s child growing up without a father and his family bereft over the loss of their youngest son and brother. Only a sentence of life imprisonment is appropriate to address this factor.

**3. Adequate deterrence and protection of the public from further crimes**

The statutory mandatory minimum sentence is necessary to deter the defendant and protect the public. The defendant returned to the drug world after spending 19.5 years in prison for his first adult drug conviction. This time, a 22-year-old died as a result, along

---

[2] PSR at 17.

[3] *Id.* at 15.

[4] *Id.*

with multiple non-fatal overdoses. The defendant has had numerous opportunities to reform his behavior with access to every available federal program. Despite this, his conduct "demonstrates the truth of the axiom that past behavior is the best predictor of future behavior." *United States v. Crawford*, 372 F.3d 1048, 1071 (9th Cir. 2004) (Trott, J., concurring).

The requested sentence is also important for general deterrence. The defendant is the most culpable individual charged in this case, which resulted in an overdose death. Overdose deaths in Alaska involving fentanyl and fentanyl analogues have increased at an alarming rate in recent years. According to a study conducted by the Alaska Department of Health, in 2023 Alaska reported its highest ever drug overdose death rate with 342 fatal drug overdoses and 74% involving fentanyl.[5] In contrast to the decreasing number of drug overdose deaths nationally, Alaska's spike in overdose deaths between November 2022 and November 2023 was the highest year-to-year increase in the entire country.[6] A significant contributing factor to the exceptional rise in overdose deaths is drug trade organizations' "gravitat[ion] towards Alaska's lucrative drug market…looking to exploit Alaska's hub locations to access remote areas, high demand, and limited law enforcement in remote areas".[7] Although the prospect of life imprisonment may not effectively deter

---

[5] Alaska Department of Health. *2023 Annual Drug Report* (September 23, 2024) at 6,8. Attached hereto as Exhibit 1.

[6] *Id.* at 8.

[7] Alaska Department of Public Safety. *2023 Drug Overdose Mortality Update* (January 2024) at 2. Attached hereto as Exhibit 2.

Mr. Tulali, it is imperative for the Court to send a clear and severe message to any out-of-state drug traffickers who are considering exploiting Alaska's "lucrative drug market" for financial gain: If you choose to distribute dangerous controlled substances in Alaska, you will choose the consequences and be brought to justice.

**4. The need to provide restitution to any victims of the offense**

J.L.'s estate and his immediate family are entitled to restitution under the Victim Witness Protection Act. While the government has received some information from the victim's family relative to restitution, the government will not be in a position as of the date of sentencing to recommend a specific amount of restitution. As a result, the government requests that the Court set a restitution hearing 90 days from the date of sentencing.

**5. Recommended Sentence**

Based on the above-cited factors including nature and circumstances of the offense and to reflect the seriousness of the offense and considering the statutory mandatory minimum sentence in this case, the United States recommends a sentence of life imprisonment and restitution to the victims. The United States does not oppose the defendant's request for recommendation to the BOP that he be designated to the FCI at Terminal Island California.

**SENTENCING HEARING**

The United States expects approximately 5 victim witnesses to attend sentencing both in-person and telephonic, some of whom may wish to give a statement.

## CONCLUSION

The United States respectfully requests that the Court impose the statutory mandatory minimum life sentence, which is sufficient but not greater than necessary to reflect the seriousness of the crime and the immense harm the defendant caused to the victim, his family, and the community.

RESPECTFULLY SUBMITTED October 8, 2024 at Anchorage, Alaska.

S. LANE TUCKER
United States Attorney

/s ALANA B. WEBER
ALANA B. WEBER
Assistant United States Attorney
United States of America

### CERTIFICATE OF SERVICE

I hereby certify that on October 8, 2024 a true and correct copy of the foregoing was served electronically on all counsel of record.

/s ALANA B. WEBER

*U.S. v. Gafatasi Tulali*
4:23-cr-00003-SLG-KFR