1                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF ALASKA

2

3    UNITED STATES OF AMERICA,   )
                             )

4             Plaintiff,      )
                             )

5         vs.              )  CASE NO. 4:23-cr-00003-SLG
                             )

6    JUNIOR GUFATASI TULALI,   )
                             )

7             Defendant.      )
   _____ )

8

9             TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 3
10   **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
              Wednesday - April 17, 2024
               8:33 a.m. - 4:49 p.m.
11                   Fairbanks, Alaska

12

13   **FOR THE GOVERNMENT:**
     Office of the United States Attorney
14        BY:  ALANA WEBER and CARLY VOSACEK
     101 12th Avenue, Suite 310
15        Fairbanks, Alaska 99701
     (907) 456-0336
16

17   **FOR THE DEFENDANT:**
     Camiel & Cheney, P.S.
18        BY:  PETER CAMIEL
     2800 First Avenue, Suite 309
19        Seattle, Washington 98121
     (206) 817-0778
20

21

22                   **SONJA L. REEVES**
          **Registered Diplomate Reporter**
23              **Certified Realtime Reporter**
         **Federal Official Court Reporter**
24              222 West 7th Avenue, #4
           Anchorage, Alaska 99513
25        Transcript Produced from the Stenographic Record

1                          I N D E X

2

    WITNESSES CALLED BY THE GOVERNMENT:                    PAGE
3
    ANDRE BROWN
4        Direct Examination By Ms. Weber                    10
         Cross-Examination By Mr. Camiel                     74
5        Redirect Examination By Ms. Weber                  102
         Recross-Examination By Mr. Camiel                  107
6
    WINSTON CROCKETT, JR.
7        Direct Examination By Ms. Vosacek                  115
         Cross-Examination By Mr. Camiel                    159
8        Redirect Examination By Ms. Vosacek                188
         Recross-Examination By Mr. Camiel                  193
9
    JEFFREY LEE
10       Direct Examination By Ms. Weber                    195
         Cross-Examination By Mr. Camiel                    203
11       Redirect Examination By Ms. Weber                  211
         Recross-Examination By Mr. Camiel                  214
12
    CRISTIN ROLF
13       Direct Examination By Ms. Weber                    216
         Cross-Examination By Mr. Camiel                    235
14       Redirect Examination By Ms. Weber                  241

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Call to Order of the Court at 8:33 a.m.)

 2              (Jury absent)

 3              DEPUTY CLERK:  All rise.  Her Honor, the Court, the

 4  United States District Court for the District of Alaska is now

 5  in session, the Honorable Sharon L. Gleason presiding.

 6              Please be seated.

 7              Your Honor, we're on record in Case No.

 8  4:23-criminal-00003-SLG, USA versus Junior Tulali.

 9              If the parties could state their appearances for the

10  record.

11              MS. WEBER:  Good morning.  Alana Weber for the United

12  States.

13              MS. VOSACEK:  Carly Vosacek for the United States.

14              MR. CAMIEL:  Peter Camiel for Junior Tulali, who is in

15  custody, seated to my left.

16              THE COURT:  All right.  Very good.

17              Good morning, everyone.  I was just looking at the

18  government's filing from yesterday evening.

19              Mr. Camiel, have you had an opportunity to look at

20  that?

21              MR. CAMIEL:  I have.

22              THE COURT:  All right.  Is there a reason why all the

23  marshals are standing today, or just feeling -- it's fine.

24  They are.

25              U.S. MARSHAL:  We were just told the first witness was
```

1  going first, so we were prepared to go back and get him.

2          THE COURT:  Yeah.  Let me finish up with the parties.

3          And, yeah, I told the marshals that we should bring in

4  the first witness, I understand is an in-custody.  Is that

5  correct?

6          MS. WEBER:  Yes, Your Honor.

7          THE COURT:  And is it Mr. Brown or someone else?

8          MS. WEBER:  Mr. Brown.

9          THE COURT:  I guess we have to resolve those issues.

10 Why don't we wait until I conclude the issues with the parties,

11 and then we'll have you bring him up.  Thank you so much.

12         All right.  Very good.  So Mr. Camiel, have you had an

13 opportunity to look at this?

14         MR. CAMIEL:  Yes.

15         THE COURT:  And what's the defense position on this?

16         MR. CAMIEL:  Well, Your Honor, I -- I continue to

17 oppose bringing in evidence of other overdoses.  I -- I can

18 point out from looking at the government's --

19         THE COURT:  And maybe bring the microphone just a bit

20 closer, Mr. Camiel.  Thank you.

21         MR. CAMIEL:  So what the government proposes is

22 bringing in five additional witnesses and put on evidence of

23 other overdoses.  They were already going to be calling

24 Mr. Brown.  He can talk about getting the note from Mr. Kearney

25 without any reference to overdoses.  He can talk about --

1          THE COURT:  Well, I don't even know what the note

2     says.  So can you tell me your recollection?

3          MR. CAMIEL:  Mr. Kearney sent Mr. Brown a note while

4     they were in custody, basically saying, I don't know anything

5     and -- he doesn't talk about other overdoses.  It's, "I was

6     just trying to help."  He says, "I'm just trying to help Mama

7     out with her pills," which is the woman who -- Kweka Warner,

8     who -- who was the resident of the house.

9          So that can come in through Mr. Brown without any

10    reference to any overdoses.

11         Mr. Brown can testify that he sold pills to other

12    people, including Mr. Andrews, if they want.  Mr. Brown can

13    talk about his Facebook messages about selling pills to other

14    people.  What they don't need is to bring in other overdose

15    victims and 911 calls and medical records.  They can get in

16    what they need without reference to other overdoses showing

17    that Mr. Brown was distributing pills to other people, so there

18    were other pills out there in the community.

19         THE COURT:  All right.  So would you concur, there is

20    some degree of relevance to the proposed evidence by the

21    government under 401?

22         MR. CAMIEL:  Very marginal.

23         THE COURT:  All right.  So on what criteria under 403

24    are you seeking its exclusion?

25         MR. CAMIEL:  Unfair prejudice.  I think a waste of

time.  But primarily, substantially unfair prejudice on balance
with the marginal probative value.  They can already get in,
without reference to the other overdoses, that there was this
large batch of pills that were being distributed in the
community.  They've already shown the effect of the pills on
Jacob Lee.  They're going to have Winston Crockett testify.
The Court has already ruled he can testify about the effect of
the pill on him, as he claims that he had a bad reaction to the
pill.

THE COURT:  All right.  So just looking at the time
and trying to use it most effectively here, am I correct they
don't object to the proposed testimony of Mr. Brown that's set
out here in this offer of proof?

MR. CAMIEL:  No.

THE COURT:  Now, that was a poorly worded question,
because I don't know if it means, no, you don't object, or no,
you do, and I'm incorrect.

MR. CAMIEL:  I don't object to the testimony that's in
the government offer of proof as to Mr. Brown because it
doesn't reference any other overdoses.

THE COURT:  Let's do this, then, because we're getting
close to 8:45.  The government can present this testimony as to
Mr. Brown only, and then we'll take up the balance at lunch
with regard to the rest of this.

Ms. Weber, will that work for the morning?

1          MS. WEBER:  Yes, Your Honor.

2          THE COURT:  All right.  Mr. Camiel?

3          MR. CAMIEL:  Yes.

4          THE COURT:  All right.  Very good.  And I appreciate

5    you doing this last night rather than this morning, Ms. Weber.

6          Anything else we need to take up -- so I think we're

7    ready to have you all go get Mr. Brown.  Thank you.

8          Anything else we need to take up at this time?

9          MS. WEBER:  Yes, Your Honor.  Based on the Court's

10   order regarding cross-examination of the cooperating witnesses

11   on their prior convictions --

12         THE COURT:  Oh, right.  We need to address that, too.

13   Go ahead.

14         MS. WEBER:  -- you directed defense to give an offer

15   of proof regarding a factual basis for underlying facts of

16   other convictions that he may be seeking to cross on.

17         THE COURT:  All right.  So the question -- before

18   cross-examination, we need to resolve what convictions, if any,

19   Mr. Camiel is going to be seeking to cross-examine Mr. Brown

20   and the scope of cross-examination that will be allowed.  So

21   let's make sure we take a break at that time and address them.

22         Let me ask first, is he cooperator one under

23   Docket 60?

24         MS. WEBER:  Yes.

25         THE COURT:  All right.  And so do you agree these are

1    the two outstanding convictions we need to address, Mr. Camiel?

2    Looks like a felony misconduct in 2012 and the plea in this

3    case, the guilty conviction here.

4           MR. CAMIEL:  Right.  Those are the two that I would be

5    seeking to cross-examine about.  I wasn't intending to get into

6    the underlying facts of the 2010 case, just the fact that he

7    has a felony controlled substance abuse conviction and the

8    sentence that he received.  And then the 2020 matter, I would

9    be getting --

10           THE COURT:  Well, yeah, that, I think we all agree --

11           MR. CAMIEL:  That's this case.

12           THE COURT:  Yes.  Right.

13           So Ms. Weber, any objection to the inquiry on the 2012

14    conviction as delineated just now by Mr. Camiel?

15           MS. WEBER:  No, Your Honor.

16           THE COURT:  All right.  Very good.  Well, that

17    resolves that.  We're a step ahead.  Anything else from the

18    government?

19           MS. WEBER:  Nothing further.

20           THE COURT:  Mr. Camiel, other topics?

21           MR. CAMIEL:  No.

22           THE COURT:  Very good.  We'll go off record.

23    Mr. Brown will come and get seated here, and then we will --

24    and I assume somebody from the marshals will remain up at --

25    with him, which is fine.  And then we will bring in the jury

1   and proceed from there.

2           All right.  We'll go off record.

3           DEPUTY CLERK:  All rise.  This matter now stands in a

4   brief recess.

5       (Recessed from 8:40 a.m. to 8:42 a.m.)

6       (Jury present)

7           DEPUTY CLERK:  Please be seated.

8       (Pause)

9           DEPUTY CLERK:  All rise.  Her Honor, the Court, the

10  United States District Court is again in session.

11          Please be seated.

12          THE COURT:  Good morning, everyone.  Ladies and

13  gentlemen, we are back in the trial.  And I had an instruction

14  I wanted to read again, as I did yesterday.

15          As I reminded you yesterday and continue to emphasize

16  to you today, it's important you decide this case based solely

17  on the evidence and the law presented here.  You must not learn

18  any additional information about the case from sources outside

19  the courtroom.

20          To ensure fairness to all parties in this trial, I'll

21  now ask if any of you have learned anything about or shared any

22  information about this case outside the courtroom, even if it

23  was accidental.  So everybody okay on that?  I don't see hands

24  raised.  Thank you, ladies and gentlemen.

25          And we are ready to proceed with the government's next

1   witness.  Ms. Weber, go ahead, please.

2          MS. WEBER:  Your Honor, the government calls

3   Andre Brown.

4          THE COURT:  All right.  And, sir, if you would stand.

5   Good morning.  And the clerk will administer an oath to you.

6       (Oath administered to the witness)

7          DEPUTY CLERK:  Please state and spell your name for

8   the record.

9          THE WITNESS:  Andre Brown, A-n-d-r-e, B-r-o-w-n.

10             ANDRE BROWN, GOVERNMENT WITNESS, SWORN

11         THE COURT:  Thank you.  Go ahead, please, Ms. Weber.

12                        DIRECT EXAMINATION

13  BY MS. WEBER:

14  Q   Good morning.  Mr. Brown, how old are you?

15  A   50.

16  Q   Where are you from originally?

17  A   I'm originally from Tampa, Florida.

18  Q   I'm sorry.  If you wouldn't mind just speaking up.  It's a

19  little hard to hear you.

20  A   I'm originally from Tampa, Florida.

21  Q   Where do you live currently?

22  A   In Florida.

23  Q   Where are you staying currently?

24  A   Currently?  FCC Fairbanks Correctional Center.

25  Q   And are you there because you have been convicted of a

1    crime?

2    A    Yes.

3    Q    Was that your first criminal conviction?

4    A    No.

5    Q    On May 16th of 2012, were you convicted of misconduct

6    involving a controlled substance?

7    A    Yes.

8    Q    Where was that conviction?

9    A    Here in Fairbanks.

10    Q    Did you plead guilty?

11    A    I went to trial.

12    Q    Why did you go to trial?

13    A    I went to trial because I felt that the way I was arrested

14    was wrong.  I didn't think that the arrest was correct.

15    Q    Did you do it?

16    A    Yeah, I did.

17    Q    You were guilty?

18    A    I was guilty.

19    Q    On November 6th of 2020, were you arrested for distributing

20    fentanyl, resulting in the death of Jacob Lee?

21    A    Yes, I was.

22    Q    In June 16th of 2021, were you convicted of that charge?

23    A    Yes.

24    Q    Was that in this very courtroom?

25    A    In Anchorage.

```
 1   Q    In Anchorage?  Did you plead guilty to that case?

 2   A    Yes, I did.

 3   Q    Were you before a judge like you are today?

 4   A    Yes, I was.

 5   Q    Did you take an oath like the one you just took?

 6   A    Yes.

 7   Q    What were you sentenced to in that case?

 8   A    168 months.

 9   Q    And how old did you say you are?

10   A    50.

11   Q    What's the significance of that sentence to you?

12   A    It's a pretty long sentence.  14 years.

13   Q    What was the reason that you pled guilty?

14   A    Because I was actually guilty of what they accused me of

15   doing.

16   Q    What they accused you of doing was distributing fentanyl,

17   resulting in the death of Jacob Lee, correct?

18   A    Yes.

19   Q    As part of that conviction, did you enter a plea agreement

20   with the United States?

21   A    Yes.

22   Q    What's your understanding of that agreement?

23   A    To be truthful and forthcoming with anything pertaining to

24   that particular case.

25   Q    Were there any promises made to you regarding your
```

1   sentence?

2   A    No.

3   Q    What's your understanding of what would happen if you lied

4   today?

5   A    That plea deal would go back.

6   Q    What do you mean, it would go back?

7   A    Like, I could start -- like, the whole process could be

8   started over again and I could be pleading.  I got a reduction

9   for a sentence.  There was still responsibility of being

10  accountable.  That could all disappear.  I could eventually get

11  a higher sentence.

12  Q    Mr. Brown, where did you get the fentanyl from that killed

13  Mr. Lee?

14  A    It was shipped up here to me.

15  Q    From whom?

16  A    From OJ Tulali.

17  Q    Do you see OJ Tulali in the courtroom today?

18  A    I do.

19  Q    Can you please identify Mr. Tulali by item of clothing?

20  A    Plaid shirt under a sweater.

21          MS. WEBER:  Your Honor, let the record reflect that

22  the witness has identified the defendant.

23          THE COURT:  So noted.  Yes.

24  BY MS. WEBER:

25  Q    How do you know Mr. Tulali?

```
 1   A   I know him from years ago.  We met in California.

 2   Q   Around when did you meet?

 3   A   Late '96, early '97.

 4   Q   And are you familiar with his voice?

 5   A   Yeah.

 6   Q   Did you know whether Mr. Tulali had ever been to Fairbanks

 7   before he was brought here on the instant charge?

 8   A   Not that I'm aware of, no.

 9   Q   Where is Mr. Tulali from?

10   A   California.

11   Q   Mr. Brown, how long have you been involved in the buying or

12   selling of controlled substances?

13   A   Most of my life.  All of my adult life.

14   Q   Are you familiar with the methods and means that drug

15   dealers use to evade law enforcement?

16   A   Absolutely, yes.

17   Q   I would like to talk about the events leading up to the

18   death of Mr. Lee.

19       Where were you in October of 2020?

20   A   Here in Fairbanks.

21   Q   When did you get here to Fairbanks?

22   A   Some time in September, the end of September.

23   Q   What was the reason for your trip to Fairbanks?

24   A   To distribute drugs.

25   Q   What drugs were you distributing?
```

```
 1   A    Actually came with the intention of distributing cocaine.
 2   Q    Where did you get the cocaine?
 3   A    In Florida.
 4   Q    Were you bringing the cocaine to Fairbanks?
 5   A    Yes.
 6   Q    Were there any other drugs that you were bringing to
 7   Fairbanks?
 8   A    Not at that particular time, no.
 9   Q    Were there other drugs that you sold in general?
10   A    Yes.  Yeah.
11   Q    What else did you sell?
12   A    I sold methamphetamine from time to time.  I sold heroin
13   occasionally.
14   Q    Where did you get that from?
15   A    Sometimes from people here, sometimes people out of state,
16   Florida and Arizona.
17   Q    Did you ever sell prescription Percocet pills or Percocet
18   pills before the instant charges?
19   A    No.
20   Q    Were you in Fairbanks the entire period between when you
21   got here in September and your arrest on November 6, 2020?
22   A    No.  I went to Anchorage a time or two.
23   Q    What were you doing in Anchorage?
24   A    Staying with my ex-wife.
25   Q    How did you get to Anchorage?
```

```
 1   A    We flew one time.  We drove one time.
 2   Q    How did you get back from Anchorage to Fairbanks?
 3   A    Drove both times.
 4   Q    What did you drive?
 5   A    One time we were in her vehicle and another time we were in
 6   a rental, which was a Hummer.
 7   Q    In 2020, were you using drugs or just selling them?
 8   A    I smoked marijuana and I might have popped a Percocet or
 9   two.
10   Q    Can you explain for the jury how you got involved with
11   using Percocets?
12   A    I went to the hospital for a tumor on my neck in 2018 and
13   was prescribed Percocets and Vicodin.
14   Q    So starting in 2018, you had a prescription for Percocet;
15   is that right?
16   A    Yes.
17   Q    And what milligram or dosage were you prescribed?
18   A    Ten milligrams.
19   Q    How long were you getting that prescription for?
20   A    I think about a year and a half.
21   Q    Did you ever sell those prescriptions that you were
22   receiving?
23   A    No, I never sold my prescription.
24   Q    Why not?
25   A    I used them.  I kind of ended up using the prescription
```

1 drugs after that.

2 Q    What happened after you stopped getting that prescription?

3 A    I started buying them on the streets of Tampa.

4 Q    Did you ever buy them here in Fairbanks?

5 A    No.  I don't recall buying any prescription drugs in

6 Fairbanks.

7 Q    Why not?

8 A    Cheaper in Florida.  And I pretty much lived in Florida.  I

9 would just come here for a couple weeks at a time.  I just

10 would bring some with me.

11 Q    And again, the Percocet pills that you brought with you,

12 what was the dosage?

13 A    Ten milligram.

14 Q    When you brought them to Fairbanks, would you sell them or

15 were they for your personal use?

16 A    They were for my personal use.

17 Q    What happened in October of 2020 that you started selling

18 the 30-milligram Percocets?

19 A    Well, I got a call from Mr. Tulali, and he was asking me if

20 I knew anything about which -- I mean, I really didn't at the

21 time know about Percocet 30s.  But I found out what the prices

22 were around town, and I seen I could make a couple dollars.

23 Q    Can you describe what 10-milligram Percocet pill looks

24 like?

25 A    White pill.

```
 1   Q   And what does a 30-milligram Percocet pill look like?
 2   A   It's a blue smaller pill.
 3   Q   Did you ever personally use the 30-milligram pills?
 4   A   I have tried it maybe once or twice before, but, yeah, I
 5   never -- I prefer the 10s.
 6   Q   Why do you prefer the 10s?
 7   A   The 30s, I just -- I don't know.  They just didn't make me
 8   feel the same.
 9   Q   Going back to that phone call with Mr. Tulali in October.
10       You said he asked you -- can you repeat what he asked you?
11   A   Just asked me if I could move them, if I knew anybody that
12   was interested in buying some, if I could help him get rid of
13   some.
14   Q   Did he tell you how much he was going to get them for, how
15   much he was going to pay for them?
16   A   I think he might have said $5.
17   Q   Did you find out whether or not you can move them, as you
18   said?
19   A   Yeah.  Yeah, I did.
20   Q   How much were you going to move them for?
21   A   Well, I found out here in Fairbanks they go for, like, $60,
22   so I was going to sell them cheaper, like 30, 35, sometimes 25,
23   depending on how many people bought.
24   Q   And were you going to sell them personally to users?  What
25   was your plan for distributing the pills?
```

```
 1   A    My plan was to distribute them to -- distribute them to
 2   people that sold them.
 3   Q    And that conversation you had where Mr. Tulali discussed
 4   prices with you, was that over the phone or in a text message?
 5   A    It might have been both.  We talked on the phone and
 6   sometimes we texted sometimes.
 7   Q    And after the conversation about the prices, did you follow
 8   up with the text message?
 9   A    Excuse me?
10   Q    After you discussed whether or not you could move the Percs
11   and if you had anyone that you knew could buy them, did he
12   confirm the agreement that you guys made?
13   A    Yeah.
14   Q    How did he confirm the agreement?
15   A    It might have been a phone call or a text message.  I'm not
16   quite sure which one.
17   Q    Mr. Brown, there should be a binder in front of you with
18   some tabs.  If you could please take a look at what's in
19   evidence as Government's Exhibit 15.
20   A    15?  I see letters on the side.  Is there a letter I can go
21   to?
22   Q    That's going to be the defense binder.  There should be
23   another binder there with numbers.
24   A    Okay.  Okay.  You said 15?
25   Q    Yes.
```

 1  A   Yeah.

 2  Q   If you look at the second page, do you recognize these as

 3  photographs of your phone from October 2020?

 4  A   Yes.

 5  Q   And who is the conversation with?

 6  A   Mr. Tulali.

 7  Q   How do you know that?

 8  A   It says "OJ."

 9  Q   And what's depicted in that picture on the second page?

10  A   The Percocet 30s.

11  Q   Is that what the pills looked like when they arrived to you

12  in Fairbanks?

13  A   Yes, they did.

14          MS. WEBER:  Your Honor, can we publish page 2 of

15  Exhibit 15, please?

16          THE COURT:  Yes, that's fine.

17  BY MS. WEBER:

18  Q   And can you note the -- the date of this?  Mr. Brown, can

19  you note what date this text was sent on?

20  A   This date was sent October 13th.

21  Q   What was your response when Mr. Tulali sent you that

22  photograph?

23  A   Thumbs up.

24  Q   He asked you to "Hit my line."  What does that mean?

25  A   Give him a call.

```
 1          MS. WEBER:  If we could turn to the next page, please.
 2   BY MS. WEBER:
 3   Q    So on October 13th at 7:00 p.m., you sent Mr. Tulali the
 4   name Marley Warner and address 310 Tipperary Court --
 5          MR. CAMIEL:  I'm going to object to leading.
 6          THE COURT:  That's sustained.  Go ahead.
 7   BY MS. WEBER:
 8   Q    Can you please read what you sent the defendant on
 9   October 13th at 7:00 p.m.?
10   A    Yes.  Marley Warner, 310 Tipperary Court, Apartment A,
11   Fairbanks, Alaska 99712.
12   Q    Who is Marley Warner?
13   A    The daughter of a friend of mine.
14   Q    Who is that friend?
15   A    Kweka Warner.
16   Q    And what's that address, 310 Tipperary Court, Apartment A?
17   A    That was actually Kweka's address.
18   Q    How old is Marley Warner?
19   A    At the time, she was maybe 14.
20   Q    And why did you send that name and that address to
21   Mr. Tulali?
22   A    To have an address to send the Percocets to, the pills to.
23   Q    Why didn't you send him your name and your address?
24   A    Well, I didn't have a residence up here.  So the residence
25   that I wanted it sent to, I wanted somebody from the
```

1   residence's name to be on the package in case there was

2   problems with the package, would be able to get the package.

3   And I sent Marley's name because she -- she was a kid.  She

4   wouldn't be arrested and charged federally.

5   Q   You weren't staying at this address, you said?

6   A   I did stay there occasionally from time to time, but I

7   wasn't that particular day, I don't think.

8   Q   So what was your plan for when the package was shipped?

9   A   Just to pick up the package, get rid of the pills.

10  Q   And if I could draw your attention to that last text

11  message on this page.  Can you read what Mr. Tulali said?

12  A   "I have it gift wrapped, but I need to know if it's

13  worthy."

14  Q   What does that mean?

15  A   That mean it's ready to be sent, shipped, it's disguised,

16  but I need to know if it's worthy, are we going to make any

17  money off of this.

18  Q   Why would it need to be disguised?

19  A   Drugs, you don't want to just -- some drugs to fall out of

20  the box that anybody might open.

21  Q   Have you ever used the mail to ship controlled substances?

22  A   Yes, I have.

23  Q   And do you just put cocaine in a plastic bag in a shipping

24  label?

25  A   No.  I'd always disguise it as something.  It might be put

```
 1    in a Teddy bear then restitched.  It might be gift wrapped in a
 2    box, look like a birthday present or Christmas present or
 3    whatever.
 4    Q   So when you said "I have it gift wrapped," it was concealed
 5    and ready to be mailed --
 6              MR. CAMIEL:  Objection.
 7    BY MS. WEBER:
 8    Q   --  is that correct?
 9              THE COURT:  Sustained.  That's leading.
10    BY MS. WEBER:
11    Q   Can you explain what it meant to you when the defendant
12    said, "I need to know if it's worthy"?
13    A   Is it worth being sent.  Are we going to make any money off
14    of it?
15    Q   What did you respond?
16    A   I don't know.  Is it on there?  I might have called.
17    Q   Do you remember how you responded?
18    A   I'm sure I responded in the affirmative.  I'm sure I said
19    yeah.
20              MS. WEBER:  If we take a look at the next page of
21    Exhibit 15.
22    BY MS. WEBER:
23    Q   What's depicted in this text message?
24    A   That's actually the package that it came in.
25    Q   Is that -- is that the actual package that it came in?
```

```
 1   A    That's the package that the mail actually came in.
 2   Q    Is it the receipt or is there a photo of a package in this
 3   exhibit?
 4   A    No.  That might have just been the -- that's just the
 5   address that was on the container it came in, the envelope or
 6   box.  I can't remember what it was sent in.
 7          MS. WEBER:  Ms. Peterson, if we can show 16.04,
 8   please.
 9          THE WITNESS:  Oh, that was -- that might have just
10   been the receipt, telling me to go to the post office to get
11   it.
12   BY MS. WEBER:
13   Q    Can you please look at the top left corner where it says
14   "from" and has a name and address?
15   A    Right.
16   Q    Do you know a Tana Manuia?
17   A    No, I don't.
18   Q    Do you know the address 817 West 134th Street, Gardena,
19   California?
20   A    No, I don't.
21   Q    Was that surprising to you that you didn't recognize the
22   "from" address?
23   A    No, not at all.
24   Q    Why?
25   A    For a couple reasons.  One, I never knew his address.  But
```

1  for two, I wouldn't send drugs to an address with my address on

2  it, with my name or address on it.

3  Q    That's if you were sending the drugs?

4  A    Right.

5  Q    And even when you were receiving -- when you were receiving

6  the drugs, did you use your name and real address?

7  A    I never used my real address, but I have used my name

8  before.

9  Q    What's the reason for using a different name or a different

10  address when mailing drugs?

11  A    Pretty much to avoid detection.  I don't want to be

12  arrested.  If the package does get caught, I don't want to be

13  caught.

14  Q    And going back to Exhibit 16.04, there's some parts that

15  are highlighted.  Did you make those highlights?

16  A    No.

17  Q    Was that how the text message was sent to you?

18  A    I can't remember.

19  Q    And what is circled?

20  A    The tracking number.

21  Q    Is there --

22  A    An "X" and a -- yeah, the tracking information, the

23  tracking number to call.

24  Q    Did you track the package?

25  A    I don't think I tracked the package.  I don't recall

1  tracking the package.

2  Q   Who tracked the package?

3  A   I don't know.  If it was tracked, it would have been from

4  his end.  I know that when the package actually came, it didn't

5  come -- it --

6          MR. CAMIEL:  Your Honor, I'm going to object.  This is

7  beyond the question.  The question was, who tracked the

8  package.

9          THE COURT:  Go ahead.

10  BY MS. WEBER:

11  Q   Did you expect a delivery date -- what's the expected

12  delivery date circled?

13  A   10-17-20.

14  Q   Do you remember what day of the week 10-17-20 was?

15  A   I think it might have been a Monday or a Saturday.  It was

16  a Saturday or Monday.  I know it was attempted delivered on a

17  Saturday.  I missed it, and I had to go get it on a Monday.

18  Q   How did you know that you missed it?

19  A   I think there was a card, or maybe I got a call.

20  Q   Who would you have gotten a call from?

21  A   From Mr. Tulali.

22  Q   So what happened next?

23  A   From when?  When I picked up the package?

24  Q   Or when you -- you --

25  A   Or when I missed it?

1  Q   When you missed it.

2  A   When I missed it, it was actually because of -- it was

3  during COVID at the time, so packages were being dropped off on

4  porches instead of them knocking on doors.  But I don't think

5  we had the right setup to get it dropped off, so it ended up

6  getting sent to the post office.  So I had to wait until

7  Monday.  That was on a Saturday.

8  Q   What happened on Monday?

9  A   Monday, I had to get Marley to -- she was a teenager, like

10 I said, so I had to pick her up from school when she get out of

11 school, took her to a doctor, then rushed to the post office to

12 get it so she could get it with her school ID.

13 Q   Why did you need to bring Marley?

14 A   Because I wasn't a resident of that residence, and I needed

15 somebody that was a resident.

16 Q   Did you attempt to pick it up?

17 A   I did, without Marley, and they told me that I needed to

18 have that residence on my ID or have somebody from the

19 residence.

20 Q   So just to be clear, you picked her up from school, right?

21 A   Yeah.

22 Q   And then what you did do?

23 A   Took her to a doctor's appointment real quick, and then

24 took her to the post office.

25 Q   What happened at the post office?

```
 1   A    We picked up the package successfully.
 2   Q    Did the package have the same sender address?
 3   A    Yes.
 4   Q    And did it have the same mailing address?
 5   A    Yes.
 6   Q    Did you look inside the package?
 7   A    Not at that particular time, no.
 8   Q    Where did you go once you picked up the package?
 9   A    I went to the address, Tipperary Court.
10   Q    And what did you do when you went to Tipperary Court?
11   A    I put the package there.  I left it there for a couple
12   hours and went and took care of a couple other things and came
13   back later that evening.
14   Q    Just to back up, what did you expect to be inside the
15   package?
16   A    500, I believe -- yeah, the Percocets, I believe, 500 of
17   them.
18   Q    Did you already pay for the pills?
19   A    No, I hadn't paid yet.
20   Q    What was the arrangement?
21   A    The arrangement was to pay $5,000 for those.
22   Q    How were you going to make the money to pay for it?
23   A    Sell them.
24   Q    Sell what?
25   A    The Percocets.
```

1  Q    And then how were you going to pay Mr. Tulali?

2  A    From the profits of those.

3  Q    Sorry to skip around a little bit.

4       So you dropped the package off at Tipperary Court and then

5  you said you left it for a couple of hours?

6  A    Yeah.

7  Q    And did you return to retrieve it?

8  A    Yeah.

9  Q    Was that the same day?

10 A    Yeah, yeah, yeah, a couple hours later.

11 Q    When you said that it was the Monday when the post office

12 opened, is that October 19th?

13 A    It might have been the 15th that the package was delivered,

14 and then the 17th that I got it, or it might have been the 17th

15 that it was delivered or the 19th.  But it was Monday, October.

16 I don't -- a couple years ago.

17 Q    If October 17th was a Saturday, would that Monday --

18 A    It was the 19th I picked it up, then.

19 Q    What was the condition of the package when you returned to

20 Tipperary Court?

21 A    It was open.

22 Q    What was open?

23 A    The envelope that it came in, the package that it came in.

24 Q    Can you describe the package in general?  Was it a box?

25 Was it an envelope?

1  A   I really can't.  Honestly, I can't remember.  I'm sure it

2  was in a box, maybe.

3  Q   Was the box open or was the contents open?

4  A   The package -- well, the package -- I don't remember if it

5  was paper.  So it might have been paper, and then a box inside

6  the paper, small box.  It's not very big.

7  Q   Can you --

8  A   I really can't remember what exactly the Percocets were in.

9  But, yeah, it was open.

10  Q   So was it just the box that was open or the bag with the

11  pills?

12  A   The bag with the pills.

13  Q   Can you explain for the jury approximately how large 500

14  pills would be?

15  A   I consider it this, maybe.

16         MS. WEBER:  For the record, Your Honor, the witness is

17  holding up a plastic cup.

18         THE COURT:  All right.

19  BY MS. WEBER:

20  Q   And what did you do with the package when you returned and

21  saw that it was open?

22  A   I didn't really -- I took it, counted up the pills and

23  started distributing them.

24  Q   Where did you take it?

25  A   Either to Anderson Apartments.  Like I said, it was a

1  couple years ago.  To either Anderson Apartments.  There was a

2  steakhouse on Cushman back then.  Upstairs, one of my friends

3  was -- had access to the upstairs.  I might have took it up

4  there and counted them up and started bagging them up.

5  Q    What do you mean when you say "bagging them up"?

6  A    Putting them in bags for distribution.

7  Q    And did you reach out to any other distributors to see if

8  they were interested?

9  A    Yeah, I did.

10  Q    Who did you reach out to?

11  A    A friend of mine, Melvin.  Another one, Cortez.  A girl I

12  know, I can't recall her name off the top right now.  But,

13  yeah, a couple people.

14  Q    Did you reach out to Winston Crockett?

15  A    I did eventually.  It was a couple -- it was a couple --

16  maybe a week or two later.

17  Q    I would like to just go through the remainder of the

18  conversation between you and Mr. Tulali in Exhibit 15.

19      Can we please publish page 7 of Exhibit 15?

20      Mr. Brown, what are we looking at in this text message?

21  A    That looks like a receipt.

22  Q    And who sent it?

23  A    I don't know.  I don't know if that was a receipt I got

24  when I picked up the package or receipt when the package got

25  shipped.  I'm not sure.

1   Q   If we could go to the previous page, please.

2       Does that refresh your recollection?

3   A   I don't -- I think that might have been me sending a

4   receipt.

5   Q   And the message under it, "hit my line," is that from your

6   side of the conversation or Mr. Tulali's side of the

7   conversation?

8   A   His side, I'm sure.  His side, yeah.  I think mine were

9   green.

10  Q   And then you sent the thumbs up?

11  A   Yeah.

12  Q   And what did he respond?

13  A   I'm sure the "hit my line" and the thumbs up meant I

14  probably called, maybe later.  I'll call you back.

15  Q   If you look at the bottom -- so you believe you called him

16  and he responded, "I'll call you back"?

17  A   Possibly.  We might have even talked then.  I'm not sure.

18  For a couple of minutes.  I'm not sure.

19          MS. WEBER:  And then if we can please skip to the next

20  page.

21  BY MS. WEBER:

22  Q   Can you please read the text messages from Saturday,

23  October 24th?

24  A   "Hit my line when available."

25  Q   And Thursday, October 29th?

1   A   "Top of the morning, Cuzin."

2   Q   And then at 12:57 p.m.?

3   A   "Hit me with about 5K.  Let's close out first run and hit

4   for the 2nd wave.  Enlighten me further."

5   Q   What did he say next?

6   A   "Name Junior Gafatasi Tulali."

7   Q   What did that mean to you?

8   A   The whole message?

9   Q   Yes.

10  A   Hit me with 5,000.  We'll close out that first round, the

11  set of pills, and I'll send for the second wave.  I sent for

12  the second shipment.

13  Q   5,000 what?

14  A   Dollars.

15  Q   And close out the first run means what?

16  A   I'll be finished paying for the first set of pills I got,

17  the first package I got.

18  Q   And then second wave referred to what?

19  A   Sending 500 more.

20  Q   Why did he say "Name Junior Gafatasi Tulali"?

21  A   That was the name to send the money to.

22  Q   And what did you respond?

23  A   "Bet."

24  Q   What does that mean?

25  A   All right.  That means okay.

