1      UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF ALASKA

2

3 UNITED STATES OF AMERICA,   )
             )
4     Plaintiff,    )
             )
5   vs.        ) CASE NO. 4:23-cr-00003-SLG
             )
6 JUNIOR GUFATASI TULALI,   )
             )
7     Defendant.    )
 _____)
8

9     TRANSCRIPT OF TRIAL BY JURY - TRIAL DAY 4
  **BEFORE THE HONORABLE SHARON L. GLEASON, DISTRICT JUDGE**
10       Thursday - April 18, 2024
        8:33 a.m. - 3:16 p.m.
11         Fairbanks, Alaska

12

13 **FOR THE GOVERNMENT:**
    Office of the United States Attorney
14    BY:  ALANA WEBER and CARLY VOSACEK
    101 12th Avenue, Suite 310
15    Fairbanks, Alaska 99701
    (907) 456-0336
16

17 **FOR THE DEFENDANT:**
    Camiel & Cheney, P.S.
18    BY:  PETER CAMIEL
    2800 First Avenue, Suite 309
19    Seattle, Washington 98121
    (206) 817-0778
20

21

22        **SONJA L. REEVES**
     **Registered Diplomate Reporter**
23      **Certified Realtime Reporter**
     **Federal Official Court Reporter**
24      222 West 7th Avenue, #4
      Anchorage, Alaska 99513
25   Transcript Produced from the Stenographic Record

1                          I N D E X

2
        WITNESSES CALLED BY THE GOVERNMENT:                PAGE
3
        SCOTT LARSON
4           Direct Examination By Ms. Vosacek              10
            Cross-Examination By Mr. Camiel                58
5           Redirect Examination By Ms. Vosacek            66
            Recross-Examination By Mr. Camiel              69
6
        MICHAEL MOORE
7           Direct Examination By Ms. Vosacek              75

8       CALEB REUTER
            Direct Examination By Ms. Vosacek              78
9
        AIMEE LUDWICK
10          Direct Examination By Ms. Weber                80
            Cross-Examination By Mr. Camiel                82
11          Redirect Examination By Ms. Weber              84

12      JOSHUA CARR
            Direct Examination By Ms. Weber                95
13          Cross-Examination By Mr. Camiel               117
            Redirect Examination By Ms. Weber             124
14          Recross-Examination By Mr. Camiel             131

15      WITNESSES CALLED BY THE DEFENDANT:                 PAGE

16      KRISTEN STOWE
            Direct Examination By Mr. Camiel              140
17      KRISTEN STOWE
            Direct Examination By Mr. Camiel              144
18

19

20

21

22

23

24

25

1          (Call to Order of the Court at 8:33 a.m.)

2          (Jury absent)

3          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

4   United States District Court for the District of Alaska is now

5   in session, the Honorable Sharon L. Gleason presiding.

6          Please be seated.

7          Your Honor, we're on record in Case 4:23-CR-00003-SLG,

8   *USA versus Junior Tulali.*

9          Will the parties please state their appearance for the

10  record.

11         MS. WEBER:  Alana Weber and Carly Vosacek on behalf of

12  the United States.

13         MR. CAMIEL:  Good morning, Your Honor.  Peter Camiel

14  representing Mr. Tulali, who is in custody, seated to my left.

15         THE COURT:  Good morning, everyone.  So I think we

16  were going to take up this other person, Mr. Camiel, this

17  morning.  AL, I believe her initials are.  So your thoughts on

18  that?

19         MR. CAMIEL:  Well --

20         THE COURT:  I kind of foretold where I was headed, but

21  I'd like to hear from you, in any event.

22         MR. CAMIEL:  Sure.  So, again, as I understand the

23  facts, she purchased pills from a person named Mr. Andrews, who

24  is not going to testify and is not being called to testify.

25  And then the government wants to connect that up with some

1   messages between Andrews and, I think, Mr. Brown.

2           THE COURT:  Which had been admitted.

3           MR. CAMIEL:  Yes.  I think it's -- particularly

4   because the Court is letting in the Mr. Slongwhite, ES,

5   overdose, I think --

6           THE COURT:  You think it's cumulative?

7           MR. CAMIEL:  Yes.

8           THE COURT:  I was just trying to read the word there.

9   All right.  Go ahead.

10          MR. CAMIEL:  I think it's cumulative and it just adds

11  to the unfair prejudice, given the marginal relevance.  The

12  jury is going to hear from Mr. Slongwhite now, and to add one

13  more to that is -- I think just makes it even more prejudicial.

14          As I understand it, the government is -- I'm not

15  100 percent sure, but I think they want to introduce the body

16  camera video of the response to her overdose.

17          THE COURT:  That is listed here, and then the 911

18  call.

19          MR. CAMIEL:  Right.  And so I think that just adds to

20  the prejudice here, given that Mr. Tulali is not charged --

21  perhaps they could have charged that, but they didn't.  And

22  there's the danger the jury is going to look at these other

23  incidents and it will outweigh maybe what they think the

24  evidence is with regard to the charged incident, but use that

25  as a basis to convict.

1        THE COURT:  All right.  Thank you.

2        The body-worn -- who am I going to hear from from the

3 government, Ms. Vosacek or Ms. Weber?

4        MS. WEBER:  Ms. Weber, Your Honor.

5        THE COURT:  All right.  Go ahead.

6        MS. WEBER:  Your Honor, as the government outlines in

7 its response to the defense motion in limine on this matter,

8 this is not a prior bad act.  Because the defendant wasn't

9 charged does not mean that it's 404(b).

10        THE COURT:  Why is it not 404(b)?  You're saying these

11 pills came from Mr. Tulali, as I understand it.

12        MS. WEBER:  Correct.  It's not a prior bad act or any

13 different bad act.  It's the result of the same shipment that

14 the defendant is charged with.

15        THE COURT:  I don't see it inextricably intertwined.

16 The way I read the case law on that, it has to be where you

17 can't tell your story completely without bringing in that act,

18 and I don't see that here.  I see this as 404(b) and subject to

19 403 balancing as well.

20        MS. WEBER:  Your Honor, the testimony that -- the

21 defense has been that perhaps Mr. Lee used heroin that was

22 laced with fentanyl after purchasing the pills from

23 Mr. Crockett.  Therefore, the government's argument that the

24 pills Mr. Lee purchased from Mr. Crockett were particularly

25 potent and had lethal amounts of fentanyl is extremely relevant

1    to show that those were the pills that caused Mr. Lee's death.

2         Your Honor, if the Court is inclined to admit evidence

3    of only one overdose to address the defense's concern about the

4    evidence being cumulative, the government would intend to move

5    forward with Aimee Ludwick, as opposed to Evan Slongwhite.

6         THE COURT:  All right.  And so how long is the 911

7    call?

8         MS. WEBER:  About four minutes.

9         THE COURT:  And the body-worn camera?

10        MS. WEBER:  I would have to double-check, Your Honor.

11    (Pause)

12        THE COURT:  Well, we can come back to that.  But I

13   don't intend to let the jury listen to a four-minute 911 call

14   that is relevant to, but not the conduct being charged here, in

15   addition to a body-worn camera of indeterminant length of an

16   officer reporting to the scene.  So at that point, there is a

17   403 issue that I think does come into play that it is the --

18   the relevance is there in the Court's view, but the -- the

19   impact of what I would anticipate being on the body-worn camera

20   and the 911 call involving conduct that has not been charged in

21   this case, at some point the prejudicial impact substantially

22   outweighs the probative value;

23        We're not going to have AL give extensive testimony

24   about her overdose, followed by a 911 call, followed by a

25   body-worn camera, about an incident that is not the subject of

```
 1   this charge.  So if you want to put it all down in about a
 2   five-minute presentation of her overdose, I would allow that.
 3   And you can pick what five minutes, but we're not going to have
 4   extended evidence.  So understand that ruling?
 5            MS. WEBER:  Yes, Your Honor.
 6            THE COURT:  All right.  And that would be the Court's
 7   ruling, is that I do see it a 404(b) issue, or at least I
 8   suppose kind of conditionally relevant, given the defense that
 9   the pills never came from Mr. Tulali in the first place.
10   Assuming the jury were to determine otherwise, it is relevant
11   with regard to the content of these pills, and I will allow it.
12   But by limiting it to five minutes, I would intend to have its
13   probative value not be substantially outweighed by what I do
14   acknowledge is prejudice, but not undue prejudice if it's
15   limited in that way.
16            So questions about the Court's ruling about AL's
17   testimony and other evidence?
18            MS. WEBER:  No, Your Honor.
19            THE COURT:  All right.  And that's combined, her
20   testimony, 911 and body camera.  You can pick how you want to
21   present that.
22            All right.  Questions about that?
23            MR. CAMIEL:  Well, still not clear whether the
24   government, then, is going to still get into the ES --
25            THE COURT:  I have ruled on ES yesterday.  So I would
```

```
 1    allow both, but the ruling on ES at this point is limited to
 2    Christopher Kearney's plea agreement and statements and medical
 3    records that you've reviewed and I've either agreed to or I've
 4    ruled on.  So it's limited in that regard.
 5           MR. CAMIEL:  So the government has not identified to
 6    me which statements in the medical records they want.
 7           THE COURT:  They can't call -- it's not coming in
 8    until that has been done and resolved.  So you understand that,
 9    Ms. Weber?  You're not to call the trooper on the medical
10    records without having Mr. Camiel have an opportunity to review
11    those statements.  That's how I ruled yesterday.
12           MS. WEBER:  Yes.
13           THE COURT:  Anything else from the government at this
14    point?
15           MR. CAMIEL:  Your Honor, I have one more.
16           THE COURT:  Let me just hear if they have anything
17    else.
18           MS. WEBER:  Your Honor, because the testimony from
19    Ms. Ludwick is going to be limited to five minutes, the
20    government would request that defense be precluded from arguing
21    in closing that had these pills been so lethal that there would
22    have been overdoses all over Fairbanks or that these 500 pills
23    would have caused a more significant effect than just one
24    person dying.
25           THE COURT:  I believe the five minutes, if presented
```

carefully, will allow you to present the severity of the
overdose of a person whose overdose is not a subject of this
trial.  So that's precluded, but you can present your five
minutes.

And if you had others that you wanted to present, we
are way past that.  So I have allowed in every person that you
have asked to address the overdose with the balancing of the
403 to restrict it.  So the five minutes stands.

MS. WEBER:  Understood.

THE COURT:  Anything else, Mr. Camiel?

MR. CAMIEL:  Yeah.  I think the government's second
witness is going to be Mr. Kearney.

THE COURT:  Mr. Kearney?  I didn't know he was going
to be called to testify.

MS. WEBER:  Yes, Your Honor.

THE COURT:  Anything -- oh, I see.  I'm sorry.  He'll
testify about his plea agreement.

MS. WEBER:  Correct.

THE COURT:  He's not going to testify about overdoses,
correct?

MS. WEBER:  Correct.

THE COURT:  All right.  Very good.

MS. WEBER:  Well, in his plea agreement, he -- in the
factual basis, he states that he sold three pills which
resulted in the overdose --

```
 1              THE COURT:  That's fine.  To the extent it's in the
 2    plea agreement, you can follow up there.
 3              Go ahead.
 4              MR. CAMIEL:  There was that, and then my intent to
 5    cross-examine him about that and about the person that he sold
 6    the pills to.
 7              THE COURT:  That's fine.
 8              All right.  Very good.  Anything further, Ms. Weber?
 9              MS. WEBER:  To clarify, it's not in the plea
10    agreement.  It's in the sentencing transcript where the
11    overdose is mentioned.
12              THE COURT:  It's not in the plea agreement?
13              MS. WEBER:  The plea agreement, it states that he sold
14    the three pills to AS, and then in the sentencing, in the
15    colloquy between the Court and the defendant, Judge Beistline
16    states, "You know the pills you sold killed -- resulted in the
17    overdose, and your co-conspirator Andre Brown, that sale
18    resulted in death.  You understand that you got lucky?"
19              And Mr. Kearney says, "Yes, sir."
20              THE COURT:  That's fine.
21              Were you aware of that?
22              MR. CAMIEL:  I was aware of that, but I was not aware
23    they were going to try to introduce statements made by the
24    judge.
25              THE COURT:  You're not trying to introduce
```

1    Judge Beistline's statements, correct?

2         MS. WEBER:  We intend to question the witness about

3    his recollection of sentencing, yes.

4         THE COURT:  Well, I do not want the judge quoted.  I

5    do see that as a 403 issue.  When you were asked X, you

6    acknowledged why.  But let's not bring Judge Beistline into

7    this.  All right?

8         MS. WEBER:  Yes.

9         THE COURT:  Very good.  Anything else?

10         MR. CAMIEL:  Mr. Kearney's actual plea agreement

11    indicates the parties agree that there's -- a certain

12    sentencing guideline factor does not apply because the offense

13    doesn't establish that death or serious bodily injury resulted

14    in the use of the controlled substance.  That's what the plea

15    agreement says.

16         THE COURT:  That's fair game to explore.

17         All right.  Very good.  Anything further, Ms. Weber?

18         MS. VOSACEK:  Your Honor, just we anticipate calling

19    Dr. Larson as our first witness, anticipate it will probably be

20    about an hour or two total with Mr. Larson, and then we would

21    just ask that we have a five-minute break to speak with

22    Mr. Kearney before his testimony.

23         THE COURT:  That's fine.

24         MS. VOSACEK:  With his attorney present.

25         THE COURT:  Sounds like we'll have a break somewhere

1  along there.  That's fine.

2          Anything else, Mr. Camiel?

3          MR. CAMIEL:  No, thank you.

4          THE COURT:  All right.

5     (Pause)

6     (Jury present)

7          THE COURT:  Good morning, ladies and gentlemen.

8  Please be seated, everyone.  Welcome back.  As I reminded you

9  throughout the course of this trial and I want to continue to

10  emphasize to you today, that it is important that the case is

11  decided based solely on the evidence and the issues of the law

12  presented here.  So you must not learn any additional

13  information about the case from sources outside the courtroom.

14          To ensure fairness to all parties in this trial, I'll

15  now again ask you whether any of you have learned anything or

16  shared information about this case outside of this courtroom,

17  even if it was accidental.  Anybody need to report anything?

18          All right.  Very good.  With that said, your next

19  witness, Ms. Weber.

20          MS. WEBER:  Your Honor, the government calls

21  Scott Larson.

22          THE COURT:  Good morning, sir.  If you could come all

23  the way up to our witness stand here.  When you get up there,

24  remain standing, if you would, and the clerk will administer an

25  oath to you.

1      (Oath administered to the witness)

2            DEPUTY CLERK:  Please state and spell your name for

3    the record.

4            THE WITNESS:  Scott Larson, S-c-o-t-t, L-a-r-s-o-n.

5               SCOTT LARSON, GOVERNMENT WITNESS, SWORN

6                        DIRECT EXAMINATION

7    BY MS. VOSACEK:

8    Q    Dr. Larson, can you please tell the jury, what is your

9    occupation?

10   A    I'm a forensic toxicologist.

11   Q    What is a forensic toxicologist?

12   A    Forensic toxicology studies drugs and alcohol and other

13   toxins in the human body for medical-legal purposes.

14   Q    Pull your mic a little bit closer.

15        And where is it that you work?

16   A    I work at NMS Laboratories.

17   Q    What is NMS Laboratories?

18   A    It's a private -- it's a private laboratory that performs

19   forensic and clinical testing on biological specimens.

20   Q    What's clinical testing mean?

21   A    Clinical testing would be like in hospitals, two separate

22   divisions.

23   Q    Do you do both kinds of work?

24   A    I only work in the forensics toxicology section.

25   Q    How long have you been at NMS Lab?

1    A    I have been there for about just less than three months.

2    Q    Where were you prior?

3    A    Prior to that, I have 18 years of experience working in --

4    as a toxicologist and a toxicology section supervisor and a

5    laboratory director at various labs.

6    Q    Can you just name your most recent?

7    A    Well, in totality, the last was Armed Forces Medical

8    Examiner System, the Washington, DC Office of the Chief Medical

9    Examiner, the Montana Forensic Science Division, and the

10    National Forensic Laboratory of New Zealand.

11    Q    What is your educational background?

12    A    I have a bachelor's degree in medical technology and

13    another one in microbiology.  I have a master's degree in

14    pharmacology, pharmaceutical sciences.

15    Q    Do you have any professional certifications?

16    A    Yes.  I have been board certified for 14 years by the

17    American Board of Forensic Toxicology.

18    Q    Are you a member of any professional associates?

19    A    I'm a member of the Society of Forensic Toxicology.

20    Q    Have you published any articles?

21    A    Yes.  I've published about five or six different articles

22    and peer-review journals.

23    Q    Have you ever testified as to a professional opinion in

24    court before?

25    A    Yes.  I have testified over 60 times.

1  Q   Can you explain to the jury what postmortem toxicology is?

2  A   It's just the study of, again, drugs and alcohol and other

3  toxins in someone who has died.

4  Q   How many toxicology cases does your lab handle a month,

5  approximately?

6  A   We do about 200,000 a year, so whatever that math is.

7  Q   I won't make you do it on the stand.

8  A   I appreciate it.

9  Q   Approximately how many cases do you handle a month?

10  A   Our goal is to do -- I do roughly about a thousand cases a

11  month, and that's split between postmortem cases and DUI cases,

12  driving cases.

13  Q   Do you have an estimate of how many cases you have handled

14  over your career?

15  A   Out of the 18 years, I'd say probably -- most labs are much

16  smaller, like local -- state and local labs are much smaller,

17  so probably around 100,000.

18  Q   Do you have any idea how many of those would be related to

19  drug overdoses?

20  A   In terms of just postmortem cases, it would be probably

21  40 percent of those, and drug overdoses might be 10 percent of

22  that, so maybe 4,000 to 5,000, roughly.  But that's just an

23  estimate.

24  Q   Can you explain to the jury the difference between your

25  specialty in postmortem toxicology and what a forensic

1    pathologist or medical examiner does?

2    A    So a medical examiner is a doctor, and they are more in

3    terms of performing the autopsy and looking for the totality --

4    looking through the totality of the body, doing that autopsy to

5    come up with a medical investigation where a toxicologist, we

6    basically just run the blood or other biological specimens,

7    looking specifically for drug and alcohol or other toxins, and

8    then interpret that.

9    Q    Do you work alongside with the medical examiner?

10   A    Yes.  In many of the -- many of the laboratories I've

11   worked in, forensic pathologists or medical examiners are in

12   the same building and we work together, yes.

13   Q    Can you explain to the jury, like, what your role is when

14   you work with the medical examiner?

15   A    So it's basically just to educate them on the different

16   drugs and help them through.  Some medical examiners have a

17   very good understanding of drugs, some less so.  So we

18   basically are just there as an educational tool to help -- help

19   them out.

20   Q    Are you familiar with NMS Labs' procedures regarding

21   evidence storage analysis and report writing?

22   A    I am, yes.

23   Q    Can you describe the process how NMS gets involved in a

24   case through generating a report?

25   A    Sure.  In terms of getting involved in a case, since it's a

1 private laboratory, we accept cases from clients all over the
2 country and even internationally. Those would be law
3 enforcement, coroners, medical examiners, other state
4 toxicology labs, private individuals, attorneys, whether it be
5 the prosecution or the defense, and hospitals. So that's how
6 we would get involved, is they would reach out to us and ask us
7 to do the testing.

8 In terms of the process in its totality of the samples
9 coming in, samples can come in many different sways. For a
10 local jurisdiction, they would just drop them off at the actual
11 lab. But since most of the work is done by jurisdictions that
12 are a long ways away from the laboratory, they would get mailed
13 in. Most of those would come in by FedEx, but sometimes it's
14 just a regular postal box.

15 So once a package comes in, it would get -- say from FedEx,
16 it would get scanned. Once it leaves the -- once it leaves the
17 truck in the laboratory, it gets scanned. That's the initial
18 documentation of us accepting that case.

19 It then moves into the sectioning section, where a picture
20 of the tracking label from the package would get taken, and
21 that gets tied into the case file.

22 It would then get moved to the accessioning section. The
23 accessioner is someone that would open up that box or open up
24 the package, document everything that's inside, both the
25 paperwork and whatever specimens were sent.

That then -- all that information gets typed into our LIMS
system, our Laboratory Information Management System, and gets
documented.  That's the tracking of that chain custody so we
know exactly what sample came in, what its condition was.

And then through that process, it then moves to a group
that would aliquot the individual from the parent container to
the individual vials that we would actually test, depending on
what test codes were ordered.

It would then move to the laboratory, where the biological
specimens would get extracted and the -- basically, whatever
drugs were in that would get isolated and then put on an
instrument.

It would then go through the instrument phase.  Data would
get reviewed off of that.  And once everything gets completed,
all the testing gets completed, all that information is
uploaded into our computer system, that's where I would come
in, is I am the only person that would then look at the case in
its totality from the time it came in to all of its testing,
and look at all of the data.  And if I was happy with all of
the results and feel everything on the report, everything from
the testing that gets put onto the report, if everything looks
good, I would then sign it and release it to the submitting
client.

So that would be kind of that independent review.  And if I
saw any issues, I can go back in and ask for additional testing

1  or ask for repeats and things like that.

2  Q   Are you familiar with -- do you know why Alaska sends

3  samples to NMS Labs?

4  A   I don't know if Alaska still has a forensic laboratory that

5  is running.  So I think they have been outsourcing, at least

6  postmortem work, for a number of years, originally in Seattle,

7  and I think that's been moved to NMS Labs.

8  Q   Have you reviewed other cases from Alaska?

9  A   I regularly review Alaska cases.

10 Q   Are you familiar with the process of detecting fentanyl in

11 biological specimens?

12 A   Yes.

13 Q   Are you familiar with fentanyl's effects on the human body?

14 A   I am, yes.

15 Q   Approximately how many cases have you worked regarding --

16 that involved fentanyl?

17 A   Historically, it was a fairly low number.  But over the

18 last five years or so, it's an increasing number.  I can't give

19 an exact number, but it's very common now.

20      MS. VOSACEK:  Your Honor, at this point I am going to

21 move to have the witness qualified to give an opinion in the

22 field of forensic toxicology, specifically as it relates to

23 fentanyl.

24      MR. CAMIEL:  No objection.

25      THE COURT:  I find the witness so qualified.

BY MS. VOSACEK:

Q   Dr. Larson, in 2020, did NMS Labs receive samples from a deceased individual named Jacob Lee?

A   Yes.

Q   And the Medical Examiner's Office requested your lab to conduct toxicology analysis on his specimen?

A   Yes.

Q   Did your lab, in fact, conduct that testing?

A   Yes.

Q   And there was a -- was there a report generated?

A   Yes.  Dr. Bill Anderson reviewed that case at the time and has since retired.

Q   How did you become involved in this case?

A   I was -- since I just started and Alaska is close to where I live, I was assigned that case.  And then I was assigned to basically then do a full review of the case and then resubmit the report.

Q   So you reviewed everything that NMS Labs has to do with this case, essentially?

A   I treated it just like a case that I would review in realtime, a case that was active, yes.

Q   Did you prepare a report and sign that report?

A   I did, yes.

Q   On the podium, there should be a binder that says "Government Exhibits."  If you could flip to Government

1    Exhibit 19.

2        Do you recognize this exhibit?

3    A    I do, yes.

4    Q    What is it?

5    A    It is the toxicology report from NMS Labs I signed.

6    Q    Is this a fair and accurate copy of the report that you

7    generated in this case?

8    A    Yes.

9    Q    Would it assist during your testimony to view and explain

10   this report to the jury?

11   A    Yes.

12        MS. VOSACEK:  Your Honor, I move to publish Government

13   Exhibit 19 as a demonstrative for the jury.

14        MR. CAMIEL:  I have no objection.

15        THE COURT:  Go right ahead.

16   BY MS. VOSACEK:

17   Q    If we could please start on the first page.

18        Can you please go over the identifying information that's

19   at the top of the report?