```
 1    Q    What did you say next?

 2    A    "I'm a go get it, throw it on this card, and shoot it."

 3    Q    What does that mean?

 4    A    That meant I was going to throw it on a Cash App card or

 5    whatever card, a Paypal card.  I don't know.  And send the

 6    money.

 7    Q    Can you explain how that works?

 8    A    Actually, it's difficult for me because I never had one,

 9    but I've always dealt with women that had the Paypal on the

10    Cash App.  So I would always get one of them to send the money.

11    I just would give them the money and then they go, you know,

12    Wal-Mart or Walgreen's, somewhere, and put it on their card and

13    send it.

14    Q    You would sell the controlled substances, take the

15    proceeds?

16               MR. CAMIEL:  Objection.  Leading.

17               THE COURT:  Please restate it.

18    BY MS. WEBER:

19    Q    To clarify, what money are you talking about?

20    A    The money from the pills, or any drugs, if somebody wanted

21    it Cash Apped or Paypal.

22    Q    What do you mean, the money from the pills?

23    A    The money from the pills that were sent.

24    Q    From selling the pills?

25    A    Yeah, from selling the pills.
```

1   Q   And what did you do with that cash?

2   A   I would get cash, but I never dealt with Paypal or I never

3   had any of those services, so I always have friends that did.

4   So I would get them to send the money.

5   Q   And are you familiar with how that person sent it once it

6   was put on a card?

7   A   I mean, it was all done with their phone.

8           MS. WEBER:  And if we could please take a look at the

9   next page.

10  BY MS. WEBER:

11  Q   What was Mr. Tulali's response?

12  A   "Educate me on my end.  You know I'm brand new.  Which

13  card, bank, or process formality?"

14  Q   What was Mr. Tulali asking?

15  A   He was asking how -- how is that, that I was going to send

16  it, like was it going to be Paypal, was it going to be

17  Western Union.  How am I going to send it.

18  Q   What did you respond?

19  A   "Wal-Mart prepaid debit, and then it could be shot all with

20  the phone."

21  Q   What did you mean when you say it could be shot all with

22  the phone?

23  A   Like once you get it on the prepaid card, we could just

24  exchange information for it over the phone.

25  Q   And a couple lines down, what did Mr. Tulali ask you?

A    "What's total being sent?"

Q    What was your response?

A    "I just counted 4 and waiting on baby to pull up with my other 15.  Plus I'm still sitting on a bundle."

Q    What does that mean?

A    That means I just counted 4,000.  I'm waiting on the girl to pull up with 1500 more of mine, and I'm still sitting on a bundle, meaning I still have plenty of pills left.

Q    What girl -- what baby were you referring to?

A    The girl -- just a girl, a woman.

Q    I'm sorry.  What does a bundle mean?

A    A bundle meant I was still sitting on a bundle of the pills.  I still had a bunch of them left.

Q    So based on that text message by October 29th of 2020, how much money had you made from the sale of the pills?

A    When the girl had pulled up, $5,500.  I'm sure I made more. I spent money and I was making money as well.

Q    And what's the -- what text message did you send Mr. Tulali at 3:44 p.m.?

A    "Is Junior Paypal.  I'm about to slide in Walgreen's and load it straight thru.  Send me his Paypal link."

Q    What was his response?

A    "Yes, sir.  My Paypal is tripping.  I'm trying to reset info now."

Q    Where were you at this time?

```
 1   A    I was in the parking lot of Walgreen's or Wal-Mart.
 2   Q    Were you loading the money onto the card, or who was
 3   loading the money onto the card?
 4   A    A friend of mine was, a female friend of mine was.
 5   Q    What was Mr. Tulali's response?
 6   A    "My Paypal is tripping."
 7   Q    When you said that you were in the parking lot, what was
 8   his -- what did he say back?
 9   A    "They let me load 15 at Wal-Mart.  I'm good now.  Standing
10   by."
11        So I said, "Bet, let me load 15 at Wal-Mart.  It's on the
12   way.  We'll do it again in the a.m."
13        So Wal-Mart would only let me put 1500 on at the time, so I
14   was going to have to come back the next day to do the other
15   1500 and so forth.
16   Q    Was that a problem for Mr. Tulali?
17   A    No, no, not at all.
18   Q    Well, how do you know that?
19   A    "Respect."  He just saying all right.
20          MS. WEBER:  If we could please look at the next page.
21   BY MS. WEBER:
22   Q    Can you read your response to "respect"?
23   A    "You get the invite from me.  Thanks, 86CB."
24   Q    Did he receive it?
25   A    He said, "I'll check once I park.  Bet, accept, and I'll
```

```
 1  shoot that installment."
 2       He says he didn't see the invitation to accept, but he's
 3  in, though.
 4  Q    And then can you please read the next set of text messages?
 5  A    Yeah.  "Sent.  Confirm.  Second installment just went out
 6  same way as first.  Confirm."
 7  Q    And then on November 3rd?
 8  A    "Five sent.  When the machine is up, another thou."
 9  Q    What does that mean?
10  A    "Another thou."
11  Q    I'm sorry?
12  A    "Five sent when the machine is up.  Another thou."
13  Q    What does that mean?
14  A    I'm assuming I was saying then, five will be sent when the
15  machine is up.  I think the machine might have been down or
16  something.  I'm not sure.  It was years ago.  And then I'm
17  saying another thousand.
18  Q    What is --
19  A    So I'm saying it will be five.  That's where we're at.  And
20  I'll send another thousand.
21  Q    Five what?
22  A    5,000.
23  Q    So by November 3rd, how much had you made -- how much --
24  what was your profit from the sale of the pills?
25  A    I can't remember.  I know I had the money that I owed and I
```

```
 1   had -- I was in the plus.  I had more than what I owed and,
 2   like I said, I was spending money as well.  I can't tell you
 3   exactly how much I made during this time.
 4   Q   Based on this text, "Five sent, machine is up, another
 5   thou" --
 6   A   Yeah.
 7   Q   -- how much minimum does that mean?
 8   A   That's 6,000.
 9   Q   What was his response?
10   A   "I'll hit your line immediately, confirmed."
11   Q   What was he confirming?
12   A   That the money is going to be sent.
13   Q   And Wednesday, 8:35 a.m., what did you text Mr. Tulali?
14   A   "Found out what the profit was.  You can only load four
15   stacks a month" -- that means 4,000 a month -- "on the card.
16   Do you know how to get the code for your account?"  And I can
17   go to Wal-Mart and drop it in your account with the code you
18   send me."
19   Q   And then, what did you send after that?  It appears to be a
20   screen shot of something?
21   A   Yeah.  That's showing him I loaded money into my Paypal
22   account.
23       Yeah.  I was thinking can I just put the money right into
24   -- instead of sending it from card to card, let me just put it
25   in your account, your Paypal account.
```

MS. WEBER:  If we can please look at the next page.

BY MS. WEBER:

Q   Mr. Brown, if you could just, for yourself, to refresh your recollection, look through the next couple text messages.  It seems like kind of just chat.

A   Yeah.

Q   Until -- if we could move forward two pages.

One more, please.

Can you please read the text message sent?

A   At the top of the page?

Q   Yes, please.

A   "Glad that it turned over.  I can only imagine.  A Miami cat in the cold.  Laugh out loud.  Terrible.  I might need to create an account.  I'll head there this evening.  I have a DMV appointment at noon.  Bet.  Should I send second wave?"

Q   What did that mean, "Should I send a second wave?"

A   Should we send the next package of pills.

Q   What was your response?

A   I gave my name and address to send it to.

Q   So did you agree?

A   Yeah.  Yeah.  I said, "Yep," then sent the name and address.

Q   What is this address that you gave?

A   That's the address to my ex-wife, actually.

Q   If we could please take a look at the next message.

1   A    "Make sure no signature required."

2   Q    Why did you say that?

3   A    So we wouldn't have the problem like the last time of me

4   having to get the girl to go to the post office to get the

5   package.

6   Q    What did Mr. Tulali respond?

7   A    "Yes, sir.  I'm not sure why it was issued on the first

8   run.  I didn't request it.  I'll confirm, though."

9   Q    And I would like to talk a little bit about how you know

10  that "OJ" stored in your phone is the defendant OJ, the

11  defendant that's sitting here in court today.

12  A    How do I know that's him?

13  Q    Did you speak to Mr. Tulali on the phone number that he was

14  using?

15  A    Several times.

16  Q    And you recognized his voice?

17  A    Yeah.

18  Q    In those phone conversations, was anything personal

19  discussed?

20  A    We discussed an old friend that we knew when we both were

21  in California at the time.

22  Q    Are you familiar with the name Lavel Wallace?

23  A    I don't recall knowing that name.

24  Q    Would you be surprised to learn that the phone number --

25          MR. CAMIEL:  Object to the form of the question.

```
 1              THE COURT:  That is sustained.
 2   BY MS. WEBER:
 3   Q    Is it possible you were speaking to Lavel Wallace?
 4   A    No.  I don't know Lavel.  I don't know a Lavel Wallace.
 5   Q    In your experience with buying and selling drugs, is it
 6   typical for people to use -- to subscribe their phones in
 7   different names?
 8   A    Absolutely.  Or just get a Straight Talk from Wal-Mart.
 9   Q    What's a Straight Talk?
10   A    A phone that just has no connections with it, where you can
11   get rid of the phone and get no connection to you.
12   Q    What's the reason for doing that?
13   A    Trying not to get caught.
14   Q    I would like to play for you what's in evidence as
15   Exhibit 16-6.  It's a voicemail that was left on your phone
16   from that phone number.
17              MS. WEBER:  Your Honor, may we publish 16.06?
18              THE COURT:  Yes, go ahead.
19              (Exhibit 16.06 playing in open court.)
20   BY MS. WEBER:
21   Q    Do you recognize the voice of that person?
22   A    Yes.
23   Q    Whose voice is that?
24   A    Mr. Tulali.
25   Q    And I would like to play what's -- to play another
```

1    voicemail that was left from user OJ on your Facebook account.

2            MS. WEBER:  It's in evidence as Exhibit No. 9.02.

3    Your Honor, may we publish?

4            THE COURT:  Yes, go ahead.

5            (Exhibit No. 9.02 playing in open court.)

6    BY MS. WEBER:

7    Q    Do you recognize the voice of the person who left that

8    voicemail?

9    A    Yeah.

10   Q    Whose voice is that?

11   A    OJ.

12   Q    Going back to your relationship with Mr. Crockett.  How do

13   you know him?

14   A    I've known Mr. Crockett.  I came up here in '92, I believe.

15   I can't remember exactly how I met him, but just -- actually,

16   one of my friends used to date his sister.  I'm sure that's how

17   we eventually met.  But I've been knowing him since '92 or '93.

18   Q    On October 26, 2020, did you reach out to Mr. Crockett to

19   help sell the pills?

20   A    Yes, I did.

21   Q    And if you could please take a look at what's in that

22   binder in front of you under Exhibit 15.01.

23           MS. WEBER:  If we could please publish page 1 of

24   Exhibit 15.01.

25           THE COURT:  Go ahead.

BY MS. WEBER:

Q   What is this?

A   Read it?

Q   Do you recognize it?

A   Yeah, yeah, yeah.  Message from Facebook Messenger.

Q   And who is the conversation between?

A   Myself and Winston Crockett.

Q   On October 26, 11:54, what did you text?

A   "What up, Playboy?"

Q   What did he respond?

A   He responded, "What's good, Fam?"

    I responded, "Just touched the soil out here with some 30s and remembered you be in that lane."

Q   What did that mean, "Just touched down the soil out here with some 30s"?

A   I was just letting him know I'm in town right now and I have some 30s, Percocet 30s.

Q   Had you just touched the soil on that date?

A   I had been in town, but me and him weren't as tight to where he was somebody that would know when I'm in or out of town like that.  So as far as he was concerned, I just hit town.

Q   When did you -- when did you actually get into town?

A   September.  Maybe the end of September.  Maybe late, September 30th, somewhere around there.

1  Q   And the 30s referred to in this message --

2  A   Percocet 30s.

3  Q   -- where did they come from?

4  A   They came from OJ.

5  Q   Did you bring 30s with you from Florida?

6  A   No, no, never.

7  Q   Did you buy any 30s from anyone else while you were in

8  Fairbanks?

9  A   No.

10 Q   Did you buy any 30s from anyone while you were in

11 Anchorage?

12 A   No.

13 Q   Did you bring any pills from Arizona?

14 A   No.

15 Q   What did you mean when you said that you remembered he was

16 in that lane?

17 A   I remembered him having pills in the past before.

18 Q   What was his response?

19 A   "Yes, sir."

20      MS. WEBER:  If we could please look at the next page.

21 BY MS. WEBER:

22 Q   If you could please read the text.

23 A   "What you asking, Fam?  I have buyers."

24      So I tell him 30.  I'm telling him $30.

25      He says, "Where you at now?"

```
 1   Q   What did you respond?
 2   A   "For you, set a price for them on the side."
 3       So I'm telling him, sell them for as much as you can, just
 4   give me 30.  Like I said, I knew they were going for $60 out
 5   here.
 6   Q   So what did "on the side" mean?
 7   A   I would tell him to set his own price for him and keep that
 8   money for him on the side.
 9   Q   What was his response?
10   A   "Can you meet me at my spot?  We could talk in person, then
11   on the phone.  I'm right there on 17th and Turner.  My mom need
12   the van, so I got to take it back to her real quick.
13       "Be right there by Anderson, right?"
14       I'm asking him if he's by Anderson Apartments.
15       "Let me shoot a word to one of my buyers and let them know.
16   Yes, sir" --
17   Q   We can look at the next page for the full text.
18   A   "I'm going to shoot a word to one of my buyers and let them
19   know.  Yes, sir, right by Anderson, the little gray apartment
20   complex right on the corner.  I'll be there in, like, ten
21   minutes.
22       "Bet.  Me too."  I tell him, "Bet.  Me too."
23   Q   What does that mean?
24   A   He's telling me where he'll be in ten minutes, and I'm
25   telling him I'll be there in ten as well.
```

```
 1   Q    Are you familiar with the gray apartment complex by
 2   Anderson?
 3   A    Yeah.
 4   Q    Had you met Mr. Crockett there in the past?
 5   A    No.  But I knew his mom stayed there.
 6   Q    And what did he respond to "Bet.  Me too"?
 7   A    Thumbs up.
 8            MS. WEBER:  If we could look at the next page, please.
 9            THE WITNESS:  "I have a buyer for two of them.  72.
10   Get to from you largest just start.  But I'm leaving WiFi now.
11   So I'm on my way to the house.  Be there in a few minutes."
12   BY MS. WEBER:
13   Q    And what did that mean?
14   A    I honestly don't know.  I knew I was going to see him soon
15   and talk to him in person.  He was telling me he didn't have
16   WiFi, so we would be out of communication for a few minutes.
17   Q    "I have a buyer for two of them," did that make sense to
18   you at the time?
19   A    Yeah.  He's telling me that he got somebody that will buy
20   two of them right now.
21   Q    Did you confirm with the thumbs up?
22   A    Yeah, yeah.
23            MS. WEBER:  And then if we could skip to the next
24   page, please.
25   Q    On October 26th, at ten -- just to back up a little bit.
```

```
 1        After those messages, did you meet Mr. Crockett?
 2   A    I did.
 3   Q    Where did you meet him?
 4   A    In front of his mom's house right on 17th and Turner.
 5   Q    Were you on foot?  How did you get there?
 6   A    I was driving a Hummer.  I think he might have been on
 7   foot.  He just jumped in my truck.  He came out of his mom's
 8   house and jumped in my truck.
 9   Q    How long after these text messages did you meet him?
10   A    Maybe ten minutes, if that.  I was literally right around
11   the corner from him.
12   Q    So right after exchanging these texts, just to clarify, you
13   got in your car and you met him?
14   A    Yeah.
15   Q    And you said he got inside of your car?
16   A    Yeah.
17   Q    What happened inside of your car?
18   A    I gave him a couple pills.  I can't remember exactly how
19   many.  Maybe three, four, five, six pills.
20   Q    And what happened after you gave him the pills?
21   A    He went his way.  He told me he wouldn't have WiFi, so we
22   might be out of communication for a little while.  He had to
23   pay his phone bill or something.
24   Q    How long did that entire exchange take?
25   A    Almost two minutes.
```

```
 1   Q    Did Mr. Crockett pay you for those pills?

 2   A    No.

 3   Q    What was the understanding there?

 4   A    That he'll give me $30 per pill whenever he got it.  Like I

 5   said, I know him for 30 years.  Whenever he got it.

 6   Q    Are you familiar with the term "fronting"?

 7   A    Yeah.

 8   Q    Could you please describe what fronting is?

 9   A    Front is basically giving somebody the narcotics on

10   consignment.

11   Q    Is it like a small business loan-type situation?

12   A    Yeah, you could put it that way.  I give you the drugs, you

13   pay me later.

14   Q    And then did there come a time when Mr. Crockett did pay

15   you for those pills?

16   A    No.  I actually never seen Mr. Crockett again until we went

17   to jail.

18   Q    And on October 26th at 10:50, what does Mr. Crockett text

19   you?

20   A    "What's good, Fam?  I got busy.  Damn kids.  I sold one,

21   but my main people will be in town tomorrow.  I just wanted you

22   to know what's up.  Them 30, they are the real thing, right?

23   If not, not tripping, just so I know what to deal -- just so I

24   know who to deal with.  There's some crazy shit going around,

25   that's all.  I do have that 30 on me, also -- but I do have
```

1  that 30 on me, also.  My birthday is in two hours.  I'm on WiFi

2  right now, but I got to make a quick run.  But I got that 30 of

3  yours on me.  Do you want me to wait until anything else is

4  gone -- wait until everything else is gone and give it you at

5  one time?  And it won't be until I go after 2:00 tomorrow

6  before they come to town.  I just like to communicate.  I took

7  one for myself to help my shoulder."

8  Q    Okay.  So just to back up a little bit, when he said "them

9  30, they're the real thing, right" --

10 A    Right.

11 Q    -- what was your understanding of what Mr. Crockett was

12 asking you?

13 A    He was asking --

14        MR. CAMIEL:  Speculation as to what's in

15 Mr. Crockett's mind.

16        THE COURT:  That's overruled.  His understanding of it

17 is what was asked, not what Mr. Crockett intended.  So I'll

18 allow it.

19 A    My understanding was he was asking me if they was real 30s,

20 which I had never sold pills before.  I was under the

21 impression they were real 30s.

22 Q    And what was your understanding of his statement, "Just

23 some crazy shit going around, that's all"?

24 A    I thought he was -- I thought he was saying people were not

25 getting high.  I really didn't know.  I wish I would have knew

1  the full extent of what was going on.  I was under the

2  impression people were complaining about the drugs.

3  Q    "Crazy" to you meant poor quality, just so I understand?

4  A    Yeah.  Yeah.

5  Q    Did you take any of the pills that you received from

6  Mr. Tulali?

7  A    I did.

8  Q    How much did you take?

9  A    I took a half of one, one night.

10  Q    When was that?

11  A    Maybe the first week of November, maybe November 1st or

12  2nd.  Like I said, I had a tumor on my neck and it was

13  bothering me, and I didn't have perk 10s, so I popped one of

14  those.

15  Q    You popped how much of it?

16  A    Just a half of one.

17  Q    What happened when you took half of the pill?

18  A    I didn't feel anything.

19  Q    Is that why you interpreted Mr. Crockett's text message --

20  A    Yes.

21  Q    -- in that manner?

22  A    Yeah, pretty much.  I mean, I took the pill after that text

23  message, I'm sure.  But, yeah.  I mean, in hindsight, when I

24  thought about it, it was, yeah, maybe people are complaining.

25  Like I said, I hadn't heard from him.

1          MR. CAMIEL:  Objection.

2          THE COURT:  It's sustained.  Go ahead.

3          MS. WEBER:  If we could look at the last page of this

4    exhibit.

5    Q   What did you tell Mr. Crockett when he asked if it was real

6    30s?

7    A   "But they are straight?  No right to know what is missing.

8    Crazy shit going around.  I'm just good to people, that's all.

9    But you family, though, I know everything is cool.

10         My response is:  "Absolutely.  And like I said, I'll throw

11   you a few."

12   Q   When did you start selling the pills that you received from

13   Mr. Tulali?

14   A   October 17th, October 18th.

15   Q   By October 26th, approximately how many had you sold at

16   that point?

17   A   Maybe -- maybe over 400 of them.  I mean, between front

18   them to some people.  I fronted some to a couple people, but --

19   and they might -- I'm sure they still owed me a couple of

20   dollars.  So I might have sold maybe 350 of them.  I might have

21   had 100 of them or 70 of them still that people owed me money

22   for.

23   Q   I would like to jump ahead a little to the date of your

24   arrest, which was November 6th of 2020.

25         What happened -- what happened on that day?  Where were

1  you?

2  A    From the beginning of that day?

3  Q    Yeah.

4  A    I was actually at the 7 Gables motel.  I got up early that

5  morning.  There was a blizzard.  It was snowing.  I ended up

6  calling Kweka to see if she needed a ride to work because the

7  snow was pretty deep out there.  I knew she couldn't get to

8  work.  I knew that Hummer, I could get around.  So I went up to

9  her house to give her a ride to work.  I went to Farmers Loop.

10      Once I got there, her daughter was there.  She asked me

11  could I give her a ride to work once I came back.  So I took

12  Kweka to work, and I came back, took Brooke to work, her

13  daughter, and I came back.  Somebody else called me.  Everybody

14  knew I had the Hummer.  Nobody could -- I mean, there was snow

15  everywhere.  Nobody could really move.  So I went and gave

16  another girl I knew, Kristen, a ride to work.  Then I went back

17  to that residence and was preparing to do laundry.

18  Q    Did you do your laundry?

19  A    I started.

20  Q    Was there anyone else at the house at the time?

21  A    Yeah.  Mr. Kearney was there, Christopher Kearney, and

22  Kweka's children.

23  Q    What was your relationship to Mr. Kearney?

24  A    No relationship.  I knew him in the past.  He has -- he was

25  Kweka's daughter's boyfriend.

1 Q   And was he at that house, the apartment on Tipperary Court,

2 when you were there on October -- in October?

3 A   No.

4 Q   Do you know where he was?

5 A   I found out later that he was in Texas, I believe Houston,

6 during this time.

7 Q   Do you know when he got back from Houston?

8 A   I don't know when he got back.  I know it was the week of

9 our arrest, though.

10 Q   So the week of November 6th?

11 A   Yeah.  Yeah.

12 Q   Does Mr. Kearney have a nickname he goes by?

13 A   Kilo.

14 Q   Do you have a nickname you go by?

15 A   Kool-Aid.

16 Q   Is that ever abbreviated, Kool-Aid to Laid?

17 A   Just Laid, yeah.

18 Q   So what happened when you were doing the laundry at

19 Tipperary Court?

20 A   Well, I did the laundry and I -- I was just about to take a

21 shower, and there was a knock at the door.  I went and answered

22 the door.  It was somebody telling us to move the van.

23 Somebody tried to drive her van, but it got stuck in the snow,

24 so somebody asked can we move the van out of the snow.

25      After I got out of the shower, I got a call from Kweka and

1   Brooke, telling me they could both leave work early, could I go

2   pick them up.  So I jumped in the truck and went to pick them

3   up, and on the way to the road, which was Farmers Loop, we got

4   arrested.

5   Q   Was there -- why was Kearney in the car with you,

6   Mr. Kearney?

7   A   We were actually going to go to the dispensary while we

8   were out.

9   Q   To buy what?

10  A   Marijuana.

11  Q   Did you -- what -- was a search warrant executed at the

12  house?

13  A   Yeah.

14  Q   Just to back up, what happened when the officers approached

15  you in the Hummer?

16  A   The officers approached me and, actually, we got stuck in

17  the snowbank.  So when they pulled up behind us, I thought they

18  were actually pulling up to try to give us a bump to push us

19  onto Farmers Loop.  I looked around, and next thing I know

20  there was guns in my face, telling us to get out of the truck.

21  So I was under the impression that they thought the drugs was

22  stolen.  They kept saying --

23          MR. CAMIEL:  Form.

24          THE COURT:  Let's hear the next question.

25  BY MS. WEBER:

```
 1   Q    What was your understanding of why you were being
 2   approached by law enforcement?
 3   A    For a stolen vehicle.
 4   Q    Was the vehicle stolen?
 5   A    It turned out that the person I had paying the rent on it
 6   wasn't paying it.
 7   Q    And what happened when they approached you?
 8   A    They took us out of the truck and handcuffed us.
 9   Q    Did they ask you any questions?
10   A    When they pulled us over, no.  They just let us know they
11   had search warrants for all the vehicles, all the
12   telecommunications devices in the house.
13   Q    Did you have your phone with you?
14   A    I did.  I asked them, can I have my phone, and that's when
15   they told me they had warrants for all telecommunication
16   devices.
17   Q    Did you try to show them anything on your phone?
18   A    No.
19   Q    And did they ask you for identification?
20   A    I'm sure they did.
21   Q    When they -- did they search the Hummer?
22   A    Yes, they did.
23   Q    Did you have anything in the backseat of that car?
24   A    Yeah.  I had a coat that had the remainder of the pills in
25   them, and maybe, I don't know, $1,200 or so, and my wallet and
```

1  ID.

2  Q   Were both you and Mr. Kearney arrested?

3  A   Yes.

4  Q   Did you know at the time that Mr. Kearney had cocaine in

5  his sneaker in the garage?

6  A   I did not.

7  Q   Were you surprised that Mr. Kearney was selling cocaine?

8  A   Somewhat, yes.

9  Q   Why was that surprising to you?

10 A   Like, I never knew him that -- I only ran across him maybe

11 four or five times in my life, and he always had a job.  I

12 actually thought he was in the military.

13 Q   Did you ever sell drugs with him?

14 A   No, no, no.

15 Q   When you were arrested, do you recall telling law

16 enforcement who you got the pills from?

17 A   Yeah.

18 Q   Who did you tell law enforcement that you got the pills

19 from?

20 A   Melvin Williams.

21 Q   Was that true?

22 A   No.

23 Q   Why did you lie?

24 A   Because maybe five or seven minutes before we got arrested,

25 him and his friend called me and asked me where I was, and five

```
 1   minutes later we were arrested.  I thought they set me up.
 2   Q    Who was Mr. Williams' friend that called you?
 3   A    We called him Slep Rock.  I can't think of his real name
 4   right now.
 5   Q    Can you spell that?
 6   A    Slep Rock?
 7   Q    Yes.
 8   A    S-l-e-p, R-o-c-k.  Clifford Andrews.  That's his name.
 9   Q    Does Melvin Williams have a nickname you know him by?
10   A    Just Melvin.
11   Q    Just Melvin.  And why did you tell police that it was
12   Melvin Williams?
13   A    I thought they had set me up.  They were other only ones
14   who actually knew where I was at when we got arrested, that I
15   knew of anyways.
16   Q    Did you sell any pills to Melvin?
17   A    I did.
18   Q    To Mr. Williams?
19        Did you receive any of the pills from Mr. Williams?
20   A    No, I didn't.
21   Q    If the police had believed you and arrested Melvin
22   Williams, would you be testifying in court today in the same
23   way you are today?
24   A    I'm sure they would have been able to quickly identify who
25   sold who the pills with our telecommunication.
```

1  Q   Did you think at the time that Melvin Williams would be

2  arrested after you named him?

3  A   Nah.

4  Q   Did you tell the police Melvin -- you were angry at

5  Mr. Williams?

6  A   No, I did not.

7  Q   Did you name Mr. Williams, because you were angry at him,

8  you believed he snitched?

9  A   That is exactly why.

10 Q   Do you have anything against Mr. Tulali?

11 A   No.

12 Q   Do you have any reason to have named him if he was not the

13 person who sold the pills to you?

14 A   No.

15          MS. WEBER:  Your Honor, may I approach the witness?

16          THE COURT:  Yes.  With what?

17          MS. WEBER:  With what's been marked for identification

18 as Government Exhibit 38.

19          THE COURT:  All right.

20          (Ms. Weber approaches witness.)

21          MS. WEBER:  I have a copy for the Court as well.

22          THE COURT:  All right.

23 BY MS. WEBER:

24 Q   Mr. Brown, do you recognize what I have handed you?

25 A   Yes.

```
1    Q    What is it?

2    A    A note from Kearney.

3    Q    When -- who is -- a note from Kearney to whom?

4    A    To me.

5    Q    How was it sent to you?

6    A    Somebody passed it to me in jail maybe.  Somebody did pass

7    it to me in jail.

8    Q    So it wasn't mailed, right?

9    A    No, no, no.

10   Q    This was while you were at FCC?

11   A    Right.

12   Q    Is there a letter, handwritten letter, next to the letter

13   that Kearney passed to you?

14   A    Yeah.

15   Q    What letter is it?

16   A    A "B."

17   Q    And what's under the "B"?

18   A    The letter or the other letter, "A"?

19   Q    What's -- what's next to "A"?

20   A    Another note.

21   Q    Who is that note from?

22   A    Kearney, as well.

23   Q    So these are both notes that Kearney passed to you in FCC?

24   A    Yeah.  Yes.

25   Q    Are they a -- are they the same letter -- did you receive
```

1   the letters, the notes?

2   A    Yes, I did.

3   Q    Are these a fair and accurate depiction of the letters you

4   received from Kearney while you were in FCC?

5   A    Yeah.

6         MS. WEBER:  Your Honor, move to admit.

7         MR. CAMIEL:  No objection.

8         THE COURT:  37 is admitted.

9         DEPUTY CLERK:  Is it 37 or 38?

10        MS. WEBER:  The original letters are 38, which is

11  shown to the witness.  These are copies.  We'll admit -- we

12  admit both -- let's admit 37 -- 38.  I apologize.

13        MR. CAMIEL:  38 is the original.  No objection.

14        THE COURT:  We'll admit only 38.  Thank you for

15  catching that, Madam Clerk.

16     (Exhibit 38 admitted)

17        MS. WEBER:  Your Honor, may I use what's been marked

18  as 37 as a demonstrative?

19        THE COURT:  That's fine.

20  BY MS. WEBER:

21  Q    It's a little difficult to read.  Can you please read that

22  first note?

23  A    "I swear to God, I said I never saw you, never got nothing

24  from you.  No, nothing, on my life, because it's true, on my

25  son's life.  I said I first saw you on that day."

1   Q    What was your understanding of what that note meant?

2   A    He was telling the truth that he never got any pills from

3   me and that that day, that morning, was the first time he had

4   saw me in months.

5   Q    Where you said "I first saw you on that day," who did he

6   say that to?

7   A    He was saying that to me.  It was a note to me.

8   Q    Was that --

9   A    The day Kearney and I got arrested was the first day we had

10  seen each other in months.

11  Q    Was he explaining what he told to law enforcement?

12  A    Yeah.  Yeah.

13  Q    So what was his purpose of sending -- what did you believe

14  his purpose to be for sending this note?

15  A    Well, I didn't know at the time why we were even arrested,

16  but he did.

17             MR. CAMIEL:  Your Honor, I'm going to object.

18             THE COURT:  That's sustained.

19  BY MS. WEBER:

20  Q    What did this note mean to you?

21  A    This note was just him telling me, hey, I told them the

22  truth that I never got nothing from you and I never --

23  Q    Told the police?

24  A    Told the police that he never got anything from me and he

25  had just seen me that day that we got arrested.

1    Q    Anything from you, meaning what?

2    A    Any drugs.

3    Q    When in relation to your arrest were these notes given to

4    you?

5    A    I don't know.  Maybe within the first week or two.

6    Q    And can you please read the second note?

7    A    "What you think they going to" -- I can't -- I can't --

8    "What you think going to happen?  They just said that they got

9    me on giving someone one of my pills, said that he overdosed,

10   but when he woke up, he said I was the person that gave it to

11   him.  I keep" -- I don't know.  I can't -- "I keep telling the

12   lawyer I don't know you on that level, or the other defendant.

13       "Lawyer say I'm facing minimum 20.  My son will be 23.  I

14   will miss everything.  All I was doing was helping Mama.  Now

15   I'm here."  I don't know what it says -- I can't -- I don't

16   know what that word is.

17   Q    "Mouth shut," could it be?

18   A    It could be.

19            MR. CAMIEL:  Your Honor, I object to leading.

20            THE COURT:  That is sustained.

21            MS. WEBER:  Your Honor, it's in evidence.

22            THE COURT:  Oh, it is in evidence?  But it's still

23   leading, so sustained.

24            THE WITNESS:  "My mouth say I just never know what's

25   going on.  I feel like I am" -- I can't make out the word.  "I

1    feel like I ain't coming home."

2    BY MS. WEBER:

3    Q    Sorry.  What was that?

4    A    "I feel like I ain't coming home," the last sentence.

5    Q    So that first sentence, "Aye Laid man," what's --

6    A    "Aye Laid man, what you think going to happen?"

7    Q    And Laid is your nick -- what --

8    A    Laid, yeah.

9    Q    Is your nickname?

10        "They got me on giving someone Mama pills."

11        What does that mean?  What did that mean to you?

12    A    That meant they gave -- he gave someone Mama's pills.

13    Q    What was your understanding of what --

14    A    I know he called Kweka "Mama."

15    Q    And when you first picked up the package from Kweka's

16    house, you mentioned it was opened?

17    A    Yeah.

18    Q    Was there any -- and then you said you brought it somewhere

19    else and counted the pills?

20    A    Right.

21    Q    How many pills were inside the package?

22    A    480.

23    Q    How many pills were you expecting from Mr. Tulali?

24    A    500.

25    Q    Did you know what happened to the 20 missing pills?