20   A    Yes.  That, starting from the top left was -- where it says

21   "report issued," that was the date that I signed that report,

22   date and time.  Below that, it says "last report issued," and

23   that was the initial and original report that was sent out by

24   Dr. Anderson in 2020.  Below that is the client number that we

25   have, 10261, and all of the identification of that client, the

1     State of Alaska Medical Examiner's Office and the address.

2         On the top right was information that was submitted to us

3     in terms of the patient name, Jacob Lee, the patient ID, the

4     chain number, which is just an internal tracking for ourselves,

5     the date of birth, the sex.  And then below that is the work

6     order number, which is a ten-digit code that we give all of our

7     cases once they come in.  That's part of that kind of tracking

8     the chain of custody, unique identifying number we can track

9     throughout the testing process.

10    Q   Can we move to the middle of the page?  There's a section

11    labeled "Testing Requested."  Can you explain what this section

12    is portraying?

13    A   So what this is, is all clients that submit samples to us

14    they have to tell us what they want us to test for.  On the

15    left, those are our internal codes.  So 8051B is the code for

16    our basic postmortem panel and blood.  Below that, 8050U, is

17    our basic urine screen.  It's an immunoassay screen that we

18    use.  And then if certain drugs come up positive on that

19    screen, then that would trigger quantification off of that, or

20    confirmation off of that.

21    Q   Okay.  We'll go back through those terms a little bit

22    later.  But just for the jury's reference, were those tests

23    performed by NMS Labs?

24    A   Yes.  Both of those tests were performed.

25              MS. VOSACEK:  Can we move to the section right below

1   it, "Tests Not Performed"?

2   BY MS. VOSACEK:

3   Q   What does this section portray?

4   A   So Tests Not Performed, it says, "Part or all of the

5   requested testing was not able to be performed," and it refers

6   to a different section later in the report.

7        MS. VOSACEK:  Can we move to the bottom section,

8   "Specimens Received"?

9   BY MS. VOSACEK:

10   Q   Dr. Johnson [sic], can you tell the jury what samples your

11   lab received to conduct the -- the --

12   A   We received seven different specimens.  The first two were

13   femoral blood in gray-top tubes.  The following two were heart

14   bloods, one with a gray top, one in a lavender vial.  We

15   received one vitreous sample, one gastric sample, and one urine

16   sample, and then it just -- it just puts in the volume that we

17   received, the collection time that would have been submitted to

18   us, and then how the individual samples were labeled as.

19   Q   Why do you receive all of these different samples?

20   A   So in postmortem toxicology, you never really know what

21   you're going to find.  So when you begin testing, sometimes if

22   everything is negative, it's very fast and you don't need very

23   much blood.  But some cases become very complex, and the

24   different matrix sources, we can use for testing and focusing

25   on different things.  So that's why medical examiners regularly

1    will take a lot of specimens, and then if we need them, we can

2    test them, but if we don't, then we don't test them.

3    Q    Is there a difference between femoral blood and heart

4    blood?

5    A    Yes.  Femoral blood is what's called peripheral blood, and

6    that is found -- so the femoral vein is in your upper thigh,

7    and that is blood that is the preferred specimen toxicology

8    testing because it's the blood that would be most consistent

9    with what's -- what would be going through the brain at the

10   time.  Where your heart blood is called central blood, and

11   central blood -- so that this is just blood literally pulled

12   from the heart and that is blood that can be affected

13   differently after death.

14   Q    And what is vitreous fluid and why is it useful?

15   A    Vitreous fluid is a fluid inside the eye or behind the eye,

16   and that gets pulled out.  That is a very good source for both

17   alcohol testing because there is very little microbial growth.

18   It's more protected after someone dies.  You can always use it

19   for regular drug testing.  It can be used as a specimen for

20   that, as well.

21   Q    Why do you collect gastric fluid?

22   A    Sometimes gastric fluid is useful in certain drug overdose

23   deaths, where we can find a large volume of pills still -- that

24   you can still see.  So that can sometimes be helpful to

25   determine those types of cases.

1  Q   Why is urine collected?

2  A   Urine can -- in postmortem toxicology, urine can be used

3  because a lot of drugs, after you take the drug, your body

4  starts breaking those down and eliminating them.  So a lot of

5  drugs are found at higher concentrations in the urine, and it

6  kind of opens up the window of detection longer than blood.

7  Q   So for example, a drug might not be present in the blood,

8  but you might be able to get it from the urine?

9  A   Yes.

10  Q   Are any of these samples effective for quantitating

11  purposes, like how much of a substance was in the body?

12  A   Like I said earlier, the -- the femoral blood or peripheral

13  blood is the blood that toxicologists prefer because it helps

14  with interpretation.

15  Q   Did your lab conduct toxicology tests in accordance with

16  generally accepted scientific principles?

17  A   Yes.

18  Q   I want to go through the testing that was done.

19        MS. VOSACEK:  We can take that down.

20  BY MS. VOSACEK:

21  Q   Can you tell the jury what kind of equipment your lab used

22  to conduct the testing in this case?

23  A   So in terms of all of the testing would have been triggered

24  off of that basic postmortem panel that we had discussed.  So

25  the initial test would have been for -- or one of the initial

 1    tests would have been for alcohol, and that would be on a

 2    GCFID.  In this case, alcohol was negative.

 3         The first step in drug testing would be immunoassay, and

 4    that's an antibody-directed test to -- to ten different drugs

 5    or drug groups, and that can -- that just is our initial screen

 6    that's very fast and easy.  And if -- if anything comes up

 7    negative, then we don't go any further, but if something is

 8    triggered positive on that, then we follow that up with a

 9    different test.

10         That different test would be on a -- what's called a liquid

11    chromatography tandem mass spectrometer, or LC-MS-MS, and

12    that's what the drug quantifications were done in this case.

13    Q    Let's start with immunoassay.  Can you explain what an

14    immunoassay is?

15    A    Yes.  It's just an antibody-directed test.  So basically,

16    if higher drug -- if drugs are present, there is binding to the

17    antibodies.  So the more drugs that's present, there's more

18    binding, and that will increase the signal.  So that's how we

19    can tell if it's positive.  If there's no drugs there, there is

20    no binding to the antibodies in the test, and it would be a

21    negative result.

22    Q    Are these immunoassays designed to, like, cast a wider net

23    or --

24    A    Yes.  There is a -- there is what's called

25    cross-reactivity.  So, for example, the benzodiazepine kit

 1  can -- a lot of benzodiazepines can cause a positive on that,

 2  and then we have to follow that up with a secondary test to

 3  figure out exactly which benzo it was.  Some of them are very

 4  targeted to, like, one drug, like the marijuana test or Delta

 5  19C.  And that's -- if that comes up positive, then we would

 6  just look for that drug.  So some are very broad and some are

 7  very focused.

 8  Q   Is it kind of like triage, to see what you're going to do

 9  next?

10  A   Exactly.

11  Q   You mentioned, I think the next test would be a

12  confirmatory test?

13  A   Yes.

14  Q   Does that testing change depending on the immunoassay, or

15  do you always use the same confirmatory test?

16  A   It would depend on which drug came up positive on the

17  immunoassay.  But most of your quantitative or confirmation

18  tests are done on the LC-MS-MS.

19  Q   Can you explain what the LC-MS-MS is?

20  A   Yes.  So LC, the liquid chromatography, is essentially what

21  we call the science of separation.  So once a drug -- or once

22  the extraction gets injected onto the instrument, there is a

23  column, and this column has certain scientific properties that

24  will separate.  As it moves through the column, different drugs

25  will separate and get isolated at different retention times.

1      At the end of the column, it would get sent to the mass

2  spectrometry, where there is a series of electrical currents

3  that hit that drug and, we'll call it fragment it.  So it's

4  kind of a fingerprint of the drug.  It's very reproducible.

5  And we would then -- those fragmentation patterns are ions in

6  different parts of the drug, and we would then look at those

7  and they would have the exact masses that we're looking for

8  predetermined, and then we would compare ratios within that.

9  So we have detection both on the front end with the liquid

10  chromatography and retention time, but then we also have the

11  detection based on the mass spectrometry.

12  Q    So it's kind of like, you have a mixture, it gets separated

13  into components, and then identified.  Is that fair to say?

14  A    Yes.

15  Q    And do you have any kind of quality control measures that

16  you use during this process?

17  A    Yes.  There is -- we have a large number of quality control

18  factors, both internally within each of the vials, and then

19  with external quality controls, where we spike drugs at known

20  concentrations, and then when we get those results, those

21  numbers, they have to line up and be acceptable.

22  Q    Let's talk about the quality control that are within the

23  vial.  What do you mean by that?

24  A    With every single sample that gets run, we would spike

25  something in called an internal standard, and that is just a

drug that's very similar to the drug of interest, and it's
roughly the same molecular wave and it's what we call
imbutyrated.  It's just -- it's called imbutyrated internal
standard.  And we spike a known concentration of that in all of
the samples, and we use that for both quantitative purposes,
but then we -- to get an actual number.  But then we also track
the amount that gets extracted.  So there's a range of what's
acceptable, and if it's too low, we would fail that case, and
if it's too high we would fail it, but if it falls within that
range, then that would be acceptable.

Q   You have a sample that's very similar to your target drug?

A   Uh-huh.

Q   So say we're testing for fentanyl.  Would you have a drug
that's very like fentanyl in terms of its chemical properties,
and you run it through the test?

A   Yes.

Q   You know how much of that drug is supposed to be present?

A   Yes.

Q   If the test does not respond as expected, you don't use the
results?

A   Yes.  So with fentanyl as the example, we run what's called
fentanyl butyrated D5, which is very similar.  The molecular
weight is 5 AMUs off of each other, so very, very close, and
have slightly different retention times.  And we would
basically use the concentration of the drug, the fentanyl found

1  in the case, and create a ratio of that with the internal

2  standard and then compare that with the calibration curve, and

3  that's how we would come up with the concentration.

4  Q   And you're doing all of this to make sure your

5  instrumentation is running correctly?

6  A   It's one -- I mean, we have internal checks.  The quality

7  control is to make sure both the instrument is running

8  correctly, the extraction was running correctly, and there

9  wasn't any issues with us being able to obtain a number of the

10  end, concentration at the end.

11  Q   What is the protocol if one of your controls fail?

12  A   If one of our controls fail, then we would usually

13  re-extract the whole batch.  But, you know, there's some

14  internal things.  But in terms of -- certain things can get

15  reported out, but basically, we have very written-in acceptance

16  criteria, and if it falls out of that, then we would not accept

17  that result, and repeat it.

18  Q   Is that part of the reason why you have excess samples, so

19  that if something happens, you can run it again?

20  A   You run it again, yeah.

21  Q   Dr. Larson, I'd again ask that we look to your report.

22          MS. VOSACEK:  And if we would be able to use it as a

23  demonstrative at this point, Your Honor, Government Exhibit 19,

24  the section toward the top, "Positive Findings."

25          THE COURT:  That's fine.

1          THE WITNESS:  I would like to just interrupt.  I'm not

2   a doctor.

3   BY MS. VOSACEK:

4   Q   I'm sorry.  Sorry about that.  Toxicologist Larson.

5   A   That's fine.

6   Q   If we can look at "Positive Findings."  Starting with the

7   first column on the left of the screen, "Analyte," what is that

8   column meant to depict?

9   A   So those are the analytes that we -- that were detected in

10  the samples.

11  Q   If you move over to the next column, "Result," what is that

12  column meant to depict?

13  A   The ones with a number or ones where we did a quantitative

14  analysis and received a number for that, and below where it

15  says "Presumptive Positive," those were just run on that

16  immunoassay that we tested -- or that we discussed before, and

17  those just came up positive, but there was no confirmation test

18  later run on those.

19  Q   When you say "quantitative," does that just mean how much?

20  A   Yes.

21  Q   Okay.  In the next column, "Units," what is that meant to

22  depict?

23  A   So "Units", any time you kind of measure something, there's

24  a unit applied with it, and nanogram -- the NG stands for

25  nanograms -- so that would be the nanograms of the drug found

1  in -- the ML stands for milliliters, and that would be
2  milliliters in blood.
3  Q    And the last column, "Matrix Source"?
4  A    So that was just which sample we tested.  The 001 would
5  have been tied to the first of those -- of the specimens
6  received, and then femoral blood just states what it was.
7  Q    Is this a summary chart of the results that you received
8  from testing Jacob Lee's samples that were sent?
9  A    Yes.  And then we tested for a lot of different drugs, and
10  these were the ones that came up positive.
11  Q    Would it be accurate to say that the urine testing at the
12  bottom, was that immunoassay screening testing that you were
13  talking about?
14  A    Yes.
15  Q    And then based on those results, you did the confirmatory
16  testing that's outlined at the top?
17  A    Not exactly, no.  Both the blood received immunoassay and
18  that got triggered, and this was just the urine alone, and
19  there's no -- they didn't order any type of confirmation on
20  these samples, on the -- on the drugs for that.  So immunoassay
21  was done independently on both.  One got confirmation and
22  received the numbers.  The other one just with -- stayed as is.
23  And that's why this has presumptive positive, because trigger
24  positive, but we can't say, you know, for sure that it's for
25  sure there because -- in the urine because we didn't run a

1  confirmation.

2  Q   Is that because you said it wasn't requested in this case?

3  A   It wasn't requested, and this test specifically is usually

4  only done -- or I shouldn't say only done.  This test is

5  usually requested to confirm heroin-positive cases.  So it

6  would have -- if heroin would have been positive, we would have

7  then triggered heroin or a 6-monoacetylmorphine specific test

8  for that.  But since it didn't come up positive, then this test

9  just kind of ends at this point.

10  Q   I'm going to follow up on the heroin questions later, but I

11  think that was a good place to move forward and talk about what

12  was found, or what was confirmed to be in the samples.

13      Let's talk about the first line, Delta-9 THC.  What is

14  that?

15  A   Delta-9 THC is the main psychoactive component of

16  marijuana.

17  Q   And when you look at -- to the right with the result, it

18  was 1.3 nanograms per milliliter?

19  A   Yes.

20  Q   In your training and experience, is this a particularly

21  high amount, low amount, or you can't say?

22  A   The only thing -- marijuana is very difficult to interpret

23  in postmortem cases.  So basically, the only thing I'd be able

24  to interpret on this is at some point in the past the decedent

25  had used marijuana.

 1   Q   Would this cause his death?

 2   A   No.

 3   Q   Let's move to the second line, fentanyl.  What was -- what

 4   is fentanyl?

 5   A   So fentanyl is a fairly highly potent synthetic opiate that

 6   is used in -- for pain relief and is used in hospitals as a

 7   surgical anesthetic.

 8   Q   Is it a drug of abuse?

 9   A   So it historically wasn't, but over the last five years or

10   so, it's kind of moved to being used as a recreational drug,

11   and has also been sometimes put into the drug supply chain with

12   -- mixed with, like, say, fentanyl or cocaine or heroin, things

13   like that.

14   Q   Is fentanyl a dangerous drug?

15   A   Fentanyl is, because that is a highly potent opiate and can

16   cause a lot of problems, yes.

17   Q   Do you happen to know, like, its potency as compared to

18   other drugs?

19   A   So opiates usually get compared directly to morphine as the

20   baseline.  So morphine is 1X.  Fentanyl is 100 times more

21   potent than morphine.

22   Q   Does that mean a smaller amount will have a bigger effect?

23   A   Yes.

24   Q   What was the result found in Jacob Lee's femoral blood?

25   A   It was 9 nanograms per mil.

1   Q   Let's move to the next line, Norfentanyl.  Can you tell the

2   jury what norfentanyl is?

3   A   Norfentanyl is what's called a metabolite of fentanyl.  So

4   when the -- when you take any drug, your body immediately

5   begins different processes to eliminate that drug and get rid

6   of it.  So one of the -- so in this case, one of the major

7   metabolites of fentanyl is norfentanyl.  That's just your

8   body's way to get rid of the fentanyl and easier to eliminate

9   it from the body.

10  Q   And was it present in this case?

11  A   It was, at 3.9 nanograms per mil.

12  Q   What significance does that have to you?

13  A   That would just show that -- the main thing that that would

14  show was that the decedent was alive long enough to start

15  metabolizing fentanyl and create the norfentanyl.

16  Q   And let's move to the next line, the cannabinoids from the

17  urine sample.  What was that result?

18  A   So cannabinoids is the generic term for marijuana use.  So

19  that just showed that we found the marijuana metabolites in the

20  urine.

21  Q   And what about the last result, the fentanyl/metabolite?

22  What does that mean?

23  A   That's the immunoassay test, which is -- this test is

24  specific to -- for the norfentanyl.  So that just showed we

25  found the norfentanyl in the urine.

1   Q   What significance does that result have to you or your

2   analysis?

3   A   It would -- I mean, if we're looking at it in totality of

4   this whole -- of the whole positive findings part of this case,

5   it just kind of confirms that the person had taken fentanyl and

6   we found it both in the blood and the urine.

7   Q   Based on the results from Jacob Lee's blood and urine, is

8   it possible that he could have taken fentanyl and survived and

9   then taken another dose of fentanyl?

10  A   Yes.  I mean, that could -- with that nor -- I mean,

11  norfentanyl sticks around a little bit longer than fentanyl

12  because it's a secondary metabolite, so it could be possible

13  that we're looking at two different events and there's -- some

14  of that 3.9-nanograms of norfentanyl was from a previous time

15  and some of it would have been from later, but that's very --

16  you know, that's very -- it's really impossible for me to say,

17  just looking at the toxicology report, exactly what that

18  timeframe of drug intake would be.

19  Q   So you can't say when he used it?

20  A   No.

21  Q   Can you say how much he used?

22  A   No.

23  Q   And you can't say what method he used it by?

24  A   No.

25  Q   Can you say -- say that the drug that Jacob Lee took was

 1  laced with another controlled substance or was mixed with

 2  another substance?  Could you say -- would another substance

 3  show up if that was the case?

 4  A   I mean, this was a fairly comprehensive test that was run,

 5  so if there was another, I guess for lack of a word, drug of

 6  interest, we would have seen it if it was at a high enough

 7  concentration.  So I can't 100 percent say there is not

 8  something else that would have been present, but it didn't

 9  trigger a positive in our testing.

10  Q   I would like to draw your attention to the second through

11  third page of Government's Exhibit 19.  It's reference -- it's

12  labeled "Reference Comments."  Do you see that?

13  A   Yeah.

14  Q   If we can start on the second page and highlight the

15  cannabinoids urine.  What is reference comments?

16  A   So reference comments are just put into our reports to help

17  our clients interpret the results.

18  Q   So what is this first section about cannabinoids relaying

19  to your client?

20  A   This is cannabinoids in urine.  So this would have been

21  that immunoassay test we had discussed, and this is just saying

22  that cannabinoids come from marijuana and that the Delta-9 THC

23  is the principal active component, and that because this was

24  that urine immunoassay screen, there are times that those

25  create false positives, there is something that may interfere

with that, and that's why it is so important for us to
definitively say it's there in the urine, we don't need a
second test.

Q    Does the presence of cannabinoids in Jacob Lee's urine
concern you that that would have killed him?

A    No.

Q    Can we move to the Delta-9 THC section?  What does this
section meant to convey to your client?

A    This is just discussing the Delta-9 THC positive that we
received in the femoral blood at a concentration of
1.3 nanograms per mil.  It talks about what marijuana is and
gives a little bit of kind of general information regarding it.

Q    And it talks about how the concentration peaks kind of go
up and then down after use; is that right?

A    Yes.

Q    Can you just explain that concept to the jury?

A    So with marijuana use, when you -- basically, there's been
studies that have shown where they're actually drawing blood
from someone as they're smoking, and you can basically -- if
you're smoking marijuana, you see basically a very steep
increase in the amount of marijuana -- or Delta-9 THC while
you're using marijuana.  And it basically continues to go
straight up until you stop, and then once you stop, then it
will slowly start breaking down over time.  So this is a very
big thing in certain, say, driving cases, like DUI-type cases,

1  but in postmortem work, it's -- it's not as important.

2  Q   And why is that?

3  A   So with marijuana, because it absorbs in the fat and

4  absorbs in, like, muscles, so you can't really tie in marijuana

5  concentrations with how much marijuana use they actually did or

6  when they used it.  You can get -- in postmortem cases,

7  depending on the decedent's makeup, if they are -- have large

8  fat reserves, you can sometimes get artificially inflated

9  numbers, or if they are more muscular, you can get smaller --

10  you know, smaller numbers.  So there's just varying -- there's

11  varying amounts that you get with marijuana concentrations in

12  postmortem cases, so it's very difficult to interpret.

13  Q   Let's move to the fentanyl section, and let's just

14  highlight the first two paragraphs.

15      Can you kind of summarize what this section is meant to

16  convey?

17  A   Yes.  So this is the femoral blood result for fentanyl, and

18  the first line is just kind of talking about kind of what it

19  is.  It talks about reported the 80 to 200 times as potent.  I

20  usually have been taught that 100 is -- is the most accurate,

21  but there is a range.  Talks about rapid onset, as well as

22  addictive properties, and then it discusses a little bit about

23  concentrations.

24  Q   Can you talk about that second paragraph, about -- I mean,

25  is that the same kind of testing where somebody is using and

1  you're drawing blood?

2  A    No.  So this actually would be done -- this would be

3  clinical testing at a hospital.  So what they're talking about

4  is -- in this portion, is it's reported the patients lose

5  consciousness at a plasma level at 35 nanograms per mil during

6  an infusion.  So that would be like a port put in an arm and

7  infusing it in.  You can get higher levels, higher

8  concentrations, at hospitals because there's supportive care.

9  So they can resuscitate people, kind of bring people back when

10 the respiratory depression gets too much with the fentanyl use.

11 So that's what that kind of loss of consciousness.  So you can

12 get higher numbers in that just because of the physical support

13 that you would have in a hospital.

14 Q    When it says 75 mcg per kg, what does that mean?

15 A    That's microgram per kilogram.  So that's 75 micrograms of

16 fentanyl per kilogram weight of the person, of the patient.

17 Q    Is a microgram smaller than a nanogram, or bigger?

18 A    It's bigger.  But this is a different type of unit of

19 measurement, so it's very tricky.  You can't necessarily

20 compare the two super easy because that's kilogram instead of

21 milliliters of blood.  This is kilograms of a person.  So it

22 would be like, an average person is like 70 kilograms.  So this

23 is just a dosing at the hospital.

24 Q    So like a very controlled dose in a clinical setting?

25 A    Yes.

1          MS. VOSACEK:  Can we move to the next section?

2    BY MS. VOSACEK:

3    Q    Fentanyl comes in a lot of different forms; is that right?

4    A    Yes.  So these are -- this is talking about transdermal

5    patches.  So historically, after someone maybe got out of

6    surgery and they were still -- they were released from the

7    hospital but still under a fair amount of pain, they could be

8    given patches and -- of various concentrations, and then that

9    would -- the numbers that you see there, or those ranges, would

10   be blood concentration ranges that would be reported, kind of

11   like what we found.  So this is comparable to our numbers.

12        So for many years, we only saw fentanyl abuse with these

13   patches that would either get stolen from the hospitals or

14   taken from someone else or sold, so these are the

15   concentrations that we were historically seeing years ago.

16   Q    And, like, why put fentanyl in a patch?  Is it --

17   A    So they're slow-release patches.  You can put on a patch

18   and you can get pain relief for large chunks of time, and

19   then -- so your doctor would prescribe these to you, and you

20   would get X number of patches over the course of your -- as

21   you're recovering from whatever surgery or whatever reason

22   you're in the hospital.  So you might get five patches, and

23   they might say put one patch on every ten hours, and then over

24   that timeframe.  Then after that, then you would move to a less

25   powerful narcotic.

1  Q   Is that to kind of make sure people don't take too much too

2  fast?

3  A   The patches were a way to kind of deal with releasing

4  patients from the hospital with very highly potent opiates.  So

5  it was just a way to kind of control that release.

6  Q   The next section talks about the serum concentrations of

7  fentanyl after you take the patch off.  So what does that mean?