```
 1   A    No.  I thought maybe he counted wrong, maybe they --
 2            MR. CAMIEL:  Your Honor, speculation as to what he
 3   thought.
 4            THE COURT:  Well, that's sustained.  Go ahead.  Let's
 5   hear your next question.
 6   BY MS. WEBER:
 7   Q    Were you -- you were paying -- how many pills were you
 8   expected to pay for?
 9   A    500.
10   Q    How many pills did you receive?
11   A    480.
12   Q    How did you feel about missing those 20 pills?
13   A    I really didn't care with this.  The price up here was so
14   different that it really didn't matter.  It wasn't worth
15   complaining about.
16   Q    If -- did you think someone stole it from you?
17   A    Not initially, no, but later I did.
18   Q    Did you think that the package came with 500, potentially?
19   A    Like I said, initially I just didn't know.  I didn't know
20   if it came with 480.  I thought it could have been a miscount.
21   Q    A miscount by whom?
22   A    By OJ.
23   Q    When Mr. Kearney wrote in the note, "All I was doing was
24   helping Mama now I'm here.  My mouth shut.  I just never know
25   what's going on," again, what -- what did you understand --
```

1  like, what was he trying to tell you -- what did you believe he

2  was telling you?

3  A   I thought he was telling me that he sold pills for Kweka.

4  Q   So I just want to go back to something you said about the

5  missing pills.

6      You said you weren't angry about the missing pills; is that

7  right?

8  A   No.

9  Q   And if you found out that Kweka had taken them, would you

10 have been angry?

11          MR. CAMIEL:  Objection.

12          THE COURT:  That's sustained.  Speculation.

13 BY MS. WEBER:

14 Q   Did there come a time when you wondered whether Kweka may

15 have taken them?

16          MR. CAMIEL:  Objection again.  Asking for speculation.

17          THE COURT:  "Did there come a time," I'll allow that.

18          THE WITNESS:  What was the question?

19          MS. WEBER:  Madam Court Reporter?

20          (Question read back by court reporter)

21          THE WITNESS:  Oh, yes, absolutely.

22 BY MS. WEBER:

23 Q   Did you pay her?

24 A   No, I didn't.  No, I didn't.

25 Q   When you suspected Ms. Warner of taking them --

```
 1              MR. CAMIEL:  Objection.
 2    BY MS. WEBER:
 3    Q   -- were you angry at her?
 4              THE COURT:  No, that's not what the testimony was, so
 5    rephrase.  You asked if he wondered.
 6              MS. WEBER:  And then I asked if he cared, did he care.
 7              THE COURT:  And he said no.
 8    BY MS. WEBER:
 9    Q   You were not angry?
10    A   No.
11    Q   If you could please take a look in that binder at what's
12    been marked as Exhibit 26.
13              MS. WEBER:  Can we please publish to the jury, Your
14    Honor?
15    BY MS. WEBER:
16    Q   Do you recognize Government's Exhibit -- what's been marked
17    as Government Exhibit 26?
18    A   Yeah.
19    Q   What is this?
20    A   Text messages between -- or Facebook Messages between
21    Clifford Dean Andrews and myself.
22    Q   Do you know who Clifford Dean Andrews is?
23    A   Yeah.
24    Q   Do you know him by another name as well?
25    A   Slep Rock.
```

```
 1    Q   Is this your Facebook account?

 2    A   Yes, I'm sure it is.  Yes.

 3            MS. WEBER:  Your Honor, move to admit Government

 4    Exhibit 26 into evidence.

 5            MR. CAMIEL:  No objection.

 6            THE COURT:  Did you say 26, and did you say 27 as

 7    well?

 8            MS. WEBER:  Just 26.

 9            THE COURT:  That's admitted.

10        (Exhibit 26 admitted)

11    BY MS. WEBER:

12    Q   What was your relationship with Mr. Andrews?

13    A   I knew him for a few years too, but really I guess he was

14    just somebody I knew from around.  I hadn't really dealt with

15    him in years until this particular time that I was in town.

16    Q   Did you sell drugs to Clifford Andrews?

17    A   Yes, I did.

18    Q   Did you ever buy drugs from Clifford Andrews?

19    A   No, I haven't.

20    Q   I would like to direct your attention to page 10 -- page 6,

21    one page before.  Sorry.  On the bottom, it says "10 of 12."

22            MR. CAMIEL:  10 of 12?

23            MS. WEBER:  Yes.

24    BY MS. WEBER:

25    Q   We'll start at the top of the page.
```

1    What happened on 10-31-2020?  The exhibit states you missed

2  a call from Clifford.  And then what did you respond?

3  A   He asked me was I in traffic.  These are all messages just

4  from him at the top, that I got so far.

5  Q   And on 11-6 at 1859 in UTC, he says, "Can you meet me at

6  the urgent care by Wendy's in, like, 30 minutes?"

7  A   Yeah.  I tell him, "Bet."  Okay.  That was the day that it

8  was a blizzard.  It was snowing like -- I said I gave a couple

9  of people a ride that day.  He was one of them.

10  Q   Were you -- why -- why were you meeting Mr. Andrews?

11  A   I met him to give him a couple of pills, but also to give

12  him a ride.

13  Q   Did you give him a couple of pills on that day?

14  A   Yeah.  I can't remember exactly how many.  Maybe 10 or 20

15  of them.

16  Q   Where did you -- where did you get the pills you gave to

17  Clifford Andrews?

18  A   They were the same pills I had delivered from California.

19  Q   Who were they delivered by?

20  A   OJ.

21  Q   In that same package?

22  A   Yeah.

23  Q   Did you ever receive any other pills from Mr. Tulali, or

24  was there just that one?

25  A   Just that one package.

1    Q    On October 17th?

2    A    Correct.

3    Q    And then take a look at the next page, please, 11 of 12.

4         So later that day, at around 1936 UTC, he says, "Pull up in

5    front."  Is this around the time that you met or was that --

6    what time did you meet Andrews on the --

7    A    I met him way earlier than that.

8    Q    So this is in universal time, so Alaska time is actually

9    eight hours earlier.

10   A    Oh, okay, okay, okay.  Yeah, that might have been the time,

11   yeah, I pulled up in front of urgent care and picked him up.

12   Q    So it seems like there's two different plans to meet.

13   There is one at -- I can't do the math -- at 10:59 a.m., "Can

14   you meet me at the urgent care by Wendy's," and then another

15   one later in the day, on the next page, "Where are you?  Pull

16   up in front.  Where are you pimping?"

17   A    This is where I thought he had set me up.  When he says,

18   "Where are you pimping," I say, "Heading into town to pick up

19   old girl from work.  What's up?"

20        And his response was:  "Just wondering."  And I got

21   arrested a few minutes later.

22   Q    Mr. Brown, I just have a couple last questions.

23        You've been referring to --

24            THE COURT:  Are you going to take this down?

25            MS. WEBER:  Please.  Thank you.

BY MS. WEBER:

Q    During your testimony, you have been referring to OJ?

A    Right.

Q    Who is OJ?

A    What do you mean?

Q    Who is --

A    Who is he to me?

Q    Who is he?

A    He's a guy I met in California several years ago.

Q    He's this man, he's the defendant?

A    Yeah, he's the defendant, yeah.

Q    So OJ is -- the person you know as OJ is the man sitting
right here in court?

A    Yes.

Q    I just wanted to clarify the terms and the names that we've
been using.

          THE COURT:  Any further questions?

          MS. WEBER:  No further questions.

          THE COURT:  Very good.  Why don't we take our morning
break, ladies and gentlemen.  Please leave your notepads here
in the courtroom.  Remember my admonition not to discuss the
case and do any research.

          We'll have you here about 10:35 a.m.  I had one point
I wanted to bring up with counsel very briefly.  You may all be
excused.  Thank you, Lisa.

1    (Jury absent)

2          THE COURT:  All right.  Please be seated.

3          Very quickly, Ms. Weber.  In your offer of proof from

4    yesterday evening, you referenced the plea agreement of

5    Christopher Kearney.  I don't have that.  Do you have a copy

6    you could provide me after the break?  You can get it to me

7    later.

8          MS. WEBER:  Yes, Your Honor.

9          THE COURT:  Very good.  Anything else to take up now?

10   Mr. Camiel, anything to take up?

11         MR. CAMIEL:  No.

12         MS. WEBER:  Your Honor, the only thing I would like to

13   bring to the Court's attention is that in defense exhibit that

14   was admitted yesterday, Exhibit -- Defense Exhibit Z --

15         THE COURT:  Which letter?

16         MS. WEBER:  Z, as in zebra.

17         THE COURT:  Got it.

18         MS. WEBER:  What was offered into evidence is a

19   McDonald's pay stub for Christopher Kearney dated

20   September 14, 2020, and there has been testimony that Jacob Lee

21   was working at McDonald's in October of 2020.  It seems like

22   defense is arguing that maybe perhaps Mr. Lee got pills from

23   Mr. Kearney.  So the fact that Mr. Kearney got the pills from

24   Mr. Brown is --

25         THE COURT:  What proof is there in the record now that

1    Mr. Kearney got the pills from Mr. Brown?

2         MS. WEBER:  I'm sorry.  What proof is in the evidence

3    that Mr. Kearney --

4         THE COURT:  Kearney got the pills from Mr. Brown?

5         MS. WEBER:  Mr. Brown testified that he left the pills

6    at Kweka Warner's house and when he came back, the box was

7    open, 20 were missing.  And based on those notes that were

8    passed in prison with Chris saying, I took the pills from Kweka

9    Warner and somebody overdosed --

10        THE COURT:  All right.

11        MS. WEBER:  -- it -- it seems as if defense is arguing

12    that maybe Mr. Lee got the pills from Mr. Kearney --

13        THE COURT:  So what is it in this note that leads one

14    to be able to infer that Mr. Kearney took the 20 pills out of

15    the box?

16        MS. WEBER:  In that second note, where he says, "I got

17    the pills from Mama."

18        THE COURT:  "From Mama's pills."

19        MS. WEBER:  Yes.  "Mama's pills" is Kweka Warner.

20        THE COURT:  Well, I can hear from the defense later on

21    that.  So that's why I asked to see the plea agreement.  If it

22    said, I got the pills from Mr. Brown, that would be something.

23    I suspect it doesn't, but I'll see.

24        MS. WEBER:  I just wanted to bring that exhibit to the

25    Court's attention.

1          THE COURT:  All right.  I'll take a look.  Let's go

2     off record and come back at -- I said 10:35, correct?

3          DEPUTY CLERK:  All rise.  This court is now in recess

4     until 10:35 a.m.

5        (Recessed from 10:22 a.m. to 10:38 a.m.)

6        (Jury present)

7          DEPUTY CLERK:  Please be seated.

8        (Pause)

9          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

10    United States District Court is again in session.

11          Please be seated.

12          THE COURT:  All right.  We are back on record.  Ready

13    to proceed, Mr. Camiel?

14          MR. CAMIEL:  Yes.

15          THE COURT:  Go right ahead.

16                    CROSS-EXAMINATION

17    BY MR. CAMIEL:

18    Q   Mr. Brown, you told the jury you're serving a 168-month

19    sentence?

20    A   Yes.

21    Q   And that seems like a long time to you, doesn't it?

22    A   It does.

23    Q   Can you speak up a little bit?

24    A   It does.

25    Q   But you were actually facing a substantially longer

1  sentence when you were first arrested, weren't you?

2  A    Yeah.

3  Q    In fact, you were told that you were facing the potential

4  of a mandatory life sentence, right?

5  A    Yes.

6  Q    And even if the government didn't pursue a sentencing

7  enhancement that would give you a mandatory life sentence, you

8  would be facing a mandatory sentence of 20 years, right?

9  A    Yes.

10  Q    And, in fact, the note we were looking at just a minute ago

11  where Mr. Kearney was referring to a minimum of 20 years,

12  that's what you were facing?

13  A    Right.

14  Q    But you ended up with a sentence less than 20 years, right?

15  A    Yes.

16  Q    And that's because you entered into a cooperation agreement

17  with the government?

18  A    Correct.

19  Q    Okay.  And that cooperation agreement is still in effect,

20  right?

21  A    As far as I know, no.  I cooperated with the people that I

22  got arrested with back then, and that was the end of it.

23  Honestly, I never even thought that they would go and get him.

24  I had no idea this was going to be happening.

25  Q    Well, the reason you're here is because, under your

1    cooperation agreement, you were -- you were promising that you

2    would continue to cooperate, including testify, even after you

3    were sentenced, right?

4    A    Oh, yes.  Yes.

5    Q    All right.  So this is part of your cooperation agreement?

6    A    I suppose so.

7    Q    Well, you told the jury that if you refused to testify,

8    your plea agreement could be vacated and you could be back

9    facing those original charges, right?

10   A    Did I tell the jury that?

11   Q    Isn't that what you said earlier this morning?

12   A    I don't recall saying that.

13   Q    All right.  Well, if you were -- what do you think would

14   happen if you told the government, "No, I'm not going to

15   testify"?

16   A    I never considered that.  I don't know.  Hopefully -- I

17   mean, as far as I was concerned, my sentence was -- I'm

18   sentenced, I'm through.

19   Q    All right.  Are you hoping for a time cut?

20   A    No, no.

21   Q    You know what the federal sentencing guidelines are, don't

22   you?

23   A    Yes.

24   Q    What are those?  Tell the jury what that is.

25   A    The federal sentencing guidelines are the guidelines by

1  which they sentence defendants according to their criminal

2  history category and the severity of their charges.

3  Q    You were facing a sentencing guideline range at the time

4  you were sentenced in this case that you pled guilty to of 235

5  to 365 months in prison, right?

6  A    I believe so.

7  Q    And you got 168, right?

8  A    Yes.

9  Q    So you were actually looking at a guideline range of

10  roughly 20 to 30 years?

11  A    Correct.

12  Q    And you got 14 years?

13  A    Correct.

14  Q    Mr. Brown, how would you describe what you did for a living

15  back in the fall of 2020 around the time you were arrested?

16  A    I sold drugs for a living.

17  Q    And you said you had been doing that most of your adult

18  life?

19  A    Yes.

20  Q    And you told us you sold cocaine?

21  A    Yes.

22  Q    Heroin?

23  A    Yes.

24  Q    Methamphetamine?

25  A    Yes.

```
 1   Q   And you admitted today, you sold pills?
 2   A   Briefly, yes.
 3   Q   When you say most of your adult life you were selling
 4   drugs, how many years?
 5   A   I don't know.  I spent several years incarcerated as well,
 6   so I would have to do the math.
 7   Q   Be fair to say you probably spent over 20 years on the
 8   outside selling drugs?
 9   A   Maybe a little less, maybe 15.
10   Q   All right.  Were you good at it?
11   A   Apparently not.
12   Q   To be able to do it for such a long time, though, you had
13   to develop some skills, didn't you?
14   A   I mean, a little.  I mean, it's not rocket science.
15   Q   Have to be a good salesman?
16   A   Not -- not particularly.  Just have it, they'll come.
17   Q   I'm sorry?
18   A   Not particularly.  Just have the drugs, addicts will come.
19   Q   Just have the drugs and the addicts will come?
20   A   Addicts will come.
21   Q   All right.  Have to be a good negotiator?
22   A   I suppose.
23   Q   You had to be able to protect your sources?
24   A   I suppose.
25   Q   Well --
```

1  A    I mean, from what, protect your sources from what?

2  Q    Well, you wouldn't want other people, like an addict, to

3  know who your source was, because then they'd go around you and

4  get the drugs from your source and you'd lose out.

5  A    Happens all the time.

6  Q    I'm sorry?

7  A    Happens all the time.  It's just a matter of who has the

8  most money to pay for whatever.  It happens all the time.

9  Q    All right.  You learn certain techniques to try to do your

10 drug dealing, right?

11 A    Yes.

12 Q    Okay.  Like not using your own name on things?

13 A    Correct.

14 Q    You talked about, for example, burner phone?

15 A    Right.

16 Q    And with a burner phone, you don't even have to subscribe,

17 right?

18 A    Right.

19 Q    Okay.  So I want to talk to you a little bit about the date

20 you were arrested, November 6th of 2020.  Right?

21 A    Okay.

22 Q    You were arrested in a Hummer, right, a Humvee?

23 A    Yes.

24 Q    And you said when the police came up to you and you saw

25 that they weren't there to help you, that they had guns out,

1  you assumed you were being arrested because it was a stolen

2  vehicle?

3  A    Right.

4  Q    Because what had happened is, you had flown down to

5  Anchorage and, using somebody else's name, you had rented that

6  vehicle, right?

7  A    I did.

8  Q    You used a guy named Terrell Codger?

9  A    I don't remember his name exactly.

10  Q    All right.  But you showed ID at the rental place

11  pretending, to be somebody else?

12  A    Correct.

13  Q    And you signed the rental agreement in somebody else's

14  name?

15  A    Correct.

16  Q    And then you drove that -- what was the length of time that

17  you were supposed to be renting the vehicle for?

18  A    I can't remember.  But we made arrangements to continue

19  paying on the rental.  But the guy that I sent money to to pay

20  apparently never paid.

21  Q    All right.  But you drove that vehicle back from Anchorage

22  to Fairbanks, right?

23  A    Yes.

24  Q    All right.  And, by the way, when you went down to

25  Anchorage and then brought the vehicle back to Fairbanks, you

1  had -- you had some drugs with you that you picked up in

2  Anchorage, right?

3  A  I don't recall picking up drugs from Anchorage and coming

4  back with them.

5  Q  Do you remember, after you agreed to cooperate, telling the

6  police that you picked up some heroin in -- a load of heroin in

7  Anchorage, brought it back to Fairbanks?

8  A  I might have.  Once again, it was almost four years ago.

9  Q  All right.  You know a guy named Hersch or Herschel, right?

10  A  Yes.

11  Q  Right?

12  A  Yes.

13  Q  He's your source for heroin, or was your source for heroin,

14  right?

15  A  One of them, yes.

16  Q  He's down in Anchorage, right?

17  A  Yes.

18  Q  He's the guy you got the heroin from to bring back to

19  Fairbanks in the stolen Hummer?

20  A  Once again, the Hummer was supposed to be getting paid for.

21  If I said that, then that's what it was.  Herschel also

22  frequents Fairbanks, as well.

23  Q  All right.  But you brought heroin back here to sell,

24  right?

25  A  Yes.

1    Q    Okay.  And that was in the fall of 2020, the time period

2    we've been talking about, right?

3    A    Yes.

4    Q    Okay.  And, by the way, you're from Florida, right?

5    A    Correct.

6    Q    And you would come out to Fairbanks once or twice a year?

7    A    Sometimes twice a year, sometimes four or five times a

8    year.

9    Q    You would come out to visit, but you would also come out to

10   sell drugs?

11   A    Pretty much, yes.

12   Q    And so in the fall of 2020, in addition to bringing that

13   heroin back from Anchorage to sell here in Fairbanks, you also

14   picked up half a pound of methamphetamine, right?

15   A    Yeah.  I believe that was here in Fairbanks.

16   Q    Okay.  And that methamphetamine, you got to sell?

17   A    Yes.

18   Q    And you got that methamphetamine from a guy who was from

19   California, right?

20   A    Correct.

21   Q    A guy named Quinton Turner?

22   A    Correct.

23   Q    What part of California is Mr. Turner from?

24   A    I believe Compton.  I never talked to him while he was

25   actually in California.

```
 1   Q   You got the methamphetamine from him here, but he's from
 2   California?
 3   A   Right.  I've only dealt with him in Fairbanks.
 4   Q   How much money did you make selling the heroin that you
 5   brought from Anchorage?
 6   A   I can't remember.  A couple thousand dollars.  I can't even
 7   remember how much heroin it was, actually.
 8   Q   When you came -- when you came to Alaska in 2020, in the
 9   fall of 2020, how much money did you bring with you?
10   A   I don't know.  Maybe $1,000.  I had cocaine coming with me.
11   Q   So you brought cocaine here.  How much did you bring?
12   A   Maybe 9 ounces.
13   Q   Okay.  And did you sell that?
14   A   Yes.  Yeah.
15   Q   Were you ever charged or arrested or charged with selling
16   that cocaine?
17   A   In the past?
18   Q   No.  When you came out in the fall of 2020?
19   A   No, no, no.
20   Q   How about the heroin -- first of all, how much heroin did
21   you bring up from Anchorage?
22   A   I can't recall.
23   Q   Do you remember how much money --
24   A   Maybe a couple ounces.  I can't --
25   Q   I'm sorry?
```

```
 1   A    Maybe a couple ounces.

 2   Q    A couple ounces?

 3   A    Maybe.

 4   Q    How much could you make from a couple ounces of heroin?

 5   A    In Fairbanks at that time?

 6   Q    Yeah.

 7   A    Selling it wholesale, maybe -- I think wholesale, maybe

 8   2500 an ounce.

 9   Q    So if you had 2 ounces, that would be 5,000?

10   A    Yes.

11   Q    And the methamphetamine, how much -- how much

12   methamphetamine did you buy to resell?

13   A    A half a pound, so 8 ounces.

14   Q    So how much did you make selling 8 ounces --

15   A    Probably that price was way cheaper.  I think the price of

16   that was maybe $700 an ounce at the time.

17   Q    That's how much you paid for it or how much --

18   A    That's how much I would have sold it for.

19   Q    And so when you say that you brought this stuff here and

20   you sold it, you were selling it to redistributors?

21   A    Yes.  For the most part, yes.

22   Q    You were higher up, kind of, in the drug-dealing chain?

23   A    Kind of, yeah.

24   Q    So you were higher up.  You'd sell it to a redistributor

25   who would sell it to a user?
```

A   For the most part.  But I also knew several users, as well,
that I kind of dealt with, I knew forever.

Q   Okay.  You talked about bringing cocaine from Florida.  But
from time to time, you brought pills from Florida too, right?

A   Yeah.

Q   Okay.  And you also, after you got up here in the fall of
2020, you didn't stay here, you were going back and forth
between Fairbanks and Anchorage, right?

A   Yeah.  I think I might -- I was only here for maybe six
weeks.  I visited Anchorage twice in those six weeks, I
believe.

Q   Okay.  And when you'd tell people you were going down to
Anchorage, what term would you use for heading down to
Anchorage?

A   I can't recall.  Maybe I'm just out of town.  I don't know.

Q   Would you say -- would you use the term "dip," I had to dip
down?

A   Oh, yeah, yeah, yeah.

Q   That's --

A   Yeah.  That was the lingo back then.

Q   Okay.  I'm going to have you look in the exhibit book.  But
this time I'm going to have you look in the smaller book that's
got the lettered exhibits.

A   This one?

Q   Yes.  I'm going to have you look at Defense Exhibit J,

```
 1   which I believe is not admitted yet.
 2            THE COURT:  Is that correct?
 3            DEPUTY CLERK:  J has been admitted.
 4            THE COURT:  J has been admitted.
 5            MR. CAMIEL:  Thank you.  I would move to publish.
 6            THE COURT:  Go ahead.
 7   BY MR. CAMIEL:
 8   Q    This is from your Facebook, right?
 9   A    Looks to be.
10   Q    It has your name, Andre Brown, Facebook, right?
11   A    Yeah.
12   Q    Who is Cortez Holloway?
13   A    A guy I knew up here.
14   Q    In what way do you know him?
15   A    I know him from the bars and stuff.  But I actually -- I
16   can't remember if I sold him or fronted him a couple of pills
17   here and there.  I believe I fronted him a couple pills a
18   couple times.
19   Q    Okay.  And so if you would look at just the highlighted
20   section of the message, that highlighted section is you sending
21   a message to Mr. Holloway, right?
22   A    Yeah.
23   Q    Okay.  Read that to the jury, the highlighted part.
24   A    "I had to dip and get into some other shit.  You know
25   anybody who would be wanting those Perc 30s?"
```

1   Q    You're telling him you had to go down to Anchorage, right?

2   A    I don't know if I was going to Anchorage or -- "dip" meant

3   I just had to leave.

4   Q    Okay.  And come back with some 30s, right?

5   A    Absolutely not.  I had to dip to get into -- and get into

6   some other shit.  I don't know.  Maybe I seen him in the club

7   that night or seen him somewhere and we spoke briefly.  Dip was

8   just the lingo.  Dip doesn't mean I necessarily went out of

9   town.  Dip means leave.  So I was asking him, does he know

10  anybody who wants Perc 30s.

11  Q    Let's have you look now at Defense Exhibit B, so in the

12  same book, but letter B.

13          MR. CAMIEL:  I believe B has been admitted.

14          THE COURT:  That's correct.

15          MR. CAMIEL:  Please, if we could publish.

16  BY MR. CAMIEL:

17  Q    That's one of your messages, right?

18  A    Yes.

19  Q    Okay.  And it's a little bit cut off at the top.  Let me

20  see if I can -- you see the date of the message?

21  A    Yep.  October 7th.

22  Q    Okay.  So you had been here in Fairbanks for a bit, because

23  you came in September, right?

24  A    Right.

25  Q    Okay.  And then according to this message here, you went

1   down to Arizona, right?

2   A    According to that message, yes.  But I didn't want him to

3   know exactly where I was at.

4   Q    But your message says, "I'm out here in AZ."

5       "AZ" is Arizona, right?

6   A    Correct.

7   Q    "About to catch a flight to AK," which is Alaska, "in a

8   second," right?

9   A    Right.

10  Q    You testified earlier today, you would go down to Arizona

11  and get drugs and bring them back here?

12  A    Correct.

13  Q    So that's what you were doing here in early October

14  of 2020?

15  A    Went to Arizona?

16  Q    That's what it says, right?

17  A    No.  I wasn't there.  I just didn't want him to know

18  exactly where I was at at the time.  But when I was here, when

19  I got here in September, I never left the state of Alaska until

20  I went away to prison.

21  Q    Well, so you just -- you were just lying to somebody when

22  you were saying you were in Arizona at the time?

23  A    Yeah.

24  Q    Okay.  Kind of like when you rented the Hummer, you lied to

25  the rental place?

```
 1  A    Yes.  Once again, I sold drugs.  We really didn't want
 2  people knowing us.
 3  Q    Let's go back to the day that you were arrested.  Okay?
 4  It's November 6th of 2020.  You're stopped by the police.
 5  You're pulled out of the car at gunpoint, right?
 6  A    Correct.
 7  Q    You've got Mr. Kearney in the car with you, right?
 8  A    Correct.
 9  Q    And the police start asking you why it is that you're in a
10  stolen vehicle, right?
11  A    Correct.
12  Q    And you told them, "Hey, I just borrowed the vehicle
13  earlier today from a guy here in Fairbanks"?
14  A    Correct.
15  Q    Which was a lie, right?
16  A    Yeah.
17  Q    And so you not only told them that, you gave them the guy's
18  name and you said, "Just met him earlier today"?
19  A    Yeah, yeah, met up with him earlier today, correct.
20  Q    And then the police started asking you about a black jacket
21  that was in the back of the car, right?
22  A    I can't remember if they asked me at that particular time
23  about it, but maybe.
24  Q    Do you remember them asking you about some pills that they
25  found in the jacket?
```

1   A   They did, yes.  Yes.

2   Q   Okay.  And initially, what you said was, "I don't know

3   anything about any pills, it's a rental car, anybody could have

4   been using this car," right?

5   A   I might have said that.

6   Q   Yeah.  And then they told you that they --

7   A   My ID was in the same coat with that, so I don't know if I

8   would have exactly said that.

9   Q   Well, they told you -- the police told you after you told

10  them you didn't know anything about the pills, they told you

11  they found your identification in that jacket with the pills,

12  right?

13  A   I don't recall that.

14  Q   But your ID was in that jacket, right?

15  A   My ID was definitely in that jacket.

16  Q   And not only were there pills, a baggie of pills in that

17  jacket, but there was money, right?

18  A   Yeah.

19  Q   A couple thousand dollars?

20  A   Maybe a thousand, maybe 1200.

21  Q   And then later that day, or at some point that day, the

22  police questioned you about the source of those pills, right?

23  A   Correct.

24  Q   And that's when you told them that you got the pills from a

25  guy named Melvin Williams, right?

1   A    Correct.

2   Q    Okay.  And you knew a Melvin Williams?

3   A    Yes.  Yes.

4   Q    In fact, you said he was a friend of yours?

5   A    Yes.

6   Q    Okay.  But you told the police that that friend of yours

7  was the one who supplied you with the pills?

8   A    Right.

9   Q    And you told us a little bit earlier, you told the jury the

10  reason you did that was to retaliate against him because you

11  thought he had turned you in?

12   A    Yes.

13   Q    So you were willing to blame somebody else for the pills

14  that were found on you because you were upset with him?

15   A    Yes.  Yes.

16   Q    You were willing to let somebody else be arrested to get

17  out of your own problem, right?

18   A    Yes.

19   Q    And not only did you tell the police that you got the pills

20  from Melvin Williams, you told them where you met with him,

21  right?

22   A  I can't recall.  Maybe.

23   Q    You told them what he drove, that he drove an old Subaru?

24   A    Yeah, yeah.

25   Q    And you told them that the two of you used to sell cocaine

1  together?

2  A    Yeah.

3  Q    And what you're telling us here today is you were just

4  lying to the police, right?

5  A    No, no.  Most of that was true, except I didn't get the

6  pills from him.

7  Q    The most important part wasn't true?

8  A    Right.

9  Q    You told us that you've used the mail before to mail and

10  ship drugs, right?

11  A    Yeah.

12  Q    You have both sent packages and received packages?

13  A    Yes.

14  Q    And you've said that sometimes you even used your own name

15  on a package, right?

16  A    Yeah, I did once or twice.

17  Q    Going back to the day you were arrested, you knew that the

18  police were also executing a search warrant on the house that

19  you just left at 310 Tipperary Court?

20  A    Yes.

21  Q    You didn't know anything about any pills that they found in

22  the kitchen in a cabinet above the microwave, did you?

23  A    Not until much later.

24  Q    You didn't put those there?

25  A    No.

```
 1   Q   You didn't know they were there?

 2   A   No.

 3   Q   You didn't see who put them there?

 4   A   No.

 5   Q   I asked you a few minutes ago about the methamphetamine

 6   that you purchased.  Who did you purchase that from?

 7   A   Quinton.

 8   Q   You got it from Quinton?

 9   A   Quinton.

10   Q   That was the Quinton Turner?

11   A   Yeah.

12   Q   And you sold that or you worked with another guy,

13   Ramone Garcia, to distribute that meth?

14   A   Yeah.

15   Q   I'm going to have you look at another defense exhibit.

16   It's letter K.

17           MR. CAMIEL:  Is K admitted?

18           DEPUTY CLERK:  Just identified.  It was not admitted.

19   BY MR. CAMIEL:

20   Q   Do you recognize what's Exhibit K, Defense Exhibit K?

21   A   Yes.

22   Q   What is it?

23   A   A message between me and Kweka Warner.

24   Q   She's the woman who lived at 310 Tipperary Court?

25   A   Yes.
```

```
 1   Q    Yes?

 2   A    Yes.

 3   Q    Okay.  She's the person that Mr. Kearney was referring to

 4   when he was talking about Mama's pills?

 5   A    Yeah.

 6   Q    So this is from your phone, right?

 7   A    Yep.

 8   Q    You messaging her?

 9   A    She's messaging me, "Are you home?"

10   Q    And then you're messaging her back?

11   A    Yes.

12   Q    Okay.  I would move to --

13        MR. CAMIEL:  I would move to introduce Defense Exhibit

14   K.

15        THE COURT:  Any objection?

16        MS. WEBER:  No, Your Honor.

17        THE COURT:  K is admitted.

18     (Exhibit K admitted)

19        MR. CAMIEL:  And move to publish.

20        THE COURT:  Go right ahead.

21   BY MR. CAMIEL:

22   Q    The green portion, that's you, right?

23   A    Correct.

24   Q    Okay.  Read what you wrote.

25   A    "No.  I'm not pretty eyes.  I had to dip to Anchorage.
```

1   I'll be back tomorrow evening."

2   Q    So November 1st, you went back to Anchorage, right?

3   A    No.  I was still in Fairbanks.

4   Q    Okay.  You had gone down to Anchorage, right?

5   A    Probably sometime early October.  Late October, November, I

6   was -- I was in Anchorage -- I was in Fairbanks from --

7   definitely from the time I got the pills until I got arrested.

8   Q    So what was this trip to Anchorage for?

9   A    I wasn't in Anchorage.  I was actually at the 7 Gables

10  motel with another woman.

11  Q    So once again, you weren't -- you didn't really dip to

12  Anchorage, you were just lying to somebody?

13  A    For the most part.  I didn't have to.  We weren't in an

14  exclusive relationship.

15  Q    Well, that wasn't my question.

16  A    Yeah.

17  Q    So another lie, right?

18  A    (No response.)

19         MR. CAMIEL:  We can take that one down.

20  BY MR. CAMIEL:

21  Q    Now, you met my client, Mr. Tulali, in the late '90s,

22  right?

23  A    Yeah, '96, '97.

24  Q    And you hadn't seen him in over ten years?

25  A    Other than Facebook, no.