8  A   So this is just discussing again, once you take the patch,

9  the serum fentanyl concentrations are reported to decrease, and

10 they talk about the half-life of the drug.  So -- and I think

11 on the next page, it kind of continues with that idea.

12 Q   If we can return to the next page.  Can you explain what a

13 half-life is?

14 A   So a half-life is just a terminology, like a pharmacology

15 terminology, and it's -- what it -- it's pretty basic.  It's

16 just basically the idea of what is the half -- what is the

17 timeframe taken to eliminate 50 percent of the drug.  So when

18 you take a drug, you start at 100 percent.  How much time does

19 it take for half of that drug to disappear.

20     So, for example, a lot of times with -- there's a range

21 with each person because everybody is different.  The low end

22 of that range for fentanyl is roughly about three hours, and

23 then it can go up to about ten hours, give or take.

24 Q   Let's talk about fentanyl toxicity.  What is fentanyl

25 toxicity?

1   A   So all drugs can be toxic if you take too much.  So what

2   they're discussing with -- specifically with fentanyl in this

3   line is, if you get a concentration that your body is not

4   really able to handle or isn't used to or is intolerant to, you

5   can start getting respiratory depression.  That's the biggest

6   one.  Respiratory depression is basically an inability for your

7   body to breathe properly, be able to get in enough oxygen.  It

8   discusses seizures, hypotension, which is essentially just low

9   blood pressure.  So you can have some cardiac problems with

10  that, also.  And it's all tied to your respiratory system.  And

11  then coma and death.

12  Q   Why does fentanyl slow down your respiratory system?

13  A   So that's -- all opiates do that.  So that's just part of

14  the opiates and tied with their -- the downstream effects of

15  activating the immuno-opiate receptors.  So that's a fairly

16  common thing with all opiate use.  Because fentanyl is such

17  a -- more powerful than a lot of opiates, it's a more

18  pronounced issue with fentanyl use.  It's the same thing with,

19  like, heroin use and things like that.

20  Q   You mentioned that you can have toxic effects of any drug;

21  is that right?

22  A   Yes.

23  Q   But you also talked about, like, how tolerance affects when

24  it would become toxic?

25  A   Yes.  So tolerance is a deal.  So the example I like to use

just, because everyone has some kind of idea with this, is
when -- like with alcohol, when someone has their first
experience with alcohol, maybe one beer, they can feel -- or
one drink, they can feel a certain effect, and over time, it
takes two or three or four drinks to feel that effect.  That's
your body's way of kind of changing its chemistry in the brain
to kind of deal with that.

So opiates, it's the exact same way, or methamphetamine or
any drug, is you start taking it and then your body changes, so
then you have to take a little bit more to get that same
effect, and then a little bit more to get that, and then your
body can just kind of deal with that differently.

Q   So somebody that's using fentanyl wouldn't always have a
toxic response?

A   No.  You can -- as someone uses more and more fentanyl over
a course of time, then their body is more tolerant to that and
can kind of negotiate that a little bit more.

Q   If somebody, say, had never used fentanyl before, like, how
would the use of fentanyl be more dangerous?

A   So it -- so it would be the same exact -- I guess if we're
going back -- can you repeat the question?  Because I don't
want to use a different analogy.

Q   I'll rephrase.

A   Your question was fine.  I was going to use a different
analogy.  I apologize.  What was your question?

1          MS. VOSACEK:  Madam Court Reporter, could you read it?

2                (Question read back by court reporter.)

3          THE WITNESS:  So if they did not have -- build up that

4  tolerance, then a higher concentration of fentanyl that maybe

5  someone that uses fentanyl a lot, they'd be fine.  And so if

6  they've never used it, then they can die, essentially.

7  BY MS. VOSACEK:

8  Q   If somebody has prior experience with just opiates in

9  general, how would that affect their naive use of fentanyl?

10  A   So you can get some cross-tolerance.  This is very

11  difficult to measure scientifically.  But the understanding

12  that we have now is that you can get some cross-tolerance from

13  opiate to opiate.  So it really comes down to the potency of

14  that.

15       For example, we used -- I testified earlier that fentanyl

16  was 100 times more potent than morphine.  If you use a little

17  bit of morphine, that would help you with the fentanyl, but

18  because it's 100 times stronger, then there would kind of not

19  be enough tolerance to help you, if that makes sense.

20  Q   Would a period of sobriety change your tolerance?

21  A   Yes.  We see that regularly with -- I apologize for

22  switching tracks.  But we see that regularly with methadone

23  use, where someone will be on a regimented methadone program

24  where they're getting a certain concentration over a period of

25  time, and then they stop for whatever reason, and maybe a month

1    or two months later they start back at that same concentration

2    they were taking before and they will have, say, methadone

3    overdose.  You can lose tolerance fairly quickly.  Basically,

4    that's your body's way of going back to equilibrium state

5    without that exposure.

6    Q    Is that why relapses can be extra dangerous?

7    A    Yes.

8    Q    Let's talk about the next section here in the middle --

9    keep it right there.  Sorry.

10        Moving past just fentanyl toxicity, it talks about

11   fatalities from fentanyl.  Do you see that?

12   A    Yes.

13   Q    What is that sentence meant to convey?

14   A    That sentence is -- just says, "In fatalities from

15   fentanyl, blood concentrations are variable and have been

16   reported as low as 3 nanograms per mil."

17        So if we go back in time, what we were kind of always

18   taught as toxicologists was 3 nanograms is when you start

19   getting nervous that someone potentially overdosed.  10 to 15

20   nanograms were the highest we would ever see because fentanyl

21   just wasn't used in the population that much.  Now, because of

22   tolerance, we see it at much higher concentrations.

23        But this is just basically saying that there is a large

24   range of concentrations where someone can die from fentanyl, so

25   you have to kind of look at each case individually to make sure

1  there is not other contributing factors.

2  Q   So what would be -- like, what information would be

3  relevant to determine if somebody overdosed from fentanyl and

4  it's kind of at the lower range you talked about, like the 10

5  to 15?

6  A   I mean, a lot.  Tolerance is the first one, what is the

7  history of use.  That would be the first one on the toxicology

8  side.  The majority of that information would be obtained from

9  the medical examiner through the autopsy, and autopsies are

10  built in a way to basically just start ruling out things.  So

11  obviously, if there's acute trauma, like a car accident or

12  someone fell off a roof, and that's very documented, or were

13  shot by a gun, you know, they can still have concentrations of

14  fentanyl, but that's probably not -- that wasn't what caused

15  the death, because the medical examiner would have been able to

16  kind of determine that, the acute effects.

17      Then there would be the other side of it, would be once

18  that kind of gets ruled out, then you start looking at other

19  disease within autopsies, so whether there's congestive heart

20  failure or whether there's heart attack or other kind of issues

21  through that.  So you would start ruling those types of things

22  out and then come to -- then bring all that information along

23  with this fentanyl concentration and kind of make that

24  determination.  But that would be part of the pathologist's

25  job.

1  Q  You talked about, historically, anything over 3, you'd

2  start to consider an overdose?

3  A  Yes.

4  Q  Even today, if a healthy person who does not have a history

5  of fentanyl came in with a result over 3, would you be

6  considering an overdose?

7  A  Yes.  I mean, because humans haven't changed in themselves.

8  It just comes down to individuals that use it.  So if someone

9  is a naive user to opiates and fentanyl in particular, then

10  that same rule would apply.

11        MS. VOSACEK:  Can we move to the next section,

12  Section 4, the fentanyl metabolite in urine?

13  BY MS. VOSACEK:

14  Q  Can you just describe briefly what this section is meant to

15  convey?

16  A  So this is similar to what we saw at the beginning with the

17  cannabinoid test in urine.  This is a targeted test to -- for

18  fentanyl metabolite in urine, and it screened positive and

19  there wasn't any follow-up testing done on that.

20  Q  Does the fact that there was no follow-up testing done in

21  the urine affect your findings in this case?

22  A  No.  I mean, because we would -- there's limited value in

23  the urine concentration anyways.  That would just be an extra

24  test that didn't really have a ton of meaning.  But this is

25  helpful at times to show there was no fentanyl found in the

1    blood.  This would show there was previous fentanyl use,

2    low-level use, and we could still detect in the system.  And

3    that -- in certain cases, that could be of benefit.  But since

4    we confirmed it in the blood, it's kind of irrelevant.

5    Q    And let's look to number 5, the norfentanyl result.

6         Can you just summarize what this section is meant to

7    convey?

8    A    This is just showing we found norfentanyl in the femoral

9    blood and stating that norfentanyl is a primary inactive

10   metabolite of fentanyl.

11   Q    And again, this just means the person lived long enough to

12   metabolize some --

13   A    Yes.

14   Q    -- fentanyl?

15   A    Yep.

16   Q    If we move down to the bottom section, the analysis summary

17   and reporting limits, what is this section of the report meant

18   to convey?

19   A    So the analysis summary and reporting limits is just, on an

20   analytical side, what our lowest concentration is that we would

21   report.  So we would never report anything below those numbers.

22   We would only report values above those numbers.

23        So -- and then I will mention there's the not-reported

24   Delta-9 carboxy-THC was canceled due to interfering substance.

25   That's the note -- you asked me a question previous on the

1   testimony off of page 1 about the test not performed.  That's
2   the reason that comment got put on there, is because there was
3   interfering substance.  I looked at the data.  It looks to be
4   Delta-9 carboxy-THC, which was the reason that test got
5   canceled as part of our quality control.  Those two peaks come
6   out too close to each other and interfere with each other, so
7   it didn't pass our acceptability criteria, so we weren't
8   allowed to report that out.
9   Q   Does the fact that that test failed have any bearing on
10  your opinions here today?
11  A   No.  It's just the -- like everything else, the drug field
12  is evolving, so there's just different types of components in
13  marijuana now that didn't historically used to be there.
14          MS. VOSACEK:  Let's move to the next page.
15  BY MS. VOSACEK:
16  Q   This is a continuation of the analysis summary and
17  reporting limits.  Is that right?
18  A   Yes.
19  Q   Let's look at the top section.  The analyte, you've got
20  acetylfentanyl and fentanyl.  Just those first two lines, what
21  is that meant to convey?
22  A   It's just discussing reporting limits again.  So at
23  0.10 nanograms, so .1 nanograms per mil, that's the lowest
24  value that we quantitate for.  So if it was .08, it would have
25  been reported as negative, but since it was above .1, that's

1   the reason why there's a concentration printed on the front

2   page of the report.

3   Q   And below that, it says "test 8050 U."  What is that

4   talking about?

5   A   That's the immunoassay test for the urine, and those are

6   the -- these are the ten drugs or drug groups that we looked

7   for in the immunoassay.

8   Q   This might be a good time to talk about heroin usage and

9   why this test is relevant to that.

10      Can you explain why you do this test and what you're

11  looking for?

12  A   Okay.  So for the heroin example that you brought up, on

13  the right side, the third one down, it says "opiates," and it's

14  at 300 nanograms per mil.  So that opiates immunoassay is

15  specifically looking for morphine, and morphine is a

16  downstream -- morphine can obviously be given in a hospital for

17  pain relief, but it is also a downstream metabolite in heroin

18  use.  So if someone takes heroin or someone takes morphine or

19  some other opiates, it would cross-react with that assay.  It

20  would trigger a positive, and then we would follow up on that.

21  Q   So if you were investigating whether or not somebody had

22  taken heroin, finding morphine is not conclusive?

23  A   Exactly.

24  Q   So what are you looking for to confirm heroin use?

25  A   So heroin breaks down very fast out of the body, so you

```
 1   have to take the half-life.  It's very, very short.  So most
 2   labs don't even test for heroin.  I have been in labs that do
 3   test for it, but we don't see it very often.  Someone has to
 4   die almost instantly for us to detect it.  There's a metabolite
 5   that comes out very quickly, and that's called
 6   6-monoacetylmorphine, and that's what we use.  That sticks
 7   around a little bit longer, and that's the compound that we
 8   look for because that's specific to heroin use.
 9   Q   In this case, was there any indication that Jacob Lee had
10   used heroin?
11   A   No.
12         MS. VOSACEK:  Can we turn back to page -- I believe
13   it's page 3 -- 3 of 4, please?  Can you highlight the signature
14   section and the sample comments?
15   BY MS. VOSACEK:
16   Q   Is that your signature?
17   A   Yes, it is.
18   Q   And, again, is this a fair and accurate representation of
19   the report that you produced?
20   A   Yes.
21   Q   And this report was produced after reviewing testing that
22   was done by NMS Labs?
23   A   Yes.
24   Q   And those tests were done pursuant to scientific standards
25   and they were reliable?
```

1   A    Yes.

2          MS. VOSACEK:  And at this time, I would offer

3   Government's Exhibit 19.

4          MR. CAMIEL:  I have no objection.

5          THE COURT:  19 is admitted.

6      (Exhibit 19 admitted)

7   BY MS. VOSACEK:

8   Q   I want to talk just a little bit about some other issues

9   that come up with toxicology.

10     Are you familiar with the term of "postmortem

11  redistribution"?

12  A   I am, yes.

13  Q   What is it?

14  A   So after your body -- after you die, all your systems or,

15  obviously, all your organs are no longer functioning.  What

16  happens is, it's basically a term describing the kind of

17  passive diffusion of drugs at high concentrations in the areas

18  with lower concentrations.  So there are parts in your body in

19  the gut.  So, for example, your gastric system, if you took a

20  bunch of pills, your liver is right below your gastric, your

21  stomach, and your liver has high concentrations of drugs it

22  accumulates through the elimination process.  So after someone

23  dies, you start getting -- in the central region, you would

24  start getting higher concentrations.  So once someone dies, if

25  you take blood right before they die versus, like, one hour

1  after they die and then ten hours after they die, it starts

2  changing.  It's a fluid situation.

3      So this is the reason why we try to get peripheral blood,

4  which is the blood that we talked about earlier from the

5  femoral vein in your upper left thigh or upper right thigh, but

6  usually it's the left.  And they clamp that out, and that's the

7  closest you would get to what's kind of going through your

8  head.

9      So basically, postmortem redistribution is just this

10  changing concentration that we see.  So if we tested -- like,

11  for example, we had heart blood that was submitted.  If we had

12  tested that heart blood, most of the time we would expect that

13  to be at a higher concentration, a slightly higher

14  concentration than what we would see in the femoral blood.

15  Some drugs have very high postmortem redistribution, depending

16  on if they absorb in the fat or kind of their chemical makeup.

17      So a long time ago in forensics, like 20 or 30 years ago,

18  heart blood was all people tested most of the time because it

19  was very easy to obtain.  And there were times when a heart

20  blood concentration with certain, like, say, antidepressants

21  can be very, very high, like lethal ranges, but then if you

22  test the femoral blood, it's actually at nonlethal

23  concentration.  So it's a bigger deal to kind of see that.

24      Fentanyl has some postmortem redistribution.  It gets --

25  the average is about 1.5.  So if we would have done testing in

1   the heart blood, theoretically it would have been higher,

2   though we can't say that.  Until you actually test it, you

3   don't know.

4   Q   So essentially, by using the femoral blood, you're trying

5   to get the most accurate picture?

6   A   Exactly.

7   Q   From your experience with drug overdoses, overdose cases,

8   can you tell us whether a victim always exhibits the same

9   symptoms?

10  A   No.  I mean, everybody is different.  Some of that would

11  be, obviously, type of tolerance.  Some of that would be type

12  of dose.  There are definitely variations.  But you can, over

13  time, kind of get generalities that you see.

14  Q   Like, for example, does somebody always vomit?

15  A   They wouldn't always.  I mean, opiate use in general causes

16  a lot of nausea for people, especially if they're not used to

17  it.  So that nausea could cause vomiting.

18  Q   Are there always, like -- are you familiar with the term

19  "froth cone"?

20  A   Foam cone.

21  Q   Foam cone.

22  A   Yes.

23  Q   What is that?

24  A   So in opiate overdoses, there's a buildup of fluid in the

25  lungs because the lack of kind of respiratory.  That's called

1  pulmonary edema.  It's just kind of a liquid, sticky liquid,
2  you can see in the lungs.  After someone dies or while they're
3  still living, they can't -- because of the respiratory
4  pressure, they can't clear out that liquid and it can build up
5  through the trachea and through the esophagus and come out the
6  mouth and that nose.  So that is something that doesn't happen
7  on every overdose, but it is fairly common.
8  Q   I want to talk about the difference between oxycodone or
9  Percocet and fentanyl.  Are you aware of, like, any differences
10  between those two drugs?
11  A   Well, the oxycodone, I mean in that scale that we talked
12  about earlier where morphine is a 1X and fentanyl is 100X in
13  generality, obviously there's some different numbers out there,
14  oxycodone would be a 2X.  So oxycodone would be twice as
15  powerful as morphine, but then fentanyl would be 50 times more
16  potent than oxycodone.
17  Q   What is the active compound in Percocet?
18  A   I'm sorry.  That's oxycodone.  I apologize.
19  Q   If somebody would have used oxycodone, what would be the
20  respect -- expected results in their blood or urine?
21  A   Well, if they used it -- I guess it would come down to the
22  timeframe.  If they used it right away and then died, we would
23  have seen it.  It would have been kind of a snapshot of time
24  that we would have seen it if it was at a high enough
25  concentration.  But if they used it outside of the window of

1    detection in blood and urine, then we wouldn't be able to

2    detect it.

3    Q    What compound would you be looking for in the blood or

4    urine?

5    A    Oxycodone.

6    Q    Are there metabolites that you detect, or just the

7    oxycodone?

8    A    There's noroxycodone.  So yes, they would have metabolites

9    as well.

10   Q    What's the window of detection?

11   A    In blood or urine?

12   Q    Let's start with blood.

13   A    So blood, I mean, this is, again, pretty tricky because it

14   all comes down to dose, so a higher dose, the window of

15   detection would go longer.  But usually we would see it in,

16   like, a 24-hour timeframe.

17   Q    What about urine?

18   A    Urine usually -- and this is the good thing with urine, why

19   it's sometimes used, is that opens up that timeframe to kind of

20   one to three days on average.  But, again, not every case is

21   exactly the same, so in generalities, one to three days with

22   urine.

23   Q    In the samples that you tested from Jacob Lee, was there

24   any indication of oxycodone use?

25   A    There was not, no.

1   Q   Can you speak to why counterfeit pills can be so dangerous?

2   A   The main issue with counterfeit pills is, I guess, kind of

3   twofold.  One, not knowing what's in them.  So counterfeit

4   pills are basically, you can get pill presses where you would

5   start with a powder and put it into a pill press and create

6   pills.  And so then there's markings on pills to kind of make

7   it so you know what you're taking, and this is just a thing

8   that the pharmaceutical companies did to help people so they

9   didn't mismatch medication.  So in counterfeit pills, it could

10  be marked as one drug, but then there's different drugs inside

11  of that.  So that's a problem.

12      Then the other side of, I guess, counterfeit pills could be

13  kind of just general quality control.  It's not made in, like,

14  a pharmaceutical laboratory.

15  Q   What do you mean by quality control?  Why is that

16  dangerous?

17  A   It would be very -- it may not be uniform.  So there could

18  be varying concentrations with that.

19  Q   So, like, when you have pharmaceuticals that are regulated,

20  they have to actually have the amount of drug that they say it

21  has?

22  A   That would be the expectation, yes.

23  Q   So, like, an oxycodone or a Percocet 10, would have

24  10 milligrams?

25  A   Yes.

1  Q   And a 30 would have 30 milligrams?

2  A   Yes.

3  Q   But if you're taking a fake Percocet pill, you have no

4  idea?

5  A   Well, I mean, you wouldn't even know if there was oxycodone

6  in that pill.  But, yes.

7  Q   Is it possible for counterfeit pills, like, from one pill

8  to the next pill to have a completely different concentration?

9  A   It's certainly possible.

10 Q   What about even within the pill.  If you break it in half,

11 could one side have more than the other?

12 A   This would all come down to kind of the purity of the

13 initial powder, I guess, that went into that.  I can't rule

14 that out.

15 Q   If somebody took a pill and reported symptoms about

16 15 minutes later of puking, constricted vision, blacking out,

17 loss of consciousness, and difficulty breathing, are those

18 symptoms consistent with fentanyl use?

19 A   It's consistent of opiate use, and with fentanyl falling in

20 that category.

21 Q   Are those symptoms consistent with toxicity from a drug?

22 A   I mean, any time that you start getting that level of

23 effects, you're into a toxic range, you're starting to vomit

24 and blackout and things like that.  It can be like any other

25 drug use that where you use too much of it, you start getting

1  those types of negative effects.

2  Q   Would it be consistent with fentanyl?

3  A   Yes.

4  Q   Let's talk about the findings again from Jacob Lee's

5  samples.

6      The fentanyl level was 9 nanograms per milliliter, and you

7  previously testified that a naive user with over 3 would be

8  concerning for overdose.  Is that right?

9  A   Yes.

10 Q   Based on your findings in this case, are you concerned that

11 Jacob Lee overdosed from fentanyl?

12 A   I mean, the concentration of 9 nanograms is definitely

13 consistent within the historical range that we see overdoses

14 in.

15 Q   Would -- could 9 nanograms per milliliter in femoral blood

16 be lethal?

17 A   Yes.

18         MS. VOSACEK:  I don't have any other questions.

19         THE COURT:  All right.  Do you want to take our break

20 first, Mr. Camiel, or go for about 15 minutes?

21         MR. CAMIEL:  I'm happy to go.

22         THE COURT:  All right.  Go right ahead, then.

23                    CROSS-EXAMINATION

24 BY MR. CAMIEL:

25 Q   Good morning.

1   A    Good morning.

2   Q    Mr. Larson, if I understand correctly, you did the testing

3   in this case, or you did the analysis recently, right?

4   A    I did the review -- the toxicology review recently, yes.

5   Q    Okay.  Because the person who did the original work

6   retired?

7   A    Yes.

8   Q    So when you did the review, did you rerun the samples, the

9   actual biological samples that were sent by the medical

10  examiner?

11  A    No.  Those samples had been discarded at that time.  So I

12  just reviewed all of the original data that was created back in

13  2020.

14  Q    So you never had -- you didn't -- you weren't the one who,

15  for example, put the femoral blood on a slide or put it into a

16  machine or -- for analysis?

17  A    No.  That would be the analytical section does that.

18  Q    You mentioned -- you were asked some questions about a

19  quality control, and you mentioned one issue that's noted in

20  the report where one test -- I think it's on page 3 on -- yeah,

21  page 3 of your report, if you have that in front of you.

22       One of the tests was canceled due to an interfering

23  substance?

24  A    Yes.  So in marijuana now, it's being kind of cultivated

25  differently and there's a large number of cannabinoids found in

marijuana.  So Delta-8 is being increased the way that they're

cultivating it and creating the marijuana, and so there's a

market for Delta-8 products just because it gives less of a

high but sometimes more of the kind of relaxation side.  So

that -- and those two peaks coelute with each other and

interfere at the baseline, so it doesn't pass our quality

control.

Q    I guess what I'm asking is --

A    It got canceled.

Q    I guess what I'm asking is, in the report, it indicates,

"Canceled due to interfering substance."  What was the

interfering substance?

A    The Delta-8 carboxy-THC, based on my opinion.

Q    Based on?

A    Based on me looking at the data and knowing where Delta-8

comes out and looking at tons of data and seeing this fairly

regularly in cases.

Q    Were there any other quality controls that came to your

attention in this case?

A    So in the fentanyl testing, the fentanyl was initially done

and one of the quality controls, the low quality control,

failed.  So what happened with that, that was -- I guess I'll

re-explain this to make sure this is clear.

     We have the external controls.  We spike at known

concentrations, and there's a range, and if it's below that --

1   you know, below that range or above that range, it fails.

2        So in this case, the low quality control failed.  Other --

3   the negative control passed.  The high control passed.  So

4   other ones passed, but this one failed.  And we had it written

5   into our acceptable criteria that if the control fails, then we

6   repeat the whole batch because we want to -- kind of helps us

7   ensure that we feel comfortable with the result that we're

8   getting.  So we don't want to report something that we're not

9   100 percent sure on.  So in this case, it failed.