```
 1   Q    So you hadn't seen him in person, I should say?

 2   A    Correct.

 3   Q    You guys communicated on Facebook?

 4   A    Yeah.

 5   Q    When you were sick and you had a tumor problem, you

 6   communicated?

 7   A    Correct.  I believe, yeah.  Yeah.

 8   Q    And you had never received anything or dealt any drugs with

 9   Mr. Tulali before you claim that he sent you this package?

10   A    Correct.

11   Q    And so all of a sudden in 2020, it's your testimony that he

12   decides to send you a package with pills from California?

13   A    We had discussed it before.  We just never -- it just never

14   came to fruition.

15   Q    Talking about the package again, you said you had the name

16   Marley Warner.  That's the name you wanted the sender to put on

17   the package, right?

18   A    Correct.

19   Q    Okay.  14 years old, a minor?

20   A    Yeah.

21   Q    So you wanted a package of pills to be sent to a minor?

22   A    I wanted the package of pills to be sent to me in the

23   minor's name.

24   Q    But using the minor's name as a recipient?

25   A    Yeah.
```

```
 1   Q    This was to protect yourself because if the package was
 2   intercepted, your name wouldn't be on it?
 3   A    Correct.
 4   Q    So once again, somebody else would get the blame for
 5   something you were involved in?
 6   A    Yes.
 7   Q    Just like with the rental car, right?
 8   A    I suppose.  I didn't anticipate anybody not paying for the
 9   rental car.
10   Q    Or just like Melvin Williams, right?
11   A    Yeah.
12   Q    So because you had her name put on the package, you had to
13   have her go with you to the post office to pick it up?
14   A    I did.
15   Q    Okay.  So you involved a minor in your drug activity,
16   right?
17   A    Yes.
18   Q    Were you ever charged with that?
19   A    No.
20   Q    Okay.  By the way, you already said you were not charged
21   with the meth and you weren't charged with the heroin, right?
22   A    Correct.
23   Q    So now you're also not charged with involving a minor in
24   receiving drugs, a drug package?
25   A    I didn't know it was a question.  What was the question?
```

1   Q   You were not charged with involving a minor --

2   A   No, I wasn't.

3   Q   -- in drug trafficking?

4      And so you say you picked up this package, what you had

5  been waiting for, right?

6   A   Yeah.

7   Q   Okay.  You said you missed out on it because nobody was

8  home when they first tried to deliver it, right?

9   A   No, no, no.  I don't think they actually delivered.  The

10  place where she stayed, it was kind of off the road, so it

11  wasn't just -- there wasn't a note to just leave it on the

12  door, so they left a slip in the mailbox and took it to the

13  post office.

14   Q   The first opportunity you could go to the post office, you

15  went there?

16   A   Right.

17   Q   And they wouldn't give you the package because you didn't

18  have a Florida ID?  I mean an Alaska ID?

19   A   I didn't have the ID for the actual residence.

20   Q   All right.  So you had to go get Marley, pick her up from

21  school and take her to the post office with you?

22   A   Yes.

23   Q   So you get this package that you have been anxious to

24  receive, right?

25   A   Right.

1  Q   You take it.  You said you took it to 310 Tipperary Court?

2  A   Correct.

3  Q   But you had been staying somewhere else.  You had been

4  staying at 7 Gables, right?

5  A   I don't know if I was October 17th.  I stayed at a couple

6  different places.  Once again, I had a wife at the time up here

7  that we weren't sometimes hanging out.  We were in the process

8  of divorce, but we hung out sometimes.  I had a couple more

9  friends I stayed the night with, or a hotel.  So I don't know

10  exactly where I was staying the night -- the day that the

11  package came there, but I know I -- I was waiting on it that

12  day at the house all day.

13  Q   But you were waiting for the package at the house, but you

14  weren't actually staying at the house?

15  A   I could have been that day.  I really can't recall.  I had

16  clothes at the house, definitely.

17  Q   It's your testimony, you left the package at the house and

18  went out for a bit, came back, and then got the package?

19  A   Yes.

20  Q   Then you took it to where you were staying?

21  A   No.  I took it to a friend's house or restaurant on

22  Cushman.  I can't remember --

23  Q   What friend's house did you take it to?

24  A   His name was Q.  We called him Q.  I dont know his real

25  name.

```
 1   Q    Q?
 2   A    Yeah, younger dude.
 3   Q    This Q, is that Quinton Turner?
 4   A    No, no, no.
 5   Q    Different person with a first name that starts with a "Q"?
 6   A    Yes.
 7   Q    That's when you opened up the package and looked inside?
 8   A    Right.
 9   Q    What did you do with the package itself?
10   A    With the package itself?
11   Q    Yep.
12   A    With the envelope that it came in?
13   Q    Yep.
14   A    I'm pretty sure I -- when I snatched it off the thing while
15   I was driving, I threw it out the window somewhere.
16   Q    What did you do with the label?
17   A    I can't recall.
18   Q    And you said you bagged it up into what?  Smaller bags?
19   A    Smaller bags, yeah.
20   Q    What quantity bags did you bag it up?
21   A    Maybe 10, 20 and 50s.
22   Q    And then what did you do with those small bags?
23   A    What do you mean?  The smaller, the 10 -- the bags with 10
24   of them in it?
25   Q    Okay.  So you have -- I take it they all come -- you get
```

1   these pills in one bag.  That's your testimony, right?

2   A    Right.

3   Q    Okay.  And you showed us, by the way, the size of total

4   quantity, right?

5   A    Yeah.

6   Q    And you said it was about the size of one of those plastic

7   drinking cups?

8   A    Yeah.

9   Q    So it wasn't a huge package, right?

10  A    No, no, no.

11  Q    In fact, it would be pretty easy to carry around, right?

12  A    Yeah.

13  Q    Pretty easy to carry on an airplane if you wanted to?

14  A    Yes, absolutely.

15  Q    Pretty easy to put in your carry-on luggage?

16  A    I wouldn't suggest it, but, yeah, I suppose, yeah.

17  Q    And you've carried drugs before on a plane, right?

18  A    In the '90s.  It's a different airport these days.

19  Q    I want to ask you about some names.  Okay?  A few more

20  names.

21      You already told us about Mr. Turner, and you told us about

22  Herschel, right?

23  A    Correct.

24  Q    And Cortez Holloway.  And the person Clifford Andrews,

25  which is Slep Rock?

```
 1  A    Yes.

 2  Q    And do you know a Ladarius Edwards?

 3  A    I do know him now, but I didn't know him before the

 4  situation.

 5  Q    Okay.  And you know -- it sounded like you weren't sure

 6  whether you know a Lavel Wallace or not?

 7  A    I don't know a Lavel Wallace, I'm pretty sure.

 8  Q    Do you know a Lavel?  Do you know anybody named Lavel?

 9  A    I don't think so.

10  Q    Sounds like you're not certain.

11  A    Believe it or not, I've met thousands of people in my life.

12  I might have met a Lavel at some point in my life, but I don't

13  recall knowing any Lavel.

14          MR. CAMIEL:  That's all I have, Your Honor.

15          THE COURT:  All right.  Redirect?

16          MS. WEBER:  Briefly, Your Honor.

17                      REDIRECT EXAMINATION

18  BY MS. WEBER:

19  Q    On cross-examination, Mr. Camiel asked you if in the fall

20  of 2020 you were charged with selling heroin or cocaine.  Do

21  you remember him asking you that?

22  A    Yes.

23  Q    Were you caught in the fall of 2020 by police selling

24  cocaine?

25  A    No.
```

1    Q    Were you caught selling heroin?

2    A    No.

3    Q    Did you at some point after being arrested tell them about

4    your dealing in those substances?

5    A    Yes, after my arrest.

6    Q    Was that under a proffer agreement?

7    A    Yes.

8    Q    What does it mean to give information under a proffer

9    agreement?

10   A    It just means that I'm telling the truth and being honest

11   about everything pertaining to whatever time I was -- they are

12   asking about.

13   Q    Are you familiar with the term "queen for a day"?

14   A    No, I'm not.

15   Q    When you had the plea agreement, was your understanding

16   that what you said could be used against you in further

17   proceedings?

18   A    I did not -- I can't remember being told that.

19   Q    Mr. Camiel asked you if -- you said that from time to time

20   you brought pills from California, in response to Mr. Camiel's

21   question.  When you brought those pills from California, were

22   you selling them?

23   A    I never brought pills from California.  I brought pills

24   from Florida when I came up.  They were Perc 10s.  They were a

25   different color, a different Percocet.

1  Q   When you brought them from Florida, did you sell those

2  pills?

3  A   No.

4  Q   What did you do with them?

5  A   They were for my personal use.  They were -- actually, when

6  I first started coming back up, they were prescribed to me.

7  And when the prescription ran out, I would occasionally buy

8  some here and there.

9  Q   And I would like to show you again what's been -- what's in

10  evidence as Defense Exhibit J.

11          MS. WEBER:  May I publish?

12          THE COURT:  Yes, go ahead.

13  BY MS. WEBER:

14  Q   Do you see this highlighted message?

15  A   Yes.

16  Q   When you said, "I had to dip and get into some other shit,

17  do you know anybody who would be wanting those Perc 30s," where

18  did you get the Perc 30s from that you were offering to sell?

19  A   From Mr. Tulali.  The only time I have ever sold Percocets,

20  they were the ones I received from California.

21  Q   Do you know the date of that message?

22  A   October 23, 2020.

23  Q   I want to circle back to Melvin Williams for a minute.

24      When you told police that Melvin Williams was the source of

25  your pills, did you expect him to get arrested?

A    I really -- I kind of did, but it was more or less I just

was frustrated.  I really thought him and Slep Rock had put me

in the situation I was in.  I had no idea why the police would

be at Kweka's house.

Q    Was there any evidence that Melvin Williams sold you the

pills that you had on your person?

A    No.

Q    Was there any evidence that the defendant sold you the

pills that were on your person?

          MR. CAMIEL:  Your Honor, object to the form of the

question.

          THE COURT:  That's sustained.

BY MS. WEBER:

Q    Did you think that Melvin Williams would be convicted of

being the source of your pills?

          MR. CAMIEL:  Your Honor, this is asked and answered on

direct.

          THE COURT:  I'll allow it on recross as well, if you

seek to explore.

          THE WITNESS:  I knew he wouldn't if they investigated

our phone conversations, they would quickly find out that I was

supplying him.

BY MS. WEBER:

Q    How would they find that out?

A    I'm sure we had -- I'm sure we had some kind of messages in

```
 1   our phones somewhere.
 2   Q    Was there other messages in your phone that would show that
 3   it was not Melvin Williams?
 4   A    Possibly.
 5   Q    Were there text messages between you and --
 6             MR. CAMIEL:  Objection.  Leading.
 7             THE COURT:  No, that was not leading.  Go ahead.
 8   BY MS. WEBER:
 9   Q    Were there text messages between you or anyone else?
10   A    About me purchasing pills, no.
11   Q    Were there messages between you and the defendant?
12   A    Yeah.  That's the only person purchasing pills.
13   Q    And on cross-examination, you were asked about involving
14   Marley Warner in the sale of controlled substances?
15   A    Right.
16   Q    Did you think that Marley Warner was going to get arrested
17   for distribution of fentanyl?
18   A    No, no, not at all.
19   Q    How come you weren't worried about that?
20   A    I know she was a minor and I knew they just -- I mean, that
21   would be -- they wouldn't charge a minor with this crime.  She
22   had no connection to California or anything.
23   Q    How old was she?
24   A    She was, I believe, 14 or 15 at the time.
25   Q    Did you involve her in your drug activity?
```

A    Not at all.  Well, other than picking up that package,
which she didn't know what it was.

Q    Did you give her the package at any point?

A    No.

Q    Was there a risk the package would have been delivered and
given to her?

A    No.  That's why I was there all day, the Saturday, until I
found out it didn't come and I had to go to the post office to
pick it up.

Q    What point in the day did you pick her up from school?

A    It was after school let out.  I took her to the doctor
appointment she had after school.

Q    You didn't remove her in the middle of the school day?

A    No, absolutely didn't.

         MS. WEBER:  I have no further questions.

         THE COURT:  Follow-up at all, Mr. Camiel?  Go ahead.

                    RECROSS-EXAMINATION

BY MR. CAMIEL:

Q    Let's start with your involvement involving Marley Warner.
When you took her to the post office, she was the one who had
to show ID, right?

A    Correct.

Q    Okay.  She had to go up to the counter and show ID and
indicate that the package was for her?

A    Correct.

```
 1   Q    And you figured you could use her because since she's a
 2   minor, she wouldn't get in much trouble, right?
 3   A    Correct.
 4   Q    But she would get in some trouble, right?
 5   A    I didn't think that.
 6   Q    Okay.  And in terms of Melvin Williams, you indicated, "I
 7   kind of expected he would be arrested"?
 8   A    Yeah.
 9   Q    In fact, that's what you wanted.
10   A    Right.
11   Q    Because if he's arrested, that alleviates some of your
12   problems?
13   A    I'm sure upon investigation they would have quickly found
14   out --
15   Q    You're assuming the police would do a thorough
16   investigation.  But the plan was, in your mind at the time you
17   told the police, I got the pills from Melvin Williams, that
18   that would help you out?
19   A    Yeah, yeah, yeah.
20   Q    Okay.  Because at the time you told them that, you were
21   sitting down with them and you were trying to make a deal with
22   them, right?
23   A    I don't know necessarily a deal, but, yeah, I was trying to
24   get out of jail.
25   Q    You wanted to go home that night?
```

1    A    Yeah.

2    Q    And they were telling you, we want to know where the pills

3    came from?

4    A    Correct.

5    Q    They were telling you, we want you to tell us the truth?

6    A    Yes.

7    Q    And so you told them, "I'm going to tell you the truth,

8    I'll tell you where the pills came from if you guys will help

9    me out"?

10   A    I don't think it was put that way.  I don't remember if

11   they told me they want me to tell the truth, but I was under

12   the impression they thought I was being honest.

13   Q    You were under the impression they thought you were being

14   honest because you're pretty good at saying things that aren't

15   true?

16   A    I don't know.

17   Q    All right.  Well, you thought you were pretty good at it,

18   right?

19   A    I wouldn't say so.  This isn't my first time in this

20   situation.

21   Q    While you were sitting in the room with the police on

22   November 6, you were telling them you got the pills from

23   Melvin Williams.  You were trying to convince them, that was

24   the truth, right?

25   A    I wouldn't go as far as convincing.  I think I might have

```
 1   told them that.  I don't think our interview was long.  I knew
 2   pretty quickly I was on my way to jail.
 3   Q   You were on your way to jail because were in a stolen
 4   Hummer?
 5   A   That was the least of my worries at that point.
 6   Q   There were some pills in the jacket that had your ID?
 7   A   Correct.
 8   Q   But you were hoping that by giving up your source, you
 9   would be looking at less time, right?
10   A   Not necessarily.  I thought I was going to go back in and
11   out.
12   Q   You thought you'd actually not have to stay in jail, right?
13   A   Right.
14   Q   If you gave up your source?
15   A   Correct.
16   Q   But you didn't want to give up your real source, right?
17   A   No.
18   Q   Okay.  So you gave up Melvin Williams.  You were willing to
19   let somebody else take the blame to protect your real source,
20   right?
21   A   Really, like I said earlier, I just was under the
22   impression he set me up, not to beat the double cross like a
23   triple cross.
24   Q   You were under an impression he set you up?  You didn't
25   know that, did you?
```

1 A    I did not.  I just know he was the only person I gave my

2 location to.

3 Q    So even though you didn't know whether he set you up or

4 not, you were willing to let him take the fall as being your

5 source for the pills?

6 A    Yes.

7 Q    Okay.  And so you knowingly lied to the police, since you

8 sat in that police station on November 6, 2020 and told them,

9 "Hey, I'm telling you the truth"?

10 A    I don't know if I said that exactly, but, yeah, I told them

11 Melvin Williams.

12 Q    I want to ask you -- you were asked about -- or you said

13 this was the first time you had ever dealt with pills?

14 A    Yes.  As far as me selling them, yes.

15 Q    Okay.  So it's your testimony, you received 500 pills and

16 within a matter of days you're able to get rid of, what, 350 or

17 400 of them?

18 A    Yeah.

19          THE COURT:  Just a moment.

20          MS. WEBER:  Your Honor, I believe it's out of the

21 scope of the recross-examination -- redirect.

22          THE COURT:  I'm sorry.  I can't hear.

23          MS. WEBER:  I believe this is out of the scope.

24          THE COURT:  It is getting pretty far afield.  Are you

25 going to be continuing this topic?

1          MR. CAMIEL:  I would, because she brought out during

2    redirect him saying that it was his first time dealing with

3    pills.

4          THE COURT:  Fair enough.  Go ahead.

5    BY MR. CAMIEL:

6    Q    So within a matter of days, your first time ever selling

7    pills, you're able to get rid of 350 or 400 of them, right?

8    A    Yeah.

9    Q    In fact, all you had left from that whole batch was what

10   they found in your jacket on November 6th, those 59 pills?

11   A    Correct.

12   Q    So had you actually gotten rid of over 400 of them?

13   A    Right.

14   Q    In a matter of days?

15   A    As mentioned, some of those people owed me money for them,

16   but, yeah, for the most part.  Maybe around 350 of them.

17   Q    You knew which people to go to who would redistribute

18   pills?

19   A    Yeah.

20   Q    Because you knew the people in the pill business?

21   A    No, no, no.  A couple phone calls, small town.

22   Q    One of the people you knew who was in the pill business was

23   Winston Crockett?

24   A    Correct.

25   Q    In fact, you sent him that message, "Just touched the soil

1  with some 30s, know you be in that lane"?

2  A   That was about ten days after I got them.  He was, like, on

3  the peripheral.  I never really considered him.  He just popped

4  in my mind one day.

5  Q   Well, when you said "know you be in that lane" --

6  A   Correct.

7  Q   -- that meant you knew he sold pills?

8  A   Yes.

9  Q   You knew he had sources for pills, right?

10  A   Yes.

11  Q   As far as you knew, he had multiple sources for his pills,

12  right?

13  A   I'd be speculating.  I don't know.

14  Q   You had known him for how long?

15          THE COURT:  Just a moment.  Go ahead, Ms. Weber.

16          MS. WEBER:  Your Honor, I believe this is now outside

17  of the scope.

18          THE COURT:  It really is getting pretty far afield.

19  So I mean, you have explored the issue of the first sale, but a

20  couple more questions and then let's move on.

21  BY MR. CAMIEL:

22  Q   How long had you known Winston Crockett?

23  A   Maybe close to 30 years, maybe.

24  Q   He had been selling pills for 30 years?

25  A   Not that I'm aware of, no.

```
 1   Q   How long did you know him to sell pills?
 2   A   I mean, I don't know.  Maybe I might have just heard his
 3   name in those circles, maybe 2018-ish, maybe.
 4              MR. CAMIEL:  Thank you.
 5              THE COURT:  Very good.  Thank you, sir.  You may be
 6   excused.
 7              (Witness excused.)
 8              Who is your next witness going to be, Ms. Weber?
 9              MS. WEBER:  Winston Crockett.
10              THE COURT:  All right.  Then let's take about
11   15 minutes here, just to have Mr. Brown escorted, and then
12   we'll come back on record.
13              I mean, we could take our lunch early again, ladies
14   and gentlemen.  What's your thought?  Take lunch now, nod your
15   head, or take a short break and then come back and do another
16   hour or so and have a later lunch?  Later lunch, raise your
17   hand.  Don't be evenly divided.
18              All right.  We'll do the later lunch and take about
19   15 minutes now.  We'll go off record.  First, leave your
20   notepads here in the courtroom and remember my admonition not
21   to discuss the case.  We'll go off record.
22              DEPUTY CLERK:  All rise.  This matter is now in a
23   brief recess.
24         (Recessed from 11:31 a.m. to 12:12 p.m.)
25         (Jury present)
```

1    DEPUTY CLERK:  Please be seated.

2        (Pause)

3        DEPUTY CLERK:  All rise.  Her Honor, the Court, the

4    United States District Court is again in session.

5        Please be seated.

6        THE COURT:  All right.  We are back on record.  That

7    took us a little longer than anticipated due to some transport

8    issues, but here we are.  Ready to proceed with your next

9    witness?

10       MS. WEBER:  Yes, Your Honor.

11       THE COURT:  And that would be?

12       MS. WEBER:  Winston Crockett.

13       (Oath administered to the witness)

14       DEPUTY CLERK:  Please state and spell your name for

15   the record.

16       THE WITNESS:  Winston Gaylord Crockett, Jr.,

17   W-i-n-s-t-o-n, C-r-o-c-k-e-t-t.

18       WINSTON CROCKETT, JR., GOVERNMENT WITNESS, SWORN

19                    DIRECT EXAMINATION

20   BY MS. VOSACEK:

21   Q   Mr. Crockett, how old are you?

22   A   I'm 47.

23   Q   Where are you from?

24   A   Fairbanks, Alaska.

25   Q   Born and raised?

```
 1   A    Yes, ma'am.
 2   Q    Where have you been -- or when you lived in Fairbanks,
 3   where did you live?
 4   A    I've lived on 16th and Gilliam and 17th and Cushman.
 5   Q    Where did you live most recently?
 6   A    I'm incarcerated.
 7   Q    I mean in Fairbanks.  I'm sorry.
 8   A    Fairbanks, 17th and Turner.
 9   Q    Did you live with anybody else?
10   A    Yeah.  It was my mother that lived there.
11   Q    Now, where are you staying?
12   A    Right now I'm serving time at Fairbanks Correctional
13   Center, but I'm in Duluth, Minnesota.
14   Q    How long have you been there?
15   A    I just got there two weeks before this.
16   Q    What's in Duluth, Minnesota?  Is that a federal prison?
17   A    Yes, a federal prison.
18   Q    Which facility are you at?
19   A    A camp in Duluth, Minnesota.  I just got there.
20   Q    What do you mean by a camp?
21   A    It's a camp for low federal inmates, inmates that have
22   shown no trouble.  A lot of programming, things of that nature.
23   Q    And did you enter a plea of guilty to a federal charge?
24   A    Yes, ma'am.
25   Q    Is that why you're in prison?
```

1    A    Yes, ma'am.

2    Q    What was that charge?

3    A    Distribution of a controlled substance.

4    Q    Was that on November -- was that related to November 21st

5    of 2020?

6    A    Yes, ma'am.

7    Q    Is that when you were indicted?

8    A    Yes, ma'am.

9    Q    So you have been -- how long have you been in custody?

10   A    I have been -- I have done almost four years.

11   Q    Were you arrested in November of 2020?

12   A    Yes, ma'am.

13   Q    You have been in -- you were out on release, though, right?

14   A    Yes, ma'am.

15   Q    Can you tell the jury what that means?

16   A    Yes.  I was on -- basically, on bail release.  The courts

17   had allowed me to go to inpatient treatment at Ralph Perdue,

18   which I had successfully completed, as well as with my

19   outpatient treatment.  It required me to take random UAs, which

20   I passed every single one.  Continual care, aftercare.  I also

21   have received my peer support license during that time at

22   Ralph Perdue.  I held a full-time job at the La Quinta hotel.

23   I was rapidly moving up, trying to get to manager, but then I

24   had to get sentenced and serve my time.

25   Q    To be clear, bail release is the period between your

1  indictment and when you were sentenced?

2  A    Yes, ma'am.

3  Q    And when were you sentenced?

4  A    I was sentenced on 6-10 of '22.

5  Q    And how long were you sentenced to serve?

6  A    I -- I was sentenced to serve 84 months, which is seven

7  years.

8  Q    What's your projected release date?

9  A    Well, once I get back, my projected release date will be

10 6-14 of '26.

11 Q    Were you originally indicted for conspiracy to distribute

12 controlled substances resulting in death?

13 A    Yes, ma'am.

14 Q    Did you enter a plea of guilty to something else?

15 A    No, ma'am.

16 Q    You entered a plea of guilty to the distribution; is that

17 right?

18 A    Yes, ma'am.

19 Q    Okay.  You entered that plea of guilty pursuant to a plea

20 agreement?

21 A    Yes, ma'am.

22 Q    That's an agreement you reached with the United States?

23 A    Yes, ma'am.

24 Q    What's your understanding of the terms of the plea

25 agreement?

```
 1   A    My plea agreement was, let me see, distribution of a
 2   controlled substance.  The agreement was five years probation
 3   upon release and an 84-month sentence, or seven years.
 4   Q    There was a range that each party could argue for; is that
 5   right?
 6   A    Oh, yes.  My range was between five and seven, seven years,
 7   was the range.
 8   Q    And so it was left to the judge to decide your actual
 9   sentence?
10   A    Yes, ma'am.
11   Q    Okay.  Were there any other terms of the agreement?
12   A    That I was to cooperate if I was asked to, to cooperate in
13   any further matters to this case.
14   Q    Okay.  What's your understanding of your obligations under
15   that agreement?
16   A    To tell the truth of exactly what happened and what took
17   place.
18   Q    And what benefit do you get in being here today?
19   A    Nothing.
20   Q    You've already been sentenced?
21   A    Yes, ma'am.
22   Q    Okay.  What is your understanding of the consequences if
23   you were to lie here today?
24   A    That my agreement, plea agreement, they put in with the
25   courts could be revoked and be resentenced to a longer term.
```

1  Q   You recently petitioned the Court for early release; is

2  that right?

3  A   Yes, ma'am.

4  Q   And the United States opposed that?

5  A   Yes, ma'am.

6  Q   That request was denied?

7  A   Yes, ma'am.

8  Q   Let's go back to October of 2020.  What were you doing for

9  employment?

10  A   At the time, I was working for the museum downtown at the

11  co-op building.  I was working there part-time.

12  Q   Were you also engaging in distribution of controlled

13  substances?

14  A   Yes, ma'am.

15  Q   Can you describe for the jury what you were doing?

16  A   Selling pills off and on, some cocaine from time to time,

17  but mainly I was just supporting my habit with methamphetamines

18  and marijuana.

19  Q   Did you have multiple suppliers, or who was supplying you

20  the drugs?

21  A   Just random people.  Just anyone I could get it from.

22  There was really no one certain person that I would go to.

23  Q   What do you mean by "random"?

24  A   Just anyone that would have it.  Anyone who I would reach

25  out to that had it -- who I believed would have it, I would

1    reach out to.

2    Q    You wouldn't go up to somebody on the street and ask them

3    if they have drugs?

4    A    No, ma'am.

5    Q    Just kind of like a community?

6    A    Yeah.  I just been here a long time, so I kind of just went

7    around to certain places.

8    Q    And certain people that you know that also use or sell

9    drugs?

10   A    Yes, ma'am.

11   Q    Approximately how many people would you say?

12   A    Less than -- I don't know.  Half dozen.  You know, I know

13   quite a few people.

14   Q    Okay.  How much were you dealing?

15   A    Can you repeat that?

16   Q    How much were you dealing?  Daily?  Weekly?

17   A    It wasn't really no certain days or nothing, just if I had

18   it.  If I was trying to make some quick money, I would look for

19   it or whatnot, but it really was no certain days.

20   Q    Was this very lucrative for you?

21   A    No.

22   Q    You talked about dealing to support your habit?

23   A    Yes, ma'am.

24   Q    Can you describe for the jury your addiction?

25   A    I had a heavy addiction on methamphetamines and marijuana.

1    I used quite a bit.  It started off as just -- just to stay up

2    to get things done.  It just increased and it just took control

3    of me and it just went out of hand.

4    Q    How long had you been using methamphetamine?

5    A    Probably about three years, three or four years.

6    Q    How frequently would you use it?

7    A    Every day.

8    Q    Multiple times a day?

9    A    Yes, ma'am.

10   Q    What about marijuana?

11   A    That was every day.

12   Q    And how long have you been doing that?

13   A    I have been smoking marijuana since I was a teenager.

14   Q    Did you use any other substances?

15   A    At that time, I had tried the Percocet and some Perc 10s,

16   some Perc 15s.  And upon this situation here where I'm locked

17   down, I had tried a half of a Perc 30.

18   Q    Okay.  What is a Perc 10?

19   A    Perc 10 is a Percocet, a hydrocodone, a pain pill to help

20   with pain.

21   Q    Were you prescribed them?

22   A    At that time when I had those, yes.

23   Q    What do they look like?

24   A    I don't know.  They come in different shapes, depending on

25   what pharmacy you get it from.  It can be oval.  It can be

1  round.

2  Q   Do you remember what color?

3  A   No, ma'am.  I wanted to say usually they're white, but I

4  just remember the color of those -- the 30s, though.

5  Q   What color were the 30s?

6  A   They were, like, an off blue-ish color, had an "M" stamp on

7  it with a "30" on it.

8  Q   What did a Perc 15 look like?

9  A   Those are often different too, as well, ma'am.  Just

10 depends on, like I said, the pharmaceutical or how they came.

11 Some come round, some come in oval shape.

12 Q   What's your understanding of the difference between a

13 Perc 10, a Perc 15 and a Perc 30?

14 A   Just the effect, how strong it is.  But I don't know, like

15 can't really say.  I mean, everybody's body is different.  But

16 it's just the strength and the milligrams.

17 Q   So the 30 would be stronger than the 10?

18 A   Yes, ma'am.

19 Q   Do you remember the timeframe that you were prescribed the

20 Perc 10s?

21 A   It was the wintertime.  I want to say it was -- it's been a

22 while back, when I was in a motor vehicle accident.  I would

23 get some from a pain clinic or from the hospital.  But it had

24 been quite a while since I had those actually prescribed to me.

25 Q   When they were prescribed to you, did you sell them?

```
1   A   No, ma'am.
2   Q   Were you ever prescribed Perc 30s?
3   A   No, ma'am.
4   Q   How do you know Andre Brown?
5   A   I've known Andre Brown for quite a few years, when his
6   family -- well, I knew his younger brother, and then I met
7   Andre Brown.  Been quite a few years, I would say over
8   15 years.
9   Q   What was your relationship with him?
10  A   We were just acquaintances.  I would see him from time to
11  time around town.  I didn't see him all that often, but when I
12  seen him we would say hi or speak.
13  Q   Were you Facebook friends?
14  A   Yes, ma'am.
15  Q   Did you have each other's cell phone?
16  A   No.  I didn't have his cell phone number, no.
17  Q   Okay.  Did you hang out together?
18  A   No.  Like I said, we just -- if we seen each other in
19  passing, we would speak.  I knew his older brother, who had
20  passed away from another illness.  And my mom knew his mom just
21  from -- like, it's been years.
22  Q   Did you sell or did you buy drugs from Andre Brown?
23  A   Yes, I did, ma'am.
24  Q   What did you buy from him?
25  A   I bought six Perc 30s.
```

1  Q   Was that the only time that you bought drugs from him?

2  A   Yes, ma'am.

3  Q   Have you ever sold drugs to Andre Brown?

4  A   No.

5  Q   How did you know Jacob Lee?

6  A   I just knew Jacob Lee through passing through other

7  acquaintances.  I knew his brother used to work for the

8  *News-Miner*, who I delivered newspapers.  That's how I met the

9  Lees, and I just met through acquaintances.  I eventually met

10  the younger brother.

11  Q   Okay.  So you worked with one of Jacob Lee's older

12  brothers?

13  A   Yeah.  Used to deliver newspapers years ago, a long time

14  ago.

15  Q   Do you remember which brother that was?

16  A   It would be -- I can't think of the name right off the top

17  of my head.  I want to say it's the older brother, middle

18  brother.  It's been a while, ma'am.  Sorry.

19  Q   I understand.

20      Were you -- what was your relationship with Jacob Lee?

21  A   He was a good guy.  He was a friend.  You know, there was

22  times where he would -- he would call me or text me to see what

23  I was up to.  There were times where he was having some issues

24  with his significant other.  Sometimes he would just call me

25  just to chitchat to get advice or things like that.

1  Q   Would you consider him a friend or an acquaintance?

2  A   Yeah, he was a good friend.  He was a good kid.  He had a

3  good mindset.  A little bit of guidance and whatnot, but he was

4  a good kid, though.  I respected him.

5  Q   Did you guys hang out together?

6  A   I wouldn't say we really, like, hung out, but, you know, if

7  he tried to get ahold of me, he would text me or whatnot or

8  reach out to me, vice-versa.

9  Q   You had each other's phone numbers?

10 A   Yes, ma'am.

11 Q   Facebook friends?

12 A   Yes, ma'am.

13 Q   Did you ever spend time at the Lee residence?

14 A   No, ma'am.

15 Q   Did you know where they lived?

16 A   Just in passing, you know, like with their brothers or

17 something.  I have never been inside the home or literally on

18 their property, no.

19 Q   Did Jacob Lee ever hang out at your house?

20 A   No.

21 Q   If you did spend time together, where would you go?

22 A   There were times where we would meet over at the Noel Wien

23 library, parking lot over off of Kyle Street, or we would meet

24 at the back of where the Pioneer Park is by the softball -- or

25 baseball fields by the crossing center.