10       The second time, the second batch, the fentanyl -- all the

11  fentanyl controls were fine.  All the controls were fine.  And

12  the fentanyl was reported out in the second batch.

13  Q   So when you're talking about -- so I guess, let me back up.

14       My question to you was whether there was a second quality

15  control issue, and I guess your answer is yes.  Is that right?

16  A   I just want to make sure --

17  Q   Well, you gave us an explanation of what that quality

18  control issue was, but there was -- in addition to the problem

19  with the THC testing, there was a second issue, and that had to

20  do with the testing of the femoral blood?

21  A   Yes.  So in that -- when we did the fentanyl confirmation

22  and quantitative, we have this low control that failed.  So we

23  repeated it, and the controls passed in the second, so then we

24  reported out the fentanyl in that second run.

25  Q   When you say "we repeated it," is that something you did or

1    something that happened by your predecessor?

2    A    When I say "we," I'm broadly speaking for the laboratory.

3    So the lab would have repeated that case, not myself, nor my

4    predecessors assigned the report.

5    Q    So when your laboratory -- for example, in this case, your

6    laboratory was contacted by the State of Alaska Medical

7    Examiner's Office to examine the specimens that were sent to

8    you?

9    A    Uh-huh.

10   Q    And you issue a report that goes to the medical examiner,

11   right?

12   A    Yes.

13   Q    And you understand they rely on that report when they

14   prepare their own report about their findings, right?

15   A    Uh-huh.

16   Q    So with regard to the problem with the initial testing of

17   femoral blood, was that indicated anywhere in the report that

18   was sent to Dr. Rolf?

19   A    No.    I mean, those types of -- we have acceptance criteria

20   built into all of our standard operating procedures and we have

21   kind of a normal course of business.    So those types of

22   decisions get made internally within the laboratory.    We follow

23   those based on our accreditation guidelines.

24   Q    Dr. Rolf would have no way of knowing from looking at your

25   report that there had been that quality control issue with

1  regard to the testing of the femoral blood?

2  A   That's true.

3  Q   I wanted to ask you about the testing that your lab was

4  asked to do, and you mentioned that the testing requested --

5  first of all, you only do the testing you're requested to do,

6  right?

7  A   Yes.

8  Q   Okay.  So the testing that was requested included

9  postmortem basic blood, so -- and I think you told us that

10 that -- that there's a whole host of substances, then, that you

11 test for.  Right?

12 A   Yes.

13 Q   Does that -- does that testing include over-the-counter

14 drugs or medications?

15 A   So things like -- like acetaminophen --

16 Q   Yes.

17 A   -- or aspirin or things?

18     No.

19 Q   So in your experience in dealing with fentanyl, and

20 particularly elicit fentanyl and the pills, it's pretty common

21 that the pills that are out there often have acetaminophen and

22 then there's a small amount of fentanyl mixed with them and

23 pressed together to make the pills, right?

24 A   That could be an adulterant into that fentanyl, yes.

25 Q   So there was no testing to see if there was any

1  acetaminophen in Mr. Lee's blood or urine?

2  A    No.

3  Q    So if Mr. Lee had consumed a fake or counterfeit pill, that

4  had acetaminophen and fentanyl, this testing wouldn't

5  confirm -- wouldn't confirm that, right?

6  A    Yes.  We wouldn't have confirmed any acetaminophen.

7  Q    Are you familiar with -- and I'm going to just use the

8  shorthand because I don't think I pronounced the name of it

9  4-ANPP?  Do you know what that is?

10 A    Yes.

11 Q    What is that?  Can you tell the jury what that is?

12 A    4-ANPP is an -- is basically a component that can be

13 artificially -- or not artificially.  It can be part of the

14 creation of fentanyl when it's being produced in a laboratory.

15 So that's just a compound that we can see as a manufacturing

16 artifact, or it also is kind of a metabolite as well.

17 Q    So that's something that's like a precursor.  It's used

18 to -- it's used to make the fentanyl?

19 A    Yes.

20 Q    And it's primarily used in the illicit labs to make the

21 counterfeit pills?

22 A    Yes.

23 Q    Did your laboratory do any testing for 4-ANPP?

24 A    We did not, no.

25 Q    Is that something that some labs test for?

```
1   A   Our laboratory does test for that in certain test codes,
2   so -- but yes, it's becoming more common to test for it as
3   we're seeing this changing drug supply.
4   Q   If you test for this 4-ANPP and you get a positive test,
5   that can mean -- you get a positive test for that as well as
6   for fentanyl, that can mean that what the person consumed was
7   one of these counterfeit pills, right?
8   A   Yes.
9   Q   If you don't -- if you did test for the 4-ANPP and you
10  didn't find any, but you found fentanyl, that could mean that
11  the fentanyl came from a pharmaceutical-grade fentanyl?
12  A   It could.  We sometimes see 4-ANPP and we sometimes don't
13  in these types of cases.
14  Q   You were asked some questions about heroin and you
15  mentioned that it metabolizes very, very quickly, right?
16  A   Uh-huh.
17  Q   Within a matter of minutes?
18  A   Yes.
19  Q   And so you don't even test for that?
20  A   That's correct.
21  Q   Instead, you look for the metabolites of heroin, right?
22  A   Yes.
23  Q   And you indicated that those stick around a little bit
24  longer?
25  A   Yes.
```

1   Q   How much longer?

2   A   Well, the 6-monoacetylmorphone, which is the main heroin

3   metabolite, that can be around -- that can stick around for,

4   off the top of my head, roughly, like, 30 to 60 minutes after

5   death, and then that further gets broken down into morphine,

6   and that stays even longer.  So we would normally see, a

7   minimum, morphine if it was heroin use, and then there are

8   different avenues that we can do to look for the

9   6-monoacetylmorphine, whether it's either in urine or using

10  that vitreous sample, that fluid behind the eye.  Those are

11  good specimens for detecting that.

12  Q   Did you test the vitreous fluid in this case?

13  A   We did not, because it did not trigger in the urine.

14  Q   And with the testing of the urine, there were no

15  confirmatory testing done?

16  A   No.

17              THE WITNESS:  Thank you.

18              THE COURT:  Redirect?

19              MS. VOSACEK:  Briefly, Your Honor.

20                          REDIRECT EXAMINATION

21  BY MS. VOSACEK:

22  Q   You were asked on cross-examination about a quality control

23  with the testing of the femoral blood?

24  A   Yes.

25  Q   Doesn't that, in fact, show your quality control measures

1    work?

2    A    I mean, we would like to think so.  We have fairly strict

3    quality control and we would rather rerun a sample than report

4    something that we're not 100 percent confident in.

5    Q    And so in the sample that was reported, all of your quality

6    control measures were in place?

7    A    Yes.  Yeah.  We would never release a result with failed

8    quality control.

9    Q    And everything passed in that test?

10   A    Yes.  For the fentanyl, yes.

11   Q    Does the fact that the first test had a quality control

12   measure that failed affect your opinion in any way?

13   A    No.

14   Q    What is acetaminophen?

15   A    Acetaminophen is -- it's a pain reliever.  So it's what you

16   take if you have, like, a minor headache.

17   Q    Does the lack of testing for acetaminophen affect your

18   opinion in any way?

19   A    No.

20   Q    Does it change your opinion that 9 nanograms per milliliter

21   for a naive user of fentanyl is lethal?

22   A    No.

23   Q    You were asked on cross about 4-ANPP.

24   A    Yes.

25   Q    Does the lack of testing for that compound change your

1  opinion in any way?

2  A    No.

3  Q    Does it change your opinion that 9 nanograms per milliliter

4  in a naive use of fentanyl is lethal?

5  A    No.

6  Q    You were asked about heroin use on cross-examination.

7  A    Yes.

8  Q    Just to reiterate, when you do the screening tests on

9  urine, you're looking for a wide net of possibilities?

10 A    Yes.

11 Q    And the test is designed to react more than not.  Is that

12 fair to say?

13 A    If the drug is present at a high enough concentration, it's

14 designed to be positive.

15 Q    And then you would go on and confirm the presence of that

16 drug?

17 A    Yes.

18 Q    When -- if somebody were -- had taken heroin, you would

19 expect a positive urine screen for how long?

20 A    Well, we also would have tested, also, in the blood as

21 well.  For heroin in urine or for morphine in the urine?  I

22 don't feel I can accurate -- I would say my first thought is

23 that same basic one- to three-day, one- to two-day timeframe.

24 But I didn't research that, so I'm not 100 percent sure on

25 that.

1  Q   If there would have been a positive result for morphine,

2  would you have investigated?

3  A   Yes.

4  Q   Okay.  Does the fact that there was no positive -- positive

5  reaction for morphine affect your opinion in any way?

6  A   I mean, without the morphine positive, I would say it was

7  highly unlikely that heroin was used at the short timeframe

8  prior to death.

9  Q   And, again, does that your change your opinion in any way

10 that 9 nanograms per milliliter of fentanyl in a naive user can

11 be lethal?

12 A   No.

13          MS. VOSACEK:  Nothing further.

14          THE COURT:  Follow-up?

15                    RECROSS-EXAMINATION

16 BY MR. CAMIEL:

17 Q   Does NMS Labs have the ability to test for acetaminophen?

18 A   Yes.

19 Q   Do you do that?

20 A   Yes, if it's requested.

21 Q   It just wasn't requested in this case?

22 A   No.

23          MS. VOSACEK:  Thank you.  That's it.

24          THE COURT:  All right.  Thank you, sir.  You may be

25 excused.

1    (Witness excused)

2         THE COURT:  Ladies and gentlemen, let's go ahead and

3    take our morning break here.  We'll take 15 minutes, until

4    10:35 a.m.  Please leave your notepads here in the courtroom.

5    Remember my admonition not to discuss the case and do any

6    research, and we'll see you back here at 10:35 a.m.  We'll go

7    off record.

8         DEPUTY CLERK:  All rise.  This matter is now in a

9    15-minute recess.

10    (Recessed from 10:21 a.m. to 10:43 a.m.)

11    (Jury absent)

12         DEPUTY CLERK:  All rise.  Her Honor, the Court, the

13    United States District Court is again in session.

14         Please be seated.

15         THE COURT:  We're back on record here, and there was

16    something the government wanted to take up.

17         MS. VOSACEK:  Yes, Your Honor, two things.

18         First, we wanted to clarify the Court's ruling.  We

19    did look back in the transcript.  When discussing the

20    Evan Slongwhite overdose, it was unclear whether you were

21    precluding us from calling Trooper Hargis.  I believe that the

22    Court said something to the effect of the plea agreement to

23    come in and hear his testimony.

24         THE COURT:  To clarify, the trooper can testify about

25    the medical records, but you must first review them with

1    Mr. Camiel outside the presence of the jury, and if there are

2    any disputes, I'll determine those.  So I don't know if you

3    have yet provided Mr. Camiel with what portion of the records

4    you're going to be seeking to get in.  Have you done that?

5            MS. VOSACEK:  We have.

6            THE COURT:  All right.  Then we can take that up at

7    the lunch hour.  Does that clarify that?

8            MS. VOSACEK:  It does.

9            THE COURT:  Great.  What's the next issue?

10           MS. VOSACEK:  The next issue is that the next witness

11   we were going to call is Christopher Kearney.  He's here, as

12   well as his attorney.  His attorney advised me he believes that

13   Mr. Kearney has a Fifth Amendment right, that he's got a

14   potential state liability as to testimony that would be

15   elicited during cross-examination.

16           So I think the Court would need to rule on whether or

17   not --

18           THE COURT:  Can we call him after lunch and take that

19   up during the noon hour?  We have 14 people waiting here.  So

20   if we can resolve that when they're not waiting and put on a

21   different witness, that would be my direction.

22           MS. VOSACEK:  Yes, Your Honor.  Ms. Weber is currently

23   trying to redact or identify the section of the 911 call for

24   the presentation about Aimee Ludwick.

25           THE COURT:  All right.

 1          MS. VOSACEK:  Aimee Ludwick, I believe, is scheduled

 2     to be here in about 15 minutes.  We could potentially proceed

 3     with testimony from the other available witness, which would be

 4     Carr, while we're waiting for that.

 5          THE COURT:  Why don't we have her come and do that in

 6     just a moment here.

 7          Anything to take up, Mr. Camiel?

 8          MR. CAMIEL:  No, Your Honor.  The government did

 9     provide me with a section of the medical records.  There is

10     another section that I'm going to seek to introduce.  It's

11     another statement that Mr. Slongwhite made.  And so I would

12     want to be able to introduce that in, I guess --

13          THE COURT:  Why don't you show that and make sure we

14     have that resolved as well.

15          MR. CAMIEL:  I have to print it out.

16          THE COURT:  That's fine.  We can do that.  I received

17     the motion.  I was told it was filed at 4:00 a.m. by the

18     defense.  But it's a motion -- have you seen this?

19          MS. VOSACEK:  Yes, Your Honor.

20          THE COURT:  Any objection to expediting it?

21          MS. VOSACEK:  No, Your Honor.

22          THE COURT:  And on the merits, any objection?

23          MS. VOSACEK:  I would just note that we don't have

24     accurate or current contact information for the individual.

25          THE COURT:  Why don't you provide whatever information

1   you have to the marshals, and we'll get the subpoena issued.

2   But if you can provide the most current that you have, that's

3   the best you can do.  So that would grant 95 that was filed

4   late -- or early, I guess, this morning.

5           All right.  So we'll get Ms. Weber in and call your

6   case agent at this time.  Is that correct?

7           MS. VOSACEK:  May I have a moment to confer with

8   Ms. Weber to ensure that that's the course of action?

9           THE COURT:  Yes.  I mean, we now have the jury has

10  been waiting 10 extra minutes, so let's go as promptly as

11  possible in that regard.

12          I will acknowledge to both sides, the logistics can be

13  challenging during trial.  I readily acknowledge that.  But

14  let's do the best we can.  We'll go off record.

15          DEPUTY CLERK:  All rise.  This matter stands in a

16  brief recess.

17      (Recessed from 10:47 a.m. to 11:01 a.m.)

18      (Jury absent)

19          DEPUTY CLERK:  All rise.  Her Honor, the Court, the

20  United States District Court is again in session.

21          THE COURT:  Please be seated.

22          What's our update?

23          MS. VOSACEK:  Your Honor, we're prepared to call

24  Michael Moore to authenticate the 911 call and move that into

25  evidence.

 1          We have Aimee Ludwick here for very brief testimony,

 2   and Caleb Reuter for very brief testimony, in an attempt to

 3   comply with the Court's order that our presentation be

 4   approximately five minutes.  We do not have another witness

 5   available immediately following.

 6          THE COURT:  Well, so are you going to rest at this

 7   point?

 8          MS. VOSACEK:  We would request a pause so that we can

 9   get rulings from the Court about Mr. Kearney and we have an

10   agreement as to the medical records for Mr. Slongwhite, and

11   then we could present Agent Carr this afternoon and then rest.

12          THE COURT:  All right.  And is Mr. Kearney there

13   available to have that issue addressed?

14          MS. VOSACEK:  He's in the marshal's custody here in

15   the building, Your Honor.

16          THE COURT:  And his attorney is here?

17          MS. VOSACEK:  His attorney left and said he would be

18   back at 11:30 a.m.

19          THE COURT:  All right.  Well, so your plan is to use

20   about ten minutes of time here, and then have the jury wait for

21   another hour?  I'm sure that they're frustrated, as well.

22          Let's proceed, then, with your next witness.  Who is

23   the trooper?

24          MS. VOSACEK:  Michael Moore.

25          THE COURT:  Okay.  I don't know who that is.

1        MS. VOSACEK:  He's a Fairbanks PD evidence technician.

2        THE COURT:  Very good.  Then let's hear from him.

3        You can bring in the jury.  Thank you.

4    (Jury present)

5        THE COURT:  Welcome back.  Please be seated, ladies

6    and gentlemen.

7        The next witness is who, Ms. Vosacek?

8        MS. VOSACEK:  Michael Moore.

9        THE COURT:  Remain standing, if you would, and the

10   clerk will administer an oath to you.

11   (Oath administered to the witness)

12       DEPUTY CLERK:  Please state and spell your name for

13   the record.

14       THE WITNESS:  My name is Michael Moore, M-i-c-h-a-e-l,

15   M-o-o-r-e.

16       THE COURT:  Okay.  Go ahead, please.

17       THE WITNESS:  Thank you, Your Honor.

18            MICHAEL MOORE, GOVERNMENT WITNESS, SWORN

19                      DIRECT EXAMINATION

20   BY MS. VOSACEK:

21   Q   Mr. Moore, where do you work?

22   A   Fairbanks Police Department.

23   Q   What's your job?

24   A   I am the evidence custodian.

25   Q   If you could please turn to Exhibit 24 of the government's

1  exhibit binder in front of you.

2  A    Yes.

3  Q    What is that disc?

4  A    It is the CD of a 911 recording.

5  Q    Are the 911 recordings recorded in the normal course of

6  business?

7  A    Yes.  Everything going into dispatch is recorded.

8  Q    So anytime somebody calls 911, it's preserved?

9  A    Yes.

10  Q    Does anybody have the ability to alter or delete it?

11  A    No.  It's stored in a separate system.

12  Q    What is the recording that's on that disc?

13  A    It was a 911 call in regards to somebody having an

14  overdose.

15  Q    What was the date?  Do you recall?

16  A    November 6, 2020.

17  Q    And did you have an opportunity to review that disc in my

18  office?

19  A    Yes.

20  Q    Is it a fair and accurate representation of that call?

21  A    Yes, it is.

22          MS. VOSACEK:  Move to admit Exhibit 24.

23          MR. CAMIEL:  No additional objections.

24          THE COURT:  Exhibit 24 will be admitted.

25      (Exhibit 24 admitted)

1          MS. VOSACEK:  Move to publish 0045 to 1:22.

2          THE COURT:  All right.  Go ahead.

3          (Exhibit 24 from time 0045 to 1:22 playing in open

4    court.)

5          MS. VOSACEK:  Permission to you publish 1:43 to 1:46.

6          THE COURT:  Go ahead.

7          (Exhibit 24 from 1:43 to 1:46 playing in open court.)

8          MS. VOSACEK:  No further questions.

9          THE COURT:  Any follow-up, Mr. Camiel?

10         MR. CAMIEL:  No.

11         THE COURT:  Thank you, sir.  You may be excused.

12      (Witness excused)

13         THE COURT:  Your next witness?

14         MS. VOSACEK:  Aimee Ludwick.

15         THE COURT:  All right.  Very good.

16      (Pause)

17         MS. VOSACEK:  I'm going to see if our other witness is

18   available so that we're not sitting here.

19         Your Honor, we're going to call Caleb Reuter.

20         THE COURT:  All right.  Good morning.  I'll ask the

21   clerk to administer an oath to you, once again.

22      (Oath administered to the witness)

23         DEPUTY CLERK:  Please state and spell your name for

24   the record.

25         THE WITNESS:  Caleb Reuter, C-a-l-e-b, R-e-u-t-e-r.

CALEB REUTER, GOVERNMENT WITNESS, SWORN

DIRECT EXAMINATION

BY MS. VOSACEK:

Q    Sergeant Reuter, did you investigate an overdose of Aimee Ludwick in 2020?

A    Yes, November 26, 2020.

Q    Were you called to the scene?

A    Yes.

Q    Did you interview her?

A    Yes.

Q    Did she provide any useful information?

A    Yes, description of the person she purchased a pill from along, with the phone number.

Q    And did you have any information about that phone number?

A    Yes.  We were able to identify the subscriber as a Clifford Dean Andrews.

Q    And did you have an opportunity to speak with Mr. Andrews?

A    Yes.

Q    Where did that happen?

A    South Cushman Street.  I think it was May 13, 2021.

Q    Did you ask him about Aimee Ludwick's overdose?

A    Yes.  I asked him about an incident that had occurred the prior year, end of the year, having to do with 30-milligram pills.

Q    What did you do to confirm that the phone number was, in

```
 1   fact, for Clifford Andrews?
 2   A   So besides the search of the publicly available databases
 3   that showed it was related to him, I asked him if I could get
 4   his phone number in case I had follow-up.  He gave me a similar
 5   number.  As he was walking away, I called that number.  It came
 6   back to an auto service company.  So I called the number that
 7   Ms. Ludwick had provided and he answered.
 8   Q   In your presence?
 9   A   Yes.
10   Q   I just told him, "Hey, I just want to make sure I got the
11   right number."  He confirmed I did, and he left.
12           MS. VOSACEK:  No further questions.
13           THE COURT:  Mr. Camiel?
14           MR. CAMIEL:  No questions.
15           THE COURT:  Thank you, sir.
16       (Witness excused)
17           THE COURT:  Your next witness, Ms. Vosacek.
18           MS. VOSACEK:  Aimee Ludwick.
19           THE COURT:  All right.  Good morning.  If you could
20   come all the way up to the witness stand.  When you get up
21   there, remain standing, and the clerk will administer an oath
22   to you.
23       (Oath administered to the witness)
24           DEPUTY CLERK:  Please state and spell your name for
25   the record.
```

```
 1            THE WITNESS:  Aimee Ludwick, A-i-m-e-e, L-u-d-w-i-c-k.

 2            THE COURT:  Thank you.

 3            Go ahead, please, Ms. Weber.

 4                AIMEE LUDWICK, GOVERNMENT WITNESS, SWORN

 5                         DIRECT EXAMINATION

 6   BY MS. WEBER:

 7   Q    How old are you?

 8   A    32.

 9   Q    And where are you from?

10   A    Circle and Fairbanks.

11   Q    Ms. Ludwick, I would like to direct your attention to

12   November 6th of 2020.  Were you living in Fairbanks on that

13   date?

14   A    Yes.

15   Q    And at around 9 o'clock p.m. that night, what did you do?

16   A    I went and bought what I thought was a Percocet 30 pill, I

17   guess.

18   Q    Can you describe what the pill looked like?

19   A    It looked orange -- or not orange, blue-ish green.

20   Q    Did you take the pill?

21   A    I did.

22   Q    How long after purchasing the pill did you take it?

23   A    About 20 to 30 minutes.

24   Q    And at around 10:01 p.m. that night, what happened?

25   A    I lost consciousness, so I'm pretty sure I overdosed.
```

1  Q   Did you receive medical treatment?

2  A   I did.

3  Q   And what happened when medical arrived?

4  A   What I was told, they Narcan'd me a few times and I just

5  came back into consciousness with a bunch of people around me,

6  medics and stuff.

7  Q   Do you know how long you were unconscious for?

8  A   I don't.

9  Q   Did you go to the hospital?

10 A   I did.

11 Q   Did you receive a diagnosis about what happened?

12 A   Yeah.  They told me it was fentanyl overdose.

13 Q   Did there come a time when you spoke to law enforcement

14 about the overdose?

15 A   Yes.

16 Q   Did you tell them about the individual who sold the pill to

17 you?

18 A   I tried to, yes.

19 Q   Did you tell them that the phone number was 970-415-6941?

20 A   I believe so.

21 Q   Did you give investigators a description of the person who

22 sold you the pill?

23 A   Yeah.  I tried to, from the best of my memory.

24 Q   What did the person look like?

25 A   To me, I thought he was like 5-11, white, maybe like

orange-ish red hair.  Was wearing all black with a hood.  My
first and only time meeting him.  I thought maybe he had a
tattoo on his neck, but I wasn't positive.

Q   This wasn't somebody that you knew or had dealt with
before?

A   No.  Never.

Q   Did there come a time when officers showed you a photo
array of individuals who they thought may have been the person?

A   Yes.

Q   Were you able to recognize anyone in that photo array?

A   I wasn't.

        MS. WEBER:  I have no further questions for this
witness, Your Honor.

        THE COURT:  Thank you.

        Mr. Camiel?

                    CROSS-EXAMINATION

BY MR. CAMIEL:

Q   Good morning, Ms. Ludwick.

A   Good morning.

Q   So how long -- talking about November 6th of 2020, how long
had you been been using pills?

A   About three years, off and on.