```
 1   Q   You would just talk about your lives together?
 2   A   Just random stuff, whatever was going on at the time,
 3   ma'am.
 4   Q   Did you also sell drugs to Jacob Lee?
 5   A   Yes, ma'am.
 6   Q   Approximately how long had you been selling drugs to
 7   Jacob Lee?
 8   A   Probably a year or so.  I'm not sure.  Like I said, it's
 9   been a while.  But I did sell a few times, yes, ma'am.
10   Q   What was your understanding of what Jacob Lee was addicted
11   to?
12   A   I know it was marijuana and pills.
13   Q   What kind of pills?
14   A   Pain pills.
15   Q   Like what kind of pills would he want?
16   A   Xanis or anything strong like Percs, Percocets.  We just
17   called them Percs or P's for short.
18   Q   Did you also sell drugs to his brothers?
19   A   Yes, ma'am, I did.
20   Q   Do you remember which brothers you sold drugs to?
21   A   No.  Like I said, it's been a while.  I just know it wasn't
22   as often as I did with Jacob, but yes, I did, ma'am.
23   Q   What did you sell, what kind of drugs?
24   A   Xanis or there was some Percocets.  I want to say from time
25   to time I had cocaine on me sometimes.  So street name would be
```

```
1  white girl.  But I had that on me at some times, too.
2  Q   Now, when you were discussing the sale of controlled
3  substances, was that like -- how did you communicate about
4  those sales?
5  A   With Jacob or with --
6  Q   With Jacob.
7  A   It was through text message.
8  Q   Had you ever -- did you just leave the text messages?  Have
9  you ever deleted the messages?
10 A   Yeah, I did delete messages.  When all this occurred and
11 when everything really hit home, I deleted them.  I did, yes.
12 Q   Why did you delete them?
13 A   I was just scared, you know, to know that a life was lost.
14 Had been up for days.  I mean, I have no excuse.  I just did.
15 Q   You were afraid of getting caught?
16 A   Yes, ma'am.
17 Q   Did you ever come to Jacob's house to sell him drugs?
18 A   No, ma'am.
19 Q   Did you sell Jacob cocaine?
20 A   Yes, ma'am.
21 Q   Were you ever confronted about your selling drugs to Jacob
22 Lee?
23 A   If I was, like I say, I don't remember.  It's been such --
24 it's been a while.  So I mean, possibly.  But I don't honestly
25 remember off the top of my head.
```

```
1   Q   If it did happen, it's fair to say you continued to sell
2   drugs to him anyway?
3   A   Yes, ma'am.
4   Q   I want to talk about what happened on October 26th of 2020.
5   Do you remember that day?
6   A   Yes, ma'am.
7           MS. VOSACEK:  And, Your Honor, I have a demonstrative
8   that I would like to use that I did provide to the defense
9   yesterday.
10          THE COURT:  No objection?
11          MR. CAMIEL:  I don't object.
12          THE COURT:  Very good.  Go ahead.
13          MS. VOSACEK:  For the record, this is a combination of
14  messages from previously admitted Exhibit 15.01 and 8.01.
15          THE COURT:  Very good.
16          MS. VOSACEK:  It's on my computer.
17          DEPUTY CLERK:  Okay.
18          MS. VOSACEK:  For the record, all of these messages
19  are from October 26th of 2020.
20          THE COURT:  Go ahead.
21  BY MS. VOSACEK:
22  Q   Mr. Crockett, did you receive a message from Andre Brown on
23  October 26th of 2020?
24  A   Yes, ma'am.
25  Q   About what time did you receive that message?
```

```
 1   A    About 1:30.

 2   Q    So you're the orange; Andre Brown is blue?

 3   A    Yeah.  I see it says 1:33 p.m.

 4   Q    That's what time you responded?

 5   A    Respond?  I think that's the time I responded back to his

 6   first message.

 7   Q    My question is, what time did Andre Brown text you?

 8   A    Oh.  11:54.

 9   Q    What did he say?

10   A    He said, "What's up, Playboy?"

11   Q    And about what time did you respond?

12   A    I responded back at 1:33 p.m.

13   Q    And what did you say?

14   A    I said, "What's good, Fam?"

15   Q    Had Andre Brown ever reached out to you like this before?

16   A    No, ma'am.

17   Q    And it looks like -- what does Brown say next?

18   A    He said, "Just touched the soil.  Out here with some 30s.

19   Remembered you were in that lane."

20   Q    What was your understanding of what he's conveying to you?

21   A    He was just letting -- he was just basically telling me, A,

22   that he knew, because I'm from here, that I knew people that

23   would be possibly interested in what he have.

24   Q    What did he have?

25   A    He had Percocet 30s.
```

1    Q    And what time did you respond?

2    A    I responded back at 1:45 p.m.  I said, "Yes, sir."

3         At 1:46 p.m., I said, "What you asking, Fam?  I have buyers

4    for 30s.  Where you at now?"

5    Q    And what were you intending to convey to Andre Brown in

6    those messages?

7    A    That I knew some people that would probably be interested

8    in what he had, Perc 30s.

9    Q    Okay.  Who do you know that would be interested?

10   A    I had contacted Mr. Lee.

11   Q    When you say, "What you asking, Fam," what are you asking?

12   A    What he was asking, like, price-wise, like what he was

13   wanting for them, what he was asking.

14   Q    And then you asked, "Where you at now?"

15   A    Yes, ma'am.

16   Q    Why did you ask that?

17   A    Because I had, like -- I had possibly knew people, so I was

18   just seeing what his location was or where he was at.

19   Q    Were you trying to set up a meeting?

20   A    Yes, ma'am.

21   Q    Okay.  Brown responded.  What did he say?

22   A    Brown responded at 1:46 p.m.  He said, "For you, set a

23   price for them."

24        At 1:47 p.m., he stated, "I'm on the side."  He was on the

25   south side of Cushman here in Fairbanks.

Q    What was your understanding of that message?

A    He was basically just telling me to sell them for whatever price I thought was fair, just to come up with a price.

Q    And what did you respond?

A    At 1:47 p.m., I said, "Can you meet me at the spot?  Should we go talk in person?  On the phone?  I'm right at 17th and Turner, at Mom's.  Need them, so I got to take it back to her really quick."

Q    What did that mean?

A    I was basically letting him know where he could meet me at, where I was at at the time.  Like I said, it's been a while.  Some of the messages are kind of jibbered.  But that's what that meant, though, I was letting him know where I was at.

Q    Were you using, like, text to talk or anything like that?

A    Yes, ma'am.

Q    Is it common when you're setting up a drug buy or sale to meet really quickly after you talk about it?

A    Yes.

Q    And what did Andre Brown respond?

A    Mr. Brown responded at 1:47 p.m.  He said, "Bet.  Right there by Anderson's, right?"  So he was basically stating that -- confirming where I lived at.  There's an apartment building next to where I lived at called Anderson Apartments.

Q    And a minute later, what did you say?

A    At 1:48 p.m., I said, "I'm going to shoot a word to one of

1   my buyers and let them know -- and let them know.  Yes, sir,

2   right by Anderson, two little gray apartments, complexes, right

3   on the corner.  I'll be there in, like, ten minutes."

4   Q   And that was at what time that you sent that?

5   A   At 1:48 p.m.

6   Q   Okay.  And Mr. Brown responded?

7   A   Mr. Brown, at 1:48 p.m., he said, "Bet.  Me, too."  He

8   said, "Bet.  Me, too."  And then I gave a thumbs up.

9   Q   So by this point, had you established an agreement to meet?

10  A   Yes, ma'am.

11  Q   Where were you going to meet?

12  A   We met right on the corner of 17th and Turner.

13  Q   About how long after that message did you meet?

14  A   Less than a minute.

15  Q   No.  The next -- those are messages.

16  A   Oh, I'm sorry.  Sorry.

17  Q   From your recollection, when you got done talking with

18  Brown, Mr. Brown.

19  A   I don't know.  Maybe 10 or 15 minutes.

20  Q   Now, this is a separate conversation.  What did you send at

21  1:49?

22  A   At 1:49 p.m., I said, "What's good, Brother?  I got some

23  30s.  They're 60 a piece."

24  Q   And who did you send that message to?

25  A   To Jacob Lee.

1  Q   Was that approximately a minute after you had agreed to buy

2  pills from Andre Brown?

3  A   Yes, ma'am.

4  Q   What did Jacob Lee respond?

5  A   Jacob Lee, at 1:49 p.m., he said, "I'll take two."

6  Q   And you responded.  What did you say?

7  A   At 1:52 p.m., I said, "Okay.  Give me, like, 15 minutes

8  because my phone shut off because I'm using the WiFi over at

9  the library.  I have to run by my house.  Text me right now

10  where you want to meet in about 15 minutes, and then I swear

11  I'll meet you, I will meet you" -- it's a double meet -- "on

12  the back side of the Pioneer Park, you know, where we used to

13  meet.  I'll be there in, like, 15 minutes."

14  Q   Why did you say that to Jacob Lee?

15  A   Because that's where I would meet, where we would meet.

16  Q   Why did you say "I swear"?

17  A   Oh, there was just times where I didn't show or didn't show

18  up.

19  Q   So what are you intending to convey to Jacob Lee in this

20  message?

21  A   That I have what he was looking for.  I had what he was

22  looking for, the Perc 30s.

23  Q   And what did Jacob Lee respond?

24  A   Jacob Lee, at 1:52 p.m., he said, "Cool."

25  Q   At 1:53, what did you message?

```
 1   A    At 1:53 p.m., "I have a buyer for two of them.  72 to get
 2   from you.  The largest, just start, but I'm leaving WiFi now.
 3   So I'm on the way to the house.  Be there in a few minutes."
 4   Q    And who did you message that to?
 5   A    That was to Brown.
 6   Q    Andre Brown?
 7   A    Yes, ma'am, Andre Brown.
 8   Q    Why is this message so, like, jumbled?
 9   A    One, I could say that I was probably under the influence
10   and I was using talk text, so talking real fast.  It jumbled up
11   the words, things that you didn't say, but it will commonly
12   just put it on there as like it looks.
13   Q    What did you mean when you said, "I have a buyer for two"?
14   A    I had a buyer for two of the Perc 30s.
15   Q    Who was that buyer?
16   A    Jacob Lee.
17   Q    Does 72 actually have any significance to you?
18   A    No.
19   Q    You weren't, like, charging $72 or anything?
20   A    No.  Like I said, it was some misprint.
21   Q    Okay.  And did Andre respond?
22   A    He did the thumbs up.
23   Q    And did you then send another message?
24   A    Yes.  At 2:30 p.m., I said, "Four minutes away."
25   Q    When you sent that message, who did you send it to?
```

1    A    Jacob Lee.

2    Q    And had you already met with Mr. Brown at that point?

3    A    Yeah.  I already have seen him -- had already seen

4 Mr. Brown.  I had already had the Perc 30s.

5    Q    Okay.  So between 1:53 p.m. and 2:13, you met with

6 Mr. Brown?

7    A    I had seen Brown, yes.

8    Q    Where did you meet?

9    A    On the corner of 17th and Turner.

10    Q    How did the transaction go down?

11    A    He pulled up next to me and I -- we basically pulled up

12 side by side like this.  I hopped out of my vehicle.  I hopped

13 in the passenger side of the vehicle that he was in.  And he

14 handed me a baggie with four -- I'm sorry, with six blue pills,

15 the Perc 30s.

16    Q    Did you -- do you remember what kind of vehicle he was

17 driving?

18    A    Honestly, no, I don't, ma'am.  I wanted to say it looked

19 like a Hummer or some type of vehicle like that, but I didn't

20 pay too much attention.

21    Q    Was anybody with him?

22    A    No, ma'am.

23    Q    Did you pay him for the pills?

24    A    No, ma'am.

25    Q    Did you have an understanding of what you owed him?

1   A    Yes, ma'am.

2   Q    What was that?

3   A    $120, roughly.

4   Q    For all six?

5   A    Yeah.  It was later stated, once I had the pills, basically

6   he would take care of me, in other words, he would either give

7   me cash or I could have a couple of the pills for myself.

8   Q    Did he front you the pills?

9   A    Yes, ma'am.

10  Q    What's your understanding of the term "fronting"?

11  A    Fronting basically means it's give it to me without no

12  cash, giving -- basically, I'm going to give this to you, and

13  then when you make the money, you just call me and whatever

14  money I made for it, I give it back.

15  Q    Okay.  So you then -- you do the transaction and then you

16  do what?

17  A    Once again, at 2:30 -- excuse me.  At 2:13 p.m., I said I'm

18  four minutes away.  And that was the message I sent to

19  Jacob Lee.

20  Q    Were you driving?  Were you walking?

21  A    I was driving, ma'am.

22  Q    Did Mr. Lee respond?

23  A    Yes, ma'am.  Jacob Lee responded at 2:13 p.m.  He said,

24  "Okay.  On my way."  And then less than a minute later, at

25  2:14 p.m., he said he's in the blue Subaru.

Q   Had you ever seen Mr. Lee in a blue Subaru before?

A   Once.  Just one time, briefly.  I think he was having some issues with his own vehicle at the time.  So I want to say he was borrowing his brother's vehicle.

Q   So what kind of car did Jacob Lee have?

A   I want to say he used to have, I don't know, like a truck or something like that.  I want to say he had a truck not too long before he was having vehicle issues.

Q   You understood his brother to have a Subaru?

A   Yeah.

Q   Okay.  And then did you meet with Mr. Lee?

A   Yes, ma'am, we did meet.

Q   Approximately how long after he sent that message did you meet with Mr. Lee?

A   Quite a few hours.  My last message was at 10:50 p.m.

Q   No.  After the message that you sent to Jacob Lee that you were on the way, how long after that did you meet with Mr. Lee?

A   Oh, just -- it was not too long after that.  Probably maybe two or three minutes in between, because we were close.  I told him I was four minutes away.  I want to say I was right about by the curling club right there by the Pioneer Park, and he didn't live far neither.

Q   And how did that transaction occur?

A   We met at the baseball fields in the back of Pioneer Park, and we met.  He pulled.  We pulled up side to side.  He stayed

```
 1    in the vehicle.  He was in the driver's seat.  He was by
 2    himself.  I was by myself.  I got out, walked over to the
 3    passenger window -- or I'm sorry, the driver window of his
 4    vehicle, and made the exchange.
 5    Q    Were the pills that you gave Jacob Lee at that exchange the
 6    pills you received from Mr. Brown?
 7    A    Yes, ma'am.
 8    Q    And the period of time where you met with Mr. Brown and
 9    then you met with Jacob Lee, did you meet with anybody else?
10    A    No, ma'am.
11    Q    Did you get drugs from anybody else?
12    A    No, ma'am.
13    Q    You immediately went from getting the pills from Brown to
14    meeting with Lee?
15              MR. CAMIEL:  Objection.  Leading.
16              THE COURT:  That's sustained.
17    BY MS. VOSACEK:
18    Q    I'll move on.
19         There were no -- were there any other messages immediately
20    following that transaction?
21    A    I'm not understanding you.
22    Q    After you sold the pills to Jacob Lee, do you have any more
23    messages?
24    A    No, not right -- not for a while.
25    Q    What did you do after you left that sale?
```

1   A   I went back to my place and pulled into the parking lot,

2   and I had one of the Perc -- sorry, one of the Perc 30s, and I

3   broke it in half and I took one myself.

4   Q   Why did you do that?

5   A   I'm an addict.  I just wanted to be high.  As an addict,

6   you know, you do whatever you have to to stay high.  There's no

7   really fathom reason.  It's just, as an addict, that's what you

8   do.  That's what I did.

9   Q   Was that one of the pills that you got from Mr. Brown?

10  A   Yes, ma'am, it is.

11  Q   What did it look like?

12  A   It was a blue.  Like I said, had the imprint of an "M" and

13  it had a "30" on it.  It was a blue pill.

14          MS. VOSACEK:  Your Honor, can we publish what's been

15  previously admitted into evidence as Government's

16  Exhibit 16.03?

17          THE COURT:  Yeah.  Go ahead.

18  BY MS. VOSACEK:

19  Q   Do you recognize those pills?

20  A   Yes, ma'am.

21  Q   What are they?

22  A   Those are the Perc 30s I was speaking of with the "30" and

23  the "M" on them.  Those are the pills that I had received from

24  Andre Brown.

25  Q   So the pills that you got looked just like that?

```
1   A    Yes, ma'am.

2   Q    What about the pill that you took, did it look like that?

3   A    Looked just like that.

4   Q    We can take that down.

5        How much of that pill did you take?

6   A    I took half of it.  I broke it in half and just took half.

7   Q    And then what happened?

8   A    Kind of don't remember.  I remember being in the hallway

9   waking up.  I was on the ground.  Felt sick, nauseous.  I -- I

10  was having respiratory issues.  Once I came through, I'm an

11  asthmatic, so I took my rescue inhaler that I have in my pocket

12  today.

13  Q    What do you mean by you were having respiratory issues?

14  A    From the pill that I took, it caused me to have some

15  breathing issues.  Like I said, it was a big gap in between,

16  you know, the time, so a lot of it is kind of just a blink from

17  there.  I just know when I woke up I wasn't feeling too good.

18  Q    Do you know how long you had been asleep?

19  A    Maybe -- most of the day, eight, nine hours.  I don't know.

20  It was quite a while.

21  Q    When you woke up, were you concerned about whether or not

22  those pills were real?

23  A    Yes, ma'am.

24  Q    Did you do anything to try to investigate that?

25  A    Yes, ma'am.
```

1        MS. VOSACEK:  Can we go back to my demonstrative, Your

2   Honor?

3        THE COURT:  Yes.

4   BY MS. VOSACEK:

5   Q   All right.  What did you do?

6   A   I sent a message out at 10:50 p.m.

7   Q   What did you say?

8   A   At 10:50 p.m., "What's good, Fam?  I got busy.  Them kids.

9   I sold one, but my new people will be in town tomorrow.  I just

10  wanted you to know what's up.  Them 30s, they are the real

11  thing, right?  If not" -- it says, "If not, not tripping, just

12  so I know who to deal with, just because some crazy" -- excuse

13  my French -- "some crazy shit has been going on around, that's

14  all.  But I do have that 30 on me.  Also, my birthday in two

15  hours, but I need some good" -- I could read the rest.  Do I

16  have to say that?

17       MS. VOSACEK:  Let's break this down.

18       THE WITNESS:  Do I need to finish that last word?

19       THE COURT:  No, you don't need --

20       MS. VOSACEK:  You don't need to.  It's okay.

21       THE WITNESS:  Then after that, at 10:56 p.m., this

22  says, "I'm by WiFi right now, but I got to make a quick run.

23  But I got that 30 of yours on me, or do you want me to just

24  wait until everything else is gone and I give it to you at one

25  time?"  It won't be until I got -- it won't be until" --

1  supposed to be, got off after tomorrow.  "Before they come to

2  town, I just like to communicate, and I took one myself to help

3  my shoulder."

4  BY MS. VOSACEK:

5  Q    Okay.  Let's talk about that.  When you say, "Them 30, they

6  are the real thing, right," what were you trying to ask?

7  A    I was just asking if they were the real Perc 30s.  I knew,

8  just through word in the street, that there were some bad pills

9  going around that people were overdosing or having some issues

10 with that was around town, so I was just confirming with him

11 they were real.

12 Q    Was that the first time you had taken a Perc 30?

13 A    That made me feel like that, yes.

14 Q    Previously, you had taken Percocet?

15 A    Yes.

16 Q    And this was different?

17 A    Yes, ma'am.

18 Q    Okay.  Can you describe a little bit more about how it was

19 different?

20 A    I just lost track of time.  I have tooken pills before, and

21 basically it did help with my shoulder.  But I never felt

22 respiratory issues.  I never lost track of time.  I never -- I

23 just never felt the way that I felt after I took just that one,

24 that half of that Perc 30 that day.

25 Q    Did you -- was your vision effected?

A    Vision was effected, my respiratory.  Like I said, I'm
asthmatic.  That was really a big concern to me.  I felt
nauseous.  Everything was really a blur.

Q    Where did you wake up again?

A    I was in the hallway.

Q    Do you remember going to the hallway?

A    I just -- last thing I remember was the door that goes into
the hallway, and then everything -- like, everything else is
just a blink from there until I woke up.

Q    Was this kind of a scary thing for you?

A    It was very scary, ma'am, and it was concerning.  Yes.
Yes, ma'am.

Q    Okay.  You go on to say, "But I do have that 30 on me."
What does that mean?

A    I was just letting him know that the other pills I had, I
still had them.

Q    Why were you communicating with Andre Brown about what you
had done with the pills?

A    I was just letting him know.  Usually when someone has any
type of drugs or something, if they front them to you, to keep
from having any issues or problems, you just communicate with
them.  You let them know what you sold or if you still got it
or whatnot, so there's no problem.  They usually just want
their money.

Q    Is that why you sent the next message?

1  A   Yes, ma'am.

2  Q   So what were you communicating in the message that you sent

3  at 10:56?

4  A   I was just letting him know what my status was, what I was

5  doing.  If he wanted whatever money I had now, if he wanted

6  that or if he wanted me just to wait until I sold everything

7  else and then got ahold of him to give him everything at one

8  time.

9  Q   Okay.  Did Mr. Brown respond to that?

10 A   Yes.  Brown responded at 10:57 p.m.  He said, "For sure, my

11 nigga, I can wait."

12 Q   Now, after that, did you send a message to Mr. Lee?

13 A   Yes, ma'am.

14 Q   Why did you send a message to Mr. Lee?

15 A   I was concerned after how I felt after I took that pill.  I

16 wanted to make sure that he was okay because I knew that I had

17 sold those two pills to him.

18 Q   You were concerned about his health?

19 A   Yes, ma'am.

20 Q   What did you say?

21 A   At 10:58 p.m., I said, "How are you doing?"

22 Q   Did Mr. Lee ever respond to you?

23 A   No, ma'am.

24 Q   Have you ever communicated with Mr. Lee after you met him

25 and sold him those pills?

1   A   No, ma'am.

2   Q   And did you follow up with Mr. Brown?

3   A   See my last text message here.  I mean, no.  My last text

4   message was at 10:58 p.m.  I just said, "Okay, but I just

5   letting you know, that's all.  That's all, Fam.  You know --

6   you know, so you" -- that's that self-text.  "What's going on

7   on my" buyer, but it said "water, based with just a little

8   bit," except that's self-talk text.  It didn't come out

9   correctly.

10          MS. VOSACEK:  We can take this down.

11  BY MS. VOSACEK:

12  Q   So at this point, you had -- how many pills did you get

13  from Andre Brown initially?

14  A   Six.

15  Q   And how many had you sold?

16  A   Two.

17  Q   Had you sold -- had you sold any other pills to anybody

18  else?

19  A   No, ma'am.

20  Q   You took a half?

21  A   Yes, ma'am.

22  Q   How many did you have left?

23  A   That left me with four.  I had two left -- three.  Yeah,

24  two, four -- yeah, I had three left.  Sorry, two.  Two.  Two

25  left.

1  Q   What did you do with the remaining pills?

2  A   So what I did was, is I initially tried to reach out to

3  other people to sell the pills.  But I didn't get no response

4  from anybody, so I ended up just flushing them and getting rid

5  of them.

6  Q   So you attempted to sell them?

7  A   Yes, ma'am.

8  Q   When you were initially approached by law enforcement, did

9  you tell them the truth?

10  A    Like I said, it was all a shock.  When they approached me,

11  I was actually with my mom.  We were coming back from -- that

12  is the year we were voting for Joe Biden when he was going for

13  the presidency, to be president, excuse me.  And it was a lunch

14  break.  I pulled into the driveway with my mom, and I was

15  approached by two FBI agents.

16  Q   Was that -- do you remember what day that was?

17  A    Whatever -- October -- well, my birthday is October 27th,

18  so I will say somewhere roughly in that area or a little after.

19  I'm not sure.

20  Q   Sometime in the fall of 2020?

21  A   Yes, ma'am.

22  Q   After Jacob Lee had died?

23  A   Yes, ma'am.

24  Q   When did you find out that Jacob Lee had died?

25  A   When I was approached by the two agents at my mom's when I

1  pulled into her house.

2  Q   So you were approached at your mom's house.  Did you tell

3  officers that you sold Jacob Lee those pills?

4  A   Not at first, no.

5  Q   Why didn't you tell them?

6  A   I was scared.

7  Q   What were you afraid of?

8  A   Everything.  Jail.  I was scared of just -- it was just a

9  shock, you know.  Just being an addict, I -- I was still using.

10 You know, thinking wasn't clear.  I was scared.  There's no

11 excuse.  There is nothing to lie about there.  I was so scared.

12 It was a shock.

13 Q   And eventually, you came in and met with law enforcement

14 again at some point; is that right?

15 A   Yes, ma'am.

16 Q   And you were interviewed?

17 A   Yes, ma'am.

18 Q   Pursuant to a proffer; is that right?

19 A   Excuse me.  Repeat that.

20 Q   Were you interviewed pursuant to a proffer agreement?

21 A   Yes, ma'am.

22 Q   And even at that point, were you completely honest?

23 A   No, ma'am, not at first, no.

24 Q   Did you, in fact, lie several times?

25 A   Yes, ma'am.

```
 1   Q    Why did you do that?
 2   A    Scared.  At that time when I had met them, I had -- I was
 3   still using.  I had been up for, like, three or four days.  My
 4   mind was rattled.  I just -- just was -- I was just lost.  I
 5   was just hoping it went all away.  You know, I figured if I
 6   tried to lie, which it didn't help anything, the situation
 7   would go away.  But, yeah, I did.
 8   Q    Did you eventually tell the truth?
 9   A    Yes, ma'am.
10   Q    Why did you tell the truth?
11   A    It was just -- it was time to come clean.  It was time to
12   do what was right and face the facts that I made a mistake.
13   Q    Are you saying all this just because that's what you think
14   I want you to say?
15   A    No, ma'am.
16   Q    Now, do you know Mr. Tulali?
17   A    No.  No, ma'am.
18   Q    Do you have any motivation to testify against him?
19   A    No, ma'am.  I don't know.
20   Q    He's never done anything to you?
21   A    No, ma'am.
22   Q    You've never communicated?
23   A    No, ma'am.
24            MS. VOSACEK:  I don't have any further questions.
25            THE COURT:  It's 1 o'clock.  We did have a longer
```

```
 1    break than before.  Go about another 15, 20 minutes, is that
 2    okay with everyone, or people want lunch now?
 3            Yes, take lunch now.  Why don't we don't that, because
 4    that is what was planned.  Would 45 be enough at this point, or
 5    would people request a full hour?
 6            45 minutes, raise your hand.  An hour?  Hour sounds
 7    good.
 8            Leave your notepads in the courtroom, remember my
 9    admonition not to discuss the case, and we'll see you at 2:00.
10       (Jury absent)
11       THE COURT:  All right.  Please be seated, everyone.
12    Why don't we take about five or ten minutes here to give the
13    marshals an opportunity to have -- to escort out the witness,
14    and then we'll come back on record and we'll discuss the
15    conviction issues, which I think we need to take up for cross
16    of Mr. Crockett's convictions, whether you're seeking to bring
17    in any or no.
18       MR. CAMIEL:  Your Honor, the only conviction I would
19    be asking him about is the current.
20       THE COURT:  Is the current one.  That resolves that.
21    And then I'm prepared to address the issue regarding
22    Christopher Kearney.  Are you ready to be heard on that?  We
23    could do that at the end of the lunch hour if you prefer, 1:45.
24       MR. CAMIEL:  That's fine.
25       THE COURT:  Is that your preference?
```

```
1              MR. CAMIEL:  Sure.

2              THE COURT:  That works for the government, I presume?

3              MS. WEBER:  Yes, Your Honor.

4              THE COURT:  1:45, we'll go back on record.

5              DEPUTY CLERK:  All rise.  This matter is now in recess

6    until 1:45.

7              (Recessed from 1:04 p.m. to 1:48 p.m.)

8        (Jury absent)

9              DEPUTY CLERK:  All rise.  Her Honor, the Court, the

10   United States District Court is again in session.

11             Please be seated.

12             THE COURT:  All right.  We are without the jury to

13   take up this issue of Mr. Kearney.  Mr. Camiel, go ahead,

14   please, your thoughts on that.

15             MR. CAMIEL:  Well, we're talking about his plea

16   agreement.

17             THE COURT:  The additional testimony would be medical

18   records from the trooper and the plea agreement.

19             MR. CAMIEL:  So of course --

20             THE COURT:  Medical records regarding ES.

21             MR. CAMIEL:  Right.  But I think what the government

22   would need to do is they'd need to call ES.

23             THE COURT:  With regard to?

24             MR. CAMIEL:  If they're going to introduce his medical

25   records and they're going to indicate that he overdosed, and if
```

he's going to testify where he got the pills from, I mean, I don't know how else -- medical records aren't going to say where the pills came from, which is what the government is --

THE COURT: So you're not planning on calling ES?

MS. WEBER: Your Honor, we're not planning on calling ES. However, Christopher Kearney will testify, on this date I sold the pill to ES, and we can show the timeframe of when ES was then subsequently hospitalized for overdose.

THE COURT: How would you plan to get in those records?

MS. WEBER: We would only admit the statements that he made to medical professionals from the medical records or we'll have a custodian of records from the hospital come and authenticate the medical records.

MR. CAMIEL: Your Honor, without waiving my other objection, I would indicate that if the Court was going to allow that to come in, I would want Mr. Brown back because I would want to ask him about -- so I would want Mr. -- I would want ES, because his statement to the police was that when he went to the house to buy the pills, there were two black males that he got the pills from. He identified Mr. Kearney and he indicated, although he was not sure, Mr. Brown looked like the other black male.

So if they are going to get in a statement in medical records about him saying he got pills, I would want to be able

1    to question Mr. ES about that.

2           THE COURT:  Well, there is nothing to preclude you

3    from calling ES.  I don't see that that's necessary to the

4    government putting on this, to establish this issue in their

5    case in chief.

6           MR. CAMIEL:  But with regard to the overall

7    introduction of evidence of other overdoses, Mr. Tulali is

8    charged with the overdose death of Mr. Lee, and there is a

9    danger that the jury could decide that evidence isn't

10   particularly strong.  But the evidence connecting my client to

11   Mr. Brown and to the other overdoses is stronger, in which case

12   a jury might convict based on that other evidence that he's not

13   charged with.  And I think that's part of the danger of unfair

14   prejudice.

15          It's also -- Mr. Crockett testified already, he said

16   he heard there had been other overdoses.  So they have got that

17   in through him.

18          THE COURT:  I did hear that testimony, and it was

19   presented.

20          I've given this some thought, and it's unfortunate

21   that here we are at this stage of the trial and I do see there

22   is relevance with regard to Mr. -- with the ES overdose, and

23   that I will allow limited additional evidence under 403.  I

24   will give -- I have considered the point that Mr. Camiel has

25   made that Mr. Tulali is solely on trial for the sale -- or the

1    ingestion of the Percocet, or the substance by JL, by Mr. Lee,
2    and no one else, and I do intend to instruct, like I said, the
3    jury in that regard.

4         But I -- where I -- seems there's some merit to the
5    government's argument that the defense has suggested that the
6    drugs that appeared to have caused the death of Mr. Lee may
7    have come from a different source entirely than Mr. Brown, or
8    ultimately, as the government alleges, Mr. Tulali.  And I do
9    see that if that argument asserted that this evidence would
10   be -- have probative value to that issue and then given -- I
11   mean, it works both ways in my mind, that there has been
12   evidence of drug overdoses, so more evidence about that is not
13   unduly prejudicial in the Court's view or substantially
14   outweigh the benefits of this testimony in this case.

15        I have given thought, too, to the severity -- I mean,
16   the severity of the charge here as to -- from both sides'
17   perspective, both from the government and the victim's
18   perspective, the family's perspective, and certainly from
19   Mr. Tulali's perspective.  And in that manner, I -- in that
20   consideration, I do see that allowing each side the opportunity
21   to present evidence that has relevance that there's a greater
22   value to it, given the extent to which each side -- the
23   interest of each side are at stake in this proceeding.

24        So for those reasons, Mr. Kearney, I'll allow the plea
25   agreement, which I've now reviewed that was provided this

morning by the government, and we can address the medical

records issue.  I hear that would be coming in through the

trooper and only under 803(4) as medical, the statements that

were made there.  And certainly Mr. -- I'll make sure that we

still have Mr. Brown here until the end of the trial.  I guess

that's the point I would want to assure with the marshals, that

he can remain here in the event that the defense wishes to

recall him when it's the defense turn to present their case.

MR. CAMIEL:  Your Honor, I would also ask, I don't

know whether the government has ES under subpoena.  If they do,

I would ask that he be --

THE COURT:  That he not be released from the subpoena?

MR. CAMIEL:  He not be released and that he be here

tomorrow or whenever the government rests.

THE COURT:  I'm hearing the government does not intend

to call ES.  Is that correct?

MS. WEBER:  That is correct.

THE COURT:  There is nothing -- the Court, if

necessary, would facilitate getting whatever order the defense

would seek.  I don't know where he is, but if I get a request

from the defense, just as I do with regard to any other

witness, I would address that.

Very good.  Anything further?

Did you subpoena him?  I guess that was really

Mr. Camiel's question.  Is he under a subpoena now?

1          MS. WEBER:  No.

2          THE COURT:  Okay.  Then I'll leave it to the defense

3     to seek appropriate means.

4          MS. WEBER:  And, Your Honor, does the Court have a

5     ruling as to the evidence regarding Aimee Ludwick?

6          THE COURT:  Well, I want to hear from Mr. Camiel on

7     that, but I guess that appears to be -- I did want to say that

8     I was more uncertain about this Kearney evidence coming in

9     until I heard the testimony today from Mr. Brown that he didn't

10    know about the pills that were above the microwave, because to

11    me, that supports the government's view that those pills had

12    been taken out of the box by somebody in the residence, either

13    who he describes as Mama or Mr. Kearney described as Mama or

14    Mr. Kearney, or somebody else himself.  So I found that

15    evidence to be persuasive in resolving this issue.

16         But anyway, on AL, no.  I'd like to hear from the

17    defense on that.  And when were you planning to call -- you can

18    present the evidence of -- you've already presented the AB

19    evidence.  So what more would we need to hear?

20         MS. WEBER:  As to ES?

21         THE COURT:  No, AL.

22         MS. WEBER:  As to AL, we have been in touch with her.

23    We would have her testify.  There's the 911 call where the

24    caller can hear AL in respiratory arrest, which has been

25    described as a symptom of overdose.  And we'll hear from the

 1    medical examiner explaining the process of how one does die.

 2          THE COURT:  Then you would be planning to call

 3    Officer Brubeck back?

 4          MS. WEBER:  We would call Officer Brubeck back, as

 5    well as Aimee Ludwick, and that would -- that would be --

 6          THE COURT:  I want to hear from Mr. Camiel on that,

 7    but do I need to decide that now, or can we get our witness

 8    back and proceed with where we are?

 9          MS. WEBER:  We can proceed.

10          THE COURT:  When are you planning to call Ms. Ludwick?

11    Is it this afternoon or tomorrow?

12          MS. WEBER:  It will be tomorrow.

13          THE COURT:  Very good.  Then we can bring up the

14    witness.  And anything else to take up while we do that?

15          MR. CAMIEL:  To be clear, so I can be prepared, so the

16    government will be calling Mr. Kearney?

17          MS. WEBER:  Yes, as well as Trooper Hargis.

18          THE COURT:  It would be helpful, I think, if you

19    identified the statement in the medical record you sought to

20    admit before that was brought up in front of the jury, and I

21    can take up any concerns Mr. Camiel has in that regard outside

22    the presence of the jury.

23          So maybe we can either do that later, at the end of

24    today, or first thing in the morning.  But that will help us

25    along.

 1          Anything else, Mr. Camiel, in the next few minutes
 2 before we bring up the witness?
 3          MR. CAMIEL:  No, Your Honor.
 4          THE COURT:  Very good.  We'll go off record.
 5          MS. WEBER:  Your Honor, I apologize.
 6          THE COURT:  That's all right, Ms. Weber.
 7          MS. WEBER:  We spoke to Trooper Hargis.  Would it be
 8 okay if he testifies virtually or remotely?  He's in Prince of
 9 Wales.
10          THE COURT:  Any objection?
11          MR. CAMIEL:  Well, I have objected to all of the
12 testimony coming in.
13          THE COURT:  Well, I mean, you've agreed on some video.
14 But I understand you're objecting to the testimony, but to the
15 format, I guess is the --
16          MR. CAMIEL:  No.
17          THE COURT:  Thank you.  I know both sides have
18 accommodated that request for each other, and I know the
19 witnesses must really appreciate it as well.
20          Very good.  Yes as to video.  We'll go off record.
21          DEPUTY CLERK:  All rise.  This court stands in a brief
22 recess.
23      (Recessed from 2:00 p.m. to 2:05 p.m.)
24      (Jury present)
25          DEPUTY CLERK:  Please be seated.

1          (Pause)

2               DEPUTY CLERK:  All rise.  Her Honor, the Court, the

3     United States District Court is again in session.

4               Please be seated.

5               THE COURT:  All right.  We are back on record with our

6     jury present.  Ready to proceed, Mr. Camiel?

7               MR. CAMIEL:  Yes.

8                         CROSS-EXAMINATION

9     BY MR. CAMIEL:

10    Q    Good afternoon, Mr. Crockett.

11    A    Good afternoon, sir.

12    Q    Mr. Crockett, you pled guilty to the charge of distribution

13    of controlled substances, right?

14    A    Yes, sir.

15    Q    You did not plead guilty to the charge of distribution of

16    controlled substances resulting in death?

17    A    No, sir.

18    Q    And had you been charged with distribution of controlled

19    substances resulting in death, you understood that you would

20    have faced a 20-year mandatory minimum sentence?

21    A    Yes, sir.

22    Q    And you entered into a cooperation agreement with the

23    government?

24    A    Yes, sir.

25    Q    They allowed you to enter into that cooperation agreement

1  even though the first number of times you talked to them you

2  lied to them?

3  A    Correct, sir.

4  Q    You explained that -- well, before we get there, you're

5  serving an 84-month sentence; is that right?

6  A    Yes, sir.

7  Q    Are you familiar with what the federal sentencing

8  guidelines are?

9  A    Not really, sir.

10  Q    Do you remember hearing about the sentencing guidelines

11  when your case was going on?

12  A    Vaguely, sir.

13  Q    Do you recall that you faced a sentencing guideline range

14  of 210 to 240 months?

15  A    Could be, sir, yes, sir.

16  Q    So the sentence you received was significantly less than

17  that, wasn't it?

18  A    Yes, sir.

19  Q    You were initially contacted by the police, does

20  November 3rd sound right when they came to you?  You were

21  talking about around election day outside your residence, you

22  were with your mother?

23  A    Yes, sir.

24  Q    You were just getting home and a couple FBI agents

25  approached you?