Q   Three years off and on.  Okay.  And what kind of pills were
you using?

A   Opiates.  Percocet.  Vicodin.  Whatever.

1  Q    Did that -- when you said Percocets, did that include

2  Perc 30s?

3  A    Yes.

4  Q    And how many times do you think you purchased Perc 30s?

5  A    Those were probably, like, less than the other ones.  A

6  little harder to find.

7  Q    But can you give us a number?

8  A    How many times in my life?

9  Q    During the time period you were using pills, yeah.

10  A    Maybe about five times, I guess.

11  Q    How many different people did you get Percocet pills from?

12  A    I would say about ten different people.

13  Q    Ten different people here in the Fairbanks area?

14  A    Yeah.  Around Fairbanks, not just Fairbanks.

15  Q    Not just Fairbanks, but the outer area as well?

16  A    Yeah.

17  Q    How did you hook up with the person who sold you the pill

18  on November 6th?

19  A    I got his phone number from someone, and I cannot remember

20  exactly who it was.  But me and a bunch of other friends who

21  did the same thing as me would try and help each other.  We're

22  sick, whatever.  And I got his phone number from somebody.  I

23  cannot be exactly sure.  But they said that this guy might be

24  able to help me, so I texted him, or I called him.

25  Q    So I wanted to make sure I heard one of your earlier

answers correctly.

How many different people were you buying Percocets from?

A   I can't say for sure, but I said ten, like maybe ten.

Q   Thank you.

THE COURT:  Follow-up at all?

REDIRECT EXAMINATION

BY MS. WEBER:

Q   Ms. Ludwick, was it unusual for you to buy pills from a stranger, somebody you didn't know?

A   Yeah.  Yes.

Q   Why did you buy a pill from somebody you didn't know in November of 2020 on that date?

A   I think I did it -- well, I know I did it because I -- I was up for a couple days and I was using, obviously, and I couldn't find any for those couple days and I was obviously having other friends try and help me and just happened to get that number, I guess.

Q   What happens when you haven't used for a couple of days? How did that make you feel?

A   It's like just opiate withdraw, flu-like symptoms.

MS. WEBER:  No further questions, Your Honor.

THE COURT:  Any follow-up on that, Mr. Camiel?

MR. CAMIEL:  No.

THE COURT:  Thank you, ma'am.  You can be excused.

(Witness excused)

```
 1            THE COURT:  And I'm going to do a very brief sidebar
 2    with counsel.
 3        (Begin bench conference)
 4            THE COURT:  I'm inclined to give this instruction at
 5    this point in time.  I can't remember who proposed it, but
 6    please take a look.  It's the limiting instruction with regard
 7    to evidence of other -- I'll just put in the past tense.  You
 8    have heard evidence.  Any objection there?
 9            MS. WEBER:  Would we use the name or initials or --
10            THE COURT:  Yeah, take a moment.  It should be
11    directly from the pattern, but with these facts added.  Yes?
12            MR. CAMIEL:  No objection.
13            THE COURT:  All right.  I can add her name.  Very
14    good.  Let's go back.  Who is next?
15            MS. WEBER:  We have one more witness, Caleb Reuter,
16    who will testify about the phone number.
17            MS. VOSACEK:  We already did Reuter while we were
18    waiting for you.
19            THE COURT:  So then we're at Mr. Kearney and that
20    issue?
21            All right.  And then is he your last witness besides
22    your case agent?
23            MS. VOSACEK:  We agreed to stipulate to the medical
24    records, so it would be Kearney and then the case agent.  But I
25    would ask that we be able to take lunch early to prep him and
```

```
 1    make sure that we have all of our exhibits ready, because there
 2    were some we were still waiting for.
 3            THE COURT:  I'll read this, and then we can excuse the
 4    jury for, I guess an hour, to take up the Kearney issue, and
 5    you'll have your prep time and come back and do the case agent.
 6    So take a lunch hour.
 7            MS. VOSACEK:  That would be my proposal.
 8            THE COURT:  I asked my Anchorage quality analyst to
 9    put together the subpoena, so that should be going to the
10    marshals here.  Let's go back on record.
11        (End bench conference)
12            THE COURT:  All right, ladies and gentlemen.  You have
13    just heard evidence related to the drug overdose of an
14    individual other than Jacob Lee.  I instruct you, this evidence
15    is admitted -- has been admitted only for the limited purpose
16    of deciding whether the defendant distributed a mixture or
17    substance containing a detectable amount of fentanyl resulting
18    in the death of Jacob Lee; and, therefore, you must consider it
19    only for that limited purpose and not for any other purpose.
20            So ladies and gentlemen, once again, I am going to
21    excuse you for an early lunch break so that I can take up some
22    issues with the attorneys, and then we should be able to
23    conclude the government's evidence this afternoon.  So I think
24    we're well on track here for concluding the evidence this week,
25    as I understand it.
```

1          So I think the lunch hour kind of -- I said lunch

2     would be around noon, and in the course of these days, they

3     average out to around noon when we took so late yesterday and

4     earlier on other days.  So I'll excuse you now.  It's 11:25.

5     We'll have you back at -- let's do 1 o'clock and make it a

6     little longer.  And I know that's longer than we've been doing,

7     but I think the benefit of that is that the afternoon will

8     proceed more efficiently for us.

9          So please leave your notepads here in the courtroom.

10    Remember my admonition not to do research or discuss the case,

11    and we'll see you back in the jury room at 1 o'clock.  I hope

12    you have a pleasant break here.

13         (Jury absent)

14             THE COURT:  Please be seated, everyone.

15             And so the concern, as I understand it, with regard to

16    Mr. Kearney is the potential for a Fifth Amendment.  Is that

17    correct?

18             MS. VOSACEK:  Yes, Your Honor.  I spoke with

19    Steven Hanson.  He represented Mr. Kearney in the underlying

20    offense.  He, I don't believe objects to the questions that I

21    would have on direct examination as they relate to the

22    proceedings that were held in federal court.  However, given

23    the fact that there was cocaine found in his shoe that was not

24    prosecuted as part of this course of events, he believes that

25    under cross-examination there is potential for a Fifth

1    Amendment issue. And I did speak with Mr. Hanson. He's on his

2    way. He's almost back at the federal building. If you wanted

3    to speak with him.

4              THE COURT: All right. Mr. Camiel, your thoughts on

5    all of this?

6              MR. CAMIEL: Well, I don't represent Mr. Kearney.

7              THE COURT: I understand that.

8              MR. CAMIEL: I'm going to be asking him about the drug

9    activities, and that includes not only the cocaine that was

10   found in his shoe, but cocaine that he sold to the person ES.

11   So the person ES, who the government wants to introduce

12   evidence about, indicated he went to that house on

13   Tipperary Court, and he not only purchased pills, but also

14   cocaine at the same time from Mr. Kearney.

15             THE COURT: All right. So what's the government's

16   authority for being able to present the questions you want, but

17   not allowing effective cross-examination of this witness?

18             MS. VOSACEK: Well, Your Honor, I haven't had a chance

19   to do much research. I have been here this morning. But the

20   questions that we intend to elicit relate directly to things

21   that he has already sworn are true under oath. I think if he's

22   going to claim a Fifth Amendment right against

23   cross-examination on those issues, that the Court could declare

24   him unavailable and take rulings as to whether or not any other

25   evidence can be presented by the defense related to those

1  issues.

2       THE COURT:  Is your position that it can be, that you

3  can present what you want from this witness, but the defense is

4  limited?

5       MS. VOSACEK:  I think --

6       THE COURT:  Or is the witness unavailable to both

7  sides?

8       MS. VOSACEK:  I think that's for the Court's

9  determination.  My position would be, we should be able to

10  introduce the plea agreement and the factual basis that he

11  swore under oath was true, and we should be able to question

12  him about the public proceedings that happened here when he was

13  sentenced.  And I don't think that he's unavailable for that

14  testimony because that has already been adjudicated and nothing

15  to do with that would implicate him in further criminal

16  proceedings.

17       THE COURT:  All right.  And can you -- you don't have

18  any authority on this point.  I mean, certainly this was

19  reasonable to be anticipated with this witness, one might

20  think.  But here we are.  It's 11:30.  Why don't we come back

21  here at 12:30, and you can give me your authority that supports

22  that position.  I can hear from Mr. Camiel.  And you'll have

23  the time.  We'll get the issue resolved between 12:30 and 1:00,

24  and to the extent Mr. Kearney testifies, he can testify at

25  1:00, followed by the case agent.

 1          All right.  We'll be back here at 12:30.  Anything
 2  else, Ms. Weber, at this time?
 3          MS. WEBER:  No, Your Honor.
 4          THE COURT:  If you have any authority, certainly I
 5  welcome it, as well, on this topic.
 6          Very good.  We'll go off record.
 7          DEPUTY CLERK:  All rise.  This matter is now in recess
 8  until 12:30.
 9          (Recessed from 11:30 a.m. to 12:30 p.m.)
10      (Jury absent)
11          DEPUTY CLERK:  All rise.  Her Honor, the Court, the
12  United States District Court is again in session.
13          Please be seated.
14          THE COURT:  All right.  We're back on record without
15  the jury to address this issue regarding the next witness.
16          So maybe I'll ask first, Mr. Camiel, what exactly is
17  the topic you want to cover where it's anticipated the witness
18  will take the Fifth?
19          MR. CAMIEL:  Well, Your Honor, the government just
20  informed me, about 40 seconds ago, that they're no longer going
21  to call Mr. Kearney.
22          THE COURT:  Well, that solves our problem rather
23  nicely, doesn't it?  Is that correct?
24          MS. VOSACEK:  Yes, Your Honor.
25          THE COURT:  I was so curious if you found the same

1   cases my law clerk and I found.

2          MS. VOSACEK:  Your Honor, if we could discuss

3   scheduling.  Maybe we can get on the same page.

4          We intend to call our last witness, Agent Carr, and

5   rest at the conclusion of his testimony.

6          THE COURT:  How long do you anticipate for his direct?

7          MS. WEBER:  Maybe approximately an hour.

8          THE COURT:  Okay.  And any estimation at all on the

9   cross?  No more than an hour?  Is that fair to say?

10         MR. CAMIEL:  It will be less than an hour.  It will be

11  much less.

12         THE COURT:  All right.  And then the government would

13  rest.  Would you be prepared with your witness in Texas at that

14  time?

15         MR. CAMIEL:  Yes.  I may need a few minutes to make

16  sure she's hooked up, but I've been in touch with her.  I was

17  in touch with her over the lunch hour.  So she will be

18  available.

19         THE COURT:  Sometime, it sounds like, around 2:30 or

20  3:00?

21         MR. CAMIEL:  Yeah.

22         THE COURT:  All right.  And what's your proposal for

23  the rest of the afternoon, then?  Do you have other witnesses

24  you would plan --

25         MR. CAMIEL:  No.  No.

    1           THE COURT:  It's just the one I have subpoenaed?

    2           MR. CAMIEL:  Yes.

    3           THE COURT:  I wanted to say, too, that although the

    4    proposed jury instructions I put out yesterday have one of the

    5    two alternatives in the model, one the defendant testified, one

    6    the defendant did not, I only put in the one he did not, based

    7    on some of the briefing.  But I certainty did not intend to

    8    indicate -- that's a decision, obviously, for Mr. Tulali to

    9    make.  If he elects to testify, that's fine.  We'll just insert

   10    the other one.  And I wanted that to be clear so that I was not

   11    expressing any opinion, but just judging from the briefing

   12    that's been done.

   13           Any questions about that?

   14           MR. CAMIEL:  No.

   15           THE COURT:  Very good.  So then -- any estimate on

   16    your direct of your witness today?

   17           MR. CAMIEL:  She's not going to be very long.  I would

   18    imagine 20 to 30 minutes.

   19           THE COURT:  So I guess my thought, then, would be --

   20    and no rebuttal is anticipated?

   21           MS. WEBER:  No, Your Honor.

   22           THE COURT:  My thought would be that we send the jury

   23    home for the day.  And as it stands now, your only other

   24    witness would be the one you're trying to subpoena for

   25    tomorrow?

1          MR. CAMIEL:  Yes.

2          THE COURT:  Then we would send the jury home, we would

3    take up the instructions on record of any changes or additions

4    that either side would propose from the draft I gave the

5    parties yesterday, and then have the jury come back at

6    8:45 a.m. tomorrow.  Does that work for the government?

7          MS. VOSACEK:  Yes, Your Honor.

8          THE COURT:  Yes, Mr. Camiel?

9          MR. CAMIEL:  Yes.  Your Honor, I guess the other issue

10   is the parties reached a stipulation as to the statements in

11   the medical records.

12         THE COURT:  Right.  Right.  So --

13         MS. VOSACEK:  We're not introducing any evidence

14   regarding Evan Slongwhite.  So at this point --

15         MR. CAMIEL:  That's news to me, but okay.

16         THE COURT:  Is that an issue we need to resolve?

17         MR. CAMIEL:  No.

18         THE COURT:  Very good.  So that's resolved.  Anything

19   else from the government at this time?

20         MS. WEBER:  Yes, Your Honor.  There're several

21   exhibits that we intend to introduce through this witness that

22   were just marked over the break, I would like to hand up to

23   counsel and Court.

24         THE COURT:  All right.

25         MR. CAMIEL:  Your Honor, if the government isn't going

 1  to be introducing any evidence as to Mr. Slongwhite, then the

 2  need for the subpoena goes away.

 3          THE COURT:  Oh, very good.  You wouldn't be calling --

 4  trying to call him.  Thank you for pointing that out.

 5          Well, we have issued the subpoena, but the marshals

 6  requested a written order, and I'll go talk to my clerk and we

 7  will not issue that and then -- is it sufficient I state on

 8  record here that the subpoena does not need to be served?  Or

 9  we can do an order quashing it, I guess.  I can get a text

10  order on that.  You can relay that word to the --

11          U.S. MARSHAL:  We can, Your Honor.

12          THE COURT:  Very good.  We'll get something on the

13  docket, something to finalize that.  Thank you for pointing

14  that out, Mr. Camiel.

15          All right.  Very good.  So that means that the defense

16  would rest today as well, Mr. Camiel?

17          MR. CAMIEL:  I'm sorry, Your Honor?

18          THE COURT:  So the defense would rest, as well, today?

19          MR. CAMIEL:  I believe so.

20          THE COURT:  All right.  Very good.  Then if there is

21  nothing further, we'll come back when we have the jury

22  assembled at 1 o'clock.

23          DEPUTY CLERK:  All rise.  This matter is now in recess

24  until 1 o'clock.

25      (Recessed from 12:36 p.m. to 12:57 p.m.)

1    (Jury present)

2         DEPUTY CLERK:  Please be seated.

3    (Pause)

4         DEPUTY CLERK:  All rise.  Her Honor, the Court, the

5    United States District Court is again in session.

6              Please be seated.

7         THE COURT:  All right.  We are back on record and

8    ready for the government's next witness.

9         MS. WEBER:  Your Honor, the government calls Special

10   Agent Joshua Carr.

11        THE COURT:  Very good.  Sir, if you would come up to

12   the witness stand, please.

13   (Oath administered to the witness)

14        DEPUTY CLERK:  Please state and spell your name for

15   the record.

16        THE WITNESS:  My name is Joshua Carr, J-o-s-h-u-a,

17   C-a-r-r.

18        THE COURT:  Thank you.

19             Go ahead, please.

20             JOSHUA CARR, GOVERNMENT WITNESS, SWORN

21                       DIRECT EXAMINATION

22   BY MS. WEBER:

23   Q    By whom are you employed?

24   A    I'm employed by the Drug Enforcement Administration.

25   Q    How long have you worked for the Drug Enforcement

1  Administration?

2  A    Since 2014.

3  Q    What's your current assignment?

4  A    Currently I'm assigned as a country attache in Tegucigalpa,

5  Honduras.

6  Q    What are some of your duties and responsibilities as an

7  attache in Honduras?

8  A    We have a unit of Honduran police officers that we're

9  working to train and equip and teach them how to run drug

10  investigations.  Our primary responsibility is liaison between

11  them and the United States and other agencies as far as funding

12  and training resources.

13  Q    How long have you been in that assignment?

14  A    Since June of 2023.

15  Q    Where were you assigned prior to June 2023?

16  A    Here at the Fairbanks post of duty.

17  Q    How long were you at the Fairbanks post of duty for?

18  A    Just over three years.

19  Q    Can you please tell the jury what you did before becoming a

20  DEA agent?

21  A    Gladly.  Yes.  Prior to working for the Drug Enforcement

22  Administration, I worked for several years for the --

23        THE COURT:  She's going to tell us how many words a

24  minute you're talking.  It's fast.  I know that, even if I

25  don't know exactly.

1          THE WITNESS:  So prior to being a DEA agent, I was an

2   intelligence officer for the National Geospatial-Intelligence

3   Agency.  That involved a couple of tours overseas to

4   Afghanistan, supporting the military special operations forces

5   using specifically geospatial information.

6   Q    How long did you do that for?

7   A    About four-and-a-half to five years.

8   Q    Can you please describe your educational background?

9   A    Yes.  I have a bachelor's degree in geography with an

10  emphasis in geospatial information systems, and other technical

11  training through the National Technical Investigators

12  Association, and high-voltage environment certifications.

13  Q    I would like to turn your attention to the incident in this

14  case.

15       Did there come a time when you were assigned to investigate

16  the overdose death of Jacob Lee?

17  A    Yes.

18  Q    What was your role in that investigation?

19  A    So my role in that investigation is primarily to assist the

20  investigators here on the local HIDTA team.  That's made up of

21  state and local investigators, and they are primarily focused

22  on the drug trafficking taking place here in Fairbanks.  And my

23  role was then to identify the drug traffickers that were

24  sending the drugs to Fairbanks.

25  Q    Were you the lead agent on that case?

1   A   Yes.

2   Q   Directing your attention to May 23rd of 2023, were you

3   working on that date?

4   A   Yes, I was.

5   Q   Sorry.  Just a minute.

6       Were you in Fairbanks?

7   A   No, I was not.

8   Q   Where were you on that date?

9   A   I was in Los Angeles, California.

10  Q   What was the reason for being in Los Angeles, California?

11  A   Following the issuance of the grand jury indictment on a

12  Junior Tulali, I was in Los Angeles attempting to locate and

13  effect that arrest.

14  Q   Were you ultimately able to locate Mr. Tulali?

15  A   Yes, I was.

16  Q   In general, can you please describe how you were able to

17  locate him?

18  A   Primarily through geospatial location information from the

19  cell phone.

20  Q   From what cell phone?

21  A   The phone number belonging to 310-482-1267.

22  Q   Where did that phone number come from?

23  A   That phone number was the phone number that was in contact

24  with Andre Brown's cell phone in October of 2020 regarding the

25  cell -- or the transfer of fentanyl pills and the payments in

1    return for that.  And the contact listed was OJ.

2    Q    What happened on that date in California?

3    A    Early that morning, we identified a vehicle parked on the

4    street that local investigators in the Los Angeles area had

5    previously identified as belonging to relatives of Mr. Tulali.

6    We established surveillance on that vehicle in the early

7    morning hours and waited for Mr. Tulali to come out, enter the

8    vehicle, and let him drive a few blocks.  Primarily, that was

9    designed to let him get away from an elementary school that was

10   right near the car.

11        Shortly thereafter, one of the local task force officers

12   initiated a traffic stop and Mr. Tulali was placed under arrest

13   at that point.

14   Q    Was there anybody else in the vehicle?

15   A    No, there was not.

16   Q    Do you see Mr. Tulali in court today?

17   A    Yes, I do.

18   Q    And is this the person you arrested on May 23, 2023?

19   A    Yes, it is.

20   Q    Can you please identify that person by an item of clothing?

21   A    A light blue-colored shirt with a gray sweatshirt over it.

22             MS. WEBER:  Your Honor, may the record reflect that

23   the witness identified the defendant?

24             THE COURT:  Yes.

25   BY MS. WEBER:

1  Q  Agent Carr, you mentioned that you were tracking a specific

2  phone number. Was that phone in the vehicle when the defendant

3  was stopped?

4  A  Yes, it was.

5  Q  What did you do with respect to that phone?

6  A  I dialed that phone number with my phone to see that the

7  phone in the vehicle began ringing at that point.

8  Q  What happened?

9  A  At that point, I was able to confirm that the phone that we

10  had been tracking through traditional thumpings and other

11  tracking methods was being carried by Mr. Tulali.

12  Q  How did you confirm it?

13  A  By placing a call to that phone.

14  Q  And what happened to that phone when you placed the call?

15  A  It began ringing, accepting the call from my work phone.

16  Q  Did you apply for a search warrant on that phone?

17  A  No, I did not.

18  Q  What was the reason that you didn't apply for a warrant on

19  it?

20  A  Primarily, given the timeframe, the amount of time that had

21  passed, and the fact that the phone was locked.

22  Q  Was there reason to think that there would still be

23  evidence of the defendant's crime on the phone?

24        MR. CAMIEL: Your Honor, I'm going to object. She's

25  asking with respect --

1          THE COURT:  That's sustained.

2    BY MS. WEBER:

3    Q    Where was the phone when you called it?

4    A    On the driver's seat of the vehicle.  It was a silver

5    Mazda.

6    Q    Was that where it was found when the agent stopped the

7    defendant?

8    A    I don't know whether it was in the vehicle or in the

9    defendant's pockets.  The officers that effect the arrest are

10   usually pretty quick about conducting that initial frisk and

11   removing items from pockets.

12   Q    What's the reason for doing that quickly?

13   A    Police officers are, first and foremost, concerned about

14   weapons.

15   Q    Did Mr. Tulali have any form of identification on his

16   person at the time?

17   A    Yes.  There was a wallet, and in that, a California

18   driver's license with the name Junior Gufatasi Tulali.

19   Q    Did the identification have a date of birth on it?

20   A    Yes, it did.

21   Q    What was the date of birth?

22   A    I believe it's January 15th of '76.

23   Q    Is there anything that would refresh your recollection?

24   A    Being able to review my arrest report and the booking

25   intake sheet.

1          MS. WEBER:  Your Honor, may I approach?

2          THE COURT:  Yes.

3          (Ms. Weber approaches witness.)

4    BY MS. WEBER:

5    Q    Does that refresh your recollection?

6    A    Yes, it does.

7    Q    What was the date of birth listed on the driver's license?

8    A    January 15th of 1976.

9    Q    Was there an address listed on the driver's license?

10   A    Yes, there was.

11   Q    What address was listed on the license?

12   A    716 South Los Angeles Street in Los Angeles, California.

13   Q    Did the driver's license contain a photograph?

14   A    Yes, it did.

15   Q    Did the photograph appear to depict the same person that

16   you were looking at?

17   A    Yes.

18   Q    Where did you bring Mr. Tulali once he was arrested?

19   A    To the U.S. Marshals facility in Los Angeles.

20   Q    For what purpose?

21   A    So with an out-of-district arrest, you have your initial

22   appearance in the district of your arrest and you're given an

23   opportunity at that time to elect for an identity hearing,

24   which usually occurs some several days later.  It's not until

25   you're transported by the marshal service to the district of

```
 1    your indictment where you're actually arraigned.
 2    Q    Was the -- was Mr. Tulali booked at any point?
 3    A    Yes.  That's done fairly quickly after.
 4    Q    What is booking?
 5    A    That's the process colloquially that we refer to in law
 6    enforcement, the fingerprinting, the photograph, the DNA swab,
 7    the basic information, names, date of birth, Social Security,
 8    things of that nature.
 9    Q    Did you ask the defendant for his pedigree information?
10    A    Yes, we did.
11    Q    Did Mr. Tulali provide you with a name?
12    A    Yes, he did.
13    Q    What name was provided?
14    A    OJ.
15    Q    Did Mr. Tulali provide you with a date of birth?
16    A    Yes, he did.
17    Q    What date of birth was provided?
18    A    January 15th of '76.
19    Q    Over the course of the investigation, did you listen to any
20    recorded calls that had been placed to that phone number?
21    A    Yes, we did.
22    Q    Did you become familiar with the voice of the user of that
23    phone?
24    A    Yes, I was.
25    Q    When you arrested Mr. Tulali in 2023 and had the
```

1   conversation during booking, did the voice sound similar to the

2   one you heard in the recorded calls?