```
1    A    Correct.
2    Q    And you had indicated that's the first time you heard that
3    Jacob Lee had died?
4    A    Correct.
5    Q    Because you hadn't heard from him in a number of days,
6    right?
7    A    Correct.
8    Q    And at that time, when they approached you and wanted to
9    talk to you and they asked you whether you had met with Jacob
10   Lee and sold him any pills.  Do you remember that?
11   A    Yes, sir.
12   Q    You told them you had not?
13   A    Correct, sir.
14   Q    And several days later, you were arrested and taken to the
15   Fairbanks Police Station, right?
16   A    No.  It wasn't several days later.  It was a little while.
17   Q    But sometime later, not the same day, but.
18   A    Yes, sir.
19   Q    A number of weeks later?
20   A    Yes, sir.
21   Q    So you're arrested.  You're brought to the Fairbanks Police
22   Department.  They sit you down and they ask you to tell them
23   the truth about what happened?
24   A    Correct.
25   Q    And you told them that, "Whatever he took, it wasn't from
```

1  me, I never did nothing with him," right?

2  A    Possibly.  Like, it's been a while, sir.

3  Q    Does that sound like what you said?

4  A    Yes, sir.

5  Q    You said, "I didn't do nothing wrong.  I had nothing to do

6  with him"?

7  A    Correct, sir.

8  Q    So once again, you weren't honest with the police?

9  A    Correct, sir.

10 Q    And then a while later, on another time you had a meeting

11 with them, this was a meeting where they had offered you a

12 cooperation agreement, right?

13 A    Yes, sir.

14 Q    And the terms of the cooperation agreement were that you

15 might receive some leniency if you are honest with them, right?

16 A    Yes, sir.

17 Q    All right.  And you started off that meeting by again

18 telling them you didn't sell Jacob Lee anything?

19 A    Correct, sir.

20 Q    And finally, later on in the meeting, you finally told

21 them, okay, I did, right?

22 A    Yes, sir.

23 Q    But when you told them that you did, initially you told

24 them this was the first time I had ever sold him anything?

25 A    Yes, sir.

```
1   Q    Okay.  And that wasn't true?

2   A    No, sir.

3   Q    And this is after you have agreed to this cooperation

4   agreement where you have been offered a benefit of the

5   potential for leniency if you tell them the truth, and you're

6   still not being honest with them?

7   A    Yes, sir.

8   Q    And they still allowed you to enter into the cooperation

9   agreement?

10  A    Correct, sir.

11  Q    Now, you described that you had your own addiction

12  problems?

13  A    Yes, sir.

14  Q    And I think you said you had been addicted to meth and

15  marijuana?

16  A    Correct, sir.

17  Q    And that you were -- you were using meth on a daily basis?

18  A    Yes, sir.

19  Q    Basically, you would use it whenever you could get your

20  hands on it?

21  A    Yes, sir.

22  Q    You were also using pills from time to time?

23  A    Correct.

24  Q    And you had used -- you described the different levels of

25  pills.  You had used the 10 and the 15s, but you also from time
```

1  to time used 30s, P30s?

2  A   It was mainly 10s.

3  Q   Mainly 10s, but sometimes 30s?

4  A   On that occasion, yes.

5  Q   You used them before that occasion that we're talking

6  about, right?

7  A   Yes, sir.

8  Q   So just to be clear, we're talking about the Perc 30s,

9  right?

10  A   Yes, sir.

11  Q   Okay.  So I'm not talking about the day that you sold on

12  October 26th, that you sold the two pills to Jacob Lee, but

13  before that, you had used Perc 30s yourself?

14  A   On that occasion, sir.  I usually -- like I said, I have

15  tooken 10s.

16  Q   You knew that there were Perc 30s, as you -- I think the

17  term you used "out there"?

18  A   Yeah.

19  Q   Out in the community, right?

20  A   Yes, sir.

21  Q   Okay.  And in terms of the pills that you were selling, how

22  long had you been selling pills?

23  A   I don't know.  I don't know.  Maybe a year or two, off and

24  on.

25  Q   And you described multiple -- you had had multiple sources

1    for pills?

2    A    Yes, sir.

3    Q    So if you couldn't find them with one person, you could go

4    to somebody else?

5    A    Yes, sir.

6    Q    And I think you said there were about half dozen sources

7    that you were aware of?

8    A    Correct, sir.

9    Q    And that you frequented?

10   A    Yes, sir.

11   Q    So if you wanted pills and you went to person number one

12   and they didn't have it, you could start contacting other

13   people, right?

14   A    Yes, sir.

15   Q    Sometimes you would see these people on the street?

16   A    Yes, sir.

17   Q    And get ahold of them that way.

18   A    Usually I got ahold of them through phone.

19   Q    Okay.  That's the usual way, but there were times where you

20   just see them and approach them and see if they had anything,

21   right?

22   A    Yes, sir.

23   Q    Going back to the methamphetamine addiction that you were

24   struggling with, when you got -- when you got your hands on

25   some meth, you would use it pretty quickly after you got it,

```
 1   right?
 2   A    Sometimes, yeah.  Depends on where I was at.
 3   Q    I'm sorry?
 4   A    Most of the time, yes.
 5   Q    Most of the time you would go home and use it, right?
 6   A    Correct, sir.
 7   Q    Because you were addicted to it?
 8   A    Yes, sir.
 9   Q    That meant you had this craving, right?
10   A    Yeah.
11   Q    And it was a real struggle not to use it?
12   A    Yes, sir.
13   Q    Now, let's -- I want to talk some about your relationship
14   with Jacob Lee.
15        Before you started selling anything to Jacob Lee, you were
16   selling to his brothers; is that right?
17   A    Yeah, I had.  Yeah.
18   Q    One of the brothers is Jeff Lee?
19   A    Yes.
20   Q    And he has another brother, Josh?
21   A    Yes, sir.
22   Q    And so you were selling to both of them?
23   A    I have a few times, yes, sir.
24   Q    What were you selling to them?
25   A    Just pills, Perc 10s or Xanaxes.
```

1    Q    So these would be pills that you would get from any of

2    these half dozen random people out there?

3    A    Correct, sir.

4    Q    And then you started selling to Jason, right, Jason Lee?

5    A    Jason?

6    Q    I'm sorry.  Jacob?

7    A    Yes, sir.

8    Q    I want to have you look at some exhibits.  There's a

9    notebook in front of you.  It's the smaller of the two

10   notebooks.  And -- yeah, that's the one.

11       I'm going to have you look at a few exhibits.  We're going

12   to start with Exhibit -- these are lettered, rather than

13   numbered -- Exhibit O, the letter O.  Do you have that in front

14   of you?

15   A    Yes, sir.

16            MR. CAMIEL:  Your Honor, I believe this has been

17   admitted, and I would move to publish.

18            THE COURT:  The deputy just indicated that's correct.

19   Go right ahead.

20   BY MR. CAMIEL:

21   Q    Mr. Crockett, do you see the screen that's in front of you?

22   A    Yes, sir.

23   Q    Do you recognize this as messages between you and

24   Jacob Lee?

25   A    Yes, sir.

1  Q   So the first page that we're looking at, can you see the

2  date at the top, January 11, 2020?

3  A   Yes, I see it.  Yes, sir.

4  Q   So you were dealing with Jacob Lee as early as January 11th

5  of 2020?

6  A   Correct, sir.

7  Q   That's about ten months before he died?

8  A   Yes, sir.

9  Q   And there's a message from you, "Only two Xani bars there.

10  2MG," 2 milligrams, "20 apiece."

11      So you're offering him Xanax; is that right?

12  A   Yes, sir.

13  Q   And it sounds like, from reading this, but you correct me

14  if I'm wrong, this wasn't the first time you had offered him

15  Xanax?

16  A   No, sir.

17  Q   For how long a period of time before January 11, 2020, had

18  you been selling to him?

19  A   It was off and on.  I don't know, sir.  I don't know exact

20  date.  It was not an everyday thing.  It was off and on, go out

21  there.

22  Q   Okay.  And then the message goes on, "Make sure you keep my

23  business to yourself."

24      You're telling him -- you're telling Jacob Lee that, right?

25  A   Yes, sir.

1   Q   And you're telling him that because you're worried that

2   he's letting his brothers know that he's still getting drugs

3   from you?

4   A   Yeah.

5   Q   Because one time when he came to get drugs from you, he

6   showed up with one of his brothers, right?

7   A   Yes, sir.

8   Q   And that upset you?

9   A   Yeah.

10   Q   And he responded to you, you see, "Of course, and I've got

11   40 for you if you can meet.  Car's got to warm up"?

12   A   Yes, sir, I see it.

13   Q   And you indicate you're on your way back from North Pole,

14   right?

15   A   Yes, sir.

16   Q   This page, you see this is now January 11th?

17   A   Uh-huh.

18   Q   And he messages you, "Hey, Bro, you got anything?"

19       See that?

20   A   Yes, I see it.

21   Q   So when he's just asking for anything, what do you

22   understand that to mean?

23   A   He's looking for anything as far as pain pills or

24   narcotics.

25   Q   So not just pain pill, but other kind of drugs?

1  A   Yes, sir.

2  Q   What were the other drugs that you were selling him?

3  A   I sold him Xani bars and Percs.

4  Q   And cocaine sometimes?

5  A   Yes, sir.

6  Q   Did you ever sell him methamphetamine?

7  A   No, sir.

8  Q   And here on January 11th, you talk again about two Xani

9  bars.

10     And then let's look at January 12th.  You see that in the

11 blue?

12 A   Yep, I see it.

13 Q   He's asking, "Any Percs," and you respond, "No"?

14 A   Correct, sir.

15 Q   And then you see January 15th, he's again asking,

16 "Anything?"

17 A   Yes, sir, I see it.

18 Q   When he would message you like that, would you sometimes

19 call him in response, rather than texting him back?

20 A   No.  Usually it was just quicker to communicate this way.

21 Q   And now we're about six days later, January 21st.  He's

22 again asking you for anything.

23 A   Yes, sir, I see it.

24 Q   And you say, "I might be able to get a couple number 15s,

25 but it won't be for about 30 minutes because I'm at work right

1    now"?

2    A    Correct.

3    Q    So way back in January of 2020, every few days, it seems

4    like, he's messaging you for some kind of drug, right?

5    A    Yes, sir.

6    Q    Because he had an addiction and you were aware of that,

7    right?

8    A    Yes, sir.

9    Q    Did you ever use drugs with him?

10   A    The only thing we ever did was just smoked marijuana

11   together.

12   Q    So you haven't seen how he used the Xanax or the pills that

13   you were selling him?

14   A    No, sir.

15   Q    I'm going to skip ahead here.

16   A    Sir, excuse me.  I back up on that one.  My apologies.

17        He did.  When he came to my house before and bought a Xani,

18   I want to say he was with his brother, he swallowed it with a

19   Bud Light or a beer of some sort, once before.

20   Q    That was a Xanax bar?

21   A    Yes, sir.

22   Q    When he messages you the message we're looking at here,

23   "Okay, cool ops," the O-P-S, "or just 15s," what is your

24   understanding of what he's asking for there?

25   A    For pills, Percocets.

Q   Ops, short for opiates?

A   Sir, I don't know.  I believe -- I look it as a misprint.
But I knew what he was into, so I kind of figured out what he
wanted.

Q   Okay.  In this response, you're saying the opi is 25.
What's an opi?

A   That's a misprint too, because I use talk text.  So I'm
talking into the phone.  I wasn't actually texting.  It was
just a fast way to communicate.  But I was basically talking
about P's for Percocet, just a short abbreviation.

Q   And then you also said, "$60 worth of girl"?

A   Yeah.  That was -- that's what the short name for cocaine.

Q   Okay.  Now we're up to -- we're looking at January 22nd.
He's asking for yellow bars.  What is he asking you for?

A   He's asking for Xanis.

Q   January 28th, "Got anything?"

A   Yeah, I see it, sir.

Q   And you respond, "One op number ten," right?

A   Yes, sir, I see it.

Q   So the relationship, it sounds like, between the two of you
was, he didn't have to say much, he could just say "anything,"
and you knew what he meant?

A   Yes, sir.

Q   There were times where he would, I think to use the term
that you have used before, he would be blowing up your phone,

1  trying to get ahold of you for stuff, right?

2  A   Yes, sir.

3  Q   Meaning that he would be repeatedly contacting you to try

4  to get stuff from you?

5  A   Yes, sir.

6  Q   Sometimes you had it and sometimes you didn't?

7  A   Yes, sir.

8  Q   I'm going to have you look at a different exhibit in that

9  book.  We're going to jump ahead to Exhibit -- the letter T.

10      Jacob Lee wasn't your only customer, was he?

11  A   Excuse me?

12  Q   Jacob Lee wasn't your only pill customer, was he?

13  A   He was mainly the one I would go to.  Sometimes I will see

14  other people.

15  Q   Let's look at -- I don't believe this is in yet.

16          DEPUTY CLERK:  It's not.

17  BY MR. CAMIEL:

18  Q   I'm going to have you take a look at Defense Exhibit T for

19  identification.  Does that look like a Facebook message of

20  yours?

21  A   Yes, sir.

22  Q   And you're reaching out to somebody, aren't you?

23  A   Yes, sir.

24  Q   This looks like it came from your Facebook account?

25  A   Correct, sir.

1        MR. CAMIEL:  Your Honor, I would offer Defense Exhibit

2  T.

3        THE COURT:  Any objection to T?

4        MS. VOSACEK:  No, Your Honor.

5        THE COURT:  All right.  T is admitted.

6    (Exhibit T admitted)

7        MR. CAMIEL:  Move to publish.

8        THE COURT:  Go ahead.

9  BY MR. CAMIEL:

10  Q   Just the highlighted portion.  This is September 11th of

11  2020.

12    You see that?

13  A   Yeah.

14  Q   Can you read what you wrote?

15  A   Yeah.  I said -- yeah.  I wrote, "Hey, if you know anybody

16  that likes pain pills, could you let me know?  I have no weed

17  or cigarettes, so I'm trying to relights my Percs for 20 a

18  piece."

19  Q   So you're offering to sell Percs because you're trying to

20  come up with some money for weed or cigarettes?

21  A   That's correct, sir.

22  Q   Who is Lexi Lance that you're messaging?

23  A   That's just a random girl I knew, worked at the gas

24  station.

25  Q   So that's somebody that you sometimes sold to, right?

1   A   We smoked weed together.

2   Q   Well, you're asking if she knows anybody who likes pain

3   pills, though, right?

4   A   Possibly, sir, yes.

5   Q   Well, that's what it says, right?

6   A   That's what it says, yes.

7   Q   Now let's look at the next exhibit, Exhibit U, which I

8   believe is not in evidence yet.

9       This is another page from your Facebook; is that right?

10  A   Yes, sir.

11  Q   You see your name on it, and it appears to be Facebook

12  messages?

13  A   Yes, sir.

14  Q   And this -- I'm looking at a highlighted message in the

15  middle.  That looks like you getting a message from somebody

16  else?

17  A   Yes, I see it, sir.

18          MR. CAMIEL:  I would offer Defense Exhibit U.

19          MS. VOSACEK:  No objection.

20          THE COURT:  U is admitted.

21      (Exhibit U admitted)

22          MR. CAMIEL:  Move to publish.

23          THE COURT:  That's fine.

24  BY MR. CAMIEL:

25  Q   Just the highlighted portion.  Who is Hunter Kemp?

1    A    She was just another girl that I knew from around town.    I

2    haven't seen her in years.

3    Q    All right.  So this is October 10th of 2020, so this is a

4    couple weeks before you meet up with Andre Brown, right?

5    A    Yes, sir.

6    Q    Because you met up with him on October 26th, right?

7    A    Correct, sir.

8    Q    She is asking you, so you know where I can get yayo or

9    Percs?"

10        First of all, what is yayo?

11   A    Yayo.  She's talking about white girl, cocaine.

12   Q    Cocaine?

13   A    Yes, sir.

14   Q    And Percocets?

15   A    Yes, sir.

16   Q    She's reaching out to you for those things?

17   A    Yes, she did, sir.

18   Q    She has been a customer before, right?

19   A    Yes, sir.

20        MR. CAMIEL:  We're going to go to the next defense

21   exhibit, Defense Exhibit Y -- V.  Excuse me, V.

22        THE WITNESS:  Which page?

23   BY MR. CAMIEL:

24   Q    It's letter V, Victor.

25        Does that look like it's also from your Facebook?

1  A    Yes, sir.

2  Q    Do you see your name on there and the Facebook account

3  number?

4  A    Yes, sir.

5        MR. CAMIEL:  I would move Defense Exhibit V into

6  evidence.

7        MS. VOSACEK:  No objection.

8        THE COURT:  All right.  V is admitted.

9     (Exhibit V admitted)

10        MR. CAMIEL:  Move to publish.

11        THE COURT:  Go ahead.

12  BY MR. CAMIEL:

13  Q    This is October 22, 2020.  Do you see that?

14  A    Yes, sir.

15  Q    And what are you messaging?

16  A    I was messaging about I have a Perc 15, if you know

17  anybody, for 30 bucks.

18  Q    And who are you messaging?

19  A    I believe I was talking to my buddy, Nathan.

20  Q    Is that another customer of yours?

21  A    No.  He was actually somebody I used to work with a while

22  back.  We never did nothing major like that, but from time to

23  time we did, yes.

24  Q    So when you say you never did anything major like that,

25  there were times where you sold this Nathan pills, right?

1    A    Yes, I have, sir.

2    Q    Or he would find you people who wanted pills, right?

3    A    Yes, sir.

4    Q    And if he found you somebody who wanted a pill, would he

5    get a cut for kind of a finder's fee?

6    A    Yeah, depends on the circumstances.  I don't know, really.

7    Just depends on what was going on at that time.

8    Q    Let's go to the next exhibit, which is letter W.

9         Do you recognize Defense Exhibit W as another page from

10   your Facebook account?

11   A    Yes, sir, I see it.

12             MR. CAMIEL:  I would offer Defense W.

13             MS. VOSACEK:  No objection.

14             THE COURT:  W is admitted.

15        (Exhibit W admitted)

16             MR. CAMIEL:  Move to publish.

17             THE COURT:  Go ahead.

18   BY MR. CAMIEL:

19   Q    This is -- I'm looking again at the highlighted part,

20   October 23, 2020.  The very next day, right?

21   A    Yes, sir.

22   Q    Okay.  And who are you messaging here?

23   A    That person, that was a family member.  That was my cousin.

24   Q    And what do you tell her?

25   A    I just said, "Hey, cousin, if you know anybody, I got a

1  Perc 15 I'm trying to get rid of for 30 bucks.  If you know

2  anyone, I got to get rid.  I got to get a new driver's license

3  and everything.  I lost my wallet."

4  Q   Now, let's go to the next letter, letter X.

5      Do you have that in front of you?

6  A   Yes, sir.

7  Q   Look like another page from your Facebook account?

8  A   Yes, sir.

9  Q   And these are messages between you and Jacob Lee?

10 A   Yes, sir.

11          MR. CAMIEL:  I think --

12          THE COURT:  Yes.

13          MR. CAMIEL:  I would move to publish.

14 BY MR. CAMIEL:

15 Q   So this message string starts on October 7th.  At least it

16 says on here "October 7th, UTC time."  Do you see that at the

17 top?

18 A   Yes, sir, I see it.

19 Q   And you see -- he's giving you a new phone number?

20 A   Yes, sir.

21 Q   And if we scroll down a little bit to October 10th, you get

22 a message from him, "PS," question mark.  What did that mean to

23 you?

24 A   P's, Percocets.

25 Q   Okay.  And you respond to "PS what," and he says "Ya."  You

1    see that?

2    A    Yes, sir, I see it.

3    Q    Do you know if you met with him on October 10th?

4    A    I can't remember if I did or not, sir.  From my knowledge,

5    I don't believe I did.

6    Q    Sounds like you're not sure?

7    A    I'm not sure, no, sir.  It's been a while.

8    Q    So then the next message down, October 12th, which is two

9    days later, you get a message from him, "Anything," question

10   mark?

11   A    Yes, sir, I see it.

12   Q    All right.  And you say, "Maybe an hour or so.  I have to

13   wait until my mom gets back."

14        And he responds, "Okay."

15        You see that?

16   A    Yes, sir, I see it.

17   Q    So October 12th, did you meet with Jacob Lee and sell him

18   anything or give him anything?

19   A    I don't believe so, because I didn't have -- when I sent

20   that message, I didn't have a vehicle.

21   Q    Again, it sounds like you're not sure.

22   A    Like I said, it's been a while, sir.

23   Q    All right.  Then we get to --

24        MR. CAMIEL:  Scroll down a little further.

25   BY MR. CAMIEL:

```
 1   Q   We have what's listed as October 24th.  Right?  You see
 2   that?
 3   A   Yes, sir, I see it.
 4   Q   So this is a couple days before you get anything from
 5   Mr. Brown, right?
 6   A   Yes, sir.
 7   Q   Okay.  So you say, "What's up, Brother Man?  I've got two
 8   Percocets I'm trying to sell.  I'm at the library.  I got a
 9   Perc 15 and a Perc 10.  50 bucks, you can have them both."
10       You see that?
11   A   Yes, sir, I see it.
12   Q   Where did those Percs come from?
13   A   Just from random places where I got them from.  There's
14   no --
15   Q   Who's the random person who provided you the Percocets that
16   you were talking about on October 24th?
17   A   Just random people.  There's no certain name person.  It
18   could be anybody, sir.
19   Q   How many different anybodies were you dealing with?
20   A   About a half dozen.  It was just whoever had what I was
21   looking for.
22   Q   You're offering him on October 24th a couple Percocets,
23   right?
24   A   Correct, sir.
25   Q   Okay.  And then it looks like you called him, right, where
```

it says you called Jacob?
A Yeah, I see it, sir.
Q And he gets back to you. "Yo, what you doing?"
A Yes, sir, I see it.
Q And then you respond, "I'm on my way back in from" -- and I'm not sure --
A Nenana.
Q Okay. He responds, "Okay."
You say, "I'm almost back to town. I'm probably about 20 minutes away."
You see that?
A Yes, sir, I see it.
Q And then he responds, "Okay, cool." Let me know, "LMK," right?
A Yes, sir.
Q So it sounds like you have offered him two Percocets and he's waiting to meet up with you when you get back, right?
A Yes, sir.
Q So that's two days before the 26th?
A Yes, sir.
Q So did you sell him those two Percocets on the 24th?
A Can you please repeat that, sir? I'm looking at it.
Q You've got -- you have offered him, on October 24th, two Percocets, right?
A Yes, sir, I see that.

1    Q    Okay.  And you tell him you're on your way back?

2    A    From Nenana.  Yeah, I see that.

3    Q    And he says "okay," and you say, "I'm almost back to town.

4    I'm probably about 20 minutes away," right?

5    A    Yes, sir, I see that.

6    Q    And he says, "Okay, cool, LMK," right?

7    A    Yes, sir, I see that.

8    Q    So sounds like you guys set up a meeting, right?

9    A    Yes, sir.  It looks that way.

10   Q    Okay.  So based on these messages we've been looking at, it

11   looks like every couple days at this point in October, he's

12   hitting you up for pills or you're offering him pills.  Is that

13   right?

14   A    Correct, sir.

15   Q    And that was because he really had a severe addiction,

16   right?

17   A    Correct, sir.

18   Q    And if you got him a pill, it didn't last very long, did

19   it?

20   A    I couldn't tell you -- I don't know.

21   Q    Well, you hit him up on the 24th and you believe you sold

22   him two Percocets on the 24th, right?

23   A    It's possible

24   Q    Okay.  Well, that's what the message looks like, right?

25   A    Yes.

```
 1   Q    So then two days later, on the 26th, he messages you, "Yo."
 2   You see that?
 3   A    Yes, sir, I see it.
 4   Q    Okay.  What do you take that to mean?
 5   A    Yo?
 6   Q    Yep.
 7   A    Hi.
 8   Q    But also, do you take it to mean he's reaching out to see
 9   if you have any more pills?
10   A    Yes, sir.
11   Q    Because your response right below that is what?
12   A    "I'm at work right now -- right now.  Soon as I come across
13   that, I'll let you know."
14   Q    Okay.  And then a little while later is the messages we've
15   already seen where you're talking about you got some 30s and
16   they're 60 apiece, right?
17   A    Correct, sir.
18   Q    So looks like you sold him something on the 24th and also
19   on the 26th?
20   A    Correct, sir.
21   Q    Now, your testimony, if I understand it correctly, is that
22   you, after you -- on the 26th, after you met with Jacob Lee,
23   you went home and you say that you took half a pill?
24   A    Correct, sir.
25   Q    And you found yourself passed out in a hallway?
```

1   A   Correct, sir.

2   Q   And you had taken 30s before and hadn't had that kind of

3   reaction, right?

4   A   Correct, sir.

5   Q   Because you had some experience taking 30s?

6   A   No, 10s and things like that.  I wasn't -- no 30s, like I

7   said, during the presence of this time here.

8   Q   Well, you talked about -- we looked at some messages you

9   had with Mr. Brown after this where you were asking him, are

10   these the real thing, right?

11   A   Yes, sir.

12   Q   You didn't say anything to Mr. Brown in your message about,

13   gee, I passed out, I had a bad reaction.  You didn't tell him

14   that, did you?

15   A   No, sir.

16   Q   In fact, you told him you still had some pills, right?

17   A   Correct, sir.

18   Q   You told him you had his money?

19   A   Correct, sir.

20   Q   And what you told the police was you told the police that

21   after you had the bad reaction, you flushed the pills, right?

22   A   Yeah.

23   Q   Yes?

24   A   I heard you.  Yes.

25   Q   But when you told them that, that wasn't exactly true, was

1   it?

2   A    No, sir.

3   Q    So even though you had a cooperation agreement and they

4   agreed that if you cooperated and you told the truth you had

5   the potential for getting a more lenient sentence, you

6   continued to lie to them, right?

7   A    Yes, sir.

8   Q    So we're going to look now at, in the same book, letter Y.

9   Do you recognize this as another page from your Facebook?

10  A    Yes, sir.

11  Q    Okay.  Do you see your name on it and you see the Facebook

12  and the account number?

13  A    Yes, sir.

14          MR. CAMIEL:  I would offer Defense Exhibit Y.

15          MS. VOSACEK:  No objection.

16          THE COURT:  Y is admitted.

17      (Exhibit Y admitted)

18          MR. CAMIEL:  Move to publish.

19          THE COURT:  Go ahead.

20  BY MR. CAMIEL:

21  Q    Looking at the top, we're looking at, in the highlighted

22  portion, October 28th, right?

23  A    Yes, sir.

24  Q    October 28, 2020, right?

25  A    Yes, sir.

```
1   Q   It was October 26th that you said you took the pill and
2   had -- or took the half pill and had the bad reaction, right?
3   A   Correct, sir.
4   Q   You had told the police that right after that you flushed
5   the pills, right?
6   A   Yes, sir.
7   Q   But here on October 28th, you're messaging somebody.  And
8   what are you saying?
9   A   "Also have some pain pills if you want, if you know anybody
10  that likes pain pills and wants -- pain pills and wants, can we
11  do or what will allow me to do."
12  Q   You're still selling pain pills, right?
13  A   Correct, sir.
14  Q   So you're either selling the pills you still had from
15  Mr. Brown or some other pills you got your hands on, right?
16  A   Correct, sir.
17  Q   Just one question.  When you met with Jacob Lee on the 26th
18  of October, he was driving a blue Subaru; is that right?
19  A   Correct, sir.
20  Q   Did you know whose car that was?
21  A   He had told me.  He said he was borrowing his brother's.
22          MR. CAMIEL:  Thank you.  That's all I have.
23          THE COURT:  All right.  Thank you.
24          Ms. Vosacek, go ahead, please.
25          MS. VOSACEK:  Thank you, Your Honor.
```

REDIRECT EXAMINATION

BY MS. VOSACEK:

Q    Mr. Crockett, when you came into court here today, did you take an oath?

A    Yes, ma'am.

Q    Did you tell -- what was that oath for?

A    Excuse me?

Q    What was your oath?

A    To tell the truth.

Q    Okay.  When you came into court and pled guilty, did you take an oath?

A    Yes.

Q    What was that oath?

A    To tell the truth.

Q    When you were encountered by law enforcement on November 3rd, did you take an oath?

A    No.

Q    Did you tell the truth?

A    No, ma'am.

Q    When you were -- the second time you were interviewed by law enforcement, did you take an oath?

A    No, ma'am.

Q    Did you tell the truth?

A    No, ma'am.

Q    When you first met for your proffer, did you take an oath?

```
 1    A    No, ma'am.

 2    Q    Did you tell the truth?

 3    A    No, ma'am.

 4    Q    Eventually, did you tell the truth?

 5    A    Yes, ma'am.

 6    Q    Now, if somebody were to look at your phone, it's pretty

 7    clear that you deal drugs?

 8    A    Correct.

 9    Q    So when you tell law enforcement, "I have never sold drugs

10    to Jacob Lee before," is that pretty easy to disprove?