3   A   Yes, it did.

4   Q   Are you familiar with the Securus recording system?

5   A   Yes, I am.

6   Q   Can you explain what that is?

7   A   Securus is --

8           THE COURT:  Can we have a sidebar here?

9       (Begin bench conference)

10          MR. CAMIEL:  The next question was going to be

11  objected to.

12          THE COURT:  Well, maybe -- what's the witness going to

13  say Securus is?

14          MS. WEBER:  He's going to say it's a -- laying the

15  foundation to admit a recorded -- I'm laying the foundation to

16  admit recorded inmate conversations.

17          THE COURT:  Is he going to say it's jail calls?

18          MS. WEBER:  Yes.

19          THE COURT:  No, you can't say that.

20          MR. CAMIEL:  And the recording itself, I would object

21  to because the preamble of every call has the whole "in

22  custody" --

23          THE COURT:  If you want to admit jail calls, it can be

24  done not by saying, "This is a recording of jail calls."  Why

25  don't you confer with counsel.  There are many other attorneys

1    at the U.S. Attorney's Office that are familiar with this.

2    That's what I thought he was going to say.  It's critical.

3    We're not going to have a mistrial here because of that.  We'll

4    take ten minutes and you can confer with him that jail calls

5    cannot come in in that manner.

6              MR. CAMIEL:  Thank you.

7        (End bench conference)

8              THE COURT:  All right.  Ladies and gentlemen, as

9    counsel make their way back, we'll take about a ten-minute

10   recess here, sort out an issue that's arisen, and have you back

11   as soon as possible.

12             Please leave your notepads here in the courtroom.

13   Remember my admonition not to research or discuss the case and,

14   we'll go off record shortly.

15             DEPUTY CLERK:  All rise.  This matter stands in a

16   brief recess.

17       (Recessed from 1:12 p.m. to 1:22 p.m.)

18       (Jury present)

19             DEPUTY CLERK:  Please be seated.

20       (Pause)

21             DEPUTY CLERK:  All rise.  Her Honor, the Court, the

22   United States District Court is again in session.

23             Please be seated.

24             THE COURT:  All right.  Ready to proceed, Ms. Weber.

25             MS. WEBER:  Yes, Your Honor.

1          THE COURT:  Go ahead, please.

2    BY MS. WEBER:

3    Q    Agent Carr, did you listen to a lawfully recorded telephone

4    conversation?

5    A    Yes, I did.

6    Q    Did you recognize the voices on the conversation?

7    A    Yes, I did.

8    Q    Who were the voices?

9    A    One of the participants in that call was the defendant.

10   Q    Can you please take a look at what's been marked as

11   Government's Exhibit 31?

12   A    Yes.

13   Q    Do you recognize that disc?

14   A    Yes, I do.

15   Q    What is it?

16   A    Contents of the disc of a lawfully recorded phone call

17   occurring between the defendant and a female.

18   Q    And can you please take a look at what's been marked as

19   Government Exhibit 42?

20        I'm sorry.  Are you looking at 42?

21   A    That's correct.

22   Q    Do you recognize it?

23   A    Yes, I do.

24   Q    Is that the entirety of the recorded phone call that you

25   reviewed?

1    A    I believe this one is an excerpt.

2    Q    Could 31 be the excerpt?

3    A    It could be, yeah.  We had the entire recording and then we

4    had a condensed version for the sake of time.

5    Q    And what's been marked as 31 is the excerpt that you

6    listened to?

7    A    That's correct.

8    Q    And has it been altered or modified in any way from the

9    original call?

10   A    Other than the time, no.

11   Q    Was the volume altered in any way?

12   A    Yes.  In the recording, the defendant's side of the audio

13   is very difficult to pick up, and so that side of the recording

14   has been amplified.

15   Q    Has it been substantively altered in any way?

16   A    No.

17        MS. WEBER:  Your Honor, move to admit Government

18   Exhibit 31.

19        MR. CAMIEL:  Object.

20        THE COURT:  You object?

21        MR. CAMIEL:  Yes.

22        THE COURT:  Do we need to discuss this?  All right.

23     (Begin bench conference)

24        THE COURT:  Go ahead.

25        MR. CAMIEL:  Your Honor, although they have the

1    preamble and shortened the call, and I -- they sent me a whole

2    lot of calls, but during the call, he has a conversation

3    with his girlfriend is the call they are using.  There is

4    discussion about him being in custody.

5            THE COURT:  Is that correct?

6            MS. VOSACEK:  I don't recall discussion about being in

7    custody.  He says something about the case has been a slam dunk

8    from their perspective, and then about the co-defendants would

9    have to come all the way back to testify.  If the Court wants

10   to review it, I think --

11           MR. CAMIEL:  There is one call that says that, but I

12   think there's some reference to did you eat -- it's pretty

13   clear he's in custody from listening to the call.

14           THE COURT:  Have you listened to the excerpt?

15           MR. CAMIEL:  They haven't sent me the excerpt.

16           THE COURT:  I don't have 31, either.

17           MR. CAMIEL:  They sent me the entire call.

18           MS. VOSACEK:  We can get you a copy of the excerpt.

19           THE COURT:  We've got a jury waiting.  Can we move on

20   and do it during the break?

21           MR. CAMIEL:  They also didn't send me the enhanced

22   version with the sound.

23           MS. VOSACEK:  I thought we did.

24           MS. WEBER:  I thought we did, too.

25           THE COURT:  I don't have 31 in my notebook.  Are we

1   going to get off the calls completely now?

2          MS. WEBER:  Yes.

3          THE COURT:  We'll come back after a break.  Go ahead.

4       (End bench conference)

5   BY MS. WEBER:

6   Q   Okay.  Agent Carr, we're going to come back to that a

7   little later.

8       For now, I would like to move on and direct your attention

9   to Exhibit -- what's been marked as Exhibit 53.

10  A   Okay.

11  Q   Do you recognize what's been marked as Government

12  Exhibit 53?

13  A   Yes.  This is a section of the location history from the

14  extraction report out of the Cellebrite system for the phone

15  seized from Andre Brown.

16  Q   And is this information all contained on Government Exhibit

17  16?

18  A   Yes, it is.

19          MS. WEBER:  Move to admit Government Exhibit 53.

20          MR. CAMIEL:  No objection.

21          THE COURT:  53 is admitted.

22       (Exhibit 53 admitted)

23          MS. WEBER:  Permission to publish.

24          THE COURT:  Yes, go ahead.

25  BY MS. WEBER:

1  Q   Agent Carr, I'm going to start with the last page of the
2  exhibit and direct your attention to line 145.
3      Can you note the date?
4  A   Thank you.  Yes.  The date listed is September 12th of 2020
5  at local Alaska time of 9:48 a.m.
6  Q   And what's the type of data that is contained in that line?
7  A   That's showing a wireless network that the phone connected
8  to at that time, and gives the approximate location of that
9  network.
10 Q   And it looks like there's coordinates on the left-hand
11 side?
12 A   That's correct.
13 Q   What do those coordinates represent?
14 A   Those coordinates represent the latitude and longitude of
15 that WiFi router, and when you were to map those, it would land
16 in the Anchorage area.
17 Q   What does that tell you about the phone on that date and
18 time?
19 A   That tells me that on September 12th, Andre Brown's phone
20 was in the Anchorage area.
21 Q   Directing your attention to line 126, can you please note
22 the date and time of that connection?
23 A   Yes.  That's the 13th of September in 2020, also Alaska
24 time of 10:17 a.m.
25 Q   And what type of data is collected in this line?

1  A    That is also showing the location of a wireless network the

2  phone connected to, and that also plots in the greater

3  Anchorage area.

4  Q    On line 121, can you please note the date and time of that

5  data entry?

6  A    That's the 13th of September at 10:42 a.m., and that also

7  plots in the Anchorage area.

8  Q    And what is WiFi at IT?

9  A    That, again, is another wireless network that's also down

10  in the Anchorage area.  Of note, that's the last location that

11  we have in the dataset in the Anchorage area.

12  Q    Did you review more datasets than just represented in this

13  exhibit?

14  A    Yes, I did.

15  Q    Were these significant because of their timeframe?

16  A    That's correct.

17  Q    And directing your attention to line 118, where was the

18  wireless network that the phone connected to?

19  A    That was at Fred Meyer here in Fairbanks, and that was

20  dated September 19, 2020, local time of 7:17 p.m.

21  Q    And then lastly, on line 92, on October 19th of 2020, what

22  wireless -- what location was the wireless network that the

23  phone connected to?

24  A    This was at Curry's Corner at 11:23 a.m. that morning.

25  Curry's Corner is approximately one block away from the North

1  Old Steese Post Office.

2  Q   Did you review the rest of the wireless connections between

3  October 19th and Andre Brown's arrest on November 6th?

4  A   Yes, I did.

5  Q   What general location was the phone -- did the phone appear

6  to be in?

7  A   In the Fairbanks area.

8  Q   Could you please take a look now at Exhibits 43 through 51?

9  A   Yes.

10  Q   Do you recognize these exhibits?

11  A   Yes, I do.

12  Q   What do you recognize them to be?

13  A   These are photos that I observed when reviewing the search

14  warrant return from Facebook for the account belonging to

15  OJ Tulali.

16  Q   And do you recognize any of the individuals depicted in the

17  photographs contained in these exhibits?

18  A   Yes, I do.

19  Q   Who in particular do you recognize?

20  A   Primarily, there's photos of the defendant.  Secondarily,

21  there's photos of members of his support group that are here

22  with him.

23        MS. WEBER:  Your Honor, move to admit Government

24  Exhibit 43 through 51 pursuant to the 902(11) and (13)

25  certification that was previously handed up to the Court.

1          MR. CAMIEL:  I have no objection.

2          THE COURT:  All right.  Those will be admitted.

3      (Exhibit 43 through 51 admitted)

4          MS. WEBER:  Permission to publish Exhibit 43.

5          THE COURT:  Go ahead.

6   BY MS. WEBER:

7   Q    This picture was taken from the Defendant's personal

8   Facebook account?

9   A    That's correct.

10  Q    Was it the same account that was communicating with

11  Andre Brown during October of 2020?

12  A    Yes, ma'am.

13  Q    Were there other communications to that Facebook account

14  between the defendant and Andre Brown before and after

15  October 2020 as well?

16  A    Yes, there was.

17  Q    Do you recognize this person?

18  A    Yes, I do.

19  Q    Who is it?

20  A    She was introduced to me as the sister of the defendant at

21  his identity hearing, and I recognize her being here today.

22  Q    Here in court today?

23  A    Yes.

24          MS. WEBER:  Permission to publish 44?

25          THE COURT:  Go ahead.

BY MS. WEBER:

Q    What was the significance of 44?

A    In the upper right-hand corner, center of that specific photo is a photograph matching the appearance of the defendant.

Q    What was the significance of finding these photos to your investigation?

A    These photos coming from the Facebook account were compared to photographs that we were able to obtain from government databases, such as driver's licenses, California DMV registrations, and to confirm that the owner, user, of the Facebook account that's titled OJ Tulali is one and the same with the individual that we had identified as Junior Gufatasi Tulali.

Q    That person is the defendant in court today that you identified?

A    That's correct.

        MS. WEBER:  Permission to publish Exhibit 45.

        THE COURT:  Go ahead.

BY MS. WEBER:

Q    How did this aid in identifying the defendant?

A    The last names listed on the gravestone, Tulali, lend us greater credence to believe that we're not looking at somebody who's created a Facebook account using somebody else's fictitious name.

        MS. WEBER:  Can we publish 46, please?

1                THE COURT:  Go ahead.

2    BY MS. WEBER:

3    Q    How did this aid in identifying the defendant?

4    A    This was another photo that matched the description of the

5    previous photographs that we were able to obtain from

6    government databases.

7    Q    When you -- do you recognize the person in this photograph?

8    A    Yes, I do.

9    Q    Who is it?

10   A    The defendant.

11   Q    Why was that significant to your investigation?

12   A    Again, greater confirmation.  The more photos that we find

13   on Facebook that you either posted or shared with somebody

14   through Facebook Messenger that match the legitimate

15   identification that we have through driver's licenses and other

16   registrations, then we start to increase our confidence

17   interval that we're looking at the right person and the right

18   Facebook account.

19   Q    You know what the defendant looks like?

20   A    That's correct.

21   Q    And you recognize him in these photographs?

22   A    Yes.

23               MS. WEBER:  Permission to publish Exhibit 47.

24               THE COURT:  Go ahead.

25   BY MS. WEBER:

```
 1   Q   Do you recognize the defendant in this photograph?

 2   A   Yes, I do.

 3           MS. WEBER:  Permission to publish Exhibit 48.

 4           THE COURT:  Go ahead.

 5   BY MS. WEBER:

 6   Q   Do you recognize the defendant in this photograph?

 7   A   Yes, I do.

 8           MS. WEBER:  Move to publish Exhibit 49.

 9           THE COURT:  Go ahead.

10   BY MS. WEBER:

11   Q   Do you recognize the defendant in this photograph?

12   A   Yes.  That would be the one on the right.

13           MS. WEBER:  Move to publish Exhibit 50.

14           THE COURT:  Yes.

15   BY MS. WEBER:

16   Q   Do you recognize the defendant in this photograph?

17   A   Yes.  That would be the individual further on the right.

18   Q   Do you see any other individuals in this photograph here in

19   court?

20   A   I do believe that one of the two individuals on the left

21   may be here in court today.

22   Q   Do they appear to be family members of the defendant?

23   A   Family members or close friends, yes.

24           MS. WEBER:  Permission to publish 51.

25           THE COURT:  Yes.
```

BY MS. WEBER:

Q   Do you recognize the defendant in this exhibit?

A   Yes.  The defendant would be the center in the photograph.

        MS. WEBER:  May we have one moment, Your Honor?

        THE COURT:  Yes.

    (Pause)

        MS. WEBER:  Your Honor, other than moving to admit

Exhibit No. 31, the government has no further questions for

this witness at this time.

        THE COURT:  All right.  You want to proceed with your

cross on the other topics, and then we'll come back to that one

with both sides later on?

        MR. CAMIEL:  Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. CAMIEL:

Q   Good afternoon.

A   Good afternoon, sir.

Q   You were the lead agent or the case agent in this

investigation?

A   Yes.  In the way we run investigations, there is a specific

case agent for each suspect, and so I was the lead case agent

on the -- specifically on the side of Mr. Tulali.

Q   All right.  And so if you're -- in terms of being the lead

case agent, you get to delegate to other people tasks as part

of the investigation?

```
 1   A    More or less.
 2   Q    You could ask somebody to go get a search warrant, for
 3   example, or apply for a search warrant?
 4   A    You can certainly request that, yes.
 5   Q    Or to go talk to somebody?
 6   A    Yes.
 7   Q    If you're present when a search is taking place, you can
 8   direct somebody to seize something that you think might be
 9   relevant?
10   A    Yes.
11   Q    Now, let's talk for a minute about the arrest of
12   Mr. Tulali.  He was arrested in May of 2023?
13   A    That's correct.
14   Q    In California?
15   A    Yes.
16   Q    And the residence you saw him leaving was in Los Angeles,
17   right?
18   A    That's correct.
19   Q    Not in Gardena, California?
20   A    No.  I believe Gardena sits in Los Angeles County.
21   Q    But not in the City of Los Angeles?
22   A    I don't believe so.
23   Q    One of the relevant locations in this investigation was an
24   address that was on the picture of a package label that was
25   found on Mr. Brown's phone, and you're aware of that, aren't
```

1   you?

2   A   Yes, sir.

3   Q   Okay.  That was 817 West 134th, Gardena, California?

4   A   Yes.

5   Q   Did you ever direct anybody to go get a search warrant for

6   that residence?

7   A   No.  We would not have been able to get a search warrant

8   for that based solely off of the shipping label.

9   Q   Well, did you ever direct anybody to go to the residence

10  and knock on the door and talk to whoever lived there?

11  A   No.

12  Q   Did you ever direct anybody to put that residence under

13  surveillance to see who came and went from the residence?

14  A   So just to clarify, because some of these --

15  Q   I would like you to answer my question first.

16      Did you ever direct anybody to go conduct surveillance at

17  that residence?

18  A   No.

19  Q   Did you ever direct anybody to go write down the license

20  numbers of the cars that were parked at the residence or coming

21  or going from the residence?

22  A   No, I did not.

23  Q   As a part of being a case agent in this joint

24  investigation, you were privy to reports that the local

25  officers were writing here, right?

1  A   Yes.

2  Q   And you took part in some of the interviews that they

3  conducted?

4  A   That's correct.

5  Q   And you took part in some of the search warrants that were

6  executed?

7  A   In terms of this investigation specifically, if you're

8  referring to Andre Brown and Winston Crockett, no.

9  Q   Well, you were aware, weren't you, that Mr. Brown had been

10 staying at the 7 Gables motel in Fairbanks?

11 A   After the fact, yes.

12 Q   To your knowledge, was there ever any attempt by any law

13 enforcement to go to the 7 Gables and search the room that

14 Mr. Brown had been staying in?

15 A   No.

16 Q   You have been doing drug investigations for a long time?

17 A   Sorry.  Is that a question?

18 Q   Yes.

19 A   Yes, I have been.

20 Q   And you understand that one of the things that's frequent

21 about people who are engaged in illegal drug activity is that

22 they often have multiple cell phones, right?

23 A   Oftentimes, yes.

24 Q   So did anybody make any effort to see whether or not

25 Mr. Brown had another cell phone?

1    A    I'm not aware of any, no.

2    Q    The way that Mr. Tulali was arrested was that there was

3    tracking of that cell phone that had the 310 area code?

4    A    That's correct.

5    Q    Back in 2020, at the time that Jacob Lee died and that this

6    investigation was taking place, or at least the first part of

7    the investigation, you were aware of the fact that that 310

8    cell phone was subscribed to by somebody named Lavel Wallace?

9    A    Yes, I was.

10   Q    Did you ever go out and try and find Lavel Wallace?

11   A    Yes, I did.

12   Q    Did you find him?

13   A    No.

14   Q    Did you ever direct or request the phone records for that

15   310 area code phone?

16   A    Yes.

17   Q    You talked about the fact that the phone -- a phone was

18   seized in the car with Mr. Tulali when he was arrested?

19   A    That's correct.

20   Q    And you never made any -- you said the phone was locked?

21   A    That's correct.

22   Q    Okay.  Now, the DEA has seized lots of phones that have

23   been locked before, right?

24   A    Yes, we have.

25   Q    You have been able to get search warrants for those phones

1   and send them to a DEA lab to be opened so that the contents of

2   the phone could be examined, right?

3   A   Yes, that is possible.

4   Q   You made no attempt to do that in this case?

5   A   That's correct.

6   Q   To your knowledge, did either you or any other law

7   enforcement ever get the phone records for Kweka Warner, who

8   lived at 310 Tipperary Court?

9   A   If they did, I'm not aware of that.

10  Q   You went through a series of photos that were obtained from

11  Mr. Tulali's Facebook, right?

12  A   Yes, sir.

13  Q   Okay.  And you pulled all these family photos that show

14  Mr. Tulali with friends and family, right?

15  A   Yes, sir.

16  Q   When you went through -- you went through his whole

17  Facebook account, right?

18  A   I wouldn't want to claim that I viewed 100 percent of it,

19  but a significant portion, yes.

20  Q   Were you looking for things that might be relevant to your

21  investigation?

22  A   Yes, sir.

23  Q   Did you find any picture of the package label that was seen

24  on Mr. Brown's phone?

25  A   No, sir.

```
 1   Q    Did you find any pictures of any blue pills?
 2   A    No, sir.
 3   Q    Or any pills?
 4   A    No.  We're referring to the pills that were sent by text
 5   message, those pictures?
 6   Q    Right.
 7   A    Those wouldn't show up in a Facebook search warrant.
 8   Q    How do you know they wouldn't?
 9   A    Well, those photos were taken and sent over text message,
10   and so they're sent separately and outside of the Facebook
11   application.
12   Q    Didn't Mr. Brown and whoever he was communicating with also
13   communicate by Facebook?
14   A    Yes, they did.
15   Q    So the only pictures you could find on Mr. Tulali's
16   Facebook were these pictures of friends and family?
17   A    No.
18   Q    Have you ever come across a situation in your
19   investigations where somebody's email has been hacked?
20   A    I cannot think of a time in the course of my career that I
21   have identified emails being hacked, and rarely, infrequently,
22   that traffickers even use emails, period.
23   Q    How about Facebook accounts being hacked?
24   A    No, I don't have anything that comes to recollection.
25   Q    You haven't come across that?
```

1 A    That's correct.

2 Q    Now, isn't it true that there was no attempt made to arrest

3 Mr. Tulali until 2023?

4 A    That's correct, there was no attempt made pursuant to this

5 investigation.  If there was by local law enforcement down

6 there, then I'm not aware of that.

7 Q    And when he was arrested, there were no pills in the car

8 where he was arrested, right?

9 A    That's correct.

10         MR. CAMIEL:  Thank you.

11         THE COURT:  Redirect?

12                    REDIRECT EXAMINATION

13 BY MS. WEBER:

14 Q    On cross-examination, you were asked about certain

15 investigative steps that were not taken regarding the address

16 on the shipping label?

17 A    Yes.

18 Q    What was the reason for not taking those steps outlined by

19 counsel?

20 A    So there's a difference between being able to make requests

21 of my fellow agents and task force officers, and the word that

22 was used in cross as being directing actions and activities.

23 And there's a difference between what I'm able to request and

24 get satisfied with my own task force group here in Fairbanks,

25 and then an entirely separate DEA division with agents that I

1  don't know and I'm asking for favors, and they have to fit
2  those investigative steps into their own cases that they're
3  working on.
4  Q   What do you need in order to apply to the Court for a
5  search warrant?
6  A   We usually need a substantial amount of evidence, at least
7  probable cause, which is 51 percent or more of the facts at
8  hand lend to a reasonable belief that the evidence is going to
9  be located in that residence, that phone, that vehicle,
10  whatever we're applying for a search warrant for.
11  Q   And you testified that you didn't believe you had probable
12  cause sufficient to apply for a search warrant?
13  A   For the Gardena address, that's correct.
14  Q   Why not?
15  A   In my experience, in -- not in every single case, but in
16  the majority of shipment cases, the address is fictitious.
17  Oftentimes, it's a vacant home that the sender knows they can
18  list, it's not going to come back to them.  And so I don't
19  focus as much on the sender address or even the sender name,
20  but I really try to follow the money and I look for who is
21  expecting to get paid for this thing.
22  Q   When you say "shipping cases," are you referring to the
23  mailing of controlled substance?
24  A   That's correct, as opposed to drugs that are brought in
25  luggage on airplanes or in concealed compartments in vehicles.

1  Q   And in your training and experience, how often do people

2  shipping controlled substances use their legitimate address on

3  the shipping labels?

4  A   Very infrequently.

5  Q   And what's the reason for that?

6  A   Pretty simple.

7        MR. CAMIEL:  She's asking him to speculate about

8  reasons that other people do things.

9        THE COURT:  You can move on to your next question.

10  That's fine.  I think that has already been addressed here

11  during this trial.

12  BY MS. WEBER:

13  Q   And you were also asked on cross-examination about not

14  obtaining a search warrant at 7 Gables?

15  A   That's correct.

16  Q   At what point in the investigation did you become aware

17  that Mr. Brown had been staying at that location?

18  A   That information comes to us weeks to months later, after

19  we're able to apply for the search warrants for phones,

20  Facebook accounts, wait to get those responses or to get the

21  phone unlocked.  So by that period of time, somebody else has

22  stayed at 7 Gables and it's not going to be fruitful to serve a

23  search warrant there.

24  Q   Are you familiar with the concept of staleness in regards

25  to a search warrant?