11    A    Yes, ma'am.

12    Q    You went through how many messages?

13    A    Quite a few.

14    Q    Right.  So is your testimony today consistent with the

15    messages that the defense showed you?

16    A    Yes.

17    Q    Does it prove, in fact, that you were telling the truth

18    today?

19             MR. CAMIEL:  Objection to the form of the question.

20             THE COURT:  That's sustained as to the form.

21    BY MS. VOSACEK:

22    Q    Did you testify consistent with the evidence that was shown

23    in your messages?

24    A    Yes, ma'am.

25    Q    That you have been selling drugs to Jacob Lee?
```

```
 1    A    Yes, ma'am.

 2    Q    Did you also testify that you have sold drugs to other

 3    people?

 4    A    Yes, ma'am.

 5    Q    Is the evidence that you were shown on cross-examination

 6    consistent with your testimony?

 7    A    Yes, ma'am.

 8    Q    Now, when you went in for your interview with the proffer,

 9    did you have a lawyer?

10    A    Yes, sir -- sorry.  Yes, ma'am.  Sorry.

11    Q    That's okay.

12         At that point, had you had meetings with your lawyer?

13    A    Yes.

14    Q    Did you have an opportunity to review evidence that the

15    government had against you?

16    A    Yeah, some, whatever he had at the time.

17    Q    If there was evidence that shows that you dealt drugs to

18    Jacob Lee on Facebook, would that persuade you to come forward

19    and tell the truth?

20              MR. CAMIEL:  Objection to the leading.

21              THE COURT:  Sustained as to the form, Ms. Vosacek.

22    BY MS. VOSACEK:

23    Q    If you're confronted with evidence that you're lying, what

24    are you going to do with that?

25    A    I have to tell the truth.
```

```
 1   Q    Why?
 2   A    Because lying is wrong and it's obviously not getting me
 3   nowhere, so better just to tell the truth.
 4   Q    Can you go back in time and erase the messages that were
 5   sent?
 6   A    No.
 7   Q    Can you undo what you have done?
 8   A    No, ma'am.
 9   Q    Can you change the facts of this case?
10   A    No, ma'am.
11   Q    Does any of your testimony on cross change your memory of
12   what happened on October 26th of 2020?
13   A    No, ma'am.
14   Q    Where did you get the pills that you sold to Jacob Lee?
15   A    From Andre Brown.
16   Q    Did you meet with anybody else?
17   A    No, ma'am.
18   Q    Did you go directly from that meeting to a meeting with
19   Jacob Lee?
20   A    Yes, ma'am.
21   Q    When you were messaging -- when we went through the defense
22   cross-examination, were the pills that you were selling to the
23   various individuals, were they Perc 30s?
24   A    No.
25   Q    What were they?
```

1  A   10s, sometimes 15s.

2  Q   And did you sometimes have pills to sell?

3  A   Sometimes.

4  Q   And sometimes you didn't?

5  A   Correct.

6  Q   Would you consider yourself like a high-volume dealer?

7  A   No.

8  Q   How much were you dealing?

9  A   It was just every now and then.  It was just if I needed

10 some quick money or just to support a habit.  I wouldn't say

11 every day.  I mean, enough, I would say, I guess.  I'm not

12 really sure how to --

13 Q   Were you getting packages shipped of hundreds of pills?

14 A   No.

15 Q   How many pills at a time would you get?

16 A   I don't know.  Maybe three, four, five.  It wasn't a whole

17 bunch or nothing like that.

18 Q   Why didn't you tell Andre Brown about your experience with

19 the pills?

20 A   I have no honest answer for that, ma'am.  I just -- I

21 didn't.  I wasn't -- I didn't -- I just didn't.

22 Q   Again, did anything that you were asked on

23 cross-examination alter your memory or your testimony about

24 where the pills came from on October 28th?

25 A   No, ma'am.

```
 1   Q    Or the timing and events that took place when you sold
 2   those pills to Jacob Lee?
 3   A    No, ma'am.
 4          MS. VOSACEK:  I don't have any further questions.
 5          THE COURT:  Thank you.
 6          Mr. Camiel, go ahead if you have further.
 7                      RECROSS-EXAMINATION
 8   BY MR. CAMIEL:
 9   Q    You were asked a question about erasing messages.
10   A    Yes, sir.
11   Q    Okay.  You deleted and erased some of your messages, right?
12   A    Yes, sir.
13   Q    In fact, after the police first contacted you, you did
14   that, right?
15   A    Yes, sir.
16   Q    Okay.  To try to hide evidence?
17   A    Yeah.
18   Q    And there were times where you would remind Jacob Lee to
19   erase the messages between you and him, right?
20   A    Correct, sir.
21   Q    Because you didn't want to leave evidence of what was going
22   on between the two of you?
23   A    Correct, sir.
24   Q    What's the largest quantity of pills that you ever sold at
25   one time?
```

A    Like I said, about three or four.  There was no bunch.  I
never had nothing like that.

Q    Did you ever sell Jeff Lee 10 pills at a time?

A    I could have.  Like, been a while, sir, so.

Q    All right.  So --

A    I could have.

Q    -- if you could have sold him 10, that's more than three or
four or five, right?

A    Correct.

Q    Now, you indicate you don't have any trouble remembering
that on October 26th of 2020, the pills you sold came from
Mr. Brown, right?

A    Yes, sir.

Q    But you can't remember or won't tell us where the pills
came from two days before that you sold to Jacob Lee?

A    Correct, sir, because -- yeah.

Q    Or the pills that you sold to him earlier that month?

A    Correct, sir.

            MR. CAMIEL:  Thank you.  Nothing else.

            THE COURT:  You may be excused here in just a moment.

            Let's take a short break, and we'll get the
government's next witness.  Be about 10- to 15-minute break,
and then we'll be back.  Please leave your notepads here.
Remember my admonition not to discuss the case, and we'll be
back shortly.

```
 1              (Witness excused)

 2              DEPUTY CLERK:  All rise.  This matter is now in a

 3    brief recess.

 4         (Recessed from 2:55 p.m. to 3:11 p.m.)

 5         (Jury present)

 6              DEPUTY CLERK:  Please be seated.

 7         (Pause)

 8              DEPUTY CLERK:  All rise.  Her Honor, the Court, the

 9    United States District Court is again in session.

10              Please be seated.

11              THE COURT:  All right.  We're ready for the

12    government's next witness.  Ms. Weber, who would that be?

13              MS. WEBER:  Your Honor, the government is calling

14    Jeffrey Lee.

15              THE COURT:  All right.  Mr. Lee, if you could come up

16    to the witness stand.  When you get up there, if you would

17    remain standing, the clerk will administer an oath to you.

18         (Oath administered to the witness)

19              DEPUTY CLERK:  Please state and spell your name for

20    the record.

21              THE WITNESS:  Jeffrey Lee, J-e-f-f-r-e-y, L-e-e.

22              THE COURT:  Go ahead, please.

23                JEFFREY LEE, GOVERNMENT WITNESS, SWORN

24                          DIRECT EXAMINATION

25    BY MS. WEBER:
```

```
 1   Q   Good afternoon, Mr. Lee.  Where do you live?
 2   A   1806 Hilton Avenue, Fairbanks, Alaska.
 3   Q   How long have you lived at that address?
 4   A   Most of my life.
 5   Q   How long have you lived in Fairbanks?
 6   A   Most of my life.  All except one year.
 7   Q   How old are you?
 8   A   30 years old.
 9   Q   Are you currently employed?
10   A   No, not at the moment.
11   Q   What do you do for money?
12   A   I work for my uncle.
13   Q   What's the highest level of education that you completed?
14   A   GED.
15   Q   I would like to go back to October of 2020.  Where were you
16   living in that time?
17   A   1806 Hilton Avenue.
18   Q   Who else lived in the home at that point?
19   A   My little brother Jacob Lee and my parents.
20   Q   Where was your bedroom in the home?
21   A   It was right across from Jacob's.
22   Q   And where -- like what floor was it on?
23   A   The basement.
24   Q   Were there any other bedrooms in the basement?
25   A   No.
```

1    Q    Can you please describe your relationship with your brother

2    Jacob Lee for the jury?

3    A    We were really close.

4    Q    What sort of things did you guys do together?

5    A    Just anything we could, really.  We would hang out, just

6    talk.  Like pretty much just hang out, really.  I don't know

7    how else to explain it.

8    Q    Did you have any hobbies or activities that you guys did?

9    A    We would play games, just go out to parties or something,

10   stuff like that.

11   Q    You mentioned parties.  Have you ever used controlled

12   substances?

13   A    Yes, I have.

14   Q    What have you used?

15   A    I have used painkillers and heroin.

16   Q    Did you use them at the same time?

17   A    No.

18   Q    How often did you use painkillers?

19   A    Probably like once a day or so.

20   Q    And around what age did you start using those?

21   A    Around 18, I believe.

22   Q    Which painkillers were you using?

23   A    Usually like Percocet 10s, Percocet 30s, whatever I could

24   get my hands on.

25   Q    Did there come a time when you stopped using painkillers

1   and started --

2   A   When I switched to heroin, yeah.

3   Q   And around when did you -- around what age did you start

4   using heroin?

5   A   I believe around, like, 21 or 22, something like that.

6   Q   When you were using pills, who were you getting that from?

7   A   Winston.

8   Q   Is that Winston Crockett?

9   A   Yes.

10  Q   Did you have other suppliers who you would get pills from?

11  A   No.

12  Q   When you started to use heroin, were you getting that from

13  Winston Crockett as well?

14  A   No, I wasn't.

15  Q   Did you get heroin from one supplier or did you have

16  multiple?

17  A   I had several suppliers.

18  Q   Can you please explain to the jury how you know

19  Winston Crockett?

20  A   We worked at the *News-Miner* together, and then we just --

21  we started talking and I don't really know exactly how I

22  started buying pills from him, but eventually we got on that

23  topic and I started buying pills from him.

24  Q   Around when were you working at the *News-Miner*?

25  A   Around the age, I think, of like 19 and -- between 19 and

1  20, something like that.  Or 18 and 20.  I don't remember the

2  exact dates.

3  Q   And when you were communicating with Crockett, what means

4  did you use to get in touch with him?

5  A   Usually texting.

6  Q   Did you know anyone else at the time that was selling

7  Percocets?

8  A   No.

9  Q   And I would like to talk more about your brother,

10  Jacob Lee.

11      You mentioned that you lived in the bedroom right next to

12  him?

13  A   Uh-huh.

14  Q   This is a strange question.  But do you have firsthand

15  knowledge of how Jacob would typically enter or exit the

16  residence that home?

17  A   Normally, he would just come through the front door.  But I

18  think there was occasions where he would go out through the

19  side garage door.

20  Q   So once in a while the side door?

21  A   Yeah.

22  Q   Do you know if Jacob ever climbed -- left the house through

23  the window in his bedroom?

24  A   I don't know.

25  Q   Do you believe he may have, or did Jacob have any reason to

```
 1   use the bedroom window to exit the house?
 2           MR. CAMIEL:  Objection.  Form of the question.
 3           THE COURT:  Sustained.
 4   BY MS. WEBER:
 5   Q    Were you -- was Jacob allowed to come and go from the house
 6   freely?
 7   A    For the most part, yeah.
 8   Q    What do you mean by that?
 9   A    I know if my parents knew he was leaving to get drugs or
10   something, they wouldn't want him going anywhere.  But, yeah.
11   Q    What about otherwise?
12   A    Otherwise, yeah, he was free to come and go.
13   Q    How would he come and go?
14   A    I'm not sure.  He wouldn't really tell me a lot of times.
15   He would just kind of leave whenever he felt like it, really.
16   Q    Through the front door and sometimes the side door?
17   A    Yeah.  As far as I knew, yeah.
18   Q    Do you have firsthand knowledge about whether Jacob Lee
19   used controlled substances?
20   A    Yes.
21   Q    What did Jacob Lee use?
22   A    Primarily painkillers.
23   Q    Which painkillers?
24   A    Percocet, Vicodin, whatever he could get, basically, from
25   Winston.
```

1   Q    I'm sorry?

2   A    From Winston.

3   Q    How do you know that he was using Percocets and Vicodin?

4   A    We would talk about it.  He would tell me.

5   Q    Do you know how often he was using?

6   A    Probably like once every couple days or so, as far as I

7   know.

8   Q    When did you find out that Jacob had been using

9   painkillers?

10  A    Probably -- probably about a few months to a year after he

11  started.  Like, I just kind of -- he told me about it, but

12  before he told me, I kind of saw the behaviors.  I saw that he

13  was using.

14  Q    What sort of behavior did you see from your brother?

15  A    Just like -- well, when he was coming and going a lot.  I

16  could just kind of tell when he was high.

17  Q    And then there came a point when you spoke about it with

18  Jacob?

19  A    Yes.

20  Q    Did you learn where he got the pills from?

21          MR. CAMIEL:  Objection.  Hearsay.

22          THE COURT:  That's sustained.

23  BY MS. WEBER:

24  Q    Did you ever go with him to buy pills?

25  A    Not as far as I remember, no.

1  Q   Did you ever use pills with Jacob?

2  A   I believe once, once or twice, yeah.

3  Q   And did you see how Jacob used them?

4  A   He would take them orally, or occasionally he would crush

5  them up and snort them.

6  Q   And what -- you said -- you mentioned that you also used

7  Percocets, right?

8  A   Yes.

9  Q   And what did they typically look like?

10 A   The Perc 10s are kind of like oval and white shaped, and

11 the Perc 30s are little blue pills.

12 Q   Around 2020, had you heard of the substance fentanyl?

13 A   I had heard of it, but I haven't, like, seen it or

14 experienced it in town or anything.  I didn't know it was in

15 town.

16 Q   Had you used it in 2020?

17 A   No.

18 Q   To your knowledge, did Jacob intentionally use fentanyl?

19 A   No.

20 Q   Ever?

21 A   No.

22 Q   And in October of 2020, did Jacob Lee have a job?

23 A   Yeah.

24 Q   Where did he, Mr. Lee, work?

25 A   I believe he worked at McDonald's.  I don't really

1    remember.  It was a while ago.

2    Q    Did you have a job?

3    A    Yes.

4    Q    What was your job?

5    A    I was a delivery driver for Bamboo Panda.

6    Q    What were your hours when you were working as a delivery

7    driver?

8    A    Around 11:00 a.m. to 10:00 p.m.

9    Q    Did you use your car as part of that job?

10   A    Yes.

11   Q    What car were you driving in October 2020?

12   A    1998 Subaru Legacy.

13   Q    What color was it?

14   A    Blue.

15   Q    And where were you on October 28th of 2020?

16   A    I was working.

17   Q    What happened on that date?

18   A    I just remember working and getting a phone call from my

19   parents telling me that my little brother had died.

20          MS. WEBER:  I have no further questions for this

21   witness, Your Honor.

22          THE COURT:  Mr. Camiel, go ahead, please.

23                      CROSS-EXAMINATION

24   BY MR. CAMIEL:

25   Q    Mr. Lee, in late October of 2020, shortly before your

brother died, were you aware of whether he had been sick and
there was concern he might have COVID?

A    Not as far as I know.  I think he had COVID maybe like a
week or two before he died, but it was a while before.

Q    Did you have any awareness that he had been home from work
sick with any kind of illness?

A    No.  I wasn't aware of that.

Q    You talked about people who lived in the house in October
of 2020.  Do you recall that Jacob's girlfriend and his son
were both living at the house at that time?

A    At that time, they weren't.  They had moved out.

Q    When do you think they moved out?

A    Probably like a month or two before he passed away.

Q    You mentioned that you own a Subaru or owned a Subaru back
then?

A    Yes.

Q    Blue?

A    Yes.

Q    And is it standard shift?

A    Yes.

Q    Did Jacob ever drive that car?

A    Not as far as I remember.

Q    Did you know that on October 26th, he drove your blue
Subaru to meet with Winston Crockett?

A    I don't -- I didn't know that.  I don't remember it, at

1    least.

2    Q    You mentioned about your meeting Winston Crockett.  Do you

3    know how it was that Jacob met Winston Crockett?

4    A    I don't, no.

5    Q    You talked about when you were using pills.

6    A    Uh-huh.

7    Q    And you mentioned that you would use both Perc 10s and Perc

8    30s?

9    A    Uh-huh.

10   Q    Is that right?

11   A    Correct.

12   Q    You were getting Perc 10s and Perc 30s.  You were getting

13   both from Winston Crockett?

14   A    Occasionally.  But that was also like several years before

15   Jacob even started using.

16   Q    How frequently were you getting Perc 30s from Mr. Crockett?

17   A    The 30s?

18   Q    Yes.

19   A    Maybe like once a week or something.  Something like that.

20   Q    Once a week over how long a period of time?

21   A    I'm honestly not sure.

22   Q    Was it -- are we talking weeks or months or years?

23   A    A few months.

24   Q    When you were purchasing pills from Mr. Crockett, what's

25   the largest quantity you ever got from him at one time?

```
 1    A    Just like two or three.  He never had that many.
 2    Q    Okay.  Do you recall being interviewed recently?  You went
 3   and met with the prosecuting attorneys and the agents, and they
 4   asked you some questions to prepare you for trial?
 5    A    Correct.
 6    Q    Do you recall indicating to them that you would purchase
 7   between ten pills of Perc 10s or Perc 30s a week from
 8   Mr. Crockett?
 9    A    Possibly a week, yeah.  But per day, it was only like one
10   or two.
11    Q    But ten pills a week would be consistent with your memory?
12    A    Something like that, yeah.
13    Q    From Mr. Crockett.
14         And that's both Perc 10s and Perc 30s?
15    A    Correct.
16    Q    How would you use the pills, the pain pills that --
17    A    I would just take them orally.
18    Q    You mentioned that your brother, at least on the occasions
19   when you saw him use pills, would either take them orally, but
20   sometimes he would crush and snort them?
21    A    Occasionally, yeah.
22    Q    Describe how he would crush the pills.
23    A    He would use something like -- something heavy and just
24   crush them up into a powder.
25    Q    On a plate, or on what?
```

A    Yeah, something like that.  Or just any hard surface,
really.

Q    And then how would he -- what would he do to snort it?

A    He'd just put in a line and then get like a McDonald's
straw or something and use that to snort it.

Q    How many times did you see him snort crushed pills?

A    Probably just like two or three times.

Q    And you mentioned that the pills that you would buy from
Mr. Crockett, you mentioned the Perc 10s that you would get
were usually white?

A    Correct.

Q    And the Perc 30s that you would get from Mr. Crockett were
usually blue?

A    Yes.

Q    When was the -- talking about now in 2020, were you using
heroin back then?

A    I believe so, yeah.

Q    How did you use the heroin?

A    Back then, I think I was shooting it up.

Q    So using a syringe?

A    Yes.

Q    Where would you do that?

A    Usually in my vehicle or something, or occasionally in my
room.

Q    In your room.  That's a basement room?

1   A    Yes.

2   Q    And in terms of your use of the Percocet pills, where would

3   you use those?

4   A    Usually in my vehicle.

5   Q    Did you ever use those in your room?

6   A    I don't think so, because normally I would take them right

7   away.

8   Q    So you would take them as soon as you got them?

9   A    Usually, yeah.

10  Q    If you bought two or three on a single occasion, would you

11  use all two or three on that same day, or would you space it

12  out?

13  A    Most of the time, I would use them in the same day.

14  Q    And that's -- it sounds like at that time, you had a severe

15  addiction problem.  Is that right?

16  A    Yes.  Correct.

17  Q    And did you believe your brother had a severe addiction

18  problem?

19  A    I thought he had been -- the last, like, month or so, I

20  thought he had been doing good.  But then him and his baby mama

21  were kind of seeing each other again, and then I found out he

22  was using again, like the last month.

23  Q    And my question was whether you thought his addiction was

24  pretty severe in the last month.

25  A    I wouldn't call it severe, but, yeah, he did have an

1  addiction.

2  Q   It was obvious to you from his behavior?

3  A   Yes.

4  Q   And you obviously weren't with him every time he purchased

5  pills, right?

6  A   Correct.

7  Q   There were times when he would come to you and indicate

8  that Mr. Crockett didn't have any pills and he would ask you if

9  you had any?

10  A   Correct.

11  Q   You never gave him any, right?

12  A   No.

13  Q   You also found out that your brother started using heroin a

14  few months before he died, right?

15  A   I found out he used it, like, once or twice, but that's it.

16  Q   Do you know where he was getting the heroin from?

17  A   No, I don't.  Well, I think -- I think it was my

18  ex-girlfriend, but...

19  Q   Is her name Bailey?

20  A   Yes.

21  Q   Bailey Rogers?

22  A   Yes.

23  Q   Did you ever see your brother use heroin?

24  A   No, I didn't see him use it.

25  Q   Did you ever talk to Mr. Crockett about not selling to your

1    brother anymore?

2    A    Yes.

3    Q    When was that?

4    A    Probably about three, four months before he passed away.

5    Q    And what caused you to -- did you do that in person or did

6    you do that by text or by phone?  How did you contact

7    Mr. Crockett?

8    A    By text.

9    Q    By text?

10   A    Yes.

11   Q    What caused you or triggered you to contacting Mr. Crockett

12   and --

13   A    Because my dad -- my little brother left his Facebook open

14   on the main computer, and my dad saw it and showed it to us.

15   So we -- like, I told -- I texted Winston and told him he needs

16   to stop selling to Jacob.

17   Q    Did Mr. Crockett respond?

18   A    No.

19   Q    Did you know anything about your brother using

20   methamphetamine?

21   A    No.

22   Q    Did you know anything about your brother using Xanax?

23   A    Yeah.

24   Q    Do you know where he got his Xanax?

25   A    No, I don't.

1  Q   Other than the time that your father showed you the

2  messages between your brother, Jacob, and Mr. Crockett, did you

3  ever look at your brother's phone or monitor his messages?

4  A   No, I didn't.

5  Q   You mentioned that there were times where you could tell

6  from his coming and going, the frequency of his coming and

7  going, that you thought he was using?

8  A   Correct.

9  Q   Did you ever follow him or monitor where he went?

10 A   No.

11        MR. CAMIEL:  That's all I have.  Thank you.

12        THE COURT:  Redirect?

13                    REDIRECT EXAMINATION

14 BY MS. WEBER:

15 Q   Mr. Lee, just to clarify, when -- you testified that when

16 you were buying pills from Mr. Crockett you were about -- you

17 stopped buying pills from Mr. Crockett when you were about

18 21 years old?

19 A   Something like that, yeah.  I don't remember the exact

20 dates, but, yeah.

21 Q   How old are you now?

22 A   30.

23 Q   So that was about nine years ago, you were buying pills

24 from Mr. Crockett?

25 A   Correct.

```
 1   Q   And did Jacob have a supplier other than Mr. Crockett for
 2   pills?
 3              MR. CAMIEL:  Objection.  Foundation.
 4              THE COURT:  That's sustained as to foundation.
 5   BY MS. WEBER:
 6   Q   To your knowledge, did Jacob have any pill suppliers other
 7   than Mr. Crockett?
 8   A   No.
 9   Q   Did there ever come a time when Mr. Crockett didn't have
10   pills available for sale?
11   A   Yes.
12   Q   What happened when Mr. Crockett didn't have pills for sale?
13   A   Jacob would come and ask me if I knew where to get any,
14   because he couldn't find any anywhere else.
15   Q   Did you?
16   A   No.
17   Q   On cross-examination, you were asked about where you would
18   use substances.  To your knowledge, where did Jacob use
19   substances?
20   A   I know he would -- pretty much the same thing.  He'd do it
21   in either his vehicle or in his bedroom.
22   Q   So if his vehicle wasn't working --
23   A   When it was working, he would do it in his vehicle.  But
24   then when -- he didn't -- when his vehicle stopped working, I
25   think he mainly did it in his bedroom.
```