1   A   Absolutely.

2   Q   Can you explain what that is?

3   A   So if I observe activity today, we would say that we're

4   still pretty fresh, and two days from now, we might still be

5   able to say that I saw you come and go in and out of the house

6   carrying a bag, or something of that nature, that we still have

7   maybe a reasonable belief that the evidence that I maybe saw

8   you carry into the home is still there 24 hours, 48 hours

9   later, but at a certain period, point in time, we say that

10   probable cause, that observation of watching the suspect

11   carrying something into a home, has now gone stale, you need to

12   go and refresh that PC.

13   Q   What is PC short for?

14   A   Short for probable cause.

15   Q   And you're not a lawyer, correct?

16   A   No, I'm not.

17   Q   You're certainly not the judge?

18   A   No.

19   Q   So you're not purporting to be telling the jury what the

20   law is in this case, are you?

21   A   No.

22   Q   Is this just your understanding?

23   A   This is just my experience and understanding of how

24   applications for search warrants typically go and what's

25   required for it.

```
 1   Q   Is this your thought process when making the decision on
 2   whether or not to apply to the Court for a search warrant?
 3   A   Yes.
 4   Q   Was this your thought process when not applying for a
 5   search warrant at 7 Gables?
 6   A   Absolutely.
 7   Q   And was this your thought process when you decided not --
 8            MR. CAMIEL:  Object to leading.
 9            THE COURT:  That's sustained.
10   BY MS. WEBER:
11   Q   You were asked about a search warrant -- why you didn't get
12   a search warrant on the defendant's phone?
13   A   Yes.
14   Q   What's the reason why you didn't even apply for a search
15   warrant on that?
16   A   The same staleness concept.  The illegal activity that
17   we're alleging is occurring in October of 2020, so by March of
18   2023, when I'm able to get that phone in my hands, I'm not -- I
19   didn't feel that I would have a high likelihood of getting a
20   search warrant approved.
21   Q   You were asked on cross-examination about the efforts that
22   you made to find Lavel Wallace.  Can you please describe those
23   efforts?
24   A   Yes.  We used a multitude of commercial, privately owned
25   databases, also official government databases, and I could not
```

1  positively find a Lavel Wallace operating in the Southern

2  California area that had any connection to the 310-482-1267

3  phone number.

4      I was, however, able to find connections with that phone

5  number to Junior Tulali and some commercial databases, so some

6  of those things helped kind of guide our investigation.

7  Q   At some point, did the subscriber information change?

8  A   Yes, it did.

9  Q   And around when was that?

10 A   Several months after November of 2020, the subscriber

11 information, which is the account holder, so to speak, the name

12 there changed to Junior Tulali.

13 Q   How do you know that?

14 A   We have the authority as federal agents to submit

15 administrative subpoenas, which are official requests to

16 telecommunications providers, airline companies, for their

17 records that they have.

18 Q   Were you submitting subpoenas for the location information

19 that you testified led to the defendant's arrest?

20 A   No.  Those are separate things.  We submit a subpoena for

21 the phone records that the company has historically.  If we

22 want something live and ongoing, we need a search warrant for

23 that.  And so in order to get the geolocation for the suspect's

24 cell phone, we need to get that information through a search

25 warrant.

Q   Why did you apply for -- why did you send a subpoena for

the subscriber information once you already had it and it

listed Lavel Wallace?

A   So one thing we look for to do is to freshen up what we

call the tolls, which is your phone call records.  Who your

phone has been texting back and forth.  So periodically we'll

refresh that, and when we get that toll sheet, the first page

is the subscriber.  So it's not something we have to request in

and of itself.

Q   Lastly, I just want to address your experience with

accounts being hacked.

    Had the defendant's Facebook been hacked, would you expect

to see evidence of that in the records?

A   I would you expect to see some change in behavior on the

account, different types of photos being posted, for example.

Q   Did you see any photos posted or change in behavior on the

account?

A   Negative.

Q   Was there any indication that the account had been hacked

before?

A   No.

Q   At any point?

A   No.

        MS. WEBER:  No further questions, Your Honor.

        THE COURT:  Cross on those topics?

RECROSS-EXAMINATION

BY MR. CAMIEL:

Q   Let's start with the failure to get the -- or to apply for a search warrant for the Gardena, California, home.

You said that many times when packages are sent that contain drugs, they will use a fictitious address or there will be a vacant residence?

A   That's correct.

Q   This was a real address, right?

A   Yes.

Q   Correct?

A   Fictitious, meaning that it's not my address if I write it, not completely fake, because at the end of the day, that package with those drugs has a financial value to me as the sender, and if it does get returned to sender, I want to be able to retrieve that.

Q   Right.  So you want to use a real address?

A   Yes.

Q   So that you don't lose valuable property, right?

A   Correct.

Q   So this was a real address and you didn't have any information it was vacant, did you?

A   No.

Q   In fact, it was lived in, right?

A   I don't know that.

1  Q   You don't know that because you never went out there to

2  check?

3  A   No.  When I'm operating here in Fairbanks, Alaska, it's

4  very difficult to go out there and check Gardena, California.

5  Q   And you talked about how hard it is to get other agencies

6  to do things for you.  This was a case where you're

7  investigating the overdose death of a young man, right?

8  A   Absolutely.

9  Q   Okay.  Pretty serious case?

10 A   It is for us, yes.

11 Q   And you can't get another law enforcement agency to drive

12 out to a residence in Gardena, California, and take a look at

13 what's going on there?

14 A   Not with the number of fatal overdoses that they themselves

15 are dealing with in their local area.

16 Q   Did you ever get any Paypal records?

17 A   No, we did not.

18 Q   Let's talk for a minute about the 7 Gables again.

19     Mr. Brown told law enforcement he was staying at the

20 7 Gables on November 6, 2020, the day he was arrested?

21 A   Okay.

22 Q   Right?

23 A   That may be the case.

24 Q   You're familiar with the reports.  You've reviewed the

25 reports.

1  A   Yes.  And when I reviewed the reports and when the

2  interview was conducted are two separate things.

3  Q   If you were familiar with the -- if you had been involved

4  in Mr. Brown's arrest --

5  A   I was not.

6  Q   No.  I'm asking if you had been.

7  A   Hypothetically?

8  Q   Yep.  He says, I'm staying at the 7 Gables, and you've just

9  found 59 pills on him and thousands of dollars, and you're

10 investigating overdose -- an overdose death, right, you would

11 have applied for a search warrant for that residence, wouldn't

12 you, or for that motel room?

13 A   I would need to get a little more information than that

14 to -- before I would go and apply for a search warrant.  But

15 that would be a step that I would be interested in pursuing.

16 Q   So let's talk about the phone subscriber information.

17     At the time in October of 2020, the subscriber to that

18 phone was someone named Lavel Wallace?

19 A   Yes.

20 Q   And to become a subscriber, they have to present

21 information to a phone company to have their name put on the

22 phone because they're going to be paying the bill, right?

23 A   You do not need to provide any formal identification.

24 Q   Well, this wasn't a burner phone, right?

25 A   Not to my knowledge.

1  Q   This is a phone where somebody is paying the phone company

2  or the cell service provider?

3  A   Yeah.

4  Q   And what you found out was, several months after Mr. Brown

5  is arrested, the phone gets a different subscriber.  Now it's

6  being subscribed to by Mr. Tulali?

7  A   Yes, sir.

8  Q   So let me just ask you this:  Based on your training and

9  experience, how much sense does it make to put your own name on

10 a phone that's been used to communicate with somebody who has

11 been arrested about shipping fentanyl pills?

12 A   Yeah, I would not say that makes a lot of sense for

13 somebody who wants to continue evading the justice system.

14 Q   Somebody who wants to avoid becoming a target of

15 investigation, they wouldn't put their name on the phone?

16 A   No, unless after some lengthy period of time has occurred

17 since that arrest and you feel like you got away with it.

18 Q   You said just a few months after, right?

19 A   Several months, so not a few, as in one or two months.

20 Q   Wouldn't it be smarter to just go get a different phone?

21 A   Oh, absolutely.

22 Q   With a different phone number?

23 A   Yes.

24 Q   Rather than continuing to use the same phone?

25 A   Yes, it would have been smarter, for sure.

1          MR. CAMIEL:  Nothing further.

2          THE COURT:  Follow-up at all?  I think that was our

3     recross.  Correct?

4          Sir, you may be excused.

5          THE COURT:  Ladies and gentlemen, there are a couple

6     topics I need to address with the attorneys.  We'll do that as

7     efficiently as possible.  Let's plan on no later than 2:30 p.m.

8     to have you back here in the courtroom and resume with the

9     evidence, which if I haven't said so already, I think I have --

10    we expect to conclude today.

11         So please leave your notepads in the courtroom.

12    Remember my admonition not to discuss or research the case, and

13    we'll see you at 2:30 p.m.

14       (Jury absent)

15         THE COURT:  Please be seated, everyone.

16         So what I'm thinking makes the most sense here is for

17    Mr. Camiel to listen to 31, which I understand you haven't had

18    the opportunity?

19         MR. CAMIEL:  Not the --

20         THE COURT:  Listen to that and see if there is a

21    dispute on that, and I'll take up that issue if there is one.

22         And then secondly, I'm hoping before you call -- is it

23    KS?  I can't remember her full name.

24         MR. CAMIEL:  Kristen Schaur, or her name at the time

25    was Stowe.

```
 1          THE COURT:  This is the person you intend to call by
 2    Zoom.  There is the order I entered at Docket 81 on April 9th
 3    that relates to an issue I reserved, and I'd like you to, now
 4    that you've probably have been in touch with this person, tell
 5    us exactly what you expect her to say about what Mr. Lee
 6    relayed to her on or about October 26th.  Is that an issue now
 7    or is that something we need to address?  Or maybe we don't.  I
 8    don't know.
 9          MR. CAMIEL:  Well, what I can tell Your Honor is that
10    the information that I've had changed.  When I filed the motion
11    seeking to introduce the conversation she had with Mr. Lee, I
12    hadn't received the government's interview.  They conducted an
13    interview with her last March, and that provided additional
14    facts that I wasn't aware of.  And I can tell the Court those
15    facts.
16          THE COURT:  I just want to know, do you seek to get in
17    statements of the decedent through this witness?
18          MR. CAMIEL:  I would still like to do that, yes.
19          THE COURT:  Does the government know which statements?
20          MR. CAMIEL:  Yes.  I think they're aware of the
21    statements.  It's in the report, and I referenced it in the
22    motion.
23          THE COURT:  Admitted to taking Percocet pills on
24    October 26, 2020?  That's what my order says.  I don't have the
25    motion in front of me.
```

 1          MR. CAMIEL:  Right.  I can read to the Court what's in

 2    the report.  It says:

 3          "Stowe said that on the evening of 10-26-2020, she got

 4    into an argument with Lee.  She believed Lee was using hard

 5    drugs because of his behavior.  He admitted to taking Percocet

 6    pills."

 7          THE COURT:  What's the date again, Mr. Camiel?

 8          MR. CAMIEL:  This is October 26th.

 9          THE COURT:  Okay.  Is that objected to at this time?

10          MS. WEBER:  Yes, Your Honor.

11          THE COURT:  And what's the basis of the objection,

12    other than what's already set out in the motion.

13          MS. WEBER:  Nothing other than what's already set out

14    in the motion.

15          THE COURT:  All right.  So is it your understanding,

16    Mr. Camiel, that the witness would testify consistent with that

17    today as to what -- because that's just her hearsay statement

18    that's in the report, correct?

19          MR. CAMIEL:  Yes.  I'm not sure that she recalls the

20    exact time now of the conversation, but -- so if I'm allowed to

21    get into it and if she doesn't remember it, she doesn't

22    remember it.  But what I would be asking her, based on the new

23    information I have, is she indicated in the government's

24    interview that three days before Mr. Lee died, so October 25th,

25    she moved out of the Lee house.  She stated she moved out

1  because he was using drugs again.  They argued.

2            THE COURT:  See, that's all fine.  My only question

3  here is:  Are you seeking to get in statements by the decedent

4  through this witness?

5            MR. CAMIEL:  If she remembers now the statements, then

6  I would, yes.

7            THE COURT:  Well, then --

8            MR. CAMIEL:  I'm in a position where -- I didn't mean

9  to interrupt.

10            THE COURT:  No, no.  I'm wondering if what we should

11  do, then, is have her on line and ask her that outside the

12  presence of the jury and see what the statements are, if any,

13  that she recalls.  And if there are some, I can hear what they

14  are and hear each side's position as to admissibility.  That

15  seems the most prudent way to proceed.

16            Any objection?

17            MR. CAMIEL:  No.

18            MS. WEBER:  Likewise.

19            THE COURT:  Listen to 31 and let me know when you're

20  ready to proceed on that topic, and then we can get -- is your

21  witness going to be available -- I think I said 2:30 p.m.?

22            MR. CAMIEL:  I talked to her over the lunch hour and I

23  told her about that time, and she said she would be standing by

24  for me to call her first.

25            THE COURT:  Why don't you also do that during this

```
 1  break.  And we'll see where we are on 31 and then go from
 2  there.  We'll take a recess.  We'll go off record.
 3          DEPUTY CLERK:  All rise.  This court now stands in a
 4  brief recess.
 5      (Recessed from 2:14 p.m. to 2:30 p.m.)
 6      (Jury absent)
 7          DEPUTY CLERK:  All rise.  Her Honor, the Court, the
 8  United States District Court is again in session.
 9          Please be seated.
10          THE COURT:  All right.  We're back on without the
11  jury.
12          So Mr. Camiel, on 31, any issues there?
13          MR. CAMIEL:  I listened to the redaction.  It's really
14  poor quality.  There's a little bit of background where -- over
15  a loud speaker, because it's in a jail.  They're announcing
16  names or something.  But they've redacted out the preamble, so
17  I don't have any objections as far as that goes.
18          THE COURT:  All right.  So with the background noise,
19  it's not evident that it's necessarily a prison?
20          MR. CAMIEL:  Well, it's not obvious, but I think if
21  somebody listened carefully --
22          THE COURT:  Well, if you'd like, I can listen to it
23  and make a determination.  I'm happy to do that.
24          MR. CAMIEL:  I don't think the Court needs to listen
25  to it.
```

1          THE COURT:  Well, then -- so, I mean, otherwise, then

2     it's going to come in.

3          MR. CAMIEL:  I understand.

4          THE COURT:  All right.  Well, with that said, then,

5     we'll have 31 played.  I thought we could get your witness on

6     the phone before we do that.

7          MR. CAMIEL:  She's here.

8          THE COURT:  She's here, very good.

9       (Oath administered to the witness)

10          DEPUTY CLERK:  Please state and spell your name for

11     the record.

12          THE WITNESS:  Kristen Christeen Stowe, K-r-i-s-t-e-n,

13     and Christeen, C-h-r-i-s-t-e-e-n, and Stowe, S-t-o-w-e.

14               KRISTEN STOWE, DEFENSE WITNESS, SWORN

15                        DIRECT EXAMINATION

16     BY MR. CAMIEL:

17     Q   Ms. Stowe, I'm going to ask you a few questions right now

18     just related to -- well, let me back up a little bit.

19          You were in a relationship with Jacob Lee?

20     A   Yes.

21     Q   And the two of you dated and you have a child together?

22     A   Yes.

23     Q   And you were living with him and with his family in

24     Fairbanks in October of 2020?

25     A   Yeah, on and off.

```
 1   Q    Okay.  And at some point, did you move out?
 2   A    Yes.  I was living with my parents, my dad.
 3               THE COURT:  I think we can go right to the key issue.
 4   I think I have enough background to get to that, Mr. Camiel.
 5   Thank you.
 6   BY MR. CAMIEL:
 7   Q    Do you recall the last conversation you had with Mr. Lee?
 8   A    Not really.  I can't really remember what was said.
 9   Q    Was it after you moved out?  Was it a phone call?
10   A    I don't remember a phone call.  It's been so long.  I just
11   can't remember the phone call or what we said.
12   Q    I sent you a report that talked about your interview with
13   the police in December of 2021.  Did you review that?
14   A    I didn't see when it was.
15   Q    Do you recall --
16               MR. CAMIEL:  Your Honor, can I lead?
17               THE COURT:  You can.
18   BY MR. CAMIEL:
19   Q    Do you recall that your last phone call with Mr. Lee, you
20   believed that he was use --
21               THE COURT:  I will ask you -- you can ask if the
22   statement refreshed her recollection.  So rephrase, please.
23   BY MR. CAMIEL:
24   Q    Did the report that I sent you refresh your recollection at
25   all?
```

1  A    No.   Sorry.

2           THE COURT:  So it's a nonissue.  Is that fair to say?

3           MR. CAMIEL:  Right.

4           THE COURT:  Very good.

5           MR. CAMIEL:  I'm sorry, ma'am.  We would like you to

6  stay because now we're going have to the jury come in.

7           THE COURT:  Ms. Stowe, we're going to have the jury

8  come in, but we'll ask you to go to the waiting room.  We're

9  going to take up another witness.  It will be probably two

10 minutes, very short.

11          Exhibit 31.  Is that correct?

12          MS. WEBER:  I believe the foundation has been laid.

13          THE COURT:  We could do that after.

14          MR. CAMIEL:  I think what the government wants to do

15 is have it admitted but then not play it in the courtroom, just

16 have it go back to the jury.

17          MS. WEBER:  Yes, Your Honor.  The sound in the

18 courtroom wasn't fantastic.  I think we could move to admit and

19 have the jury listen when they go back and have the laptop.

20          THE COURT:  I essentially admitted Exhibit No. 31 in

21 our prior.  Exhibit No. 31 is admitted.

22      (Exhibit 31 admitted)

23          THE COURT:  You could refer to it, then, in closing,

24 either side, as you see fit.

25          So, Ms. Stowe, we're going to bring the jury in.  I

know you just had an oath administered to you, but I'm going to
ask the court clerk to administer another oath to you when the
jury is here so they see that. You can actually stay right
here in the courtroom. We're going to go get the jury. I
wanted you to not be surprised when we administer an oath to
you about five minutes after we just did.

MR. CAMIEL: Your Honor, before you get the jury, I
assume the government is resting?

THE COURT: Very good. Is the government resting?

MS. WEBER: Yes, Your Honor.

THE COURT: You're making a motion?

MR. CAMIEL: I will make a motion. I don't know if
you want me to do it now.

THE COURT: No. But you can say you're making the
motion, and I will defer.

MR. CAMIEL: I would move, pursuant to Federal Rule of
Criminal Procedure 29, to dismiss.

THE COURT: And pursuant to that same rule, I'll defer
ruling. But that's noted on the record, then, that the motion
was made when the government rested.

So thank you, Mr. Camiel. I overlooked that.

(Pause)

(Jury present)

THE COURT: All right. Welcome back, ladies and
gentlemen. Please be seated. And before we proceed, is the

1  government -- has the government rested?  Is that correct?

2           MS. WEBER:  Yes, Your Honor.

3           THE COURT:  All right.  Very good.

4           Then, Mr. Camiel, is there evidence that the defense

5  seeks to present?

6           MR. CAMIEL:  Yes, Your Honor.  We would call

7  Kristen Stowe, who will be appearing remotely.

8           THE COURT:  Ms. Stowe, I'm going to ask the courtroom

9  deputy to administer an oath to you.

10      (Oath administered to the witness)

11          DEPUTY CLERK:  Please state and spell your name for

12  the record.

13          THE WITNESS:  Kristen, K-r-i-s-t-e-n, and then

14  C-h-r-i-s-t-e-e-n, and Stowe, S-t-o-w-e.

15               KRISTEN STOWE, DEFENSE WITNESS, SWORN

16                        DIRECT EXAMINATION

17  BY MR. CAMIEL:

18  Q    Ms. Stowe, what state are you testifying from?

19  A    (Indiscernible), Texas.

20  Q    Can you repeat that again, where you're testifying from?

21  A    Copperas Cove, Texas.

22  Q    Copperas Cove, Texas?

23  A    Yes.

24  Q    How old are you?

25  A    25.

1    Q    Did you used to live in Fairbanks?

2    A    Yes.  I'm from Fairbanks.

3    Q    Is that where you were born?

4    A    Yes.

5    Q    And do you have family here?

6    A    Yes.

7    Q    Did you know Jacob Lee?

8    A    Yes.

9    Q    How was it that you knew him?

10   A    He was the father of my child and he was my boyfriend at

11   the time before he passed away.

12   Q    How long before he passed away -- well, when did you meet

13   him in relation to when he passed away?

14   A    2018, somewhere around there.

15   Q    And at some point, did the two of you begin dating?

16   A    Yep.

17   Q    And you mentioned you have a child together.  You have a

18   son; is that right?

19   A    Yeah.

20   Q    How old is your son?

21   A    He's five years old.

22   Q    When you first met Jacob Lee, to your knowledge, was he

23   using prescription pain pills?

24   A    No.

25   Q    At some point, did you become aware that he was using

```
 1  pills?
 2  A   I always known.
 3  Q   I'm sorry?
 4  A   I've always known.
 5  Q   You have always known?
 6  A   Yeah.
 7  Q   And how is it that you knew that he was using pills?
 8  A   (Indiscernible).
 9  Q   I'm sorry?
10  A   Define dope.
11  Q   I didn't understand your answer.
12  A   Define dope.  You said, when did I find out that he did
13  dope.  I said, define what you're talking about, dope.
14  Q   When did you learn that he was using controlled substances?
15  A   The whole time we were dating and before we were dating.
16  Q   What kinds of things were you aware that he was using?
17  A   Everything.
18  Q   By "everything," can you be a little more specific?
19  A   Drugs.
20  Q   What kind of drugs?
21  A   Any drugs.
22  Q   Was he using pain pills?
23  A   Sometimes.
24  Q   Was he using Xanax?
25  A   Yes.
```

```
 1   Q    Were you aware of whether or not he was using
 2   methamphetamine?
 3   A    No.
 4   Q    Were you aware of whether or not he ever used heroin?
 5   A    No.
 6   Q    Was there a period of time where you also used some drugs
 7   with him?
 8   A    Yes.
 9   Q    What kind of drugs were you using with him?
10   A    Percocet.
11   Q    Do you know where he would get his Percocets from?
12   A    Just -- (indiscernible).
13   Q    I'm sorry?
14   A    Just Winston.
15   Q    Just Winston?  That's the only person --
16   A    Yes.
17   Q    That's the only person you knew he got pills from?
18   A    Yes.
19   Q    How about the other drugs that he used, do you know where
20   those came from?
21   A    No.
22   Q    So he was using other kinds of drugs, but you don't know
23   where he got them from?
24   A    Correct.
25   Q    And at some point, obviously, you were pregnant, right?
```

```
 1   A    Yes.

 2   Q    And did you stop using when you became pregnant?

 3   A    Yes.

 4   Q    And I want to turn your attention closer in time to when he

 5   died.  Okay?

 6        In October of 2020, were you living at Jacob Lee's family

 7   home?

 8   A    Not when he passed away, but on -- I would live with them.

 9   Q    And --

10   A    I would move out sometimes.

11   Q    I'm sorry?

12   A    I would move in and move out.

13   Q    And why was that?

14   A    We had our differences.

15   Q    Were some of the arguments about having to do with him

16   still using drugs?

17   A    Yes.

18   Q    Do you recall when the last time was that you moved out in

19   relation to when he died?

20   A    Like two weeks.

21   Q    Do you recall last month being interviewed by the

22   prosecuting attorneys in the case?

23   A    Yes.

24   Q    Do you recall what you told them about when you moved out

25   in relation to when he died?
```

```
 1  A    That I wasn't sure.

 2  Q    Okay.  What do you remember telling them?

 3  A    I don't know.

 4  Q    Do you remember telling them that it was three days before

 5  he died that you moved out?

 6            THE COURT:  Was that an objection or --

 7            MS. WEBER:  Yes, Your Honor.

 8            THE COURT:  What's the basis for the objection?

 9            MS. WEBER:  Leading.  She said she did not recall.

10            THE COURT:  It is leading.

11            Do you want the lights on or off, Mr. Camiel?

12            MR. CAMIEL:  I'm not sure what's easier for the jury

13  to see.

14            THE COURT:  We're getting a lot of glare off my

15  glasses.  That's better.

16            All right.  Go ahead, Mr. Camiel, your next question.

17  BY MR. CAMIEL:

18  Q    When you did move out the last time that you moved out

19  before he died, what was the reason for that?

20  A    Our differences.

21  Q    What were the differences about?

22  A    Drugs.

23  Q    Drugs?  And what kind of --

24  A    Yes.

25  Q    What kind of drugs?
```

```
 1   A   Percocet.

 2   Q   How did you know he was using Percocet?

 3   A   Because we used to do them.

 4   Q   So you knew what he was like when he had been using?

 5   A   Yeah.

 6   Q   In terms of his behavior?

 7   A   Yes.

 8   Q   You knew Mr. Crockett; is that right?

 9   A   Yes.

10   Q   You'd met him before?

11   A   Yeah.  We hung out with him before.

12   Q   And he was somebody that you knew Jacob got pills from?

13   A   Yes.

14   Q   Do you know if he -- if Jacob Lee got any other drugs from

15   Mr. Crockett, any other kinds of drugs?

16   A   Xanax.

17   Q   Do you know how often Mr. Lee would get drugs from

18   Mr. Crockett?

19   A   No.

20   Q   Were you ever with him when he went to pick up drugs from

21   Mr. Crockett?

22   A   No.

23   Q   In terms of Jacob Lee's use of pills around the last time

24   that you saw him, would you say that he was addicted or had an

25   addiction problem?
```

1    A    Yes.

2    Q    Yes?

3    A    Yes.

4    Q    If he didn't have pills, would he appear to go through

5    withdrawals?