```
 1  Q    To your knowledge, how long would two Percocet 30 pills
 2  last Jacob?
 3          MR. CAMIEL:  Objection.  Foundation.
 4          THE COURT:  That's sustained.
 5  BY MS. WEBER:
 6  Q    Do you know how much Jacob -- how Jacob consumed the pills?
 7  A    Yeah, orally or, like I said, he would crush them up and
 8  snort them occasionally.
 9  Q    Did he take an entire pill at a time?
10  A    Usually, yeah.
11  Q    And when he took it orally, would he take them -- would he
12  take two at a time?  One at a time?
13  A    Usually, it was just one at a time, as far as I knew.
14  Q    And would he take one per day?  How often would he take
15  them in one day?
16          MR. CAMIEL:  Objection.  Foundation.
17          MS. WEBER:  To your knowledge?
18          THE COURT:  As to foundation, that's sustained.
19  Rephrase.
20  BY MS. WEBER:
21  Q    When you were using pills, how many -- when you were
22  addicted to the Percocet 30 milligrams, how many would you take
23  per day?
24  A    I would take about one a day.  For the Percocet 30s, I'd
25  take about one a day.
```

1    Q    So even for somebody severe -- when you were severely

2    addicted to these pills, one 30-milligram pill would satisfy

3    that addiction for that day?

4    A    Correct.

5    Q    Would you say that Jacob's addiction was less severe than

6    yours in October of 2020?

7              MR. CAMIEL:  Objection.  Foundation.

8              THE COURT:  Well, we've already heard this.  I'll

9    allow it.  Go ahead.

10             THE WITNESS:  Much less severe.

11             MS. WEBER:  I have no further questions.

12             THE COURT:  Go ahead, Mr. Camiel.

13                       RECROSS-EXAMINATION

14   BY MR. CAMIEL:

15   Q    You indicated that Jacob would -- your brother Jacob would

16   come to you if he couldn't find pills anywhere else?

17   A    Correct.

18   Q    So did that indicate to you or did you hear him indicate he

19   had been out looking for other sources?

20   A    He couldn't find any other sources.

21   Q    But he --

22   A    That's why he came to me.

23   Q    Did he indicate he looked?

24   A    He looked, but he couldn't find any.

25   Q    When is the last time he came to you asking for any pills?

1  A   It was probably at least, like, six months or so before he

2  died.

3  Q   How many times did you actually see your brother use pills?

4  A   A rough estimate, I would say probably at least, like, ten

5  times.

6  Q   When was the very last time you ever saw him use any pills?

7  A   Probably about two months before he passed away.

8  Q   Where were the two of you?

9  A   In his bedroom.

10 Q   Did you use with him?

11 A   No.

12 Q   He was just using in front of you?

13 A   Yeah.

14         MR. CAMIEL:  Thank you.

15         THE COURT:  Thank you, sir.  You may be excused.

16     (Witness excused)

17         THE COURT:  Your next witness, Ms. Weber?

18         MS. WEBER:  Your Honor, the government calls Dr. Rolf.

19     (Pause)

20         THE COURT:  Good afternoon.  If you could come all the

21 way up to the witness stand.  When you get up there, if you

22 could remain standing, the clerk will administer an oath to

23 you.

24     (Oath administered to the witness)

25         DEPUTY CLERK:  Please state and spell your name for

the record.

THE WITNESS:  My name is Cristin Marie Rolf,
C-r-i-s-t-i-n, my last name is spelled R-o-l-f.

THE COURT:  Thank you.

Go ahead, please, Ms. Weber.

CRISTIN ROLF, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. WEBER:

Q   Can you please tell the members of the jury what you do for
work?

A   What I do for a living, I'm a medical examiner here for the
State of Alaska.  I perform autopsies on people who die of
sudden, unusual, or even violent deaths, and also come to the
court of law and discuss the cases in trials as well.  And what
I do is, I come up with a cause and manner of death for these
people who die of unusual deaths for the State of Alaska.

Q   How long have you served in your role as the medical
examiner for the State of Alaska?

A   I served as a medical examiner since July of 2014.

Q   Where did you work prior to the State of Alaska?

A   Well, I worked in Kentucky as a medical examiner, basically
doing the same thing I do here for the State of Alaska, and I
worked for University of Kentucky and performed autopsies there
as well.

Q   How long were you working as a medical examiner in Kentucky

1  for?

2  A   It was 17 years.  And then we came up here to Alaska a

3  couple times on vacation, and when a job came up, we took the

4  job here because we liked coming here.

5  Q   How many autopsies have you performed in the course of your

6  career, approximately?

7  A   Oh, approximately 5,000, 6,000.  I usually do about 250 to

8  300 a year.

9  Q   Can you please give the jurors a rough estimate as to the

10  percentage of autopsies you perform that are related to drug

11  overdoses here in Alaska?

12  A   I'm having an exact percentage in my head right now.  It

13  varies.  Actually -- and, again, it depends on availability of

14  the drugs to people in the state.  Boy, I almost say almost

15  50 percent.  Almost half of my cases, or maybe even more, are

16  drug related and caused by drugs directly, either the toxic

17  effects of the drugs on the person themselves, and also

18  accidents, suicides, homicides that can occur related to drugs.

19  And that might bring me way above 50 percent of my cases

20  heavily involved.

21  Q   Can you please tell the jury about your educational

22  background?

23  A   So to become a medical examiner, I received a degree of --

24  Bachelor of Science in biology and pre-medicine at Kent State

25  University in Ohio, then went to the Medical College of Ohio at

Toledo, received my degree called Doctor of Medicine in 1991.

Then went To Case Western Reserve University Hospitals in Cleveland, Ohio, where I trained to be a pathologist, and that's the doctor that does, basically, lab work. They look at biopsies, might do autopsies, which not so common in the hospitals anymore. They also do lab work, such as microbiology, looking at cultures. They may be involved in virology, blood banking, also be involved in other types of lab work, such as basic blood work and even toxicology, and they may also do other microscopic work, like electron microscopy, all the things like that. So as an anatomic and clinical pathology covers all of that.

I did a five-year training program at Case Western Reserve University Hospitals, then did a one-year training program at Cuyahoga County Coroner's Office in Cleveland, Ohio. Started my job in Kentucky as a medical examiner.

Q    That's it?

A    And also to keep up your training, you go to, like, conferences every year in your subject, in forensics, which is my, you know, subspecialty. And then we also might do online training as well, to keep up your medical license.

Q    I apologize. It's a robust educational background.

As part of your job as a medical examiner, do you hold any licenses? Do you hold any licenses as part of your job?

A    I hold my license for medicine in Ohio, Kentucky, and then

1    here in Alaska.

2    Q   Are you also board certified by the American Board of

3    Pathology?

4    A   Yes, and anatomic, clinical, and forensic pathology.

5    Anatomic is that part of pathology where you do the biopsies

6    and autopsies, and the clinical part is where you do the lab

7    work.

8    Q   Do you conduct regular trainings as part of your licensure

9    and board certification requirements?

10   A   Yeah.  That's a continuing education I add to my other

11   education.

12   Q   Are you a member of any professional societies?

13   A   National Association of Medical Examiners.  That's a

14   nationwide society or club or group that involves pathologists.

15   And then the American Academy of Forensic Sciences.  It's

16   another group that involves both pathologists and multiple

17   other people that -- other divisions of forensics.  And then

18   I'm a member of the College of American Pathologists and the

19   American Society of Clinical Pathologists.  That's just for the

20   general pathology.  And then the American Medical Association

21   as well.

22           MS. WEBER:  Your Honor, at this time, I would move for

23   Dr. Rolf to be permitted to offer opinion testimony as to the

24   field of forensic pathology.

25           MR. CAMIEL:  No objection.

1          THE COURT:  I'll find the witness so qualified.

2     BY MS. WEBER:

3     Q    Dr. Rolf, I would like to turn your attention to

4     November 2nd, 2020.  Were you working at the State of Alaska

5     Medical Examiner's Office on that date?

6     A    Yes, I was working at the Medical Examiner's Office on

7     November 2nd, the year 2020.

8     Q    On that date, did you conduct a postmortem examination on

9     the body of Jacob Lee?

10    A    Yes, I performed an autopsy on Jacob Lee on

11    November 2nd, 2020.

12    Q    Did you perform a full autopsy to determine the cause of

13    death of Mr. Lee?

14    A    Yes.  And a full autopsy involved the head as well as the

15    trunk and external and internal examination.

16    Q    What's the difference between a full autopsy and just the

17    external investigation?

18    A    External exam is when you look at a body and you don't look

19    at the organs.  You're basically looking at outside of the body

20    for evidence of disease or injury.  You will document the

21    outside of the body.  And internal, if you want me to explain,

22    is where you open the head, look at the brain and what's in the

23    head, and then you also open the trunk and look inside the --

24    at the organs to see if there is disease or injury in there.

25    Q    As part of the postmortem examination, did you receive

1  information about the circumstances of Mr. Lee's death?

2  A    Yes.  We receive a narrative report in the morning.  What

3  we have is investigator narrative -- investigators that produce

4  these narratives during evening, the day before, or around the

5  time of the person's death, and then we review that and perform

6  an autopsy.

7  Q    What did you learn from that information?

8  A    Jacob Lee was an otherwise healthy young adult male, but he

9  was having some cold symptoms at his work and he was found

10 dead.  He basically died suddenly.  It wasn't like an accident,

11 you know, like a physical trauma or accident or anything like

12 that.  He was just found dead on his bed.

13 Q    Did it have any information about when Mr. Lee was last

14 known alive?

15 A    Yes.  He was last -- I always refer to my paperwork here.

16           THE COURT:  That's fine.

17           THE WITNESS:  I can forget room number, all that.  He

18 was last known alive on the 27th of October at 7:30 a.m., And

19 he was found dead the next day, 1722 military time, so that

20 would make it like 5:22 in the afternoon, evening.

21 BY MS. WEBER:

22 Q    Did the information indicate whether an inspection of the

23 body was performed on the scene?

24 A    They were worried about COVID-19.  He had symptoms of

25 cough, fever, runny nose, and some shortness of breath, and

1 possibly COVID positive. So at the time, we had a warning that

2 he may have had this condition. We tested him, and it turned

3 out to be negative, so we went ahead and performed the autopsy.

4 Q   Was there information from Officer Brubeck contained in the

5 report regarding his observations of the body?

6 A   There is -- we have a notation in our narrative that he had

7 called us and basically was undetermined cause. He did have a

8 medical history of an old appendectomy, where he had his

9 appendix taken out. And he did a polysubstance abuse and

10 marijuana use. Heroin and methamphetamines in the past was

11 used.

12 Q   If you could take a look at that binder in front of you

13 with the number tabs.

14 A   Letters here. And this thing here?

15 Q   Yes. There's a tab with the number --

16 A   21?

17 Q   Exhibit 20.

18 A   You said 1D?

19 Q   20.

20 A   20. All right. Yes, 20.

21 Q   If you look at the bottom of the page, it has different

22 page numbers. If you take a look at 4 of 4 in that exhibit.

23 A   Oh, 4 of 4. Sorry about that. I think I got it. Is it

24 Investigative Narrative?

25 Q   Yes. So on -- towards the middle of that page, is there

1    anything that would refresh your recollection as to the

2    information that you had at the time you conducted the autopsy

3    from Officer Brubeck?

4    A    Yeah.  He's mentioned here on the -- in the middle,

5    "Inspection of body is performed by Officer Brubeck."

6    Q    And what did Officer Brubeck observe?

7    A    It was cold, meaning his body -- algor mortis, I want to

8    tell you what that is.  Algor mortis is cooling of the body

9    after death.  So the body kind of cools down over time because

10   it is no longer producing heat.  His body felt cold.  He was in

11   full rigor, means he was stiff.

12        And want me to mention the other, livor mortis?  Livor was

13   fixed, but consistent with positioning.  What livor is,

14   l-i-v-o-r, is the settling of the blood in the body.  So when a

15   person dies, your blood is no longer circulating around in your

16   skin.  Gives it somewhat pink or bright appearance.  The blood

17   somewhat looks more purple, cyanotic, or kind of a purple

18   appearance, and it's subtle sounding.  So when a person is

19   lying on their back or if they're lying on their back, the back

20   will look more purple and there will be a line between the

21   lighter skin and the darker skin.  That's where the blood --

22   and the body has an unusual appearance where the blood will

23   settle down and give kind of a light appearance on the upper

24   surface, and the bottom surface is darker.  That's what livor

25   is.

1    And then rigor is the stiffening of the muscles.  So I want
2    to make sure everybody understood that.
3    And then no recent injuries, trauma noted, healing
4    abrasions noted, minor debris on arms and legs.  No suspicion,
5    but history of drug abuse present.
6    Q    And Dr. Rolf, do you consider these circumstances in
7    determining the cause of death in this case?
8    A    Yes.  What I see is a body of a person who may have some
9    minor injuries, but they may not be fatal and don't appear to
10   be cause of death.  So whatever the problem is would be
11   internal, in his body.  And we look inside the body after we
12   check the outside to get the cause of death.
13   Q    So it's not just -- is it just your examination or do you
14   take into account the circumstances and the information
15   provided by the investigators as well as your observations?
16   A    Yes.
17   Q    Did you draft a report detailing your postmortem
18   examination of Jacob Lee's body?
19   A    Did I make a report?  Yes, I made a report.
20   Q    If you could take a look in that binder at Exhibit 20.01.
21   Do you recognize that document as Jacob Lee's postmortem
22   examination report?
23   A    Yes.
24   Q    Is it a true and accurate copy of the report from
25   Jacob Lee's postmortem examination?

1  A    Yes.

2  Q    Would it assist you during your testimony to view and

3  explain this report to the jury?

4  A    Yes.

5          MS. WEBER:  Your Honor, permission to publish

6  Government Exhibit 20.01 as a demonstrative exhibit.

7          MR. CAMIEL:  I have no objection.

8          THE COURT:  Go ahead, then.

9  BY MS. WEBER:

10 Q    So if you can start on page 3.  I'd like to ask some

11 questions about this section of your report.

12      Does it discuss the external examination that you performed

13 in this case?

14 A    Yes.  And your arrow is at that -- I can see it on here as

15 well, the same thing.

16 Q    Can you please describe what the external examination

17 entails?

18 A    An external examination is an examination to explain what

19 it is.  It's an examination of the body, how it was received,

20 what clothing was on, if there's any evidence or anything that

21 has to be removed from the body.  Also, just physical

22 appearance of his body, if there was injuries, if there's no

23 injuries, if there's any malformations or evidence of disease

24 on this person's body.

25 Q    As part of your external investigation of Jacob Lee's body,

did you notice any obvious signs of significant trauma?

A    Not a significant trauma, but he did have some blunt force
trauma on his chest area, but these were not fatal in nature.
Internal exam was free of internal trauma.

Q    Did the blunt force trauma impact your cause of
determination in any way?

A    No.

Q    Was there anything that you discovered during your external
investigation of Jacob Lee's body that was inconsistent with
the determination that he died from a fentanyl overdose?

A    No.  His body was that of a well-nourished, well-developed
healthy-appearing young male.  He was only 22 years.

Q    As part of your postmortem examination, did you look for
any evidence that Jacob Lee had vomited prior to his death?

A    He had a small amount of greenish vomitus material on the
right side of his mouth, just on his mouth and face area some
vomitus.

Q    Does a fentanyl overdose victim always vomit before they
die?

A    Probably not always, but people in general may vomit before
they die.  Or they -- it varies.  Some people do, some people
don't.

Q    So it didn't really have any significance to the cause of
death evaluation?

A    No.  With an opiate overdose like a fentanyl overdose, he

1  could aspirate some of his vomitus.  I didn't see any large

2  amounts of it in his airway or anything, but this can cause a

3  bronchopneumonia, other type changes down in the lungs, when

4  people are not protecting their airway when they're on opiates.

5  Q   After the external investigation, did you conduct a full

6  autopsy on Jacob Lee's body to determine the cause of death?

7  A   Yes.

8  Q   And before we get into the autopsy, I just want to briefly

9  discuss the timing of the autopsy.

10      Approximately, how long after Mr. Lee's death did you

11  conduct his autopsy?

12  A   We conducted it on November the 3rd at 8:30 in the morning.

13  He was found dead on the 28th, so it was some time between the

14  body being delivered to us.  Unfortunately, here in Alaska,

15  it's a pretty large state, so bodies have to be shipped to us.

16  So it took several days.  The 27th -- 28th, he was found dead.

17  Q   Does the timing of your autopsy in this case affect --

18  undermine the reliability of your cause of death determination

19  at all?

20  A   No.  The body was well preserved otherwise.

21  Q   And I would like to talk about the autopsy that you

22  conducted.  If we can look at the fourth page of your report.

23      Does this section of your report detail the full autopsy

24  that you performed on the body of Mr. Lee?

25  A   You said the fourth page or the sixth page?

1  Q   I said the fourth page, but it --

2  A   Yeah, it's showing the sixth page of mine and yours.  There

3  you go.

4  Q   And as part of your autopsy, did you inspect Mr. Lee's head

5  and neck organs?

6  A   Yes.

7  Q   Did the inspection of Mr. Lee's neck organs cause you to

8  believe that Mr. Lee's death was something other than a

9  fentanyl overdose?

10  A   The inspection just showed normal-appearing neck structure.

11  There was no trauma or injury.  He did have a little bit of

12  yellowish material in the trachea, but he was also known to

13  have bronchitis.

14  Q   So nothing that indicated that he died of anything other

15  than a fentanyl overdose in his head and neck?

16  A   No, no other trauma or any unusual disease that caused his

17  death.

18  Q   And did you inspect Mr. Lee's cardiovascular system?

19  A   Yes.

20  Q   Did the inspection of Mr. Lee's cardiovascular system cause

21  you to believe that his death was anything other than a

22  fentanyl overdose?

23  A   Yes.  There was no other cause of death or no other unusual

24  disease or severe disease that was -- cardiovascular system of

25  a young, healthy male.  There was no deformity or changes in

his heart valves.  Coronary arteries were free of
atherosclerosis.  And the myocardium, the heart muscle, looked
normal.  There was no scarring or anything like that, either.

Q   There was nothing in your internal investigation that made
you believe that Mr. Lee's death was anything -- was something
other than a fentanyl overdose?

A   No, there was no other conditions.  Basically rule out
other conditions in him.

Q   And if we can take a look at page 1 of your report, please.
    As part of your postmortem examination, did you also
extract biological samples from Jacob Lee's body?

A   Yes.  We removed vitreous and blood -- let's see if we had
urine -- and urine for toxicology examination.

Q   What did you do with those samples?

A   What we do is we send them to a lab called NMS, National
Medical Services, and they perform a toxicology exam.  We also
did a nasal swab on his nose to determine whether he really did
have COVID-19 or not, and we got a negative result.

Q   Did you receive a report that included the toxicology
findings back from NMS Labs?

A   Yes.

Q   Did you consider those results in making your determination
as to the cause of Jacob Lee's death?

A   Yes.

Q   Did the toxicology analysis reveal fentanyl in Jacob Lee's

1  system?

2  A    Yes.

3  Q    Can you please describe for the -- explain to the jury what

4  fentanyl is.

5  A    Fentanyl is an opiate, either medication or nowadays it's

6  known to be an illicit drug as well.  Fentanyl is a synthetic

7  opiate that is made to act similarly to drugs such as heroin or

8  morphine or oxycodone, hydrocodone, Suboxone, other drugs that

9  causes, basically, pain relief, and they will also cause

10  drowsiness, sleepiness.  If taken too much, it will cause a

11  person's respiratory system, brain to shut down where they stop

12  breathing, and then their cardiovascular system will collapse

13  or stop.  The heart will stop beating, and you can die suddenly

14  or over a somewhat protracted time from these drugs if taken in

15  large amounts.

16  Q    Were you able to tell from the toxicology results that

17  Jacob Lee had fentanyl in his system at the time of his death?

18  A    Yes.

19  Q    Did the results indicate the presence of norfentanyl?

20  A    Yes.

21  Q    What is norfentanyl?

22  A    Norfentanyl is a breakdown product of fentanyl.  So as the

23  body breaks it down or metabolizes it, it breaks down the drug.

24  Q    For someone who is not a chronic fentanyl user, what could

25  cause norfentanyl to be present in their blood or their urine?

1 A   That means the person was metabolizing the drug, and if it

2 got into the kidneys soon enough, it would show up in the

3 urine.

4 Q   So how would that happen?

5 A   They have to live either a few minutes to a few hours or so

6 before it shows up in the kidneys.

7 Q   If someone was not a chronic fentanyl user and had two

8 pills containing fentanyl, would that hypothetically result in

9 having norfentanyl present in the blood?

10 A   Yes, that will.  As the body breaks down the fentanyl,

11 norfentanyl will show up.

12 Q   Can you explain that?

13 A   As I don't have all the exact chemical breakdown products

14 or the actual chemistry in my head as to what happens, the

15 toxicologist might be able to explain that better.  But as the

16 body metabolizes fentanyl, it becomes norfentanyl.  That's not

17 a separate drug.  It's part of actual fentanyl that becomes

18 broken down in the system.

19 Q   Were you able to determine from the toxicology report that

20 Jacob Lee had a large concentration of fentanyl in his blood?

21 A   Yes.  He had 9.0 nanograms per ML.  The usual amount that a

22 person would take for pain would be, they'd end up with 1 to

23 about 3, in the general area of that.

24 Q   Was there enough fentanyl in Jacob Lee's system to cause

25 his death all by itself?

1    A    Yes.

2    Q    Based on your training and experience, do you believe the

3    fentanyl range in the toxicology report to be reliable?

4    A    Yes.  His blood was not in poor condition.  It was -- the

5    body was well preserved and we sent the blood to the lab.

6    Q    You sort of already explained how fentanyl actually causes

7    death, so I'm not going to go back into that.

8         Does fentanyl cause respiratory depression?

9    A    Yes, it causes respiratory depression.

10   Q    Did the fentanyl in Jacob Lee's system cause his death in

11   this case?

12   A    Yes.

13   Q    I would like to draw your attention to the first page of

14   your report.

15        What was the immediate cause of death that you determined

16   for Jacob Lee?

17   A    Immediate cause of death is acute toxic effects of

18   fentanyl.  That would be at the bottom of the page and the top,

19   the top line underneath Roman numeral I.

20        MS. WEBER:  If you could highlight the bottom of the

21   page for cause of death.

22   BY MS. WEBER:

23   Q    And is it your conclusion that Jacob Lee died of an

24   overdose caused by using fentanyl?

25   A    Yes.

1  Q    Is your report and findings reviewed by anybody else?

2  A    Findings reviewed by anyone else?  Did explain that maybe

3  they had another pathologist review my report.  I don't have

4  the name in front of me.

5  Q    Did the pathologist who reviewed your report have any

6  questions or concerns about your conclusion?

7  A    I never got any questions, that I remember.

8  Q    Do the medical examiners have a standard of review for

9  conclusions or reports?

10 A    Yes.  We often review each other's cases.

11 Q    So did somebody review your case with Jacob Lee?

12 A    I'm not sure if someone did or not.  Usually do that for

13 homicide cases and infants.

14 Q    Would it be noted in your report if it was reviewed, or is

15 it more informal?

16 A    At the time, it was more informal.

17 Q    And you note as a contributing factor, acute bronchitis and

18 bronchopneumonia?

19 A    Yeah, acute bronchitis with patchy bronchopneumonia.  That

20 means he did have multiple areas in the lungs where he had

21 pneumonia, and did have bronchitis, which is inflammation of

22 the airways.

23 Q    Was it in a state of severity that he would have died from

24 the pneumonia in and of itself at that stage?

25 A    It didn't appear to be.  I mean, if that was all that was

wrong with him, you might say that that could have caused the

death.  He did not have more diffuse or large areas of the lung

involved by pneumonia.  He was also a younger,

healthier-appearing male.  It's unusual that someone this

healthy and young would have this condition, but with the

history of opiate abuse, that you would be more prone to

getting pneumonia, especially the bronchopneumonia, where if

he's on an opiate, he doesn't protect his airway as well, can't

cough up anything that goes down his airway, and things can

settle in the lung or become pneumonia much easier.

Q   With the pneumonia, that would not in and of itself have

killed Mr. Lee at that time?

A   I don't think so, because there's an overwhelming amount of

fentanyl in his system.

Q   Did the fentanyl make -- potentially make the pneumonia

worse?

A   Yeah, it would probably make it worse because he's no

longer able to protect his airway.  If you have acute

bronchitis or a cold or infection going on, he wouldn't be able

to fight it off as well.  It can go down the airway and

wouldn't be able to cough it up as much.

MS. WEBER:  I have no further questions for this

witness, Your Honor.

THE COURT:  Mr. Camiel, go ahead, please.

MR. CAMIEL:  Thank you, Your Honor.

1                        CROSS-EXAMINATION

2    BY MR. CAMIEL:

3    Q    Good afternoon, Dr. Rolf.

4    A    Good afternoon.

5    Q    So I wanted to continue to talk to you about your report.

6    And you were just talking about the fact that Mr. Lee had this

7    acute bronchitis and bronchopneumonia, and you labeled that as

8    a contributing condition?

9    A    Yes.

10   Q    So it contributed to his death?

11   A    Yes.  It was a condition of significance enough I couldn't

12   ignore it, and it was present.

13   Q    Is there any way to tell how long he had had that

14   condition?

15   A    Difficult to tell.  There was a report that he did have

16   some cough and shortness of breath going on.

17   Q    You talked about information that you receive from either a

18   medical examiner investigator or from a police officer at the

19   scene, and some of that information made it into your final

20   report, right?  Just for example, on the first page, the --

21   under --

22   A    Yes.  There was a report of polysubstance abuse, ethanol,

23   marijuana, heroin, and methamphetamine use, and a history of

24   cough and fever, runny nose, shortness of breath.

25   Q    So do you know where the information came from, the history

1  of polysubstance abuse, the ethanol, marijuana, heroin, and

2  methamphetamines?

3  A    This is in our narrative report from our investigators.

4  Q    But you don't know who provided that information to the

5  investigator?

6  A    We do have Officer Brubeck had made a report of him dying.

7  I don't see anyone else mentioned.  It was reported by the

8  police.

9  Q    So that came -- so the material you have indicates that it

10  came from the police, but you don't know where they got that

11  information?

12  A    Not that I know of.  I have to read a little more into

13  this.  Just a report that he was found deceased.  It doesn't

14  mention who found him dead or anything like that.

15  Q    In that first page of your report, one of the other things

16  that I see you note under letter F was probable puncture

17  injuries of the right forearm.  Can you tell, what is that?

18  A    He had small injuries on his forearm that looked like they

19  might have been caused by a needle.

20  Q    Do you remember how many there were, or does your report

21  indicate?

22  A    I don't think I counted.  There weren't that many, but -- I

23  don't have where I have them.  There is a possibility they

24  could have been caused by medical intervention.  I'm not sure.

25  It was mentioned on the front page.

1  Q   You don't know what the cause of those were?  It could be

2  from a needle?

3  A   Possibly.  I don't know whether it was he doing -- he doing

4  it himself or whether it was from medical therapy.

5  Q   All right.  One of the other things that I see that you

6  noted on the first page of your report was, in Roman numeral

7  III, clinical major depressive disorder with panic attacks?

8  A   Yeah.

9  Q   Does that have any significance?  Is there a reason why

10 that's contained in your report?

11 A   That is just mentioned from his medical records.  I try to

12 mention whatever conditions a person may have.

13 Q   It sounds like from your testimony, from the physical

14 examination that you did, you didn't see anything that would

15 indicate a cause of death.  You're relying on the toxicology

16 report to make your final determination, right?

17 A   Yes.  There was nothing else that would cause death.  He

18 did have pneumonia, but doesn't look like it was very

19 extensive.  But basically, the rest of his body didn't have

20 another reason to be --

21 Q   So from the information that you have, either from the

22 toxicology report or from your physical examination of Mr. Lee,

23 you have already told us that from the toxicology report, that

24 indicated a lethal dose of fentanyl, right?

25 A   Yeah.

Q   Can you tell us what type of fentanyl he ingested?  In
other words, was it a powder or liquid or from a patch?

A   All I can say is fentanyl.  If I couldn't see it, I
wouldn't be able to tell you what it was.

Q   One of the things that you do when you do your autopsy, the
internal examination, is you look at the gastrointestinal tract
and the stomach contents; is that right?

A   Yes.

Q   Did you see any pill fragments or dissolved pills or
anything like that?

A   Didn't see anything that looked like that in the stomach.
He had, looked like rice and some brown liquid.  If it was a
smaller number of pills or if it was ground up or something, it
may not show up in the stomach contents.

Q   All right.  And did you see any, like, indication of, like,
any blue dye?

A   No blue dye that I could see, but, again, it depends on the
number of pills.  If he took a lot of pills, like someone would
try to do in a suicide or something like that, you would see
like a sludge that would start building up and you would see
it.  But in his case, if he took a pill, it dissolved.

Q   You can't tell whether he took a pill or whether he might
have used or ingested fentanyl in some other form; is that
right?

A   No, I can't tell by just looking at the gastric contents.

Q   Not just the gastric contents, but from the toxicology
report and your entire examination, you wouldn't be able to
tell us whether the fentanyl that got into his bloodstream came
from a pill versus powder versus something else?

A   No.  All I can say is it's in his blood.

Q   Can you tell when he ingested the fentanyl?

A   Not exactly.  I mean, it was obviously recent.  It could
have been a few hours ago.  It could have been more recent.
With this patchy pneumonia, he may have had it in his system a
little bit longer than a few minutes.  Sometimes people can
take it and die suddenly, within seconds, and other people will
take a little longer to die.

Q   Could -- so in addition to not being able to tell us in
what form he took the fentanyl, I take it you're not able to
say how he ingested it, right?

A   I can't say that.  I mean, he could have inhaled it or he
could have taken it by mouth or even injected it, but it's
just -- I just know it's in his system.

Q   Does it make a difference in terms of how quickly the drug
fentanyl affects somebody, does the manner in which they use it
impact that?

A   If one injects it or inhales it, it might take -- it would
be a lot -- much quicker or it would be -- the drug would act
on the body much faster because it hits the blood immediately.

Q   Did you -- so when you -- you take samples of his blood and

samples of his urine, right?  And those are put into test tubes

and they're sealed, and then you send those off to the lab; is

that right?

A    Yes.

Q    And did you make any specific requests of the lab in terms

of what panels to run or what screening to do?

A    I didn't write down what the panel was, but at least a

basic exam, which involves all the drugs of abuse.  I don't

have the toxicology report, unless you have it.

Q    The toxicology report would show what panels you requested?

A    Yes.

Q    And when I use the word "panel," can you explain to the

jury what that is?

A    Well, a panel is -- I did find the tox report -- is just

the list of drugs that the lab would perform.

Q    If somebody uses heroin, how long does that stay in their

system, in your experience?  How long -- how long would it take

before it no longer showed up in blood or urine?

A    Actual heroin disappears within seconds.  Once it enters

the body, it becomes morphine.  And morphine has a -- I don't

have the half-life or how long it takes to break down, but

depends on the amount, if the person takes a large amount, or

it depends on how fast they may metabolize it.  It might take

hours, maybe a day or so before it disappears.

Q    But the heroin itself, if somebody used heroin, it would

1   metabolize in seconds?

2   A    Yeah.  Heroin is, like, called the parent compound, and

3   that would break down a lot faster.  And probably the only way

4   you could tell that a person took heroin -- not took heroin,

5   but find heroin in a person, you would have to look at it in

6   the skin right around where he injected it.  But heroin breaks

7   down almost immediately and becomes morphine.

8   Q    How about something like acetaminophen, how long does that

9   stay in the system?

10  A    Yeah, I don't have all these half-lives in my mind right

11  here.  If you have a toxicologist, might be able to give a

12  better answer.  But that might take hours to break down, too.

13  And, again, depends how well a person's liver is working and

14  all that.

15          MR. CAMIEL:  Thank you.  That's all I have.

16          THE COURT:  Any redirect?

17          MS. WEBER:  Yes.

18                      REDIRECT EXAMINATION

19  BY MS. WEBER:

20  Q    On direct examination, you were asked if you were able to

21  tell when Mr. Lee ingested the fentanyl.  Based on the

22  information, based on the rigor and the algor and the lividity,

23  can you approximate how long he had been dead by the time he

24  was discovered on the 28th?

25  A    He was probably dead, if he was at room temperature,

```
 1   probably around eight hours, maybe, a little more, a little
 2   less.  You can't get an exact time that a person dies.
 3   Q   In the binder in front of you, if you could please take a
 4   look at what's in evidence as Exhibit No. 6.
 5   A   Exhibit No. 6.  A CD?
 6   Q   Is there a -- a larger binder up there?
 7   A   You mean --
 8            THE COURT:  It's 006.
 9            THE WITNESS:  I have 006, a photograph.  Oh, I got it.
10   I have it.
11   BY MS. WEBER:
12   Q   Is 006 --
13            MS. WEBER:  Can we publish for the jury so we know
14   what we're looking at?
15            THE COURT:  Go ahead.
16   BY MS. WEBER:
17   Q   Is that an example of what you were talking about lividity
18   earlier?
19   A   Yes.  Lividity is the settling of blood.  Those purple
20   areas on his body are areas where blood is settling out on the
21   body.  And in the whiter areas, skin where either something was
22   pressing against the skin or just, you know, blanching it out.
23   And it's kind of like when you take your finger and you press
24   it against your skin and it turns white under your finger.
25   Q   Based on the lividity that we can see in this picture and
```

1   the description of that Mr. Lee was already cold to the touch
2   and full rigor had set in, approximately how long do you
3   believe he would have been deceased for, for all those factors
4   to set in?
5   A   Approximately eight hours.  Livor, rigor, the stiffening
6   all occur and are fully developed around eight hours room
7   temperature.  Then over time, then that begins to dissipate or
8   disappear or become blurred by the decomposition.
9   Q   And on cross-examination, you were asked if you could tell
10  if he ingested it recently.  If somebody inhales fentanyl,
11  could they die immediately after ingesting it?
12  A   They more likely die a little quicker, yeah, because
13  inhalation brings it directly into the blood and in large
14  amounts.
15  Q   If someone who is not a chronic fentanyl user took fentanyl
16  and died immediately, would they have norfentanyl present in
17  their blood?
18  A   Sometimes they can.  Just depends on how if -- it's a few
19  minutes or so, it might start breaking down.  But if they die
20  almost instantly and -- might be so little amount, might only
21  see the fentanyl.  But a lot of times, I do see norfentanyl.
22  Q   If a person who is not a chronic user took one pill
23  containing fentanyl one day, and then took a second pill
24  another day, would that -- would you expect to see norfentanyl
25  present in their blood?

A   Yes.  And then if the pills were fentanyl, to explain them,
they have varying amounts of fentanyl.  Sometimes there's a
lot, sometimes there's a little, because the fentanyl that is
bought on the street or not from a doctor, the level is not
controlled.  So you never know -- a person never knows what
they're going to get.  You may get a large amount.  You may get
a small amount.  Those might vary in levels of fentanyl.

Q   Is a finding of norfentanyl in the urine more significant
to timing of when the substance was taken?

A   Yes.  It will show that, you know, at least a few minutes,
a few hours that the fentanyl metabolized and then begins to
show up in the urine.

Q   So if somebody died very shortly after taking fentanyl, you
would not expect to see it in their urine.  Is that --

A   If they died very quickly and did not produce any more
urine, then yes.

Q   If somebody took heroin 24 hours before they died, would
you expect to see that in their -- morphine in their blood or
urine?

A   Yeah.  I mean, it depends on the amount and how fast they
break it down.

Q   Typically, would you expect to see the morphine within
24 hours of death?

A   Most likely.

Q   What about oxycodone?

```
 1   A   Similarly, you start seeing it showing up in the urine.
 2           MS. WEBER:  I have no further questions.
 3           THE COURT:  All right.  Any follow-up?
 4           MR. CAMIEL:  No.
 5           THE COURT:  Thank you, ma'am.  You may be excused.
 6        (Witness excused)
 7           THE WITNESS:  Thank you.
 8           THE COURT:  All right.  Well, is this a good time to
 9   call it a day, Ms. Weber?
10           MS. WEBER:  Your Honor, can I move 20.01 into
11   evidence?
12           THE COURT:  Take a moment.  That's the report itself.
13           MR. CAMIEL:  Just the report.  Yes, no objection.
14           THE COURT:  Just 20.01?
15           MS. WEBER:  Yes.
16           THE COURT:  Yes.  Then that will be admitted.
17        (Exhibit 20.01 admitted)
18           THE COURT:  Anything else?  We can conclude for today?
19           MS. WEBER:  No, Your Honor.
20           MR. CAMIEL:  No, Your Honor.
21           THE COURT:  Very good.  So ladies and gentlemen, we'll
22   send you home for the day.  I'll have you back here at
23   8:45 a.m. tomorrow.  I sure appreciate, and I know the parties
24   do, how timely you have all been in getting here because,
25   obviously, we can't start until you all are here.  So thank
```

1    you.

2            As I reminded you the last few days and I'll continue

3    to emphasize to you today, it is important that you decide this

4    case based solely on the evidence and law presented here, and

5    that means that after you leave here for the night, you must

6    not conduct any independent research about this case, the

7    matters in this case, the legal issues in the case, or the

8    individuals or other entities involved in this case.  This is

9    important for the same reason that jurors have long been

10   instructed to limit that exposure to traditional forms of media

11   information, such as television and newspapers.  Please don't

12   communicate with anyone in any way about the case.  You must

13   ignore any information about the case you might see while

14   browsing the internet or on social media feeds.

15           And with that, I wish you all a pleasant evening.

16   Please leave your notepads on your chairs.  We'll see you

17   tomorrow morning at 8:45 a.m.

18       (Jury absent)

19           THE COURT:  All right.  Please be seated, everyone.

20           And a couple things here.  What's our plan for

21   tomorrow, Ms. Weber, in terms of the government's case?  Are we

22   on schedule?

23           MS. WEBER:  We are ahead of schedule.  Tomorrow we

24   have toxicologist Scott Larson, as well as we're going to

25   arrange to have Christopher Kearney and hopefully Trooper

Hargis. And then depending on the ruling about Ms. Ludwick, we may have Agent Carr testify and wrap up or call more additional witnesses.

THE COURT: I guess I would like to be able to tell the jury no later, certainly, than the end of the day tomorrow, whether it looks realistic for the case to go to the jury on Friday or not.

From your perspective, what are your thoughts there, Ms. Weber?

MS. WEBER: It seems more likely, Your Honor, that it would go to the jury Friday, depending -- again, depending on the ruling of the defense.

THE COURT: Mr. Camiel?

MR. CAMIEL: I guess the only question I have is whether we need to be prepared for closing tomorrow afternoon.

THE COURT: No. I would say not. I have got a set of draft instructions for you, I'll ask the courtroom deputy to hand out for you shortly. But with regard to the AL issue, I did indicate at the lunch hour I wanted to hear from Mr. Camiel on that. Is now a good time for you to weigh in on that, Mr. Camiel, or 8:30 a.m. in the morning?

MR. CAMIEL: Your Honor, maybe 8:30 a.m. I don't have that in front of me right this minute.

THE COURT: I will say, from what I read of the proffer, it appears closer connection to the facts as presented

1    in this case than is the case with ES, so I'll give you that

2    heads up.  And be prepared for that in the morning.

3            With regard to the jury instructions, I have prepared,

4    with my clerk's assistance and the submissions that you made, a

5    set for your consideration that we can discuss maybe hopefully

6    at some point during the day tomorrow.  There are a couple of

7    points I wanted to make.

8            The defendant asked for an instruction on willfully.

9    I did not include that.  But model instruction for the circuit,

10   4.6, is not an instruction at all.  It's a comment that says it

11   really varies on the case.  And when I looked at the elements

12   as set forth here and relatively undisputed, it did not have,

13   that I saw, the word "willfully" anywhere, so I did not include

14   that.  But I'm certainly -- when we hear argument and discuss

15   the instructions, I can hear otherwise.

16           The government included a proposed instruction on

17   character of the victim, that Mr. Lee had a character for

18   substance abuse issues.  I don't see that type of character

19   trait as applicable here.  If you look at the comment, the

20   character of the victim is relevant in a case where it's an

21   assault or a self-defense-type issue, and who was the first

22   aggressor and the character comes in in that way.  And that's

23   what the comment of 3.5 takes.  Oh, and also, sexual conduct of

24   the victim can come in, but obviously, not the case, either

25   case here.

1          So I'm disinclined to give that as well, but can hear

2     argument.

3          I'll ask Madam Clerk to hand out these sets, which for

4     the three attorneys, that we can take up in due course.  They

5     say "draft phase 1."  Obviously, we'll delete the reference to

6     phase 1 when we finalize this.  There are some portions that

7     are highlighted that need further information, I think

8     specifically on how -- which of the expert witness/lay witness

9     instructions to use.  We've got a variety now in the model

10    rules.

11         So with that, 8:30 a.m. tomorrow.  We can take up AL

12    and any other issues.

13         Oh, the other thing I neglected to say, I put in the

14    full names of both Mr. Lee and the cooperators in this, and I

15    would intend to do that in the set that we give the jury.  I

16    think that would be helpful.  And then afterward, when we

17    docket the jury instructions, I would intend to redact those or

18    make them initials so that it was no longer in the record of

19    the case, if you will, when the final instructions are

20    docketed.

21         So Ms. Weber, any objection to that approach?

22         MS. WEBER:  No, Your Honor.

23         MR. CAMIEL:  No.

24         THE COURT:  With that, anything further from the

25    government?

1          MS. WEBER:  One quick thing.  One of the victim's

2     family members is not going to be able to be present in court

3     tomorrow.  He's not going to be testifying, but wanted to know

4     if he could call in to the bridge line.

5          THE COURT:  So in addition to the one that's been

6     calling in periodically?

7          MS. WEBER:  Yes.

8          THE COURT:  Yes.  But I would ask that you convey to

9     them to call in before five minutes before the hearing is

10    scheduled to start, because then they won't interrupt the

11    proceedings getting on the overhead.

12          Would that be of assistance to you?

13          DEPUTY CLERK:  Yes.

14          THE COURT:  So call in five minutes before the

15    hearing, rather than whenever convenient.  And if they can't

16    call in then for any reason, they should coordinate with your

17    victim person to call in during the next break, as opposed to

18    whenever it's convenient for that person.  All right?  Very

19    good.

20          MS. WEBER:  Okay.

21          THE COURT:  Anything else, Ms. Weber?

22          MS. WEBER:  No, Your Honor.

23          THE COURT:  Anything else?

24          MR. CAMIEL:  Your Honor, just with regard to defense

25    witness who is going to appear by Zoom.  I was going to tell

1   her, based on what I've heard, to be available at 1:00

2   tomorrow.

3         THE COURT:  That seems very optimistic, but I'll go

4   with that.

5         MR. CAMIEL:  Well, I just want to make sure that she's

6   available when we need her.

7         THE COURT:  I would say, let's take it up at the noon

8   hour and come up with a precise time.  But I appreciate you

9   bringing that up.  But I think at the noon hour, we'd be in a

10  better position to give her a precise timeframe.

11        MR. CAMIEL:  Thank you.

12        THE COURT:  With that, we'll go off record.

13        DEPUTY CLERK:  All rise.  This matter is now

14  adjourned.  This court now stands adjourned -- stands in recess

15  until 8:30 a.m. tomorrow morning.

16    (Proceedings concluded at 4:49 p.m.)

17

18

19

20

21

22

23

24

25

```
 1                         CERTIFICATE

 2        I, Sonja L. Reeves, Federal Official Court Reporter in and
      for the United States District Court of the District of
 3    Columbia, do hereby certify that the foregoing transcript is a
      true and accurate transcript from the original stenographic
 4    record in the above-entitled matter and that the transcript
      page format is in conformance with the regulations of the
 5    Judicial Conference of the United States.

 6        Dated this 10th day of December, 2024.

 7

 8                              /s/ Sonja L. Reeves
                              SONJA L. REEVES, RDR-CRR
 9                            FEDERAL OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```