6    A    Yes.

7    Q    How frequently was he using, to your knowledge?  Was he

8    using every day?

9    A    Every other day.

10    Q    Do you know how he took the pills?

11    A    No.

12    Q    In your experience, when he got pills from Mr. Crockett,

13    would he just put them away for a few days or would he use them

14    right away?

15    A    He would, like, take them every other day, like put them

16    away for every other day.

17    Q    But you don't -- do you know whether he -- would he swallow

18    the pills or would he crush them and snort them?  Do you know?

19    A    I think he would just take them, just pop them.

20    Q    So you talked about him using pills.  What strength of

21    pills did he get from Mr. Crockett?

22    A    I'm not sure.

23    Q    In other words, did he get 30-milligram pills?  Do you

24    know?

25    A    Looking back, some 30s.

1    Q   You had seen some 30s?

2    A   Yeah.

3    Q   In terms of the last time you saw Jacob, how close in time

4    to that had you seen 30s?

5    A   Like, a couple times.

6    Q   Within a week of his death or a month or several months?

7    A   I'm not sure.

8    Q   But you are sure that on multiple occasions he got 30s from

9    Mr. Crockett?

10   A   Yes.  Or 5s or 10s.

11   Q   I'm sorry?

12   A   Or 5s or 10s.

13   Q   Okay.  Thank you.

14          MR. CAMIEL:  That's all I have.

15          THE COURT:  Cross?

16          MS. VOSACEK:  No cross, Your Honor.

17          THE COURT:  All right.  Thank you very much,

18   Ms. Stowe.  You may be excused at this time.  Good-bye.

19      (Witness excused)

20          THE COURT:  All right.  Mr. Camiel, do you need to

21   confer at all with your client or are you ready to call any

22   additional witnesses?

23          MR. CAMIEL:  Your Honor, let me confer.

24          THE COURT:  Sure.

25      (Pause)

1          MR. CAMIEL:  Your Honor, we have no additional

2     witnesses.

3          THE COURT:  All right.  Thank you.

4          So ladies and gentlemen -- and no rebuttal from the

5     government; is that correct?

6          MS. WEBER:  That's correct.

7          THE COURT:  So that concludes, then, the presentation

8     of the evidence in this case.  The next stage of the proceeding

9     is going to be for me to instruct you on the applicable law,

10    and then the lawyers will give their closing arguments.  I'll

11    have some brief follow-up statements.  And we are going to be

12    ready to do that.  I've given the lawyers, late yesterday,

13    proposed jury instructions, and I need to discuss them with

14    them, make sure we're all in agreement, or I rule on any

15    disagreements about the applicable law.  So that's what we're

16    going to do the rest of the afternoon.  I hope not the rest of

17    the afternoon, but as much time as we need, and have you back

18    at 8:45 a.m. in the morning, at which time we'll conclude the

19    case to go to the jury for deliberations.  I anticipate that

20    will be later in the morning.

21         And I better confer it's the same in Fairbanks.  We're

22    going to provide them lunch, are we not?

23         DEPUTY CLERK:  Yes.

24         THE COURT:  Because I know we do in Anchorage.

25         We provide our jurors lunch, and I would expect that

1   we do provide the same here in Fairbanks.  So the court staff

2   will come and take lunch orders, and then the case will go to

3   the jury for deliberations.

4           So I will once again read the instruction that I read

5   to you at the end of every day.  And at the conclusion of the

6   arguments tomorrow is when we'll select, randomly, the two

7   alternates to be excused from deliberating at that time.

8           And as I've stated before this trial started and

9   throughout, you as the jurors are to decide this case based

10  solely on the evidence presented here in the courtroom.  This

11  means that after you leave here for the night, you must not

12  conduct any independent research about this case, the matters

13  in this case, or the issues in the case or the individuals or

14  other entities involved in the case.  And it is important for

15  the same reasons that jurors have long been instructed to limit

16  their exposure to traditional forms of media information, such

17  as television and newspapers.

18          Please also, do not communicate with anyone in any way

19  about the case.  You must ignore any information about the case

20  that you might see while browsing the internet or on your

21  social media feeds.

22          So with that said, ladies and gentlemen, please, once

23  again, leave your notepads in the courtroom, and we'll see you

24  back at 8:45 a.m. tomorrow morning and conclude the case at

25  that time.  Have a pleasant evening.  Thanks for your careful

 1  attention.

 2      (Jury absent)

 3          THE COURT:  All right.  Please be seated, everyone.

 4          So we have a few -- some time here.

 5          So I gave these out yesterday, and I don't know if you

 6  had had time to look at them.  Are you ready to take this up

 7  now, or would you request 45 minutes or an hour break before we

 8  do so?

 9          MR. CAMIEL:  Your Honor, I would be fine taking them

10  up now.

11          THE COURT:  What about the government?

12          MS. VOSACEK:  I think we can take them up now, Your

13  Honor.

14          THE COURT:  Very good.  Beginning with the preliminary

15  closing instructions.  I was going to get my law clerk, though.

16          Can you give Amelia a call?  Do you have her number?

17          DEPUTY CLERK:  Do you want me to go grab her?

18          THE COURT:  All we'll do on the cover page is delete

19  "proposed" and the date.  I'll add my signature and the date.

20          So the first -- and then on all of these that have the

21  cites to the model jury instruction, obviously we'll delete all

22  of that.  The first -- through page 10 are all from the

23  pattern, pretty straightforward.  I assume no disagreements or

24  changes from the government on that?

25          MS. WEBER:  No, Your Honor.

 1          THE COURT:  Likewise, Mr. Camiel?

 2          MR. CAMIEL:  No.

 3          THE COURT:  All right.  Page 11 is the first -- and

 4  this is Ms. Collins, Amelia, my wonderful clerk who assisted me

 5  on this.

 6          So page 11, Mr. Camiel, is there any -- I think you

 7  had a longer version of this proposed.  But do you have any --

 8  do you want to put in anything in this regard about the

 9  criminal conviction, is what comes to my mind?  Wasn't there a

10  prior conviction of Mr. --

11          MR. CAMIEL:  Mr. Brown had the 2012 prior conviction.

12          THE COURT:  Right.  Would you seek to add that here?

13          MR. CAMIEL:  Yes.

14          THE COURT:  All right.  "You have heard evidence that

15  Andre Brown was previously convicted of a crime."

16          Is that sufficient or would you seek more detail?

17          MR. CAMIEL:  I think the name of the crime.

18          THE COURT:  And I just don't recall what he was

19  previously convicted of?

20          MR. CAMIEL:  I can find it.

21          THE COURT:  We can look that up.  Do you seek to

22  include both the 2012 and the 2021?

23          MR. CAMIEL:  I think that would be appropriate.  So

24  the 2012 is misconduct involving a controlled substance in the

25  third degree felony.

```
 1              THE COURT:  I would say felony misconduct in the
 2    third.  All right.  And the 2021?
 3              MR. CAMIEL:  Is distribution of fentanyl resulting in
 4    death.
 5              THE COURT:  What page are you reading from?  From your
 6    notes?  I know I can find that in mine.  We'll add that.
 7              Any others you would propose to include here?
 8              MR. CAMIEL:  With Mr. Crockett --
 9              THE COURT:  I think there's a separate testimony.  If
10    you look at the next page, 12, has the received government
11    benefits.
12              MR. CAMIEL:  Right.  But Mr. Crockett also had the
13    conviction that the jury heard about.
14              THE COURT:  Oh, in this case?
15              MR. CAMIEL:  Yes.
16              THE COURT:  So you would -- all right.  So that would
17    go here as well.
18              "You have also heard evidence that Winston Crockett
19    was convicted of" -- and put in the same.  "You may consider
20    this evidence in deciding whether or not to believe this
21    witness."
22              MR. CAMIEL:  His conviction was distribution of a
23    controlled substance, but not the resulting in death.
24              THE COURT:  Correct.  Okay.
25              MS. WEBER:  Your Honor, the cooperator's convictions
```

1   for this matter to impeachment, is that appropriate for the

2   next instruction?  Maybe Mr. Brown's first conviction, the

3   other conviction, would be proper for this instruction, and

4   then 3.9 would address their guilty pleas in the instant

5   matter.

6          MR. CAMIEL:  I think it's two separate matters.  They

7   each have a criminal conviction, but they each also received

8   benefit from the government by cooperation agreements, and I

9   think that's a separate --

10         THE COURT:  I do think they are two distinct things,

11  as I understand it.  They're under two different provisions of

12  the evidence rules.  It's a specific provision for prior

13  convictions, and these are convictions.  So I would include the

14  2021 in the first instruction, and then copy the pattern on

15  page 12, which doesn't really refer to a conviction at all, but

16  the fact of receipt of benefits, as a separate issue.

17         MS. WEBER:  Okay.

18         THE COURT:  All right.  Very good.  And so turn -- so

19  we'll change page 11.

20         Page 12, apart from deleting the highlighting, any

21  changes the government would propose there?

22         MS. WEBER:  No, Your Honor.

23         THE COURT:  Mr. Camiel?

24         MR. CAMIEL:  No, I think this was pulled from the

25  pattern.

1          THE COURT:  I think so too, yeah.

2          All right.  Next is page 13.  And this identifies the

3    four people who testified purely as experts in the case.  So

4    any objection to 13, page 13?

5          MS. WEBER:  Your Honor, just that Cristin Rolf, her

6    first name begins with a "C."

7          THE COURT:  Thank you.  C-r-i-s-t-i-n.

8          MS. WEBER:  Yes.

9          THE COURT:  Any changes that you would propose,

10   Mr. Camiel, to page 13?

11         MR. CAMIEL:  No.

12         THE COURT:  I left all the options that we recently

13   added to this model jury instruction.  And what would the

14   government propose with regard to lay opinions?  I don't think

15   there were really any expert opinions.  In any event, is the

16   government seeking to include anything from pages 14 through

17   18?  We had some officers testify generically about the drug

18   trafficking, but -- in any event, Ms. Weber, are you seeking to

19   add any of this into the instructions?

20         MS. WEBER:  No, I don't believe, Your Honor.

21         THE COURT:  Mr. Camiel, do you think any of this would

22   be helpful to the jury here?

23         MR. CAMIEL:  Well, I think option one doesn't apply.

24         THE COURT:  I do agree, it doesn't.  And option two,

25   there weren't really lay and expert opinions.  I think maybe

1    the best one might be lay opinions.

2          MR. CAMIEL:  The only, I guess -- so some of the --

3    yeah, some of the officers gave generic testimony, and then

4    there was the testimony from Special Agent Carr when he did

5    a -- essentially, he did a voice identification, which you

6    don't have to be an expert to do.

7          THE COURT:  Right.  Well, do you want to take a few

8    minutes and come up with your proposal, and I'll give it some

9    thought?  In all candor, I put these in here thinking we would

10   discuss them, and I haven't really thought about their

11   application here until I've heard all the evidence.  But I

12   would like to conclude these today.  So if you want to take a

13   few minutes.

14         These are directly from the pattern, correct?

15         MR. CAMIEL:  Thinking about it, this may be more

16   confusing to the jury than helpful.  And so I'm not sure it's

17   necessary to have, because I think they would be trying to

18   figure out, okay, what were the opinions.

19         THE COURT:  Right.  If we gave any, I would be

20   inclined for option three and -- or just do facts and

21   perhaps -- unless we identified and all agreed what's expert

22   opinion and lay opinion.

23         So is your position not to include this?

24         MR. CAMIEL:  Yes.

25         THE COURT:  And the government agrees?

1          MS. WEBER:  Yes.

2          THE COURT:  All right.  We just changed this, and I'm
3  not sure it's more helpful.  About a year ago, the committee
4  did all of these versions.

5          Anyway, 14 through 18, we will delete.

6          19 and 20, likewise, I put in the pattern.  But I
7  would ask the government if there are any charts or summaries
8  that apply here.  It seems more that it's excerpts as opposed
9  to summaries.  I don't think we really need either 19 or 20.  I
10  think it was clear enough to the jury that you had the full
11  document admitted and then a portion of it.

12          MS. VOSACEK:  I agree.

13          THE COURT:  So okay with that, Mr. Camiel?

14          MR. CAMIEL:  Yes.

15          THE COURT:  So 19 and 20, likewise deleted.

16          21 is straightforward from the pattern.  Any
17  disagreement with that?

18          MS. WEBER:  No, Your Honor.

19          MR. CAMIEL:  No.

20          THE COURT:  Very good.

21          22 is the first substantive instruction that tracks
22  the pattern.  So any changes that the government would propose?

23          MS. WEBER:  No, Your Honor.

24          THE COURT:  Mr. Camiel?  I know you made your record
25  regarding some of the additional language you would ask for

```
 1   elements.  I'm not going to include those.  But apart from
 2   those proposals that you had, any objection to this?
 3            MR. CAMIEL:  No.  I think you have the second part of
 4   it, where I do have objections.
 5            THE COURT:  Okay.  Very good.  All right.  So 22 is
 6   fine.
 7            23 is the definition of possession from the pattern.
 8   I assume no objection there from the government?
 9            MS. WEBER:  No.
10            THE COURT:  Mr. Camiel?
11            MR. CAMIEL:  No.
12            THE COURT:  24, likewise, is from the pattern, the
13   definition of knowingly, which is in the substantive
14   instruction.  Any objection there?
15            MS. WEBER:  I'm sorry, Your Honor.  On page 23, the
16   defendant is charged with distribution, not possession.
17            THE COURT:  If you look, my law clerk had the exact
18   same observation.  And if you look at the substantive
19   instruction, page 22, "Distributing means delivering or
20   transferring possession of fentanyl."  That's why it has in it
21   a definition of possession --
22            MS. WEBER:  That makes sense.
23            THE COURT:  -- within the definition of distributing.
24            So that's why I included it.
25            Mr. -- and so does that explain -- any objection to
```

1    its inclusion at this point?

2              MS. WEBER:  No, Your Honor.

3              THE COURT:  Mr. Camiel?

4              MR. CAMIEL:  No.

5              THE COURT:  24 is the pattern on knowingly.  Any

6    objection there?

7              MR. CAMIEL:  No.

8              MS. WEBER:  No objection.

9              THE COURT:  So 25 through 26 is the but for and the

10   acting -- the independently sufficient.  And you're right,

11   Mr. Camiel, I haven't heard your position on this.  I have

12   reviewed it.  I did look at the Supreme Court case on this, the

13   name of which is escaping me, but on this independently

14   sufficient.  So I look forward to your thoughts on it.  The

15   highlighting of Mr. Lee's name is just to remind us when we go

16   to docket this after trial to make it initials.

17             So any objection to this -- I did change the example

18   that the -- I made some changes from the government's proposal

19   that I replaced the victim with decedent, I believe was my

20   intent.  And I used the example that was in the other case in

21   this district, the Spayd case, about a shooting as the example

22   of independently sufficient in lieu of a drug case, just to not

23   be suggestive in that regard.

24             Any objection to this as drafted from the government?

25             MS. WEBER:  No, Your Honor.

1          THE COURT:  Mr. Camiel, go ahead, your thoughts on

2    this.

3          MR. CAMIEL:  Well, the objection I have starts on

4    page 26 of the instruction.

5          THE COURT:  Okay.

6          MR. CAMIEL:  The paragraph -- the last paragraph.

7          THE COURT:  Okay.

8          MR. CAMIEL:  The government does not have the burden

9    of establishing intended death.  And this goes to the argument

10   that I made in my trial brief and in my jury instructions

11   regarding the lack of a mens rea for such a severe sentencing

12   enhancement.  And I understand that there is the *United States*

13   *versus Houston* that went the other way, but I did cite some

14   dissenting opinions, including an en banc case --

15         THE COURT:  Judge Fletcher, I believe?

16         MR. CAMIEL:  Yes.  Where there was great concern about

17   the lack of mens rea, particularly given the recent Supreme

18   Court decisions in other types of like firearm cases that --

19   where the Court has found that there does need to be a mens

20   rea.

21         So that's my objection to --

22         THE COURT:  It's noted.  And I'm going to instruct, as

23   I'm obligated to do, consistent with the current Ninth Circuit

24   authority.  But your objection is certainly noted, and it can

25   be pursued if and when warranted with the circuit.

1          But with that objection noted, any other concerns with

2     this proposed instruction on pages 25 and 26?

3          MR. CAMIEL:  No.

4          THE COURT:  All right.  27 is directly from the

5     pattern, the on or about issue.  I assume no objection from the

6     government?

7          MS. WEBER:  No.

8          THE COURT:  Likewise, Mr. Camiel?

9          MR. CAMIEL:  No.

10         THE COURT:  All right.  And 28 is just about the

11    verdict form.

12         So it's my practice at this stage, after I have read

13    all of these instructions to the jury and have given them a

14    copy, to have the clerk hand out a verdict form to each of the

15    jurors at that point in time for them to read to themselves

16    silently.

17         I'll also discuss with our courtroom deputy, because

18    she hasn't done a trial with me, nor I with her, about our

19    goldenrod-colored verdict form.

20         So we'll have one verdict form only per -- per phase

21    of the trial as needed.  That will be goldenrod.  And we'll ask

22    our courtroom deputy to hold that up so that everybody can

23    see -- you can ask Suzannette for information on that -- can

24    see that that's the official one they need to fill out.  But

25    I'll have them read it all to themselves before your closing

1  arguments because I find that that's helpful less so here

2  because it's one count, but helpful when it's -- for the jury

3  to know the tasks they are charged with addressing.

4      So I used pretty much the standard form for the jury

5  verdict form and the model instructions.  But any changes that

6  the government would propose to the verdict form for phase one

7  here?

8      MS. WEBER:  No, Your Honor.

9      THE COURT:  Mr. Camiel?

10     MR. CAMIEL:  No.

11     THE COURT:  Apart from your objection to the

12  additional elements as noted.  So apart from that?

13     MR. CAMIEL:  Apart from that, no.  I think the verdict

14  form is similar to what I proposed.

15     THE COURT:  I do.  Yes, I think it is, and tries to

16  track the pattern.

17     All right.  Very good.  That brings us to the final

18  closing instructions.  These are what I will give after you

19  have completed both sides' closing arguments.  These are all

20  from the model jury instructions.  So I wouldn't anticipate any

21  objections.

22     But Ms. Weber, any additions or changes that you would

23  propose?

24     MS. WEBER:  No, Your Honor.

25     THE COURT:  Mr. Camiel?

1          MR. CAMIEL:  No.

2          THE COURT:  All right.  Very good.  And I don't know

3     if -- I do have the instruction in here about only on trial,

4     you have heard evidence that the defendant may have committed

5     other acts not charged here, you may consider this evidence

6     as evidence -- you may not consider it as evidence of guilt.

7          Do you want to expand on that limiting instruction?

8     I've already given it at the time of the witness when the

9     witness testified, but I'm going back now to page 10 and I

10    would -- if the defense sought to get more specific about that,

11    that's fine.  If not, I think we have adequately addressed it.

12    This is --

13         MR. CAMIEL:  No, I would not ask.

14         THE COURT:  Very good.  That brings us to the

15    phase-two jury instructions, and this relates to the prior

16    felony conviction.  And we discussed earlier in the week some

17    of the inconsistency between the indictment and the statute,

18    and so this is the more onerous burden, if you will, for the

19    government to establish the serious drug felony, even though

20    parts of the indictment are under the subsection that would

21    require just a drug felony conviction.

22         But in any event, as I think we all agreed earlier in

23    the week that the jury would be asked to determine this under

24    the serious drug felony.

25         So any changes at this point, Ms. Weber?

1        MS. WEBER:  No, Your Honor.

2        THE COURT:  Likewise, Mr. Camiel?

3        MR. CAMIEL:  No.

4        THE COURT:  And then we just basically -- page 3 is a

5  modification of the pattern to reflect that it's bifurcated

6  here.

7        Moving on to the verdict for phase two.  Any changes

8  that the government would propose?

9        I didn't catch this, but I would add the word

10 "unanimously" to each of the questions.  "We, the jury,

11 unanimously find."  I assume no objection?

12       MS. WEBER:  No, Your Honor.

13       THE COURT:  I would add that to the start of both 1, 2

14 and 3, the word "unanimously" ahead of "find."

15       So anything else that you would change or propose

16 here, Ms. Weber?

17       MS. WEBER:  No.

18       THE COURT:  Very good.

19       Mr. Camiel, anything further?

20       MR. CAMIEL:  No.

21       THE COURT:  All right.  So that will be the

22 instructions.  We'll have a complete set for both sides at

23 8:30 with the numbered.  If we get them done sooner, which I

24 anticipate we will, by in the next half hour or so, would

25 either side like to have them emailed?  Sometimes people like

1 to show them.

2 　　　　MS. VOSACEK:  Yes, Your Honor.

3 　　　　THE COURT:  All right.  We'll do that.  We'll get both

4 sides a cone copy.

5 　　　　In terms of your anticipated length of closing, for

6 the government?

7 　　　　MS. VOSACEK:  Probably about 45 minutes.

8 　　　　THE COURT:  Mr. Camiel, are you in that range as well?

9 　　　　MR. CAMIEL:  Yes.

10 　　　　THE COURT:  Very good.  Then that's what we'll do.

11 And see you at 8:30 a.m. in the morning.  I told the jurors

12 8:45 a.m.  Maybe you won't have any issues at all to take up at

13 8:30 a.m., and that's fine.

14 　　　　Ms. Weber, anything further?

15 　　　　MS. WEBER:  No, Your Honor.

16 　　　　THE COURT:  Mr. Camiel, anything further?

17 　　　　MR. CAMIEL:  No.

18 　　　　THE COURT:  Very good.  We'll see you in the morning.

19 We'll go off record at this time.

20 　　　　DEPUTY CLERK:  All rise.  This matter is now

21 adjourned.  This court now stands in recess until 8:30 a.m.

22 　　(Proceedings concluded at 3:16 p.m.)

23

24

25 　　　　　　　　　　　　　　CERTIFICATE

1      I, Sonja L. Reeves, Federal Official Court Reporter in and
for the United States District Court of the District of
2  Columbia, do hereby certify that the foregoing transcript is a
true and accurate transcript from the original stenographic
3  record in the above-entitled matter and that the transcript
page format is in conformance with the regulations of the
4  Judicial Conference of the United States.

5      Dated this 12th day of December, 2024.

6

7                              /s/ Sonja L. Reeves
                          SONJA L. REEVES, RDR-CRR
8                          FEDERAL OFFICIAL COURT REPORTER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25